UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ————————————————— x | |
| RUBEN A. LUNA, Individually and on Behalf of All Others Similarly Situated, : | Civil Action No. |
| : | |
| : | CLASS ACTION COMPLAINT FOR |
| Plaintiff, : | VIOLATIONS OF THE FEDERAL |
| : | SECURITIES LAWS |
| vs. : | |
| : | |
| CARBONITE, INC., MOHAMAD S. ALI and ANTHONY FOLGER, : | |
| : | |
| Defendants. : | DEMAND FOR JURY TRIAL |
| : | |
| ————————————————— x | |

Plaintiff Ruben A. Luna ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Carbonite, Inc. ("Carbonite" or "the Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Carbonite common stock between February 7, 2019 and July 25, 2019, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.      Defendant Carbonite, headquartered in Boston, Massachusetts, is a software company that provides cloud-based backup services.  On October 18, 2018, Carbonite launched its "Server Backup VM Edition" for managed services providers ("MSPs').  The new service was designed to allow MSPs to protect their virtual data both locally and in their own cloud.  Carbonite called the launch "the culmination of one of our largest cross-functional efforts, led by our exceptional engineering organization. . . . "  The Server Backup VM Edition was projected to add "meaningfully" to Carbonite's revenues for fiscal 2019.  Instead, from the start of its launch, the Server Backup VM Edition was of poor quality and technologically flawed and received poor customer reviews and complaints, or as Carbonite put it: "the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite" and Carbonite was forced to remove "any growth expectations associated with virtual server edition from our short-term outlook."  Just as problematic, the poor reception of the Server Backup

VM edition in the marketplace was acting as a "disruptive" factor in and among Carbonite's salesforce, keeping the sales organization from closing opportunistically on several larger deals during fiscal 2019.

3.       During the Class Period, Defendants issued materially false and misleading statements regarding the technological quality of the Server Backup VM Edition and its potential to add "meaningfully" to Carbonite's financial performance for fiscal 2019.   Specifically, Defendants failed to disclose that: (i) Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result of the foregoing, Carbonite lacked any reasonable for issuing its positive projections and financial forecasts.

4.       Finally, on July 25, 2019, Carbonite announced that it was withdrawing its Server Backup VM Edition product from the marketplace and consequently dramatically lowered its financial projections for fiscal 2019 and 2020.   That same day, the strongest proponent and supporter of Server Backup VM Edition, Defendant Ali (defined below), announced he was leaving Carbonite.  On this news, Carbonite stock declined more than 24%, from $23.90 per share when the market closed on July 25, 2019, to $18.01 per share when the market closed on July 26, 2019, on extremely heavy trading volume.

## JURISDICTION AND VENUE

5.       The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

7.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).  Carbonite maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein occurred in this District.

8.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff purchased the common stock of Carbonite during the Class Period, as set forth in the accompanying certification, incorporated by reference herein, and has been damaged thereby.

10.      Defendant Carbonite is a software company that provides cloud-based backup services.  Carbonite's shares trade under the ticker "CARB" on the NASDAQ, an efficient market.  Carbonite is a Delaware corporation with its principal place of business in Boston, Massachusetts.

11.      Defendant Mohamad S. Ali ("Ali") was the Chief Executive Officer ("CEO") of Carbonite during the Class Period.

12.      Defendant Anthony Folger ("Folger") is, and at all relevant times was, during the Class Period, Chief Financial Officer ("CFO") and Treasurer of Carbonite.

13.      Defendants Ali and Folger are collectively referred to herein as the "Individual Defendants."

14.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Carbonite's quarterly reports, shareholder letters,

press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

15. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Carbonite. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Carbonite stock was a success, as it: (i) deceived the investing public regarding Carbonite's prospects and business; (ii) artificially inflated the price of Carbonite common stock; (iii) enabled Defendants Ali and Folger, as well as other Carbonite insiders, to collectively sell close to $3 million of their personally-held Carbonite stock to the unsuspecting public; and (iv) caused Plaintiff and other members of the Class to purchase Carbonite common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

**Background**

16. On October 18, 2018, Carbonite launched the Server Backup VM Edition for MSPs. MSPs are entities that remotely manage a customer's IT infrastructure and/or end-user systems. A virtual machine (VM) is a software program or operating system capable of performing tasks such as running applications and programs as if it were a separate computer. Carbonite's Server Backup VM edition was designed to allow MSPs to protect virtualized environments both locally

and in their own cloud.  In introducing the Server Backup VM Edition, Carbonite hoped to compete against such companies as Veeam, which pioneered the market for VM data protection.

