UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUBEN A. LUNA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CARBONITE, INC., MOHAMAD S. ALI and ANTHONY FOLGER, <br><br> Defendants. | No. 1:19-cv-11662-LTS <br> **(Consolidated)** <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ............................................................................................4

PARTIES ..............................................................................................................................5

SUBSTANTIVE ALLEGATIONS .......................................................................................8

    The Company and Its Business..............................................................................8

    Carbonite Launches Its New Virtual Machine Backup Solutions .......................9

    The Server VM Edition Never Functioned Properly ..........................................13

    Despite the Fact that the Server VM Edition Did Not Work, Defendants Released It and Continued to Boast About It to the Market .............................................14

    Defendants Make the Shocking Revelations that the Server VM Edition Did Not Work and that Ali Is Leaving His Post as CEO Effective Immediately ............16

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD........................................................................19

THE TRUTH EMERGES....................................................................................................28

DEFENDANTS VIOLATED SEC DISCLOSURE RULES AND REGULATIONS.................28

ADDITIONAL FACTS PROBATIVE OF SCIENTER........................................................30

    A.    That the Individual Defendants Made Numerous Specific Statements Regarding the Server VM Edition and Other Products Offered on Carbonite's Data Protection Platform Is Directly Relevant to the Scienter Analysis ..........................................30

    B.    Defendant Ali's Suspiciously Timed Resignation Supports a Strong Inference of Scienter ......................................................31

    C.    The Individual Defendants' Class Period Stock Sales Support a Strong Inference of Scienter ......................................................32

CLASS ACTION ALLEGATIONS ....................................................................................35

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ..................................................................37

**Page**

LOSS CAUSATION..................................................................................................................37

NO SAFE HARBOR ...............................................................................................................39

COUNT I .................................................................................................................................40

    Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
    Thereunder Against All Defendants ................................................................................40

COUNT II ...............................................................................................................................41

    Violations of Section 20(a) of the Exchange Act Against the Individual
    Defendants .......................................................................................................................41

PRAYER FOR RELIEF ..........................................................................................................42

JURY DEMAND .....................................................................................................................43

Lead Plaintiff Construction Industry and Laborers' Joint Pension Trust ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, makes the allegations set forth herein based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Carbonite Inc.'s ("Carbonite" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, other publicly disclosed reports and information about Defendants (defined below), and interviews with former Carbonite employees. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Carbonite common stock between October 18, 2018 and July 25, 2019, inclusive (the "Class Period"), against the Company and certain of its current and former executive officers (together, "Defendants," as further defined below) seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Carbonite is a software company providing cloud-based backup services and data protection solutions for consumers and small businesses.  The Company offers a number of data protection and data backup products, several of which the Company added to its menu through a wave of recent acquisitions, making up the "Carbonite Data Protection Platform."

3.      On October 18, 2018, Carbonite launched its "Server VM Edition," a new product purportedly designed to enable businesses to select, manage, and recover their virtual data from a

single location.  Carbonite's stated intention was for its data protection products, including the new Server VM Edition, to be managed seamlessly on a single computer screen.

4.     The vehicle for effecting that goal was another offering also announced that day – a revamped version of the "Carbonite Data Protection Console" (the "Console").  Carbonite boasted that it now "offer[ed] a single console to monitor and manage all of your virtual server backup and recovery jobs."   Defendant Anthony Folger ("Folger"), Carbonite's Chief Financial Officer ("CFO"), underscored the significance of adding the Server VM Edition to the Company's product pipeline, stating that "*[w]e've got a new offering out, Carbonite Server Virtual Edition[,] which I think <u>is a really important product for us</u>*."

5.     Indeed, Defendants continued to boast about the product throughout the Class Period, stating, for example, that "*we have put something out that we think is just completely competitive and just <u>a super strong product</u>*. . . ." and that the Server VM Edition "*significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market*."

6.     This case focuses on Defendants' misrepresentations about the Server VM Edition and failure to disclose that it *never* worked properly – from before its launch, until Defendants finally pulled it from the market.  Data backups using the Server VM Edition never happened as they were supposed to.  As an example, a client would schedule a backup for three days in a week at a certain time after business hours.  Carbonite would let the Server VM Edition run and the client would call the following morning and often report that either the files they were attempting to back up had not updated, or they were unable to open the files because they were corrupted.  Given the many problems with the Server VM Edition, at one point, the Company rushed to put out a large patch to try and fix the problems.

7.      An internal Carbonite team, which concentrated solely on the Server VM Edition, would meet on a daily basis to attempt to ascertain the problems with the product.  There was also an internal chat group called "***Get VME Healthy***," comprised of, *inter alia*, Carbonite engineers, software architects, and development operations employees dedicated to fixing the many problems with the product.

8.      Despite the many issues with the Server VM Edition and an internal scramble to deal with them, Defendants never once mentioned the existence of any problems relating to the Server VM Edition to investors.

9.      On July 25, 2019, Defendants revealed to the market – for the first time – that the Server VM Edition was in fact not working properly and was of poor quality.  Specifically, Defendants announced that "***the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite***," and acknowledged that the problems with the Server VM Edition were "***disruptive***" on the rest of the Carbonite sales force.

10.      In light of these many issues, Defendants withdrew the Server VM Edition from the market entirely and slashed their revenue guidance for the remainder of 2019.  Carbonite management admitted that the withdrawal of the Server VM Edition was a major factor in the downward revenue guidance.

11.      At the same time that Carbonite revealed that the Server VM Edition did not work, the Company also made the shocking announcement that defendant Mohamed Ali, its President and Chief Executive Officer ("CEO") for the past five years, had resigned from the Company, effective immediately.

12.    On this news, the price of Carbonite common stock plummeted more than **_24%_**, falling from $23.90 per share on July 25, 2019, to a close of $18.01 per share on July 26, 2019, on extremely heavy trading volume.

13.    As a result of Defendants' materially false and misleading statements and omissions, Carbonite common stock traded at artificially inflated prices during the Class Period.  After the above revelations, however, the price of Carbonite common stock declined significantly.

14.    Before the truth about the Server VM Edition was revealed to the market, the Individual Defendants (defined below) and other senior Carbonite executives cashed in, collectively selling over $6.4 million of their personally-held Carbonite shares to the unsuspecting investing public at artificially inflated prices.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Carbonite maintains its headquarters in this District and many of the acts and conduct that constitute the violations of the law complained of herein occurred in this District.

18.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Market ("NASDAQ"), a national securities market.

- 4 -

## PARTIES

19.     Lead Plaintiff purchased Carbonite common stock during the Class Period, as set forth in its previously filed certification, which is incorporated by reference herein, and was damaged thereby.

20.     Defendant Carbonite is a software company that provides cloud-based backup services.  During the Class Period, Carbonite's shares traded under the ticker "CARB" on the NASDAQ, an efficient market. On December 24, 2019, Carbonite was acquired by OpenText Corporation, a Canadian software company, for $1.42 billion.  Carbonite common stock was subsequently delisted from NASDAQ on January 6, 2020.  Prior to the acquisition, Carbonite was a Delaware corporation with its principal place of business in Boston, Massachusetts.

