UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RUBEN A. LUNA, individually and on behalf of all others similarly situated, | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil No. 19-cv-11662-LTS |
| CARBONITE, INC., MOHAMAD S. ALI, and ANTHONY FOLGER, | ) ) ) ) |  |
| Defendants. | ) ) |  |

ORDER ON DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT (DOC. NO. 52)

October 22, 2020

This securities class action, brought by and on behalf of Lead Plaintiff Construction Industry and Laborers' Joint Pension Trust and other similarly situated holders of common stock of Defendant Carbonite, Inc. ("Carbonite"), alleges that Defendant Carbonite and two of its officers, Defendants Mohamad S. Ali and Anthony Folger,[1] made materially false statements that misled investors in violation of violation of Section 10(b) of the Securities Exchange Act ("the Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. Doc. No. 45.[2] Defendants filed a Motion to Dismiss, Doc. No.

---

[1] Defendants Ali and Folger served as Carbonite's CEO and CFO respectively during the Class Period.

[2] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

52, Plaintiff opposed, Doc. No. 56, Defendants replied, Doc. No. 58, and the Court held a hearing on October 15, 2020. For the following reasons, the Motion to Dismiss is ALLOWED.

## I. THE CONSOLIDATED AMENDED COMPLAINT'S ALLEGATIONS[3]

### A. Factual Allegations

#### 1. Carbonite Launches VME Despite Internal Warning

Defendant Carbonite is a software company that provides backup services, archiving, data protection, and workload migration to customers. Doc. No. 45 ¶¶ 32–34. The company went public in 2011 and experienced rapid growth over the next several years, including a 75% revenue increase from 2015 to 2017. Id. During the Class Period (October 18, 2018 to July 25, 2019), Carbonite offered a variety of data protection and data backup products to support small businesses. Id. ¶ 34. On October 18, 2018, Carbonite launched the Server Backup VM Edition ("VME"), a new product designed to allow businesses to manage, store, and recover virtual data from a single console. Id. ¶¶ 35–36.

Behind the scenes, VME had trouble getting off the ground. Plaintiff alleges that VME never worked, from the time before it was officially launched until it was withdrawn in July 2019. Id. ¶ 44. Prior to its official launch in October 2018, Carbonite gave VME to a handful of

---

[3] The Court recites facts alleged in the Consolidated Amended Complaint, Doc. No. 45, and draws all reasonable inferences in favor of Plaintiff. Saldivar v. Racine, 818 F.3d 14, 16 (1st Cir. 2016). Additionally, Defendants submitted complete versions of the filings, communications, and presentations that Plaintiff references in the Consolidated Amended Complaint. While ordinarily "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden . . . courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). SEC filings and undisputed communications referenced in the Consolidated Amended Complaint are the sorts of documents courts routinely consider at the motion to dismiss stage. See, e.g., Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015). Accordingly, the Court will consider the submitted exhibits where indicated.

customers to test out the product. Id. ¶ 47. There was "not one successful customer backup" among these customers. Id. ¶ 48. Carbonite employees reported internally that the product was not ready and should not be running, but the company decided to launch the product anyway. Id. ¶¶ 47–48. Once it was released, Carbonite rushed out a large patch to try to fix VME's problems. Id. ¶ 51. Carbonite had an internal "tiger team" and a group chat dedicated to troubleshooting VME. Id. ¶¶ 49–51. However, few customers purchased VME and Carbonite's attempts to fix the product were unsuccessful; despite the patches, VME "never once successfully backed up a customer's data." Id. ¶ 52. In early summer 2019, Carbonite made an internal decision to stop selling the product before publicly announcing its withdrawal in late July. Id. ¶ 53.