17.     In conjunction with the launching of the Server Backup VM Edition, Carbonite also introduced its "refreshed" and expanded Data Protection Console which would be a "purpose-built backup for virtual machines (VMs) and enable[] businesses to select, manage and recover their VM data from a single location, the Carbonite Data Protection Console."  The combination of the Server Backup VM Edition with the "refreshed" Data Protection Console would permit Carbonite to offer to its customers "a fully integrated service that protects virtualized environments both locally and in their own cloud."

18.     As Defendant Ali stated in the October 18, 2018 press release:

The delivery of Carbonite Server VM Edition simultaneously with the launch of our flagship Carbonite Data Protection Console is the culmination of one of our largest cross-functional efforts, led by our exceptional engineering organization. . . .  Our customers and partners are eager to have an integrated and easy to use data protection solution for both physical and virtual servers.  I am especially pleased that we can promote Rob to his new role given his leadership to date and his ongoing contributions to the vision for our platform.

19.     Just a couple of weeks later, on November 1, 2018, when Carbonite released its third quarter 2018 financial results for the period ended September 30, 2018, Defendant Ali made it clear that the launch of the Carbonite Server VM Edition was integral to the execution of Carbonite's "strategic plan" to "address all of the market's most pressing data protection needs."

20.     On the same day, Carbonite held a conference call with analysts and investors to discuss the Company's earnings and operations.  During his prepared remarks, Defendant Ali provided more detail with respect to the significance of the Carbonite Server VM Edition. Defendant Ali stated, in pertinent part:

While I am very pleased with our financial results, what was even more impressive this quarter was the great progress we have made with respect to our longer-term strategic priorities.  We are successfully executing on our longer-term product

strategy and vision, and we have achieved some important milestones on that exciting task.

During the quarter the team launched a Carbonite Data Protection Console, a unified platform to easily manage all of a business's data protection needs. ***This was one of the single biggest development efforts in the company's history and is a very important milestone in our evolution to become the leading data protection company for businesses.  Built with a modern architecture and a clean, elegant user experience, the platform is fully extensible and incredibly easy to use.*** There are several screenshots available in the accompanying slide deck.

Over time, the console will serve as the unifying platform for all of our data protection offerings, supported by the robust product engines and highly efficient and scalable Carbonite cloud infrastructure.  As Carbonite continues to evolve the console to provide businesses an integrated management experience for their entire IT footprint, IT managers will be able to log into the console to manage the data protection of all their systems, including physical, virtual, cloud and endpoints.

Carbonite Server, which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. This significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market.

Businesses today need data protection for all their systems, from legacy systems to those that are fully virtualized.  In a world where data sprawl continues at a rapid pace, one where workloads are frequently moving, businesses also need a streamlined management experience so they can quickly and easily optimize backup and recovery performance, no matter where the data resides.

With our newest release, we offer robust, all-in-one server protection for physical, virtual, and legacy systems, including agentless VM backup for VMWare and Hyper-V.  No longer do you need to choose different solutions for physical and virtual.  This combined solution makes it much easier for midmarket companies to buy and deploy.

We're also clearly differentiated from others in the market with our integrated cloud and storage appliances available through a Hardware-as-a-Service offering.  These are big product releases and are the first visible results of our significant internal development efforts.  [Emphasis added]

21.     More importantly, during this conference call, Defendant Ali made it clear that the

launch of Carbonite Server VM Edition would be a key driver in the growth of Carbonite's

financial performance for 2019 and 2020.  This is illustrated in the following exchange:

**Eric Martinuzzi -** *Lake Street Capital Markets, LLC, Research Division - Director of Research & Senior Research Analyst*

Yes, I wanted to focus on kind of a longer-term question. I know you just had sort of a strategic offsite with some of the key people in your organization, just brainstorming. As far as what you come out of that meeting with, really, really excited about for 2019. Is it around, "Hey, we've now got the Carbonite Data Protection Console"? Is it around the Mozy conversion? Is it around the M&A landscape? If you could just talk about one or two things about which the team is really excited for 2019 and beyond.