21.     Defendant Mohamad S. Ali ("Ali") was the President and CEO of Carbonite beginning in 2014, and a member of its Board of Directors beginning in 2015.  Defendant Ali resigned from his positions with Carbonite on July 25, 2019.  As CEO, defendant Ali spoke on Carbonite's behalf in press releases, conference calls, presentations and SEC filings.  Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Ali signed and certified the Company's Form 10-K filed with the SEC on February 28, 2019.

22.     Defendant Anthony Folger ("Folger") was the CFO and Treasurer of Carbonite during the Class Period, assuming his roles in 2013.  As CFO, Defendant Folger spoke on Carbonite's behalf in press releases, conference calls, presentations and SEC filings.  Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Defendant Folger signed and certified the Company's Form 10-K filed with the SEC on February 28, 2019, and both of the Company's Forms 10-Q filed with the SEC on November 5, 2018 and May 10, 2019, respectively.

23.     Defendants Ali and Folger are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Carbonite's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

25.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Carbonite.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Carbonite stock was a success, as it: (i) deceived the investing public regarding Carbonite's prospects and business; (ii) artificially inflated the price of Carbonite common stock; (iii) enabled defendants Ali and Folger, as well as other Carbonite insiders, to collectively sell over $6.4 million of their personally-held Carbonite stock to the unsuspecting public; and (iv) caused Lead Plaintiff and other members of the Class (defined below) to purchase Carbonite common stock at artificially inflated prices.

26.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational

trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

27.     Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

28.     As officers and controlling persons of a publicly held company whose shares were registered with the SEC pursuant to the Exchange Act, and were traded over NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful and accurate information.  The

Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Carbonite's business and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

30.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

31.     Defendant Carbonite was founded on February 10, 2005 in Boston, Massachusetts, and went public in August 2011.

32.     Prior to being acquired by OpenText Corporation in November 2019, Carbonite was primarily a Software-as-a-Service ("Saas") business providing backup, disaster recovery, high availability and workload migration technologies, in addition to email archiving.  Carbonite was originally a consumer-oriented business that helped users back up their photos, videos, and documents.  In 2010, Carbonite introduced a version of its software specifically designed for small to medium-sized businesses.

33.     Carbonite grew rapidly in light of a number of acquisitions from 2011 through 2019, allowing it to shift from a consumer centric company to more business oriented.  As a result of its acquisition strategy, Carbonite's revenue grew 75% from 2015 to 2017 alone, while its bookings, which according to the Company, "represent the aggregate dollar value of customer subscriptions and software arrangements, which may include multiple revenue elements, such as software licenses, hardware, professional services and post-contractual support, received by us during a period," grew 70% during the same time period.

34.     During the Class Period, Carbonite offered a number of data protection and data backup products making up the "Carbonite Data Protection Platform," supporting small to medium-sized businesses with scalable cloud infrastructure.  According to Company filings, "[t]he Carbonite Data Protection Platform allows individuals and organizations to select and deploy the right form of protection for each type of system, enabling them to meet a wide range of recovery objectives with a single vendor solution."

**Carbonite Launches Its New Virtual Machine Backup Solutions**

35.     On October 18, 2018, Carbonite issued a press release announcing the launch of the Server VM Edition and Carbonite's Server Backup VM Edition for Service Providers, to be offered on the Company's revamped "flagship" Console.

36.     According to Carbonite's website "Carbonite Server VM Edition is specifically designed to simplify disaster recovery of virtual workloads.  The solution automates complex processes so that VMs can be recovered in minutes."  The Server VM Edition was intended to be a "purpose-built backup for virtual machines (VMs) and enables businesses to select, manage and recover their VM data from a single location, the [Console]."

37.     The Company praised the Server VM Edition as "[a] complete data protection solution ensur[ing] the safety of all systems," which "enables fast, flexible recovery of VM data in minutes."

38.     Carbonite stated that the Server Backup VM Edition for Service Providers "enables Carbonite's community of Managed Service Providers (MSPs) to offer a fully integrated service that protects virtualized environments both locally and in their own cloud."

39.     "Virtualization" contemplates creating a "virtual" version of something. Virtualization in the context of a Virtual Machine ("VM") utilizes software to emulate the functionality of a physical computer environment.  This creates a virtual computing environment that functions as if it was a physical computer, but can be accessed without using the physical computer.

40.     A VM is essentially a replication of a computer system capable of performing tasks, such as running applications and programs as if it were a separate physical computer.  A VM, usually referred to as a "guest," is created within a physical computing environment referred to as the "host."  Multiple VMs can exist within a single host at one time.  Simply, a VM allows for one computer to operate a separate operating system as if it were on its own computer. The following graphic illustrates the functionality of a VM:



41.     The Server VM Edition was designed to allow data generated on a VM to be backed up and protected as if it were on an ordinary computer.  The following chart prepared by Carbonite set forth how the Server VM Edition was supposed to function:



42.     The Console, which Defendant Ali stated "will serve as the unifying platform for all of our data protection offerings," was intended to allow companies to monitor all of their data protection and backup solutions purchased from Carbonite on just one screen.  The Console, coupled

with the Server VM Edition, in theory, would be a "purpose-built backup for virtual machines (VMs) and enable[] businesses to select, manage and recover their VM data from a single location, the [Console]." The following is a sample screenshot from the Console:



43.     Analysts covering Carbonite were excited at the capabilities of the new products offerings.   For example, on October 12, 2018, just days before they officially launched on October 18, analysts from Jeffries issued a report, stating as follows:

> The company has also invested in a unified Data Protection Console which will give customers or managed service providers the ability to manage all their data protection products within the context of a single user interface.  This platform has a whole new architecture which is microservices based, as well as focused on continuous integration.  This enables agile development where every block of code has its own testing and is capable of supporting high frequency releases.  The concept of continuous improvement is real in this instance.  ***Currently the company is shipping its Carbonite Server VM Edition for the Data Protection console, with the expectation that Carbonite Server and Carbonite Recover will be available within the data protection console soon and that all products will be available in the next few quarters.  Having one interface to handle all your data needs will both***

*improve the customer experience as well as increase the ability to upsell as customers will see the potential use of other offerings*.[1]

**The Server VM Edition Never Functioned Properly**

44.     The Server VM Edition never worked as it was supposed to, from the time even before it was officially launched by Defendants in October 2018, until Defendants finally acknowledged its shortcomings and withdrew the product from the market entirely.

45.     As an example, a client would schedule a backup for three days in a week at a certain time after business hours.  Carbonite would let the Server VM Edition run and the client would call the following morning and often report that either the files that they were attempting to back up had not updated or that they were unable to open the files because they were corrupted.

46.     Further, a Carbonite client's machine would have trouble identifying the virtual machine that data was supposed to go to and/or Carbonite's machines were not able to save the data as they were supposed to.

47.     Carbonite first gave the Server VM Edition to a handful of clients to test the product on a trial basis.  Before the product was officially released, Carbonite employees working on the Server VM Edition reported internally that the product was not ready and should not be running.