### 2. Carbonite Emphasizes VME's Functionality and Importance

Despite VME's problems, Defendants made statements during the Class Period emphasizing that VME worked and that it was an important part of Carbonite's portfolio. Id. ¶ 54. On November 1, 2018, a few weeks after its launch, Defendant Ali stated on a call with analysts and investors that VME "significantly improves [Carbonite's] performance for backing up virtual environments and makes us extremely competitive going after that market." Id. ¶ 77. Defendant Folger spoke on behalf of Carbonite at an investor conference on November 15, 2018, noting that VME was a new product, and while Carbonite had not been particularly strong in that market before, "I think we have completely overhauled the product and we have put something out that we think is just completely competitive and just a super strong product . . .." Id. ¶ 79. On December 6, 2018, Folger told a conference that VME was "a really important product for us, and I think it will help us address a pretty big segment of the market." Id. ¶ 57. Carbonite released a press release on February 7, 2019, which quoted Ali saying that Carbonite had

"significantly strengthened our product platform." Id. ¶ 82. This last statement did not specifically mention VME.

On May 2, 2019, Carbonite issued a press release announcing its financial results for the first quarter of 2019 and disclosed that those results were higher than previously forecasted. Id. ¶ 93; Doc. No. 53 at 13. Notably, Plaintiff fails to allege any VME-specific statements after these May 2 financial results (or indeed after the December 6, 2018 statement), though they do allege additional general statements. On a call with investors following the first quarter results announcement, Ali said:

> We have the right product portfolio to serve the broader set of businesses . . . and we have the incredible product, ease of use that businesses have come to know and expect. Our focus continues to be on bringing all of our products together under the unified data protection platform to continue to deliver great value to the market, and we'll be sure to update everyone as we make progress throughout 2019.

Doc. No. 45 at ¶ 97. One month later, on June 10, 2019, Folger spoke at a conference; when asked about macroeconomic changes impacting Carbonite, he responded that they were "not seeing any dramatic changes." Id. ¶ 99. Folger also touted Carbonite's data protection business, noting Carbonite had a "a competitive advantage certainly [i]n enterprise, because we're just so efficient we can store data in such an efficient way that it allows us to price competitively, and we did this in the consumer space." Id. ¶ 101.

### 3. Carbonite Formally Withdraws VME from the Market

On July 25, 2019, Carbonite issued a press release to announce second quarter 2019 financial results and revealed that Ali was resigning from his role as President and CEO, effective immediately. Id. ¶ 64. Simultaneously, Carbonite reduced its financial guidance for 2019 for both GAAP and non-GAAP revenue as seen in the table below:

|  | **Prior FY 2019 Guidance (5/2/2019)** | **New FY 2019 Guidance announced 7/25/2019** |
|---|---|---|
| GAAP Revenue | $457 M - $471 M | $443.5 M - $448.5 |
| Non-GAAP Revenue | $491 M - $505 M | $477.5 M - $482.5 |

See id. ¶ 65; Doc. No. 53 at 14.

On a conference call later that day, Folger told investors for the very first time that VME was being withdrawn from the market and had been removed from 2019 financial guidance entirely. Doc. No. 45 ¶ 66. Folger conceded that VME was "not at the level of quality" that customers expected from Carbonite, and that its withdrawal had led to reduced revenue projections for the rest of 2019. Id. ¶¶ 66–67. He explained that "maybe a third" of the guidance reduction was due to VME's failure.[4] Doc. No. 54-3 at 14. Analysts reacted negatively to the news that VME was being pulled from the market as well as to Ali's resignation. See Doc. No. 45 ¶¶ 69–71. The price of Carbonite common stock dropped by 24%, from $23.90 per share on July 25, 2019, to $18.01 per share on July 26, 2019. Id. ¶ 72. Plaintiff alleges that Defendants made materially false and misleading statements about VME's performance, which caused Carbonite common stock to be traded at artificially inflated prices during the Class Period. Once the product was pulled, the decline in share price "removed all of the inflation from the price of Carbonite common stock, causing substantial economic losses to investors who had purchased Carbonite common stock during the Class Period." Id. ¶¶ 144–45.

### 4. Folger and Ali Sell Carbonite Common Stock

Plaintiff also alleges that Defendants had substantial motives to not disclose the problems with VME; in particular, that Defendants Folger and Ali, as well as other company executives,

---

[4] Folger noted that the remaining two-thirds of the reduction was due to "wanting to ensure that we've got the right baseline around pipeline conversion and large deals" and "trying to set a baseline that . . . [can] set new leadership up for success and allow us to be very comfortable achieving and sort of growing off of baseline going forward." Doc. No. 54-3 at 14.

sold more than $6.4 million of personally-held shares of Carbonite common stock while in possession of non-public information about VME. Id. ¶ 122.