**Mohamad S. Ali -** *Carbonite, Inc. - President, CEO & Director*

Yes, Eric, no, thank you. It's great. So first of all, we do two strategic offsites a year, and I'll tell you where we did them. The first one we did at Converse, which is a Nike company. And that was fun. And then the second we actually did at Iron Mountain, which they're a great partner.

And going into '19 and '20, a big part of it is we have a platform now that can deliver data protection across the board. And we have a user experience that allows you to continue to very easily -- allows you to cross-sell, allows you to provide the APIs into the MSPs, which we never had before. And so a big part of the strategy was focused on, "How do we leverage that now?" We're sort of at the point that we've been building to for 4 years now. We have it. ***We're actually starting to see some of the impact of having that platform. We're starting to see deals that are bigger than the deals that we've seen before, in part because customers are buying multiple products***. Just last week, we had a deal that was 3x our normal deal size, and it had all 3 products in it. The customer bought all 3 things together.

And so a lot of it had to do with continue to integrate our solutions, integrate our IT platform and leverage that to automate. And as we look at our close rates across the different sides of the deal, how do we now optimize our close rates across the entire spectrum of deal sizes that we have?

So yes, it's now building -- getting the benefits from the platform that we have been creating for 4 years. So thanks for asking. It was very exciting.

**Eric Martinuzzi -** *Lake Street Capital Markets, LLC, Research Division - Director of Research & Senior Research Analyst*

And the MSP portion, if I could just ask a follow-up, what is kind of MSP as a percent of your business bookings, or maybe as just a percent of your total bookings, and where do you think that goes over time?

**Mohamad S. Ali -** *Carbonite, Inc. - President, CEO & Director*

Yes, I'm going to have Anthony answer it, but I want to tell you it's not big, but it is growing, and it's growing nicely. And it's actually amazing how successful we've been with the MSP partners without really providing them the APIs, the tooling, what they actually need. ***Now we have what they need, and we had 30 MSPs, sizable ones here at Carbonite last week, and they just love what we had. Each one of these products have the APIs that they need, and they can deploy our stack in their data centers if they choose, or they can run it -- they can integrate with the APIs and run it in our data center***. It's very exciting. I'll turn it over to Anthony to talk about the MSPs that we have today.

**Anthony Folger -** *Carbonite, Inc. - CFO & Treasurer*

Yes, thanks, Mohamad. I would say MSPs are probably sub-10% of our business, but I think growing very quickly as a channel for us. So we may at some point in the future cross that 10% threshold, but sub-10% today. [Emphasis Added].

**Materially False and Misleading Statements Made During the Class Period**

22.     The Class Period begins on February 7, 2019. On that date, Carbonite issued a press release announcing its full year 2018 financial results and provided financial projections and guidance for fiscal 2019. Defendant Ali commented on the results stating, in pertinent part:

We delivered on our strategic priorities in 2018. . . . We significantly strengthened our product platform and introduced one of the most complete Software-as-a-Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability. In 2019 we plan to build upon these efforts, further expanding our data protection platform and delivering a broader set of solutions to our customers, while we invest aggressively in our distribution channels with a focus on driving continued growth and profitability.

* * *

**Business Outlook**

Based on the information available as of February 7, 2019, Carbonite expects the following for the first quarter and full year of 2019:

First Quarter 2019:

|  | Current Guidance (2/7/2019) |
|---|---|
| GAAP Revenue | $76.5 - $77.5 million |
| Non-GAAP Revenue | $77.0 - $78.0 million |
| Adjusted EBITDA | $20.0 - $21.5 million |

Full Year 2019:

|  | Current Guidance (2/7/2019) |
|---|---|
| GAAP Revenue | $468 - $482 million |
| Non-GAAP Revenue | $488 - $502 million |
| Non-GAAP Gross Margin | 80.5% - 81.5% |
| Adjusted EBITDA | $129 - $134 million |

Carbonite's expectations of adjusted EBITDA for the first quarter and full year of 2019 excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense and acquisition-related expense from net income (loss). The 'Business Outlook' above assumes nine months of contribution from Webroot.