48.     Despite the fact that there was not one successful customer data backup before the product was released, the decision was made to launch the product anyway.

49.     There were even internal Carbonite teams dedicated to addressing the problems with the Server VM Edition.  A team called a "tiger team," concentrated solely on the Server VM Edition would meet on a daily basis to attempt to ascertain problems with the product.

---

[1]     Unless otherwise noted, all emphasis is added.

50. In addition, there was an internal chat group called "***Get VME Healthy***," comprised of, *inter alia*, Carbonite engineers, software architects, and development operations employees dedicated to fixing the many problems with the product.

51. In light of the many issues associated with the Server VM Edition, there was a rush to put out a large patch to try to fix the problems.  In fact, there were hundreds of bug fixes in one software version alone.  Carbonite employees communicated internally about this in the spring of 2019.

52. But these attempts to fix the product were not successful, as the Server VM Edition never once successfully backed up a customer's data.  There also were very few (if any) clients who actually purchased the product.

53. Significantly, Carbonite even stopped selling the Server VM Edition to clients early in the Summer of 2019 – ***before*** publicly announcing its withdrawal – in light of the unfixable (and previously undisclosed) problems.  The internal message was to stop selling the product until it was fixed.

**Despite the Fact that the Server VM Edition Did Not Work, Defendants Released It and Continued to Boast About It to the Market**

54. Throughout the Class Period, notwithstanding the fact that the Server VM Edition plainly did not work, Defendants never once mentioned the existence of any problems with the product, or the ongoing effort within Carbonite to identify and address them to the market.  Instead, Defendants continuously boasted about the supposed functionality of the Server VM Edition and its importance to the Company going forward.

55. For example, on November 1, 2018, defendant Ali highlighted this new product, stating that "Carbonite Server, which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. ***This significantly improves***

*our performance for backing up virtual environments and makes us extremely competitive going after that market*."

56.     Similarly, on November 15, 2018, defendant Folger, speaking about the Server VM Edition at an analyst conference, stated that "*we have put something out that we think is just completely competitive and just <u>a super strong product</u> in a streamline user management*. . . ."

57.     And, on December 6, 2018, while speaking on behalf of Carbonite at the Barclays Global Technology, Media and Telecommunications Conference, defendant Folger explained the significance of adding the Server VM Edition to the Company's product pipeline, stating that "*[w]e've got a new offering out, Carbonite Server Virtual Edition which I think <u>is a really important product for us</u>, and I think it will help us address a pretty big segment of the market*."

58.     On February 7, 2019, Carbonite announced the acquisition of U.S.-based cybersecurity company Webroot Inc. for $618.5 million.  Defendants highlighted the benefits for the Company from this major acquisition, through the combination of the data protection capabilities of Carbonite and endpoint security solutions of Webroot.

59.     Specifically, on a conference call held the same day to announce both Carbonite's full year 2018 results and the acquisition of Webroot, defendant Ali stated that "[c]ombined, we can secure the endpoint with the best cloud-based, machine-learning, fiber security product, Webroot, and if infiltrated, we can recover automatically with the best cloud-based backup and recovery product, Carbonite."

60.     Analysts reacted favorably to the Webroot acquisition.  For example, in a report issued just after its announcement on February 8, 2019, analysts at Craig-Hallum Capital Group commented that "Webroot's end-point management security offering fits nicely with CARB's end-point back-up business with no customer or channel overlap."

- 15 -

61.     The significant expansion of Carbonite's business and offerings through the Webroot acquisition, however, did nothing to change Defendants' tune on the supposed quality of the products of the core Carbonite business, which included the Server VM Edition.  Less than three weeks later, on February 26, 2019, defendant Ali spoke on behalf of Carbonite at the JMP Securities Technology Conference, during which he once again highlighted the Company's technology, stating that "**our technology works and works really, really well**."

62.     Even as late as June 10, 2019, just 20 days before the end of the second quarter, on the precipice of the announcement of the withdrawal of the Server VM Edition from the market because it did not work, Folger once again touted Carbonite's data protection capabilities.  This time, Folger emphasized the supposed efficiency of Carbonite's data storage, stating that "***[w]e're just so efficient we can store data in such an efficient way that it allows us to price competitively*[.]**"

63.     Defendants also offered revenue guidance for the full year 2019 on several occasions during the Class Period – which incorporated sales of the Server VM Edition – notwithstanding the fact that it was not even working.

**Defendants Make the Shocking Revelations that the Server VM Edition Did Not Work and that Ali Is Leaving His Post as CEO Effective Immediately**

64.     On July 25, 2019, Carbonite issued a press release announcing its second quarter 2019 financial results for the period ended June 30, 2019.  In the press release, Carbonite disclosed that defendant Ali, its President and CEO for the past five years, had resigned from the Company, effective immediately.

65.     In addition, Defendants substantially reduced their financial guidance for 2019 for: (i) GAAP revenue to a range of $443.5 million to $448.5 million, a decrease from its prior guidance of $457 million to $471 million; and (ii) non-GAAP revenue to a range of $477.5 million to $482.5 million, a decrease from its prior guidance of $491 million to $505 million.

66.     Later that day, on the Company's conference call with analysts and investors, defendant Folger gave his explanation for the reduced guidance.  Folger revealed to the market – *for the first time* – that the Server VM Edition did not function properly and that, as a result, Defendants were withdrawing it from the market and removing the product from its 2019 financial guidance entirely.  Folger also reminded those on the call that Defendants had previously told the market that the Server VM Edition was going to "meaningfully" contribute to the Carbonite's revenues in 2019 and 2020.  Folger stated, in pertinent part, as follows:

> So what happened?  Well, in the second quarter, we experienced challenges in our data protection business related to products and go-to-market effectiveness.  ***Towards the end of the quarter, we determined that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite***.
>
> ***Many of you will remember that this was newly launched in Q3 of 2018 and something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020.***  While we assessed the best path forward, ***we have removed any growth expectations associated with virtual server edition from our short-term outlook***.

67.     Defendants conceded that the Server VM Edition being of poor quality and being withdrawn from the market directly caused them to reduce their revenue projections for the remainder of 2019.

68.     In addition, Interim CEO Stephen Munford elaborated on the problems with the Server VM Edition and resultant revenue guidance reduction for the remainder for 2019, stating that "we launched the product in a market that is growing and there's a lot of demand.  ***But we just didn't have the quality we needed.  And we need to step up***."  Munford further acknowledged that the issues with Server VM Edition were "***disruptive to the sales organization***."

69.     Analysts following Carbonite reacted negatively to the news disclosed on July 25, 2019 that the Server VM Edition was being pulled from the market because it did not function properly, as well as the unexpected immediate resignation of defendant Ali from his post as

- 17 -

the Company's President and CEO.  For example, in a July 26, 2019 report titled "Product challenges lead to reduced outlook," analysts at RBC Capital Markets commented that "[e]ssentially the virtual server edition of the server backup product, *a product that was expected to meaningfully contribute to revenue in 2H/19 and CY/20*, was determined to be lacking in quality and removed from the outlook while the company assessed the best approach from here."