Folger entered into a Rule 10b5-1 trading plan on May 3, 2019, id. ¶ 125, the day after the release of the positive first quarter financial results. During the Class Period, Folger sold 39% of his holdings of Carbonite common stock for proceeds of nearly $2 million, over $1 million of which came from five sales made between May 30, 2019 and July 1, 2019, the months shortly before the announcement that VME was being pulled from the market. Id. ¶ 123–24. Plaintiff emphasizes that Folger sold 7,891 shares of Carbonite stock for proceeds of $203,903 on July 1, 2019—three weeks before VME was pulled from the market and after Defendants admit they were internally aware of VME's problems. Id. ¶ 125. Defendants note that the scrutinized sales were made automatically, either to satisfy tax obligations or pursuant to Folger's Rule 10b5-1 trading plan.[5] Doc. No. 53 at 24–25. Plaintiff notes that Folger sold 15% more of his Carbonite shares during the Class Period than during a 280-day control period prior to the Class Period, from January 10, 2018 through October 17, 2018. Doc. No. 45 ¶ 126. However, Folger ended the Class Period with approximately 38,000 more shares of Carbonite common stock than he had at the beginning of the Class Period.[6] See Doc. No. 54-16.

Ali entered into a Rule 10b5-1 trading plan on September 5, 2018. Doc. No. 53 at 23 n.11. Pursuant to that plan, Ali sold 84,147 shares during the Class Period, which yielded proceeds of $1.975 million. Doc. No. 45 ¶ 127. Ali did not sell any shares of Carbonite common

---

[5] Specifically, Folger's transactions on May 30, 2019, June 4, 2019, and June 17, 2019 were all "shares automatically sold solely to satisfy tax withholding obligations," while the transactions on June 3, 2019 and July 1, 2019 were shares sold automatically pursuant to the Rule 10b5-1 plan. Doc. No. 54-16 at 31–35.

[6] Folger began the Class Period with approximately 74,941 shares of Carbonite stock prior to a sale made on October 19, 2018, Doc. No. 54-16 at 17, and ended the Class Period with approximately 113,911 shares after a sale made on July 1, 2019, Doc. No. 54-16 at 35.

stock during the control period. Id. Ali began and ended the Class Period with approximately the same number of shares of Carbonite common stock.[7] See Doc. No. 54-15.

### B. Legal Allegations

Plaintiff claims Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by making misleading statements in furtherance of a scheme to deceive the investing public and artificially inflate the price of Carbonite common stock. Doc. No. 45 ¶¶ 150–54. Plaintiff further claims that Defendants Ali and Folger violated Section 20(a) of the Exchange Act because they exercised control over Carbonite during the time that Carbonite and its officers allegedly violated Section 10(b). Id. ¶ 155–56.

## II. LEGAL STANDARD

"Under the PSLRA, as with any motion to dismiss under Rule 12(b)(6), we accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008). "In order to survive a motion to dismiss, a complaint must allege 'a plausible entitlement to relief.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 560 (2007)). "For a complaint to state a claim for securities fraud under section 10(b) and Rule 10b-5, it must plead six elements: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Id. (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

Under the PSLRA, a plaintiff's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

---

[7] Ali began the Class Period with approximately 336,360 shares of Carbonite stock prior to a sale made on December 3, 2018, Doc. No. 54-15 at 14, and ended the Class Period with approximately 332,360 shares after a sale made on June 17, 2019, Doc. No. 54-15 at 38.

regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Additionally, the scienter element requires the plaintiff to show "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A). "In this circuit, a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or 'a high degree of recklessness.'" ACA Fin. Guar. Corp., 512 F.3d at 58 (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). "Recklessness in this context is a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Local No. 8 IBEW Retirement Plan & Trust v. Vertex Pharms., Inc., 838 F.3d 76, 80 (1st Cir. 2016) (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 77 (1st Cir. 2012)). "The omission must 'present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Id. (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d at 77) (alteration omitted). "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under Rule 12(b)(6)." Id. at 59 (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999)). Scienter "should be evaluated with reference to the complaint as a whole rather than to piecemeal allegations" and "competing inferences should be weighed against plaintiffs' preferred interpretation of the facts." Id. A "strong inference" of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent." Id. (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007)).