23.     On May 2, 2019, Carbonite continued projecting positive financial results for fiscal 2019 when it released its first quarter 2019 financial results for the period ended March 31, 2019, and increased its projections for fiscal 2019 for non-GAAP revenue to a range of $491 million to $505 million, an increase from its prior guidance of $488 million to $502 million. On that date, Carbonite issued a press release in which Defendant Ali stated, in pertinent part:

We had a good first quarter and a strong start to 2019, with first quarter revenue and adjusted EBITDA above the high-end of our guidance. . . . We are excited to have closed the Webroot acquisition as planned and started the integration process. Together, these leading solutions will provide robust protection of data, devices and networks for our partners and customers.

24.     On the same day, Carbonite held a conference call with analysts and investors to discuss the Company's earnings and operations. During his prepared remarks, Defendant Ali

- 9 -

represented that the Company delivered better-than-expected revenue driven by strong

performance of Carbonite data protection solutions stating in pertinent part:

> We've delivered better-than-expected revenues in the first quarter, driven by strong performance of our Carbonite data protection solutions as well as the benefit of having closed the Webroot transaction a few days before the end of the quarter. In addition to delivering better-than-expected revenue, we also exceeded our adjusted EBITDA guidance and reported strong earnings per share and free cash flow.

> \*        \*        \*

> During the first quarter, we successfully closed several larger customer transactions and we continue to see large deal momentum in the pipeline, primarily on the data protection side of the business. The ease-of-use and the power of our solutions combined with our award-winning customer service creates an opportunity to serve these larger customers, while we continue to focus on our core end market, which is small and midsized business.

> \*        \*        \*

> We have the right product portfolio to serve the broader set of businesses like these 2 great organizations, and we have the incredible product, ease of use that businesses have come to know and expect. Our focus continues to be on bringing all of our products together under the unified data protection platform to continue to deliver great value to the market, and we'll be sure to update everyone as we make progress throughout 2019.

25.    For his part, Defendant Folger provided the Company outlook, stating in pertinent

part:

> Now turning to our outlook. As I think about the growth profile of our data protection business, I continue to expect low single-digit revenue growth in 2019 with growth in subscription revenue, partially offset by a decline in our non-subscription revenue. Consistent with our prior outlook, I expect our endpoint security business to continue growing in the low double digits. Combined that should produce mid-single-digit revenue growth in the near term with the opportunity to accelerate, driven by additional focus on investment in our indirect channels, successful cross-selling and realizing revenue synergies from our combination with Webroot. For the second quarter, we expect GAAP revenue to be in the range of $119 million to $123 million. This includes the impact of purchase accounting adjustments on deferred revenue. Non-GAAP revenue in the range of $133 million to $137 million with the large sequential increase driven by a full quarter of Webroot contribution, and adjusted EBITDA in the range of $34 million to $36 million.

26.     Further, during the question and answer session, Defendant Ali talked about the excitement from their products and their channel, stating in pertinent part:

**Matthew George Hedberg** - *RBC Capital Markets, LLC, Research Division - Analyst*

It's really good to hear the success on large deals on the data protection side.  I would imagine some of that's due to the unified data protection platform.  But I guess can you put a finer point on sort of the success there and maybe sort of how you think about the pipeline of these larger deals?  And because I imagine some of the sales cycles can be little bit longer there.  But just a little bit more color on sort of how you're thinking about that side of your business.

**Mohamad S. Ali** - *Carbonite, Inc. - President, CEO & Director*

Yes, I'll tell you a little bit, and then Anthony can add to it.  So actually, these larger deals are Carbonite endpoint deals typically.  As Anthony mentioned, last year we launched a new endpoint product.  And this endpoint product gives us scalability beyond anything that we had before.  The product that we had previously really was a fit for a company up to 25 employees.  Beyond that, there were scalability issues and mostly deployment and manageability issues.  It wasn't built for large-scale centralized management mostly.

This new product that we have out there, I mean has these excellent features up and down, right, and sort of has everything that you need.  And this product, it does core backup, it does ransomware protection.  It does legal hold.  If you lose the device, you can locate it on a map.  If you lose the device, you can remotely wipe it.  So it's really a full-feature product, and it can scale to a business of up to 2 million customers.  So it's extremely, extremely scalable.  It's globally deployable.  So if you're a business with operations in 50 countries, it can be deployed.