70.    Similarly, analysts at Northland Capital Markets issued a report on July 26, 2019 expressing their disappointment of the news revealed by Defendants.  The Northland Capital Markets analysts commented that "*[a]gain, the server side disappointed. Blame was laid on the new Virtual Server Backup product this time*."

71.    Also, analysts at JMP Securities issued a report stating that "*Carbonite's new Virtual Server back-up product did not work correctly, therefore management does not expect it to generate the revenues it was previously projecting for later this year*."  The JMP Securities analysts also commented on defendant Ali's unexpected resignation from the Company, noting that "*given that Mr. [Ali] did not stay for a transition period, we suspect his departure may have been prompted by board members that may be dissatisfied with his performance*.  Accordingly, we suspect the board will seek new leadership that will bolster the company's struggling execution."

72.    In reaction to this news, the price of Carbonite common stock fell from $23.90 per share on July 25, 2019, to close at $18.01 per share on July 26, 2019 – a decline of $5.89 per share, or more than *24%*, on high trading volume of more than 7 million shares trading, more than 14 times greater than the average daily trading volume during the Class Period.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
### MADE DURING THE CLASS PERIOD

73.     The Class Period begins on October 18, 2018.  On that day, Carbonite issued a press release announcing the launch of the Server VM Edition.  In the press release, defendant Ali was quoted as follows:

> The **delivery of Carbonite Server VM Edition** simultaneously with the launch of our flagship Carbonite Data Protection Console is the culmination of one of our largest cross-functional efforts, led by our exceptional engineering organization . . .  Our customers and partners are eager to have an integrated and **easy to use data protection solution for both physical and virtual servers**.

74.     The statements in ¶73 above by defendant Ali regarding "the delivery of Carbonite Server VM Edition" and describing it as "easy to use" were materially false and misleading when made, because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statements were made:

(a)     that the Server VM Edition was not functioning properly, because, for example, a Carbonite client's machine would have trouble identifying the virtual machine that data was supposed to go to and/or Carbonite's machines were not able to save the data as they were supposed to;

(b)     that Carbonite employees working on the Server VM Edition reported internally that the product was not ready for customer use and should not be running;

(c)     that despite the fact that there was not one successful customer data backup before the product was released, the decision was made to launch it anyway; and

(d)     as a result of the foregoing, the "delivery" of the flawed Server VM Edition was premature, would be a disappointment to any customers who used the product, and was not "easy to use," because it did not work.

75.     On November 1, 2018, Carbonite announced its results for the three months ended September 30, 2018 in a press release, which it filed with the SEC on Form 8-K (the "3Q18 Press Release").

76.     Following the issuance of the 3Q18 Press Release, Carbonite held a conference call on the same day with analysts and investors to discuss the Company's financial performance for the third quarter of 2018.

77.     During the call, in his prepared remarks, defendant Ali highlighted the recently launched Carbonite Server VM Edition, stating, in pertinent part, as follows:

> Carbonite Server, which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. ***This significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market***.
>
> Businesses today need data protection for all their systems, from legacy systems to those that are fully virtualized.  In a world where data sprawl continues at a rapid pace, one where workloads are frequently moving, businesses also need a streamlined management experience so they can quickly and easily optimize backup and recovery performance, no matter where the data resides.
>
> With our newest release, we offer robust, ***all-in-one server protection*** for physical, virtual, and legacy systems, including agentless VM backup for VMWare and Hyper-V.  No longer do you need to choose different solutions for physical and virtual.  ***This combined solution makes it much easier for midmarket companies to buy and deploy***.

78.     The statements in ¶77 above by defendant Ali that Carbonite Server "significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market," provides "all-in-one server protection" and that its new offering "makes it much easier for midmarket companies to buy and deploy," were materially false and misleading for the reasons stated in ¶74 above.

79.     Two weeks later, on November 15, 2018, defendant Folger spoke on behalf of Carbonite at the Craig-Hallum Capital Group Alpha Select Conference.  He promoted the Server VM Edition as follows:

> So I think we are feeling very good about having delivered, not only the console, but few new products this year and feel pretty good about how we're positioned moving forward with this.  ***One of the products that we did deliver also that is integrated with the console is our Server VM Edition***.  So think about this as protecting your server infrastructure, but it is specifically targeting virtual machines.  This is a market that we haven't been particularly strong in, in the past, we've been okay.  ***I think we have completely overhauled the product and we have put something out that we think is just completely competitive and just a super strong product in a streamline user management, it's got a ton of APIs for monitoring***.

80.     The statements in ¶79 above by defendant Folger that the Server VM Edition was "deliver[ed]" and was "just completely competitive and just a super strong product" were materially false and misleading when made for the reasons described in ¶74 above.

81.     On February 7, 2019, Carbonite announced its financial results for the year ended December 31, 2018 and announced the Webroot acquisition, in a press release, which it filed with the SEC on Form 8-K (the "FY18 Press Release").

82.     Defendant Ali was quoted in the FY18 Press Release stating that "[w]e delivered on our strategic priorities in 2018. . . .  ***We significantly strengthened our product platform*** and introduced one of the most complete Software-as-a-Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability."

83.     The statement in ¶82 above by defendant Ali that Carbonite "significantly strengthened" its product platform in 2018 was materially false and misleading when made because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew, or recklessly disregarded, at the time the statements were made:

(a)     that the Server VM Edition was not functioning properly, because, for example, a Carbonite client's machine would have trouble identifying the virtual machine that data was supposed to go to and/or Carbonite's machines were not able to save the data as they were supposed to;

(b)     that Carbonite employees working on the Server VM Edition reported internally that the product was not ready and should not be running;

(c)     that despite the fact that there was not one successful customer data backup before the product was released, the decision was made to launch it anyway;

(d)     that there were internal Carbonite teams dedicated to addressing the problems with the Server VM Edition.  A team called a "tiger team," concentrated solely on the Server VM Edition, would meet on a daily basis to attempt to ascertain problems with the product;

(e)     that there was even an internal chat group called "***Get VME Healthy***," comprised of, *inter alia*, Carbonite engineers, software architects, and development operations employees dedicated to fixing the many problems with the product; and

(f)     as a result of the foregoing issues with the Server VM Edition, Carbonite had not "significantly strengthened" its product platform.

84.     In the FY18 Press Release, Defendants provided the following revenue guidance: (i) GAAP Revenue guidance for the full year 2019 ranging between $468 million - $482 million; and (ii) Non-GAAP revenue guidance for the full year 2019 ranging between $488 million - $502 million.

85.     The revenue guidance referenced in ¶84 above was lacking in a reasonable basis and materially false and misleading when made because Defendants knew or recklessly disregarded that

due to the aforementioned problems associated with the Server VM Edition (*see* ¶¶44-53), Carbonite would be unable to meet the stated guidance.

86.     Following the issuance of the FY18 Press Release, Carbonite held a conference call on the same day with analysts and investors to discuss the Company's financial performance for 2018.