## III. DISCUSSION

Defendants argue that the Consolidated Amended Complaint should be dismissed for two reasons: first, that Plaintiff's allegations do not raise a strong inference of scienter, and second, that Plaintiff does not allege actionable material misrepresentation or omission. Here, Plaintiff's allegations fail to raise a strong inference of scienter by showing "either conscious intent to defraud or a high degree of recklessness." ACA Fin. Guar. Corp., 512 F.3d at 58 (citation omitted). Thus, the Court allows the Motion to Dismiss and limits its analysis to scienter.

Plaintiff points to a variety of individual statements made by Defendants as probative of scienter because, according to Plaintiff, Ali and Folger knew or recklessly disregarded that they were making false or misleading statements about VME's capability. Doc. No. 45 ¶ 113. However, Plaintiff never successfully alleges that Defendants had conscious intent to defraud investors. Certainly, Ali and Folger made statements after VME's launch that the product would make Carbonite "extremely competitive" and that VME was a "really important product." Id. ¶¶ 114–15. Notably, all VME-specific statements alleged in the Consolidated Amended Complaint were made during the product's launch on October 18, 2018 or shortly thereafter.[8] See id. ¶¶ 73–74, 77–80, 115. No facts suggest that Ali and Folger did not reasonably believe when they made these statements that VME's problems could be fixed. Plaintiff notes that Carbonite had a "tiger

---

[8] Plaintiff also alleges several general statements about Carbonite's competitiveness and portfolio to be misrepresentations, see, e.g., id. ¶ 99, but no statements are alleged after June 10, 2019, see id. ¶¶ 99, 101. While Plaintiffs emphasize that Defendants stop stopped selling VME to customers in summer of 2019 before formally pulling it from the market on July 25, 2019, see id. ¶ 53, they do not allege any misrepresentations, VME-specific or otherwise, made during this time.

9

team" that met daily to ascertain VME's functionality and that an internal chat group comprised of "engineers, software architects, and development operations employees" was "dedicated to fixing the many problems with the product." Id. ¶¶ 49–50. Plaintiff would infer an intent to defraud from the development of troubleshooting mechanisms, but a competing inference is stronger here: creating varied teams and rushing out software patches suggests a sincere belief that VME could be made operational with enough work. Moreover, issuing patches and bug fixes following the release of new software is standard fare.

Neither Ali nor Folger's stock sales during the Class Period support an inference of scienter. Ali entered into a Rule 10b5-1 plan prior to the Class Period, and his sales of Carbonite stock during the Class Period were made automatically pursuant to that plan. See Doc. No. 54-15. The purpose of Rule 10b5-1 trading plans is "to insure against being accused of having engaged in a stock sale 'on the basis of . . . adverse material non-public information.'" Stiegele ex rel Viisage Tech., Inc. v. Bailey, Civ. A. No. 05-10677-MLW, 2007 WL 4197496, at *13 (D. Mass. Aug. 23, 2007) (quoting Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003)). "The presence of a Rule 10b5-1 trading plan rebuts an inference of scienter and supports the reasonable inference that stock sales were prescheduled and not suspicious." Harrington v. Tetraphase Pharm., Inc., No. 16-10133-LTS, 2017 U.S. Dist. LEXIS 71274, at *21 (D. Mass. May 9, 2017) (citations omitted). Additionally, Ali possessed approximately the same number of Carbonite shares at the end of the Class Period that he had at the beginning, which also contravenes an inference of scienter. See In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 224–25 (D. Mass. 1999) (noting the fact that defendants "retained 94%, 62%, and 75%" of their stock holdings "suggests that the sales were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values"); see also In re Apple Computer Sec. Litig.,

10

886 F.2d 1109, 1117–18 (9th Cir. 1989) (relative amount of officer's holding sold is important to question whether sales can support inference of scienter).