And so what we've seen is that some of these newer partners that we've brought on board like Dell and some of the other ones that have access to a customer set that ranges from the SME to the enterprise, they are bringing to us these -- some of these larger deals.  And they're exciting, and we're using the same product to fulfill those deals.  But you're right.  I mean those do have longer sales cycles, and we put a small team in place to work those longer sales cycle deals.  But at the end of the day, though, the product set that we have, our focus is really on the SME market.  And I think with this particular product, it does scale up and down, and we do have a channel that can sell it.  So it's exciting in that regard. Does that answer the question?

- 11 -

27.    For his part, Defendant Folger commented that they were seeing "good returns from

[] channel partners," and that the pipeline was building "quite nicely" around these partners, as

reflected in the following exchange:

**Matthew George Hedberg** - *RBC Capital Markets, LLC, Research Division - Analyst*

Yes, it does.  Yes.  And then maybe as a somewhat related question, you mentioned channel partners a couple of times in your answer.  Given Webroot's focus more on the MSP side and you guys have a channel focus, you highlighted additional partner investments you guys are making.  I think you've even highlighted Veritas. How do you kind of think about, from a spending perspective, the balance between leveraging MSP, sort of a business that you're still trying to probably get your arms around, but also sort of investing in channel?  I mean is there sort of like a trade-off of trying to balance the 2?

**Anthony Folger** - *Carbonite, Inc. - CFO & Treasurer*

Yes, and great question.  So at the high level, you can think about Webroot as having a channel of 14,000 MSPs and Carbonite having a channel of 10,000 VARs or resellers, and some of them happen to be very big like a Dell or a CDW or a Veritas, and some of them are very small.  So we continue, on the data protection side, the Carbonite side to invest in those channel partners because we're seeing good returns from those channel partners, especially now that we have the new portfolio of products, and in 2019 we will be unifying them under the console.  So now that we have the portfolio, we're putting the dollars to enable the partners.

One of the things -- in Q4, I think one of the things that happened in Q4 was that we had a lot of new products but we probably didn't spend enough to enable the partners.  And now, we are investing behind those partners so they are enabled. And we are seeing the pipeline build quite nicely around those partners.  But those are not MSP partners, right?  That's sort of the -- I'd call them all VARs of some sort or the other.

Once we have -- now those VARs are actually interested in selling Webroot.  And so the enablement that we're doing behind those partners on the data protection product will be extensible to enabling them to sell Webroot security products, right? And Webroot has multiple security products.  It has the endpoint security, but it also has security awareness training, has DNS, they have Wi-Fi.  So they have 4 products there that could -- at the right time, could go into the VAR portfolio.  And then on the flip side, as we enable Carbonite endpoint and Carbonite Server, integrate that with the RMM dashboard, the MSPs will start being able to the sell that in 2020.  So the investments that we're making on the channel partners on the data protection side is important for the new products that we brought to market but will also pay dividends once we enable them on the Webroot products.

- 12 -

28.     The statements referenced above in ¶¶22-27 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that Carbonite's Server Backup VM Edition was of poor quality and technologically flawed;

(b)     that Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition;

(c)     that the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and

(d)     as a result of the foregoing, Carbonite lacked any reasonable basis for issuing its positive projections and financial forecasts.

**The Truth is Revealed**

29.     On July 25, 2019, Carbonite issued a press release announcing its second quarter 2019 financial results for the period ended June 30, 2019.  In this release, Carbonite announced the resignation of  Defendant Ali and dramatically reduced its financial guidance for fiscal 2019 for (i) GAAP revenue to a range of $$443.5 million to $448.5 million, a decrease from its prior guidance of $457 million to $471 million; and (ii) non-GAAP revenue to a range of $477.5 million to $482.5 million, a decrease from its prior guidance of $491 million to $505 million.

30.     On the same day, Carbonite held a conference call with analysts and investors.  In his opening remarks, Defendant Folger offered an explanation for the dramatically reduced financial guidance for fiscal 2019, stating in pertinent part:

> So what happened?  Well, in the second quarter, we experienced challenges in our data protection business related to products and go-to-market effectiveness. ***Towards the end of the quarter, we determined that the virtual server edition of***

*our server backup product was not at the level of quality that customers have come to expect from Carbonite*.