87.     During the call, defendant Folger was asked by an analyst from Jeffries if anything in Carbonite's core business had changed that would impact their ability to make financial projections for the Company.   The following exchange took place:

**Joseph Anthony Gallo** - *Jefferies LLC, Research Division - Equity Associate*

This is Joe on for John.  Congrats on the acquisition.  I just wanted to focus on the core business for my questions.  You guys had a strong quarter on the bottom line, but were short again on the top line.  I appreciate the color on the large deals being more back-end-loaded, but the guide was also at least a little bit below what we were expecting. ***Has anything changed in the business to kind of make it more difficult to forecast***?

**Anthony Folger** - *Carbonite, Inc. - CFO & Treasurer*

***No*** -- and this is Anthony, thanks, Joe.  I don't think -- ***I wouldn't say there's anything that makes it more difficult to forecast***.  We've certainly seen more of a mix on larger deals.  And I think in the fourth quarter for sure, we saw more deals later in the quarter.  I think those would be the 2 elements that we've -- that have started to evolve and certainly were prevalent in the fourth quarter.

88.     The statement in ¶87 above by defendant Folger that, for the core Carbonite business, "I wouldn't say there's anything that makes it more difficult to forecast," was materially false and misleading when made for the reasons described in ¶83 above.

89.     On February 26, 2019, defendant Ali spoke on behalf of Carbonite at the JMP Securities Technology Conference.   During the conference, Ali was asked by a JMP Securities Analyst why the Webroot acquisition was a good fit for Carbonite.  Ali took the opportunity to boast about Carbonite's technology.  That exchange was, in pertinent part, as follows:

- 23 -

**Q - Erik Suppiger** . . .  The big news out of the earnings call was the acquisition of Webroot, company's about three-quarters your size.  You're growing rapidly with that acquisition.  Why is an endpoint vendor a logical fit with a SaaS backup vendor – you're broader than backup – but why that fit?

**A - Mohamad S. Ali**: Great question . . .  So, as you know, we've been expanding our capability around what's called data protection, that's our category, it includes backup, for quite some time.  And we have now become the largest endpoint data protection company out there.  And we have a very large installed base of small and mid-sized businesses that protect all their endpoints using our product.

And what this means is they back up all their endpoints – and we have over 100,000 businesses – they back up all their endpoints to our cloud.  And so if something goes wrong, like a ransomware attack, they're able to recover.  And we've actually had – we don't how many people have used our product for ransomware recovery where we've had over 12,000 individuals at companies call our call center and say they've been encrypted with ransomware, and could you help us recover, and we have helped 100% of them recover.  ***So our technology works and works really, really well***.  And so you look at a company like us, which is we're a leader in endpoint data protection[.]

90.     The statement in ¶89 above by Defendant Ali that Carbonite's "technology works and works really, really well," was materially false and misleading when made for the reasons described in ¶83 above.

91.     Two days later, on February 28, 2019, defendant Ali spoke on behalf of Carbonite at Morgan Stanley's Technology, Media & Telecom conference.  At the conference, Ali was asked directly by a Morgan Stanley analyst whether there were any issues with the Carbonite data protection platform.  That exchange was, in pertinent part, as follows:

**Melissa A. Franchi** - *Morgan Stanley, Research Division - VP and Research Analyst*

Got it.  Are there any gaps in the platform from a feature functionality perspective?

**Mohamad S. Ali - Carbonite, Inc.** - *President, CEO & Director*

The Carbonite data protection platform?

**Melissa A. Franchi** - *Morgan Stanley, Research Division - VP and Research Analyst*

Yes, exactly.

**Mohamad S. Ali - Carbonite, Inc**. - *President, CEO & Director*

- 24 -

*I mean, there are always gaps, right? But we -- I think we have filled probably well over 90% of the gaps*.  And it's been -- we've done it very, very aggressively over the last 3 years, means today, we can recover a business from hours, which would be backup rate, to seconds.

92.     The statement in ¶91 above by Defendant Ali regarding "gaps" in Carbonite's data protection platform, was materially false and misleading when made for the reasons described in ¶83 above.

93.     On May 2, 2019, Carbonite issued a press release announcing its financial results for the first quarter of 2019 ended March 31, 2019, which it filed with the SEC on Form 8-K (the "1Q19 Press Release").

94.     In the 1Q19 Press Release, Defendants provided the following revenue guidance: (i) GAAP Revenue guidance for the full year 2019 ranging between $457 million - $471 million; and (ii) Non-GAAP revenue guidance for the full year 2019 ranging between $491 million - $505 million.[2]

95.     The revenue guidance referenced in ¶94 above was lacking in a reasonable basis and materially false and misleading when made because Defendants knew or recklessly disregarded that due to the problems with the Server VM Edition (*see* ¶¶44-53), Carbonite would be unable to meet the stated guidance.

96.     Following the issuance of the 1Q19 Press Release, Carbonite held a conference call on the same day with analysts and investors to discuss the Company's financial performance for the first quarter of 2019.

97.     While giving his opening remarks during the call, defendant Ali discussed the products in Carbonite's data protection business, in pertinent part, as follows:

---

[2]     On the Company's earnings call held later that day, defendant Folger explained that the decrease in projected GAAP revenue was "entirely driven by a change in purchase accounting for Webroot's deferred revenue."

**Mohamad S. Ali -** *Carbonite, Inc. - President, CEO & Director*

***We have the right product portfolio to serve the broader set of businesses like these 2 great organizations, and we have the incredible product, ease of use that businesses have come to know and expect***.  Our focus continues to be on bringing all of our products together under the unified data protection platform to continue to deliver great value to the market, and we'll be sure to update everyone as we make progress throughout 2019.

98.     The statements in ¶97 above by defendant Ali that Carbonite had "incredible product[s]" with "ease of use" were materially false and misleading when made for the reasons described in ¶83 above.

99.     On June 10, 2019, with less than three weeks remaining in the second quarter, defendant Folger spoke on behalf of Carbonite at the Stifel Cross Sector Insight Conference.  During the conference, Folger was also asked by the Stifel analyst about issues impacting Carbonite's business.  That exchange went, in pertinent part, as follows:

**Brad Reback**

Okay. And to your point on moment ago around, 4Q being more of an execution issue than a macro issue.  Obviously, some aspects of infrastructure software have suffered a little bit here.  Are you seeing any issues on the macro front more recently?

**Anthony Folger, Chief Financial Officer and Treasurer**

***Nothing, recently***.

I mean again, we're so transactional -- and vast majority of our transactions are a few thousand dollars a year.  That's the type of subscription we're selling, it's not a generally not a six figures type deal that we're out there pursuing.  And so we tend to watch traffic deal read through the channel, and just transaction volumes and ***I don't think if there's anything telling us, and frankly we leverage our channel partners a lot as well to just understand what's going on with the demand environment and with the end users and we're not seeing any dramatic changes in that from a macro perspective***.

- 26 -

100.    The statement in ¶99 above by defendant Folger that they had seen "nothing recently" on the macro front impacting Carbonite's business was materially false and misleading when made for the reasons described in ¶83 above.