Folger's stock sales also do not support an inference of scienter. While his trading plan was not adopted until after the Class Period began, three out of the five sales that Plaintiff challenge as suspiciously timed were made to satisfy tax obligations. "Other federal courts have found such sales - i.e., sales to cover tax liabilities - as weighing against an inference of scienter." In re Radian Sec. Litig., 612 F. Supp. 2d 594, 611 (E.D. Pa. 2009); see also Simon v. Abiomed, Inc., 37 F. Supp. 3d 499, 511 (D. Mass. 2014) (considering defendants' tax sales unsuspicious). Folger also ended the class period with over 38,000 more shares of Carbonite common stock than he had at the beginning of the period, which "negates any inference that he had a motive to artificially inflate . . . stock during that period." Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 246 (1st Cir. 2015).

In sum, while VME may not have successfully backed up a customer's data before or after release, the totality of allegations fails to support a strong inference of scienter based on intent to defraud. This is particularly so in light of the substantial efforts to develop or repair VME, the disappearance of VME-specific statements shortly after the launch, the absence of specific operational factual misrepresentations,[9] and the stock sales taken in context.

For Plaintiff to plead scienter by high degree of recklessness, he must show "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Local No. 8 IBEW Retirement Plan & Trust, 838 F.3d at 80. This Plaintiff has not done.

---

[9] Cf. In re Allaire Corp. Secs. Litig., 224 F. Supp. 2d 319, 328–29 (D. Mass. 2002) (describing software company's fraudulent statement that they had "completed successful beta testing at more than 500 sites").

The facts that Plaintiff pleads show that VME did not work (at the outset or ever), but they do not show that Carbonite and its officers acted beyond the level of "inexcusable negligence" with regard to the statements they made to investors. Under Tellabs, the Court must consider "competing inferences rationally drawn from the facts alleged." 551 U.S. at 314. Here, a competing inference—that Carbonite believed VME was fixable—is more cogent and compelling than Plaintiff's inference of extreme departure from the standards of ordinary care in light of the various allegations describing patches and repair efforts. Moreover, nothing suggests Defendants' optimism transformed into recklessness during the Class Period.[10]

The first quarter 2019 results exceeded expectations, suggesting that Defendants did not anticipate meaningful revenue or sales from VME until later in the fiscal year. In fact, the Complaint alleges that Folger told investors that VME was "something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020." Doc. No. 45 ¶ 66. By the end of the second quarter, Defendants had withdrawn VME. In the end, Carbonite's optimism was misplaced. Going forward with the product launch may have been a poor business decision, especially with the benefit of hindsight, but "[a]llegations of corporate mismanagement are not actionable under Rule 10b5." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 760 (1st Cir. 2011). The timeline of the launch and withdrawal does not support the inference of a high level of recklessness.

Further, there is no factual allegation that Defendants Ali and Folger were on notice at any point prior to VME's withdrawal from the market that VME had no hope of working. Without that allegation, Plaintiff cannot show that Ali and Folger's statements were sufficiently

---

[10] To the contrary, VME-specific statements disappeared, suggesting, if anything, that optimism mellowed, and Defendants accordingly tempered or adjusted their public statements.

reckless to prove scienter. Plaintiff alleges that "because of their positions within the Company," Ali and Folger must have known that VME could never be functional and that any representations made about it would be false and misleading. Doc. No. 45 ¶ 24. However, "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information . . . Without more, Plaintiffs fail to meet the PLSRA requirement to state with particularity facts giving rise to a strong inference of scienter." PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 688 (6th Cir. 2004); see also In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 228 (D. Mass. 1999) (allegations that defendant must have had actual knowledge of false statements or reckless disregard for the truth based on board membership or executive position are insufficient to raise a strong inference of scienter).

Plaintiff points only to the fact that Folger made the announcement that Carbonite would be pulled from the market as indicia of his "access to information" about VME. Doc. No. 56 at 34. That Folger made a formal announcement on behalf of Carbonite fails to suggest that he knew throughout the Class Period that VME did not work and could never work. As the First Circuit has noted:

> In cases where we have found the pleading standard satisfied, the complaint often contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so. No such direct evidence is pled in the complaint here.