Many of you will remember that this was newly launched in Q3 of 2018 and something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020.  *While we assessed the best path forward, we have removed any growth expectations associated with virtual server edition from our short-term outlook*.  Our go-to-market efforts were also challenged in the second quarter.

Compared to Q1, we converted pipeline at a lower rate and also closed fewer large deals.  While we saw encouraging results from our channel, it was not enough to offset these challenges.  With new leadership in place, we are already taking steps to improve our performance.  However, our Q2 trends form a new baseline that we are flowing through our model, resulting in our lower guidance for the year. [Emphasis added].

31.     Just as importantly, as explained by Carbonite's interim CEO and President, Stephen Munford, the poor quality and technological flaws of the Server Backup VM Edition were acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019.  Munford stated, in pertinent part:

Firstly, as you mentioned, the problems that our virtual server launched and us pulling down from the market, I mean, *we launched the product in the market that is growing and there's a lot of demand.  But we just didn't have the quality we needed.  And we need to step up.  And that is disruptive and it's, yes, at least part, if not all, the reason for the lower guide.  But it's part of that and is disruptive to the sales organization.  So that is not less about being in a good market.  It's more about not executing on your product strategy*.  [Emphasis added]

32.     In response to the above revelations, the price of Carbonite stock declined more than 24%, from a close on July 25, 2019 of $23.90 per share, to a close on July 26, 2019 of $18.01 per share, on extremely heavy trading volume.

33.     The market for Carbonite stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and omissions as set forth above, Carbonite stock traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class (defined below) purchased or otherwise acquired Carbonite stock relying upon the integrity of the market price of Carbonite stock and market information relating to Carbonite, and have been damaged thereby.

34.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Carbonite stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Carbonite's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Carbonite and its business, prospects, and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Carbonite stock was removed and the price of Carbonite stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

36.    As alleged herein, Carbonite and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Carbonite, their control over, and/or receipt and/or modification of Carbonite's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Carbonite, participated in the fraudulent scheme alleged herein.

37.    Defendants were further motivated to misrepresent the Company's business metrics and financial prospects in order to profit from selling Carbonite common stock.  Indeed, during the Class Period, Carbonite senior executives and directors , including Defendants Ali and Folger, collectively sold 131,286 of their personally-held Carbonite shares, reaping ***close to $3 million*** in gross proceeds, as follows:

| Filer Name | Transaction Date | Price | Shares | Proceeds |
|---|---|---|---|---|
| **Mohamad Ali** | 2/14/2019 | $24.70 | 21,511 | $531,322 |
| **(CEO)** | 2/15/2019 | $23.76 | 7,998 | $190,032 |
| | 3/4/2019 | $0.00 | 3,199 | $0 |
| | 3/14/2019 | $24.45 | 4,000 | $97,800 |
| | 3/18/2019 | $24.46 | 4,000 | $97,840 |
| | 5/31/2019 | $23.50 | 4,000 | $94,000 |
| | 6/17/2019 | $0.00 | 3,199 | $0 |
| | 6/17/2019 | $23.96 | 4,000 | $95,840 |
| | | | **51,907** | **$1,106,834** |
| | | | | |
| **Robert L. Beeler** | 2/15/2019 | $23.96 | 775 | $18,569 |
| **(Officer)** | | | **775** | **$18,569** |

- 16 -

| | | | | |
|---|---|---|---|---|
| **Anthony Folger** | 2/11/2019 | $24.08 | 1,924 | $46,330 |
| **(CFO)** | 2/13/2019 | $25.57 | 2,224 | $56,868 |
| | 2/15/2019 | $23.96 | 2,873 | $68,837 |
| | 3/4/2019 | $23.08 | 1,611 | $37,182 |
| | 3/15/2019 | $24.58 | 1,611 | $39,598 |
| | 5/30/2019 | $23.65 | 1,612 | $38,124 |
| | 6/3/2019 | $23.42 | 9,776 | $228,954 |
| | 6/4/2019 | $22.60 | 22,539 | $509,381 |
| | 6/17/2019 | $23.60 | 1,612 | $38,043 |
| | 7/1/2019 | $25.84 | 7,891 | $203,903 |
| | | | **53,673** | **$1,267,221** |
| | | | | |
| **Norman Guadagno** | 2/11/2019 | $24.08 | 1,283 | $30,895 |
| **(Officer)** | 2/12/2019 | $24.59 | 3,010 | $74,016 |
| | 2/15/2019 | $23.96 | 1,090 | $26,116 |
| | 2/15/2019 | $23.71 | 2,509 | $59,488 |
| | 3/4/2019 | $23.08 | 535 | $12,348 |
| | 3/5/2019 | $22.30 | 1,265 | $28,210 |
| | 3/15/2019 | $24.58 | 535 | $13,150 |
| | 5/30/2019 | $23.65 | 535 | $12,653 |
| | 5/30/2019 | $23.50 | 1,265 | $29,728 |
| | 6/17/2019 | $23.60 | 535 | $12,626 |
| | | | **12,562** | **$299,229** |
| | | | | |
| **Cassandra Hudson** | 2/11/2019 | $24.08 | 1,007 | $24,249 |
| **(Officer)** | 2/13/2019 | $25.57 | 598 | $15,291 |
| | 2/15/2019 | $23.96 | 887 | $21,253 |
| | | | **2,492** | **$60,792** |
| | | | | |
| **Paul S. Mellinger** | 2/11/2019 | $24.08 | 1,497 | $36,048 |
| **(Officer)** | 2/15/2019 | $23.96 | 1,121 | $26,859 |
| | 3/4/2019 | $23.08 | 550 | $12,694 |
| | 3/15/2019 | $24.58 | 550 | $13,519 |
| | 5/30/2019 | $23.65 | 550 | $13,008 |
| | 6/17/2019 | $23.60 | 550 | $12,980 |
| | | | **4,818** | **$115,107** |
| | | | | |
| **Danielle O Connell** | 2/11/2019 | $24.08 | 1,176 | $28,318 |
| **Sheer** | | | | |
| **(General Counsel)** | 2/13/2019 | $25.57 | 1,113 | $28,459 |
| | 2/15/2019 | $23.96 | 934 | $22,379 |
| | 3/4/2019 | $23.08 | 459 | $10,594 |
| | 3/15/2019 | $24.58 | 459 | $11,282 |
| | 5/30/2019 | $23.65 | 459 | $10,855 |
| | 6/17/2019 | $23.60 | 459 | $10,832 |
| | | | **5,059** | **$122,720** |

| Grand Total | 131,286 | $2,990,472 |
|---|---|---|

## LOSS CAUSATION/ECONOMIC LOSS

38.     During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Carbonite common stock and operated as a fraud on Class Period purchasers of Carbonite common stock.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Carbonite common stock fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of Carbonite common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

39.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Carbonite who knew that those statements were false when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

40.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    Carbonite stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Carbonite stock; and

(e)    Plaintiff and other members of the Class purchased Carbonite common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

41.    At all relevant times, the market for Carbonite common stock was efficient for the following reasons, among others:

(a)    Carbonite common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)    As a regulated issuer, Carbonite filed periodic public reports with the SEC; and

(c)    Carbonite regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Carbonite during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Carbonite shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Carbonite or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Carbonite; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act<br>and Rule 10b-5 Promulgated Thereunder<br>Against All Defendants**

48.      Plaintiff incorporates ¶¶1-47 by reference as if fully set forth herein.

49.      During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.      Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Carbonite common stock during the Class Period.

51.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Carbonite common stock.  Plaintiff and the Class would not have purchased Carbonite common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

52.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Carbonite common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

53.     Plaintiff incorporates ¶¶1-52 by reference as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of Carbonite within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Carbonite, and their ownership of Carbonite stock, the Individual Defendants had the power and authority to cause Carbonite to engage in the wrongful conduct complained of herein.  Carbonite controlled each of the Individual Defendants and all of its employees.  By reason of

such conduct, the Individual Defendants and Carbonite are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 1, 2019

_____

THEODORE M. HESS-MAHAN
HUTCHINGS BARSAMIAN
MANDELCORN, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone:  781-431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

- 23 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
VICKI M. DIAMOND
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vdiamond@rgrdlaw.com

ADEMI & O'REILLY, LLP
GURI ADEMI
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone:  414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com

*Attorneys for Plaintiff*