101.    Defendant Folger was also asked about the competitive advantage of Carbonite's data protection business.  That exchange was, in pertinent part, as follows:

**Brad Reback**

So over the years giving your consumer roots when the company was founded, you made a large investment in the back-end infrastructure, on the data center side.  And I think, least knowing the company as long as they have, that has actually become a competitive advantage for you.  So maybe explain where you are in consolidating the data center, what type of cost advantage do you think that gets versus the competitors who right on top of someone else's your hyper scale cloud?

**Anthony Folger, Chief Financial Officer and Treasurer**

Yes.

So we are probably storing north of 300 petabytes of compressed deduced data, which is a big footprint.  And we're essentially doing that in two data centers in the US., one East Coast, one West Coast.  And you're right, when we came.  But what we did know how to do was manage cloud infrastructure at scale.  We had 1.5 million consumer subscribers.

And it is not possible to on-board 1.5 million consumer subscribers and less everything you do in the data center is automated.  And that's provisioning storage all the way through to when a customer churns; we capture their storage, and all the tools that we had to move data from one side to another, just everything that we could do.

We were forced to build not for any sort of competitive advantage or cost advantage.  But because if we didn't, I think the business would have collapsed under the weight of a 1.5 million pane consumer subscribers.  So as we started to move into the enterprise space, what we realized is that our cost of storing a gigabyte of data was an order of magnitude less than what anyone else could sell it to us for.  And generally meaningfully less even than our competitors and the fact that, we went out and bought several of them, we got a pretty good look inside their infrastructure, and at least in terms of what we've seen, we are more efficient than anybody in the space.

***And so it has become I think a competitive advantage certainly [i]n enterprise, because we're just so efficient we can store data in such an efficient way that it allows us to price competitively, and we did this in the consumer space****. . . .*

- 27 -

102.     The statement in ¶101 above by defendant Folger that Carbonite had a "competitive advantage" because "we're just so efficient we can store data in such an efficient way," was materially false and misleading when made for the reasons described in ¶83 above.

## THE TRUTH EMERGES

103.     On July 25, 2019, Defendants revealed to the market – for the first time – that the Server VM Edition was not working properly and was of poor quality.  Specifically, Defendants announced that "***the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite***."

104.     As a result, Defendants announced that they were withdrawing the Server VM Edition from the market entirely and slashed their revenue guidance for the remainder of 2019.  Carbonite management admitted that the withdrawal of the Server VM Edition was a major factor in the downward revenue guide.

105.     At the same time Carbonite revealed that its Server VM Edition did not work, the Company also made the surprising announcement that defendant Ali had resigned from the Company, effective immediately.

106.     On this news, the price of Carbonite common stock plummeted more than ***24%***, falling from $23.90 per share on July 25, 2019, to a close of $18.01 per share on July 26, 2019, on extremely heavy trading volume.

## DEFENDANTS VIOLATED SEC DISCLOSURE
## RULES AND REGULATIONS

107.     Pursuant to Item 303, and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations.

Such disclosure is required by an issuer in the management's discussion and analysis section of

Forms 10-K and 10-Q.

108.   In May 1989, the SEC issued an interpretive release on Item 303 (the "1989

Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that
> are reasonably expected to have material effects, such as: A reduction in the
> registrant's product prices; erosion in the registrant's market share; changes in
> insurance coverage; or the likely non-renewal of a material contract.
>
>            *      *      *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is
> both presently known to management and reasonably likely to have material effects
> on the registrant's financial condition or results of operation.

109.   Furthermore, the 1989 Interpretive Release sets forth the following test to determine

if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management
> must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to
> fruition? If management determines that it is not reasonably likely to occur, no
> disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the
> consequences of the known trend, demand, commitment, event or uncertainty, on the
> assumption that it will come to fruition.   Disclosure is then required unless
> management determines that a material effect on the registrant's financial condition
> or results of operations is not reasonably likely to occur.

110.   Item 303 required the disclosure of known risks and uncertainties to Carbonite

presented by the Company's Server VM Edition.   The Company did not make such required

disclosures in the Forms 10-K and 10-Q filed during the Class Period, in violation of Item 303.

111.   As alleged herein, during the Class Period, the Server VM Edition did not work

properly.   The problems associated with this product, which were known by Defendants, were

known risks and uncertainties that were reasonably likely to – and when they came to fruition did – adversely affect Carbonite's financial condition and results.

112.    Accordingly, Item 303 required disclosure of these known risks and uncertainties, in the Forms 10-K and 10-Q filed during the Class Period.  These SEC filings, however, failed to mention and describe the risks or uncertainties to the Company's business in connection with the failing Server VM Edition.  The omission of this information violated the disclosure obligation imposed by Item 303.

### ADDITIONAL FACTS PROBATIVE OF SCIENTER

113.    As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants Carbonite, Ali, and Folger knew or recklessly disregarded that the statements identified above were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading.

**A.      That the Individual Defendants Made Numerous Specific Statements Regarding the Server VM Edition and Other Products Offered on Carbonite's Data Protection Platform Is Directly Relevant to the Scienter Analysis**

114.    The Individual Defendants made numerous specific statements during the Class Period about the functionality and importance of Carbonite's Server VM Edition.  For example, on November 1, 2018, defendant Ali highlighted this new product stating that "Carbonite Server, which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. ***This significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market*.**"

115.    In addition, on December 6, 2018, defendant Folger stated that "***[w]e've got a new offering out, Carbonite Server Virtual Edition which I think <u>is a really important product for us</u>***."

116.    Further, on February 28, 2019, when asked directly if there were "any gaps in [Carbonite's data protection] platform from a feature functionality perspective," Ali responded

"*I mean, there are always gaps, right?  But we -- I think we have filled probably well over 90% of the gaps*."

117.    Similarly, on June 10, 2019, defendant Folger boasted about the Company's data protection platform, stating that "*we're just so efficient we can store data in such an efficient way that it allows us to price competitively[.]*"

118.    These specific statements reflect that the Individual Defendants were receiving specific information regarding the Server VM Edition and Carbonite's data protection products.  The only other plausible inference that could be drawn from these pronouncements is that the Individual Defendants either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to relating to such matters.  In either event, such deliberate recklessness satisfies the scienter requirement.

**B.     Defendant Ali's Suspiciously Timed Resignation Supports a Strong Inference of Scienter**

119.    On July 25, 2019, the final day of the Class Period, Carbonite announced that not only was the Server VM Edition being pulled from the market, but that the Company's CEO, defendant Ali, was stepping down from his position which he had held for five years.

120.    The sudden and unforeseen resignation by Defendant Ali also supports a finding of scienter given that he stepped down on the very same day that Carbonite disclosed the issues with the Server VM Edition and the drastically reduced guidance for fiscal year 2019.

121.    Indeed, analysts at JMP Securities commented that "*given that Mr. [Ali] did not stay for a transition period, we suspect his departure may have been prompted by board members that may be dissatisfied with his performance*.  Accordingly, we suspect the board will seek new leadership that will bolster the company's struggling execution."

**C.      The Individual Defendants' Class Period Stock Sales Support a Strong Inference of Scienter**

122.      Defendants possessed substantial motives for failing to disclose the problems with the Server VM Edition.  During the Class Period, Defendants Ali and Folger, as well as other senior Company executives, in connection with the fraudulent scheme alleged herein, sold more than $6.4 million of their personally-held shares of Carbonite common stock while in possession of material non-public information, as set forth below:

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Mohamad Ali | President and Chief Executive Officer | 12/3/2018 | 4,000 | $28.25 | $113,000 |
| | | 12/14/2018 | 13,888 | $26.50 | $368,032 |
| | | 12/19/2018 | 3,999 | $25.55 | $102,174 |
| | | 1/29/2019 | 10,353 | $27.56 | $285,329 |
| | | 2/14/2019 | 21,511 | $24.70 | $531,322 |
| | | 2/15/2019 | 7,998 | $23.76 | $190,032 |
| | | 3/14/2019 | 4,000 | $24.45 | $97,800 |
| | | 3/18/2019 | 4,000 | $24.46 | $97,840 |
| | | 5/31/2019 | 4,000 | $23.50 | $94,000 |
| | | 6/17/2019 | 4,000 | $23.96 | $95,840 |
| | | | **84,147** | | **$1,975,369** |
| Anthony Folger | Chief Financial Officer and Treasurer | 10/19/2018 | 10,000 | $35.36 | $353,600 |
| | | 10/29/2018 | 2,881 | $33.26 | $95,822 |
| | | 11/30/2018 | 1,611 | $27.95 | $45,027 |
| | | 12/17/2018 | 1,631 | $25.67 | $41,868 |
| | | 1/28/2019 | 2,109 | $27.65 | $58,314 |
| | | 2/4/2019 | 2,240 | $28.78 | $64,467 |
| | | 2/11/2019 | 1,924 | $24.08 | $46,330 |
| | | 2/13/2019 | 2,224 | $25.57 | $56,868 |
| | | 2/15/2019 | 2,873 | $23.96 | $68,837 |
| | | 3/4/2019 | 1,611 | $23.08 | $37,182 |
| | | 3/15/2019 | 1,611 | $24.58 | $39,598 |
| | | 5/30/2019 | 1,612 | $23.65 | $38,124 |
| | | 6/3/2019 | 9,776 | $23.42 | $228,954 |
| | | 6/4/2019 | 22,539 | $22.60 | $509,381 |
| | | 6/17/2019 | 1,612 | $23.60 | $38,043 |
| | | 7/1/2019 | 7,891 | $25.84 | $203,903 |
| | | | **74,145** | | **$1,926,319** |
| Norman Guadagno | SVP Marketing | 10/29/2018 | 1,595 | $33.26 | $53,050 |
| | | 10/30/2018 | 2,699 | $32.13 | $86,719 |
| | | 11/8/2018 | 5,013 | $30.00 | $150,390 |
| | | 11/30/2018 | 640 | $27.95 | $17,888 |
| | | 12/3/2018 | 1,160 | $28.28 | $32,805 |
| | | 12/17/2018 | 816 | $25.67 | $20,947 |
| | | 1/14/2019 | 2,314 | $27.99 | $64,769 |
| | | 1/15/2019 | 2,814 | $27.57 | $77,582 |
| | | 1/28/2019 | 1,275 | $27.65 | $35,254 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 1/29/2019 | 3,019 | $27.98 | $84,472 |
| | | 2/4/2019 | 1,121 | $28.78 | $32,262 |
| | | 2/5/2019 | 2,629 | $28.99 | $76,215 |
| | | 2/11/2019 | 1,283 | $24.08 | $30,895 |
| | | 2/12/2019 | 3,010 | $24.59 | $74,016 |
| | | 2/15/2019 | 1,090 | $23.96 | $26,116 |
| | | 2/15/2019 | 2,509 | $23.71 | $59,488 |
| | | 3/4/2019 | 535 | $23.08 | $12,348 |
| | | 3/5/2019 | 1,265 | $22.30 | $28,210 |
| | | 3/15/2019 | 535 | $24.58 | $13,150 |
| | | 5/30/2019 | 535 | $23.65 | $12,653 |
| | | 5/30/2019 | 1,265 | $23.50 | $29,728 |
| | | 6/17/2019 | 535 | $23.60 | $12,626 |
| | | | **37,657** | | **$1,031,581** |
| Cassandra Hudson | VP Finance and Chief Accounting Officer | 2/4/2019 | 2,053 | $28.78 | $59,085 |
| | | 2/11/2019 | 1,007 | $24.08 | $24,249 |
| | | 2/13/2019 | 598 | $25.57 | $15,291 |
| | | 2/15/2019 | 887 | $23.96 | $21,253 |
| | | | **4,545** | | **$119,877** |
| Todd Krasnow | Director | 11/6/2018 | 4,500 | $29.39 | $132,255 |
| | | 11/6/2018 | 2,000 | $29.39 | $58,780 |
| | | 11/15/2018 | 6,218 | $27.91 | $173,544 |
| | | | **12,718** | | **$364,579** |
| Paul S. Mellinger | SVP Global Sales | 10/29/2018 | 2,241 | $33.26 | $74,536 |
| | | 10/30/2018 | 2,768 | $32.29 | $89,379 |
| | | 11/30/2018 | 829 | $27.95 | $23,171 |
| | | 12/17/2018 | 840 | $25.67 | $21,563 |
| | | 1/7/2019 | 2,528 | $26.00 | $65,728 |
| | | 1/28/2019 | 1,702 | $27.65 | $47,060 |
| | | 1/29/2019 | 3,307 | $27.72 | $91,670 |
| | | 2/4/2019 | 1,121 | $28.78 | $32,262 |
| | | 2/11/2019 | 1,497 | $24.08 | $36,048 |
| | | 2/15/2019 | 1,121 | $23.96 | $26,859 |
| | | 3/4/2019 | 550 | $23.08 | $12,694 |
| | | 3/15/2019 | 550 | $24.58 | $13,519 |
| | | 5/30/2019 | 550 | $23.65 | $13,008 |
| | | 6/17/2019 | 550 | $23.60 | $12,980 |
| | | | **20,154** | | **$560,476** |
| Danielle O. Connell Sheer | General Counsel and Secretary | 10/29/2018 | 1,553 | $33.26 | $51,653 |
| | | 11/8/2018 | 5,193 | $30.00 | $155,790 |
| | | 11/30/2018 | 691 | $27.95 | $19,313 |
| | | 12/17/2018 | 700 | $25.67 | $17,969 |
| | | 1/28/2019 | 1,394 | $27.65 | $38,544 |
| | | 2/4/2019 | 2,223 | $28.78 | $63,978 |
| | | 2/11/2019 | 1,176 | $24.08 | $28,318 |
| | | 2/13/2019 | 1,113 | $25.57 | $28,459 |
| | | 2/15/2019 | 934 | $23.96 | $22,379 |
| | | 3/4/2019 | 459 | $23.08 | $10,594 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 3/15/2019 | 459 | $24.58 | $11,282 |
| | | 5/30/2019 | 459 | $23.65 | $10,855 |
| | | 6/17/2019 | 459 | $23.60 | $10,832 |
| | | | 16,813 | | $469,967 |
| Grand Total | | | 250,179 | | $6,448,169 |

123. During the Class Period, defendant Folger, in connection with the fraudulent scheme alleged herein, sold 39% of his holdings of Carbonite common stock for proceeds of nearly $2 million, while in possession of material non-public information.

124. The timing of the Class Period Carbonite common stock sales by defendant Folger was especially suspicious. In particular, in the two months prior to the announcement that the Server VM Edition was being pulled from the market, Folger sold more than 43,000 shares of Carbonite stock for proceeds of over $1 million.

125. On July 1, 2019 – just over three weeks before the pulling of the Server VM Edition and reduction of revenue guidance – Folger sold 7,891 shares of Carbonite stock for proceeds of $203,903. This stock sale was made *after* Defendants admit they were aware of the problems with the Server VM Edition (*see* ¶¶44-53), but weeks before they disclosed them to the market. Moreover, while this sale was made pursuant to a Rule 10b5-1 trading plan, that plan was adopted *during* the Class Period on May 3, 2019. A trading plan adopted during a class period is recognized as probative of scienter.

126. Further, defendant Folger sold 15% more of his personally-held Carbonite shares during the Class Period than he sold during a control period prior to the Class Period from January 10, 2018 through October 17, 2018.[3]

---

[3] The "control period" before the Class Period consists of 280 days, which is the length of the Class Period.

127.    Defendant Ali's Class Period stock sales – which yielded him proceeds of $1.975 million – were similarly suspicious, because they far exceeded his pre-Class Period sales. Specifically, defendant Ali sold 84,147 shares during the Class Period, but did not sell a single share of Carbonite common stock during the control period.

128.    Taken collectively, Defendants Ali and Folger's Class Period Carbonite stock sales were suspicious and unusual in both amount and timing.  This supports an inference of scienter because those sales were timed to capitalize on Carbonite's inflated stock price before the news that the Server VM Edition did not work properly was revealed to the market.

### CLASS ACTION ALLEGATIONS

129.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Carbonite common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

130.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Carbonite common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Carbonite or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

133.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Carbonite;

- whether the Individual Defendants caused Carbonite to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the price of Carbonite common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

134.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

135.    During the Class Period, the market for Carbonite common stock was an efficient market for the follow reasons, among others:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Carbonite common stock traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company's stock traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Lead Plaintiff and members of the Class purchased or acquired Carbonite common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

136.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

137.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

138.    As detailed herein, Defendants' false and misleading statements and omissions caused and maintained artificial inflation in the price of Carbonite common stock by misrepresenting and

concealing the relevant truth about the Server VM Edition.  Lead Plaintiff, and other investors purchased Carbonite common stock at these inflated prices and suffered damage when the price of Carbonite common stock declined upon the revelation of the relevant truth.

139.    As a result of their purchases of Carbonite common stock during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Carbonite common stock to trade at artificially inflated levels throughout the Class Period.

140.    On July 25, 2019, Defendants revealed to the market that the Server VM Edition was not working properly and of poor quality.  Specifically, Defendants announced that "***the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite***."

141.    As a result, Defendants announced that they were withdrawing the Server VM Edition from the market entirely and slashed their revenue guidance for the remainder of 2019.  Carbonite management admitted that the withdrawal of the Server VM Edition was a major factor in the downward revenue guide.

142.    At the same time Carbonite revealed that its Server VM Edition did not work, the Company also made the surprising announcement that defendant Ali had resigned from the Company, effective immediately.

143.    On this news, the price of Carbonite common stock plummeted more than ***24%***, falling from $23.90 per share on July 25, 2019, to a close of $18.01 per share on July 26, 2019, on extremely heavy trading volume.

144.   As a result of Defendants' false and misleading statements, Carbonite common stock traded at artificially inflated prices during the Class Period.  After the above revelations to the market, the price of Carbonite common stock declined significantly.

145.   By concealing from investors the adverse facts detailed herein, Defendants presented a materially misleading picture of Carbonite's business.  When the truth about the Company was revealed to the market, the price of Carbonite common stock substantially declined.  This share price decline removed all of the inflation from the price of Carbonite common stock, causing substantial economic losses to investors who had purchased Carbonite common stock during the Class Period.

146.   The decline in the price of Carbonite common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Carbonite common stock negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' conduct as detailed herein.

147.   The economic loss, *i.e.,* damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' scheme to artificially inflate the price of Carbonite common stock and the subsequent significant decline in the value of Carbonite common stock when Defendants' prior misrepresentations and the relevant truth were revealed.

148.   In sum, as detailed above, the rapid share price decline described herein served to remove artificial inflation from the price of Carbonite common stock, and was a direct and foreseeable consequence of the revelation of the relevant truth concealed by Defendants.

## NO SAFE HARBOR

149.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein

were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Carbonite who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

150.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

151.    During the Class Period, Defendants disseminated or approved the false statements above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations or omissions and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Carbonite common stock during the Class Period.

153.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Carbonite common stock.  Lead Plaintiff and the Class would not have purchased Carbonite common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

154.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Carbonite common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

155.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

156.    The Individual Defendants acted as controlling persons of Carbonite within the meaning of Section 20(a) of the Exchange Act:

(a)     By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading;

(b)      The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c)      Because of their positions as CEO and CFO respectively, the Individual Defendants directly participated in the Company's management and were directly involved in Carbonite's day-to-day operations.  The Individual Defendants also controlled the contents of Carbonite's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

     D.     Awarding Lead Plaintiff and the other members of the Class such other and further

relief as may be just and proper under the circumstances.

## JURY DEMAND

     Lead Plaintiff hereby demands a trial by jury.

DATED:  January 15, 2020          HUTCHINGS BARSAMIAN
                        MANDELCORN, LLP

                        */s/ Theodore M. Hess-Mahan*
                  THEODORE M. HESS-MAHAN, BBO #557109
                  110 Cedar Street, Suite 250
                  Wellesley Hills, MA  02481
                  Telephone:  781/431-2231
                  781/431-8726 (fax)
                  thess-mahan@hutchingsbarsamian.com

                  *Local Counsel*

                  ROBBINS GELLER RUDMAN
                    & DOWD LLP
                  SAMUEL H. RUDMAN
                  DAVID A. ROSENFELD (*pro hac vice* pending)
                  ROBERT D. GERSON (*pro hac vice* pending)
                  PHILIP T. MERENDA (*pro hac vice* pending)
                  58 South Service Road, Suite 200
                  Melville, NY  11747
                  Telephone:  631/367-7100
                  631/367-1173 (fax)
                  srudman@rgrdlaw.com
                  drosenfeld@rgrdlaw.com
                  rgerson@rgrdlaw.com
                  pmerenda@rgrdlaw.com

                  *Lead Counsel for Lead Plaintiff*

- 43 -