In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 31 (1st Cir. 2012). Plaintiff claims that employees "reported internally" that VME was not ready prior to its launch, Doc. No. 45 ¶ 47, but no "direct evidence" is pled connecting any such reports to Ali and Folger.

In addition to the absence of allegations supporting knowledge, the substantive allegations are insufficient for scienter by recklessness. The factual allegations describing

13

VME's problems lack context or weight. The Consolidated Amended Complaint is devoid of allegations that at launch time (or at any point prior to withdrawal) anyone thought VME could never work. Nor does the Consolidated Amended Complaint contain any allegations regarding the nature or scope of the problems with VME. While Plaintiff alleges Defendants launched VME without achieving a successful customer backup, that bare allegation does not describe an extreme departure from the standard of care, at least in the software industry, in the absence of any other further allegations and in the context of a product for which the company does not anticipate meaningful sales or revenue for at least six more months. The Court has also considered whether the ultimate failure of VME to ever operate successfully suffices to support a reasonable inference that at the time of launch, the Defendants consciously knew it would fail or at least recklessly released the product. See In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 329 (D. Mass. 2002) (plaintiff claimed "fraud by hindsight" by arguing that the "subsequent dire performance of the product was so bad that it supports an inference that the Defendants must have known the dire truth when they made the statements"). But in contrast to Allaire, which had detailed and specific factual allegations, the Consolidated Amended Complaint does support an inference of fraud by hindsight because of the lack of specific, contextualized allegations.

Finally, Plaintiff points to the resignation of Defendant Ali as CEO following VME's withdrawal from the market as evidence of scienter. They characterize his departure as "sudden and unforeseen" and "suspiciously timed." Doc. No. 45 ¶ 119–121. "The problem with the Plaintiffs' allegation is that they bring no other facts to support the conclusion that the resignations indicate scienter. The Plaintiffs rely solely on the timing of the resignations . . . This is not enough to build up the scienter inference." Washtenaw Cty. Emples. Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 112–13 (D. Mass. 2014). The inference Plaintiff wishes to draw is

further undermined by the fact that Ali was named CEO of International Data Group, a technology media company, on the same day as his resignation from Carbonite. Doc. No 54-13 at 4. "[T]here are any number of reasons that an executive might resign, most of which are not related to fraud." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005). Claims about Ali's resignation are insufficient to raise an inference of scienter.

Simply put, considering the allegations of the Consolidated Amended Complaint as a whole under the governing legal standard, Plaintiff has failed to allege recklessness defined as an "extreme departure from the standards of ordinary care." Local No. 8 IBEW Retirement Plan & Trust, 838 F.3d at 80 (1st Cir. 2016).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss both counts of the Consolidated Amended Complaint is ALLOWED.[11]

In one sentence at the end of their opposition to the motion to dismiss, Plaintiff has requested leave to amend the Consolidated Amended Complaint again. Doc. No. 56 at 39. Plaintiff filed this lawsuit on August 1, 2019, over fourteen months ago. Doc. No. 1. This action was one of several virtually identical actions filed contemporaneously all of which were consolidated into the present action on November 21, 2019. Doc. No. 36. Pursuant to an agreed-upon schedule, Plaintiff filed the operative Consolidated Amended Complaint on January 15, 2020, Doc. No. 45, Defendants filed their pending motion to dismiss on March 10, 2020, Doc No. 52, and Plaintiff opposed on May 4, 2020, Doc. No. 56. In the months since the filing of the motion (or in the months before) Plaintiff has never submitted a proposed second amended

---

[11] Liability under Section 20(a) requires a "primary violation," so Count II of the Consolidated Amended Complaint fails along with Count I. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 84 (1st Cir. 2002).

complaint, asserted that a further amended complaint would cure the deficiencies in the operative complaint, identified the additional allegations it would advance, or explained how additional allegations would cure the deficiencies in the operative complaint. Accordingly, this request to amend is denied, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

SO ORDERED.

　/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge