UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - - - - x

RUBEN A. LUNA, Individually and on     :
Behalf of All Others Similarly
Situated, et al.,                      :     Civil Action No.
                                             1:19-cv-11662-LTS
        Plaintiffs,                    :

   v.                                  :

CARBONITE, INC., et al.,               :

        Defendants.

- - - - - - - - - - - - - - - - - - - x



BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


VIDEOCONFERENCE MOTION HEARING



Thursday, October 15, 2020
11:05 a.m.






John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

    ROBBINS GELLER RUDMAN & DOWD LLP
    BY:  ROBERT D. GERSON AND DAVID A. ROSENFELD
    58 South Service Road
    South 200
    Melville, New York  11747
    (631) 367-7100
    rgerson@rgrdlaw.com
    drosenfeld@rgrdlaw.com


    HUTCHINGS, BARSAMIAN, CROSS AND MANDELCORN, LLP
    BY:  THEODORE M. HESS-MAHAN
    110 Cedar Street
    Wellesley Hills, Massachusetts  02481
    (781) 431-2231
    thess-mahan@hutchingsbarsamian.com


On behalf of the Defendants:

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    BY:  JAMES R. CARROLL AND IMMANUEL FOSTER
    500 Boylston Street
    Boston, Massachusetts  02116
    (617) 573-4800
    james.carroll@skadden.com
    immanuel.foster@skadden.com

**P R O C E E D I N G S**

(In open court.)

THE DEPUTY CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

Today is October 15th, the case of Luna vs. Carbonite, Inc., et al., civil action 19-11662, will now appear before this Court.

Counsel, please identify themselves for the record.

MR. HESS-MAHAN:  Theodore Hess-Mahan, liaison counsel for plaintiffs.

MR. ROSENFELD:  Good morning, Your Honor.  David Rosenfeld from Robbins, Geller, Rudman and Dowd on behalf of the lead plaintiff.

MR. GERSON:  Good morning, Your Honor.  Robert Gerson, an associate at Robbins, Geller, Rudman and Dowd, on behalf of the plaintiff.

MR. CARROLL:  Good morning, Your Honor.  James Carroll on behalf of Carbonite, Mr. Ali, and Mr. Folger. With me, but out of the picture, is my colleague, Immanuel Foster.

THE COURT:  Good morning to all of you.

All right.  I will -- give me one moment.  In this COVID world, everything is not quite as well set up as the courtroom.

Okay.  So Mr. Carroll, it's your motion, so I'll hear you first.  I do have a copy of your slides.  I printed them out.  I haven't read them, but I printed them out.  So you can share your screen if you want, but you don't have to because I can look at them here.

I assume you sent them to the other side, too?

MR. CARROLL:  I did, indeed.

THE COURT:  Okay.  Go ahead.

MR. CARROLL:  Your Honor, thank you very much.  And thank you to Your Honor's courtroom team for the help facilitating the logistics.

To set the table for my argument, Your Honor, I'm going to attempt to do three things.  First, some very brief background and --

THE COURT:  One thing that I just do want to say to both of you --

I apologize for interrupting you.

I've read all the papers.  I've read the amended complaint.  And so we're all clear, one, you don't have to say everything that's in the briefs, because I have read them, and you don't waive anything by not saying it.  The only way you waive something is if, in this hearing, you say, "I waive," whatever.  So if you didn't have this hearing, you wouldn't have waived anything.  And so if you talk about one thing, but not the other nine things -- so I

just tell you that to keep that in mind.

And second, one thing that's helpful, I found, on these Zoom hearings, I think you're all by and large doing it, but when you're not talking, if you mute yourself, then you don't switch the speaker source inadvertently because there's background noise, or what have you. And I'll do the same.

And likewise, if you see Rachel, the court reporter, wave or something, it usually means there's a problem, and we'll have to stop for a moment.

MR. CARROLL: Thank you, Your Honor. I don't intend to regurgitate the briefs, and I will attempt to be reasonably concise.

The three things I want to do is talk a little bit about Carbonite and what Carbonite is and was until it was acquired at the end of last year. I do want to take a brief tour through the misstatements that are alleged in the complaint, and there's not so many of them that it's not a very manageable task, and then, respectfully, at the end of my remarks I'd like to address the one-line request made at the very, very end of the plaintiffs' opposition memorandum to file yet another complaint.

So first, a very little bit about Carbonite, again, until it was acquired at the end of last year, located in downtown Boston, originally started in 2005 as an independent

software company, developing software principally for consumers, software that would do things such as backup your photos or backup your videos. Over time, it innovated and transformed to be something in the order of a 1,000-employee business-oriented company that offered dozens of data protection software products, data backup, and data security products with a myriad of features and functions, some of those developed organically by developers here, and some of them came with a number of acquisitions that Carbonite did over the years.

In October of 2018, Carbonite introduced, at the same time, two new products to its already extensive platform. The products were the data protection console, which Your Honor will see in the papers. I'm not going to talk about it much here, because it's not the one that's at issue in the case. And the second one was the server backup VME Edition, or "VME" for short. That was a data backup solution for virtual machines. That was a new product that Carbonite had not had in its arsenal prior to the announcement in October of 2018.

Now, as with the launch, I think, virtually of any product in any industry, Carbonite made optimistic statements about its hopes for the VME product as it was launching it into the market, but success of any new technology, and perhaps particularly software, is never guaranteed.

Carbonite had long cautioned investors that its new solutions to address new environments and new challenges could have defects, errors, could have failures in the design or failures in the performance.  And that's a disclosure that had been out there even before the class period and, indeed, with respect in particular to software solutions designed to address virtual environments.  And as we know, the VME software, it turned out to have bugs and reliability problems that prevented it from being the success that Carbonite hoped it would be.

As consistent with the allegations in the complaint, Carbonite worked feverishly to improve the product during the period of time after the launch, but ultimately decided to withdraw it in July of 2019, which marks the end of the class period here.  So the class period alleged by the plaintiffs begins with the launch of the VME product and ends with its withdrawal from the market in July, about nine months later.

Now, that date of the withdrawal, July 25, 2019, on that same day the withdrawal was announced, there were two other things announced, as well.  The first was the resignation of Mohamad Ali, the then CEO of Carbonite, and it was announced that he was leaving Carbonite to pursue another opportunity.  And indeed, it's a matter of public record what that opportunity was, because another much larger local

technology and media company, IDC, announced on that very same day that he had been appointed the chief executive officer of the larger company.  That was announced that day.

Further, on the 25th of July, 2019, was announced that Carbonite was reducing its forward-looking earnings guidance.  Carbonite provided earnings guidance to the market.  It updated it in July of 2019 and reduced the guidance a little bit, three percent at one end of the guidance, five percent at another end of the guidance.  So that all happened on the 25th of July, 2019.

The next day, July 26th, the stock dropped about 24 percent, and very, very shortly thereafter, this securities fraud class action was filed.

Now, the theory in the case is that Carbonite knew that the server VME product didn't work and wasn't going to work from the very beginning, from even before the class period started.  And so plaintiffs' theory, as it goes, essentially, is that with the knowledge that this was a defective product, Carbonite, nonetheless, trained its sales people to sell it, trained its customer support people to support it, made a public launch of it into the market with its customers, worked feverishly to try and fix it, all the while knowing that it wouldn't work and it never worked.

And why is it, according to the plaintiffs, that that sort of exercise took place?  It was, so the story goes,

to permit Ali and Folger, the two defendants in the case, CEO and CFO at the time, to sell stocks at fraudulently inflated prices.  That's the case in a nutshell.  The stock sale allegations -- and I'll come back to them later -- don't work both because Ali's were all done pursuant to 10b5-1 plans that preexisted even the class period, and Mr. Folger's -- he sold stock during the class period, pursuant to 10b5-1 plans, but wound up with more -- owning more shares of Carbonite at the end of the class period than he had at the beginning.

Now, it's all too easy and, frankly, Your Honor, all too common to see a securities fraud class action case filed immediately following a stock drop, and because of that ease, special pleading rules apply.  And those rules, most particularly the requirement that facts, not conclusions and not suppositions, but facts supporting a strong inference of *scienter* be pled, are really the gatekeeper rules that apply here.  And against that backdrop, what I'd like to do, with the Court's permission, is just take a quick tour through the allegations that are alleged to be the misleading allegations and why it is they don't come close, respectfully, to meeting the pleading standard.

If I could -- if I could share the screen.

THE COURT:  Okay.

MR. CARROLL:  I know it's not my job to ask questions, but are you able to see this screen?

THE COURT:   (Nods head.)

MR. CARROLL:   Thank you very much.

So the misrepresentations alleged in the case, number 16 -- and I'd respectfully submit, Your Honor, they fall into four groups, and I'll deal briefly with each group.

So the first group, seven of them, they actually do concern the VME product.  And as we'll see, all of those seven alleged misrepresentations were made either on the very day of the product launch, before it's out into the market, or within about three and a half weeks of the product being launched.  So before it's really out in the market and feedback can be had from endusers in the market.  So that's -- those are the statements.  That's the first group that actually deal directly with the VME.

Five of the 16 deal with Carbonite's technology, generally, and statements that refer to their platform and their catalog of products and don't make any specific reference to the VME.  Two refer expressly to other products, not at all at issue here, having nothing to do with the VME.  And the final two of the challenge statements are classic forward-looking guidance that were accompanied by cautionary language.  And those two, we submit, Your Honor, are exactly what is meant to be within the PSLRA Safe Harbor Bill.

So I'm going to go back very briefly through each one of those four categories of alleged misstatements.

This chart has a lot going on, but this is the chart that deals with those alleged misstatements that actually directly concern the VME product.  In the middle of the slide, you'll see I've put a timeline there showing the class period.  At the very end there's July 25th, when the withdrawal of the VME product was announced.  And at the beginning, October 18th, that's the very start of the class period, with the launch of the product.

The numbers in the red parenthesis that are shown, those are the challenge statements, the first seven of the challenge statements that deal with this.  And the first thing you'll be struck with, of course, is that all of these statements are right either at the very day the class period begins, or shortly thereafter, before the product has been out in the market.

And the nature of the statements themselves are statements of optimistic -- optimistic opinion, as terms of the hopes of the product.  And I'll just give you a couple examples, Your Honor.  If you look, for example, at Statement 5, "The new solution makes it much easier for midmarket companies to buy and deploy."

Statement 6, "I think we are feeling very good about having delivered not only the Console" -- that's the other product that was announced on the 25th, "but also the integrated VME, and we think it's a super strong product."

These are classic statements of corporate optimism made at the beginning of the product launch, Your Honor, and they were made in an environment -- I have quoted it at the bottom, I won't dwell on it.  It's in the briefs.  They're made in an environment where the company has risk factors out there and in the marketplace that talk about the risk of product defects, errors, failures, and performance.  That's the first seven statements.  I'd respectfully suggest, Your Honor, they don't come close to being material misstatements of fact.

I'll go to the second grouping, please.  The second grouping are five of the 16.  And these are challenge statements where, read in context, what the statements are talking about is Carbonite's technology more generally, its platform, it's suite of products, of which there are many.  And these statements are also statements of opinion.  You'll see they all talk about I think this, I think that, but they're not even referring to the VME.

So take a look at the very first one, by way of example.  There's a question asked at an analyst conference, Morgan Stanley conference, February of 2019, and there's a question posed to this CEO at the time, whether there's gaps in their product offering.  And he opines, "I mean, there's always gaps, but I think we have probably -- we have filled probably well over 90 percent of the gaps."

That's not a statement of fact with respect to the VME; that's a CEO commenting on his product portfolio. And he talks about what he thinks, and he uses the word "probably." Not the stuff a securities fraud case is made of.

I won't do them all, Your Honor, but if you look at the bottom box on this slide, it's talking about a question about what's going on on the macroenvironment and what's the demand environment with endusers. Are you seeing any changes? He's talking about what are you seeing in the macroenvironment to the software business. Nothing here about the VME, even. It doesn't even touch on it.

Oh, and jump ahead to the third group.

Go two slides, please. One slide back, please.

So two -- this is the third group. This is two statements that are challenged in the complaint, and I've got the paragraphs in the complaint listed there.

Two of the challenge statements don't -- don't -- not only just refer not -- not refer to the VME; rather, they refer specifically to other products. So the first one, there's a talk about the company's data centers. The company has data centers among what they do that store data for people. Not the server VME product at all. And the statement is talking about what they think about their data centers and it says, "Well, we're so efficient, we can store

data in such an efficient way, it allows us to price competitively.  We did this in the consumer space."

This is one of the statements that the plaintiffs say is fraudulent.  It has nothing to do with the VME.  It has to do with the data centers.  That's not the VME.

Finally, the bottom box there, Carbonite acquired a company called "Webroot," and that company had certain endpoint security products.  And the company talked as to what makes us a leader in endpoint data protection -- again, not about the VME at all, about a different product.

The final group, Your Honor, I mentioned earlier. That's the two forward-looking guidance provisions to the market.  Carbonite provided its forward-looking guidance of how it thought it would do in terms of revenues for the full year, 2019, and as I mentioned earlier, it had adjusted them downward.  This is classic forward-looking guidance.  It's accompanied by cautionary language, and it's exactly the kind of statement protected by the Safe Harbor of the PSLRA.

Now, with that as the background of looking quickly at each of the challenge statements, how, then, does the complaint attempt to say that there's some sort of scienter here?  Putting aside that these aren't actionable statements and they're really statements of opinion or puffery or optimism, putting that aside, what does this complaint attempt to do to try to allege scienter?  And I submit, Your

Honor, it does three things.

The first thing it attempts to do is it alleges, well, your CEO resigned on the same day that it was announced that the product, the VME server product, was being removed from the market, and therefore, that somehow suggests some insinuation of scienter.  But that turns a blind eye to the fact that the CEO, it's a matter of public record, gave himself a promotion by accepting a CEO of a much larger -- CEO position of a much larger company, and that's the very same day.  No inference can be drawn there beyond that, that Mr. Ali left one job to take a bigger job.  That's, respectfully, the only fair inference that can be drown.

The second thing the plaintiffs do in the complaint is they point to certain alleged facts and say, "Well, these are omissions, and here are some facts that should have been disclosed."  But we'll look at them, and none of them are particularized and none of them are tied to either Mr. Ali, nor to Mr. Folger.

And the last point I'll come to on this section is the insider trading allegation.  So we've talked about the resignation of Mr. Ali, the *ModusLink* case.  The *Metzler* case involving Biogen considered those same questions about executive resignation.  What's here is not nearly enough to support an inference of scienter.

Let's go quickly and take a look at the omissions,

please.  I'm not going to do all of them.  I've just given examples, but these are the examples that are emphasized both in the amended complaint and also emphasized in the opposition brief.  So the plaintiffs claim that there's an omission with respect to the fact that there was a so-called tiger team, and this tiger team was concentrated on the VME. It would meet on a daily basis to work on fixing the products with the problem.

Well, first of all, there's nothing unusual about a software company having launched a new product, having people dedicated to work on bug fixes.  My Apple iPhone, which is just a marvel of technology, when I get a new one, when it comes out, I get bug fixes and patches and updates all designed to respond to user issues that have been noticed once a product has been in the field.  But even this allegation says nothing with respect to Mr. Ali or Mr. Folger.  It says that there's a tiger team.

We cited the fact that that's the form, but what did this tiger team say?  Did they have any connection to Folger or Ali?  It doesn't even say who the members were, how senior they were, whether they even spoke to either of the defendants.

Similarly, there's reference to a chat, that a chat room was used by the people working on the project.  It says there was a chat room, but it doesn't say what any of the

chat said.  There's no allegations in the complaint as to who was in the group, whether the group involved Mr. Ali or Mr. Folger.  All of those kinds of particularized facts are absent from the complaint.

Next page, please.

Just do two more of these, Your Honor, which says, again, same theme.  There was a rush to fix hundreds of bugs found in the software.  Carbonite employees communicated internally about that.  Well, I don't how you can do bug fixes without internal communications, and I don't see how there was anything that supports an inference of scienter to say there were bugs in the product.  But the complaint doesn't say anything to tie this information to the defendants.

Similarly, with respect to the allegation about the product -- there being a prelaunch beta test of some customers and it not -- the product not performing, nothing in the complaint gives any details on that.  Nothing in the complaint ties that alleged fact to the Defendants Folger or Ali.  There's just nothing there.  Those allegations leave you with questions that the complaint does not answer.

So -- next, please.

The final attempt the plaintiffs make to try and infer scienter is the stock trading that I touched on very briefly at the beginning.  Every one of Mr. Ali's trades were

made pursuant to a preclass period 10b5-1 plan. Most of Mr. Folger's trades were, as well. Those that were not were made pursuant to a 10b5-1 plan that was consistent with his history of entering into 10b5-1 plans in May of the -- in May of the year, prior to the June delivery of his compensation that included the stock units to be sold. The rest of them are all sold expressly to satisfy tax obligations. And Your Honor, this is all a matter of public record.

I appreciate the appendix on this motion is voluminous, but they're all in there demonstrating that they're all pursuant to 10b5-1 plans and the dates that those 10b5-1 plans were entered.

So I've talked, Your Honor, about what is in the complaint. I want to dwell for a moment on what's not in the complaint. This complaint is entirely made on information and belief. There are loads of cases that emphasize how cautiously information and belief allegations need to be taken. There's no allegations of any so-called confidential witnesses with factual information that could be used to bolster the credibility. There's no reference to any internal, contemporaneous document that could be used to support an inference of state of mind. None of those things that are typically found in a complaint sufficient to pass muster under the PSLRA are in this complaint.

What the plaintiffs offer is a rote paragraph at

the beginning of the complaint that says everything is on information and belief, including interviews of former employees.  But nothing whatsoever is said with respect to who those employees are, not by name, but not even by title, no suggestion that there's been any information that formed the basis of this complaint by anyone who had access to senior management at the company.  So in a word, effectively, none of the hallmarks of a particularized pled complaint can be found in this complaint.

And Your Honor, it's been seven months since we had the motion to dismiss and over a year since the complaint was filed.  There has been, respectfully, plenty of time.  If plaintiffs had facts to put into an amended complaint, a further amended complaint, there quite respectfully has been plenty of time to do it.  It's not the Court's job, and it shouldn't be the defendants' burden to comment seriatim on multiple amended complaints.  And we respectfully submit that having had that time, the plaintiffs have had the adequate opportunity and there ought not be any further amendment here.  The plaintiffs' request for one is entirely unaccompanied by any explanation whatsoever as to how any amended complaint would be different or better than this one. We ask, please, Your Honor, that this case be dismissed now and with prejudice.

THE COURT:  Thank you.  I think at the moment, I

don't have any questions.  That's very helpful.

I will hear from -- which one of you for the plaintiffs?

MR. GERSON:  Robert Gerson, Your Honor.

THE COURT:  Go ahead, Mr. Gerson.

MR. GERSON:  Your Honor, defendants chalk this case up to nothing more than a bad business decision, that any new product experiences issues.  I think everyone here on this Zoom call would agree; it was a bad business decision to launch VME.

But this case is not about the fact that it was a bad business decision.  This case is about the fact that they made affirmative, positive statements about VME after they made that decision, and that is why we have a claim for securities fraud.

Right from the beginning, on November 1, 2018, Mr. Ali, the CEO of the company, states directly to investors on an earnings call, this new product we have, the server VME Edition, it, quote, Significantly improves our performance for backing up virtual environments.

And not just that, he goes on to tell investors, "It makes us extremely competitive in going after that market."  It's not a statement of hope, it's not a statement of optimism.  It's not a statement about the future.  That's a statement that right now we've got this new product, and

Carbonite is a competitor right now in the VM backup market because of this product.

These are part of his prepared remarks, Your Honor. They weren't off-the-cuff statements. They're on an earnings call. They prepared remarks for the call. Two weeks later, this time the CFO of the company, Mr. Folger, says, "Our new product, the server VM edition, is just completely competitive and just a super strong product." Again, right now. But it did not even work. This case is not about the fact that VME had bugs; this case is about the fact that VME was a backup product that did not backup data.

THE COURT: What if the day before he gave the statement that you just mentioned, the engineer, chief engineer in the team, overseeing the development of the product and the bug fixes, said, "Hey, great news. You know, I've been telling you that I thought we could fix it. We just fixed it. It backed up somebody's -- it backed up beta customer 2's data and restored it. I think we -- I think we've turned the corner, and it worked. And I -- I think we should be able to work out." You know, can he then say the things he said?

MR. GERSON: Well, perhaps. But Your Honor, that's not what happened here. The information that we have pled in this complaint makes clear that this product didn't work before it was launched, and it didn't work while it was

launched.

You know, Your Honor, the federal securities laws do not create an affirmative duty on the part of the company to disclose everything about their business practices.  But if they choose to speak, those laws require that they do so in a manner that does not leave a false or misleading impression.

And that is what happened here.  They spoke directly about this really important product, without even a whisper ever once suggesting to investors that there was anything remotely wrong with the product.  By volunteering relevant material information, they assumed an obligation to tell the whole truth.  There's a duty to make it complete and accurate.

Defendants' brief and counsel's argument, they take the kitchen sink approach.  They try to slice and dice all of the alleged misstatements to knock out this rather straightforward case.  But what you don't read and what you have not heard this morning is, "Your Honor, they're wrong.  The VME did work.  It was working before we launched it.  It did make us competitive on day one."

A company's statements must -- once made, must not be so incomplete as to mislead.

You know, they point to the fact --

THE COURT:  Did they launch a product -- suppose

they said that in June -- that a class period starts -- I forget exact what date.  Was it October?

MR. GERSON:  October of 2018.

THE COURT:  So suppose in June or July, the CEO says, you know, "I'd like to have a discounted product, because I think it would fill out a gap in our portfolio.  Go develop it, and tell me what you think," and meets with the engineers in September.

And they say, "Yeah, you know, we think we could develop that.  Here's the design.  Here's how it looks.  We got the user interface all done.  It looks great, slick, easy to use, be really simple, easy to use."

CEO says, "Awesome," all in on the user interface, and the engineer says, "Now we just have to develop the guts, make the thing work, do it.  And but I think -- yeah, I think we can do that."

And so CEO has the press conference and says, "Well, we've got this new product.  We're launching it this year, you know, we're launching it now.  It's going to be great.  It's a great product.  And of course, it's not done yet.  We haven't backed anybody up yet.  It's just not done. It doesn't work, because they haven't finished it.  And it might work and of course no one knows for sure whether it will work until it is finished."

Can he do that, or does he -- is that crossing the

line?

MR. GERSON:  Is what crossing the line, Your Honor?

THE COURT:  Well, he's got -- he launched it.  It's a great product.  It says all the same things that Ali said on the October date, but the product is not done yet.  The engineers, they got the user interface done.  It looks great.  It's vaporware.

You've heard that term, right?

MR. GERSON:  Yes.

THE COURT:  And so the user interface looks great.  It's done.  It's slick.  It fills a marketing need for them, but the engineering guts that make it work, the code, hasn't all been written.  It's been sketched out.  The engineers think they can do it.  They think it will work, but it doesn't actually work.  It's not done.  It's not actually operational or, you know, it's a little ways away.

And the financial guidance is we're back-ending, you know, in terms of sales and revenue for this fiscal year, we're back-ended -- you know, we haven't baked in much of anything for the first half of the year.  We expect significant revenue from it second half of the year and the following fiscal year.

And can he say those -- can he come back and say what Ali said, if that were the facts?

MR. GERSON:  Well, Your Honor, I mean, again -- I

appreciate your question, but what matters here is that they said these things to investors about this product that didn't work, and they pull it because those things didn't happen. The problems weren't salvageable.

THE COURT:  Well, right.  But what I'm trying to get at -- and I'm glad you appreciate my question, but what I'm getting at is what is the line -- I'm trying to figure out where the line -- obviously, it's easy if they had no product, they never -- no one had written anything, it was nothing.  He just stood up and said, "We have it," and that was completely fake.  Right?  That's a super simple case, and the other case is really easy.

They have the whole product, and it went through beta testing and all the beta testing came back and they have little issues.  But it was working.  And they released it, and then the thing, three months or some period down the road, blew up on them and they withdrew it.  That's also a different case and --

What I'm trying to probe is the line between where they, you know, can launch it and say what Ali said when it's a little -- you know, where it is on this line of how -- how far do they have to have it done before they can say it?

MR. GERSON:  Right.  Right.  No, I understand.  I mean, they can launch a product, perhaps, maybe, if it has bugs.  I mean, they talk about bugs.  You know, Apple will

maybe release an operating system with bugs, but its main functionality, the main thing that it's supposed to do still works.  And the issue here is that the main functionality of the product did not work.  It was a backup product --

THE COURT:  I think some of your colleagues probably sued Apple for some of the iOS releases on the grounds that it didn't work, because it drained the battery too fast, or -- even though it performed all the other functionality, or what have you.  But I hear your point.

MR. GERSON:  Right.  I mean, this -- again, bugs are bugs.  A backup product that doesn't backup is a different story.  A car with a flat tire is an issue.  A car without an engine that can't take you anywhere, I mean, that's what it is.  This didn't work.  So you know, perhaps -- you know, again, they say, "We told investors.  We warned about this."  They point to these boilerplate and generic risk disclosures about all of their products.

And one of the statements, actually, that they point to, Carbonite got rid of in the middle of the class period.  So they have this statement that they point to.  They say, "We are in the process of addressing challenges of dynamic and accelerating market trends."  So Judge, the changing PC market and the adoption of the mobile devices, the increase in the use of virtualized environments.

Now, their brief actually cut out the whole part

about the challenge of dynamic and accelerating market trends. They say -- the brief reads, "We're in the process of addressing challenges about the increase in the use of virtualized environments." But they were actually -- if you look at the 10-K, they were warning about market trends, so they had nothing to do with the issue here. This was a product that did not work.

And again, as Judge Young held in the *Allaire* case, you know, defendants' statements -- they made statements, you know, relative to other companies. "This thing makes us extremely competitive." As Judge Young held, "When a company initiates a comparison with other company's products, it must fully disclose."

That's 224 F.Supp.3d, at 332.

For example, you know, defendants -- counsel makes the argument that -- essentially that, you know, statements can only be false if they actually talk about the product; that many of the statements here weren't false, because they didn't say the words "VME." But again, I think the *Allair*e case is instructive there.

There, the Court held actionable the following statement:

"The products in our platform" -- similar to here. "The products in our platform are not constrained by a need to support or promote a particular legacy technology or

particular operating system."  That's 224 F.Supp.2d, at 332.

Now, there, Judge Young found that one product on the platform, this product called "Spectra," did require particular legacy technology, and that statement is actionable.

The same thing is true here with respect to the statements made about Carbonite's data protection platform. They told investors right away, "This thing is competitive. This thing is a super strong product."

Now, they -- Mr. Carroll talks about statements of optimism and statements of hope.  I think, Your Honor, your decision in the *Talbots* case is instructive here where you have that the context is key.  These statements were all in the context of this new product.  And Your Honor held that -- you look at whether a statement is so vague, so general, so loosely optimistic and, also, you know, whether a statement is material or not.

Here, investors would very well have wanted to know that this, quote, really important product defendant said was going to meaningfully contribute to revenues this year, didn't actually work.  Their puffery arguments fail.

THE COURT:  Does it matter at all -- nobody argued about this, but I'm just wondering, does it matter at all to the significance of any of the statements, the materiality of the statements, or to the scienter analysis that the -- it

seems that the stock, starting at the beginning of the class period, just went, as a general proposition, down, down, down, to the end.  And then they made the announcement at the last day of the class period, and then, boom, it dropped 25 further percent.

So I am just wondering, did anybody really even care about this product?  I understand the company cared about it, but did the market really care that much about this product?

MR. GERSON:  Well, certainly, Your Honor, we would submit that it does.  But on the day that they announced that they were pulling it, the stock dropped almost 25 percent.  And the analysts were sure to call out that this time it was because, you know, Carbonite disappointed yet again.  This time it was because of a failed product.  So both analysts and investors themselves certainly cared about this product.

In addition, Your Honor -- so you know, again, boilerplate, cautionary language, our products, generally.  Nothing about here, nothing about this ongoing problem, nothing about this product that doesn't work.

Separately, Your Honor, defendants had an affirmative obligation to disclose the known risks and uncertainties associated with this issue, under Item 303.  This is a classic Item 303 uncertainty.  We allege that the product and its potential impact on Carbonite's business

constituted a known uncertainty that defendants reasonably expected would have had a material unfavorable impact on the company's financial condition.  We don't allege the failure to disclose a trend.  The uncertainty here is that the product did not work, and we don't know when it's going to work.

They conceded that VME was supposed to meaningfully contribute to revenues.  But if it doesn't work, it's not going to meaningfully impact revenues.  There's a known uncertainty associated with that, and investors had no clue about this.  That should have been disclosed in the SEC filings.

And as the First Circuit held in the *Silverstrand* case, plaintiffs need only raise a reasonable inference that the defendants had knowledge of this Item 303 uncertainty.  Here, they admit what the problems were --

THE COURT:  You still need scienter, even if there's a 303 issue?

MR. GERSON:  You need the reasonable inference that the defendants had knowledge.

THE COURT:  But then what about -- do you still need scienter?

MR. GERSON:  You need -- it's not necessarily the same level for a -- an Item 303 claim.  The *Silverstrand* court, 707 F.3d 95, First Circuit, 2013:

"Plaintiffs need only allege a reasonable inference defendants had knowledge."

Moving on to scienter, Your Honor, again.  When evaluating a motion to dismiss, court must assess the complaint holistically.  The scienter inquiry is taking all the facts alleged collectively, whether -- not whether one individual allegation or not, whether it meets that standard.  Plaintiff can combine various facts and circumstances indicating a fraudulent intent to show a strong inference of scienter, and here the complaint does that.  Defendants launched a really important product that plainly did not work.  They spoke favorably about it, and they never hinted that anything was wrong.

The problems were so bad, the Defendant Folger and others finally made the internal decision to pull it from the market.  They decided, "We're not going to fix this thing."  Perhaps they launched it with the hope that they would fix it, but their false statements caught up with them.  They said, "All right.  We've got to pull this thing."  Before they came clean on the truth about it, they sold a significant amount of their stock, each reaping approximately $2 million in proceeds.  And on the very same day that they do this, Defendant Ali, the CEO of the company, resigned, effective immediately, and without a replacement.

And courts have held that that, in itself, is

suspicious, if he resigned on that same day.

THE COURT:  He got a bigger job.  I mean, if he resigned from Carbonite -- no disrespect to Carbonite -- because he got a job as CEO of Apple, like, kudos to him.  Like everybody doesn't -- and the fact that there was no replacement, I don't think there's a circuit in the country who would think that that scenario suggested that his resignation without a replacement suggested anything nefarious.  I think the obvious conclusion would be he got an opportunity to make 100 times as much money and a much bigger professional opportunity, and he wasn't going to stick around at Carbonite for one day, even if it meant he left them without a successor.

MR. GERSON:  Well, first --

THE COURT:  It's sort of what I look at -- not quite -- IDG is not Apple, but to the extent he got a bigger job, what inference do I draw from that?

MR. GERSON:  Well, I mean, first, Your Honor, the analyst covering Carbonite, you know, they commented on his abrupt resignation and thought it was suspicious.  They said, quote, Given that Mr. Ali did not stay for a transition period, we suspect his departure may have been prompted by board members dissatisfied with his performance.

We don't know exactly why.  But again, Your Honor, the First Circuit held in *Aldrige v. A.T. Cross Corp.*, even

under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor.  And we allege many different indicia of scienter, including insider sales.

Now here, the insider sales suggest -- further suggest motive for securities fraud.  Defendant Folger sold 39 percent of his stock, and courts regularly, regularly hold a magnitude of significantly less than that, provide a strong inference of scienter.  He sold 43,000 of 74,000 shares right at the end of the class period.  And even worse, 8,000 of those shares were on July 1st of 2019.

Now, the day they pulled the product, he tells the market, towards the end of the quarter, towards the end of the second quarter, "We determine that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite." But this sale was made on the first day of the third quarter. So even taking Defendant Folger for his word, that he didn't know anything, even though he spoke about it favorably, consistently, he didn't know anything until some time in the second quarter, he sold stock anyway on the first day of the third quarter.

And defendants argue out, "Well, that sale was pursuant to a 10b5-1 plan, not so fast."  But that plan was entered into on May 3rd of 2019, shortly before he made this

statement.  And courts routinely hold that a training plan adopted during a class period is recognized as probative of scienter.

They make all these factual arguments about vesting, and again, you know, the bottom line here is that they do not actually respond to the allegation that this sale of stock was made after he admits he, himself, knew this thing didn't work.

Plaintiffs also allege that Defendant Ali's sales were suspicious, and defendants argue that all of the trades were pursuant to a 10b5-1 plan.  But first off, the 10b5-1 plan here was entered into just before the class period started.  It was in September of 2018.  This wasn't a trading plan that dated back years in time; this was weeks.  It was September 5th of 2018.  This was weeks before they had officially launched this product.  That, in and of itself, is suspicious.  It gave them a reason to be motivated to speak positively, because he's about to sell his shares.

In addition, Your Honor, defendants argue that -- that Mr. Ali couldn't have sold his stock before this.  They say, "Well, he never sold" -- "you know, he never sold stock before the class period or in the control period that we allege."  We have a control period of the exact same amount of time as our class period:  280 days.  And they say, "Well, he didn't sell stock there, because he didn't fully vest."

But in fact, after re-reviewing all the materials for today's hearing, it appears that Ali had hundreds of thousands of shares that had vested and were eligible for sale from shortly after his start date at the company through the end of the control period.  And 250 of those shares were options granted to him on his start date that had vested because of the stock price achieving different targets.

But he, nonetheless, didn't sell a single share of Carbonite stock until December 8, 2018, after VME was launched.  Those trades support an inference of scienter.

And they say, also, that the shares increased here, but that just glosses over the issue that it's because of vesting of shares.  They didn't go out on the open market and purchase a single share of stock during the class period.

Again, Your Honor, here this is -- this company is not -- to give an example, this company is not 3M.  This is a relatively small company offering a certain amount of -- you know, a few products.  This one product that they called was really important for the company and spoke about frequently, it is simply implausible, implausible if the CFO and CEO have no idea about this thing; they have no idea if it works or not.

You know, so at a minimum, if they somehow were entirely unaware that this really important product didn't actually work, they were highly reckless in touting it as

they did to investors.  Because if they did -- you know, if they didn't know their statements posed a danger in misleading investors, they were highly reckless not to know it, reckless enough to incur liabilities under the securities law.

And again, it is very important that, you know, they try to cherry pick our scienter allegations, one by one. But that's not what the Supreme Court said to do in *Tellabs*. You have to look at this holistically.  And here, there's no conclusion that can be drawn, other than the fact that the defendants acted with the requisite scienter.  It's clear recklessness, insider sales.  They made statements about the product; they said it was really important; the guy leading the charge on it left the company.

And you know, again, they admit to having access to information.  Mr. Folger was on the team of people -- presumably Mr. Ali was, but he was not there at the time of the July 25, 2019, call-- on a team of people that decided to pull it, because it did not work.  Considering all of those allegations holistically, plaintiff has satisfied its burden of pleading a strong inference of scienter.

THE COURT:  Thank you, Mr. Gerson.  I don't have any questions for you.

I have one question for you, Mr. Carroll.

So what about Mr. Gerson's argument, that they've

alleged that prior to launch, it didn't work, and that they were warned that don't -- there are people -- not that they were warned, but there were people in the company that said, "Don't launch it yet," and more particularly, that it didn't work.  And then they said -- Ali said what he said, which Mr. Gerson pointed to, at the outset, and that those statements were fraudulent misrepresentations that were made in light of the fact that it didn't work.

MR. CARROLL:  Yes.  Thank you, Your Honor.

As Your Honor articulated the question, I think the answer was within it.  People in the company said it didn't work.  Who said it didn't work?  When did they say it didn't work?  Did anyone ever say to Mr. Ali that it didn't --

THE COURT:  Well, but it's a -- but they've alleged factually.  They've made a factual allegation that it had never worked prior to the launch; that they never, prior to launch, successfully backed up anything, any product -- any data, and/or hadn't -- it hadn't successfully worked; maybe that's a better way to put it.

So either the -- one, it may be a reasonable inference that in a company the size of Carbonite, the CEO, touting a product on its launch date as super important, or that wasn't quite the words but words to those effect, would know of its development status.  But if he didn't know, it may be -- maybe it's reckless.  That's sort of -- either he

knew or he didn't know, but it might be a reasonable inference that he did know.  But the question is, could he say those things, and what does that support, in the face of that --

I'm not saying, in fact, it didn't work.  I'm not saying, as a finding, that there weren't any other things going on.  But on the complaint, it seems to me, I have to -- it's a factual allegation that it didn't work as of the launch date.

And so I guess the question would be, (a), is it a reasonable inference that, in this kind of company, that he would know?  Is it a reasonable conclusion, what Mr. Gerson argues, that if he didn't know anything about its status, that it had never worked, that that was reckless, then, to say what he said.  And if he did know, was it support of the scienter?  Is it fraudulent?

MR. CARROLL:  So I think the answer to the question, you need -- you need to know more information that the complaint doesn't provide.  Right?  So what you would need to know, in terms of the conclusion that the product didn't work --

Let's accept that, for the moment, as a fact, that it didn't work.  You need to know a little bit more about what that means.  It didn't work in terms of it didn't work in that all the bugs were gone?  It didn't work in the sense

that people didn't think they would be able to achieve its fundamental functions by some reasonable point of time once it's in the market?  It needs more facts and definition as to what it means, and it certainly requires, under the precedent in this circuit, it certainly requires some facts to suggest that Ali knew.

What the plaintiffs say here, Your Honor, when we challenge -- in our brief, we challenge them for the absence of any particularized facts.  What they say is not any facts. They say, "Oh, it is beyond -- it is beyond belief that they wouldn't have known."

Counsel just said they only have a few products. That's -- there's no allegation in the complaint that they only have a few products, nor in good faith could there be. Carbonite has been around for a long time and has a lot of products.  And around this time in the class period, it's a matter of public record, they had something like 1,000 employees.

And respectfully, if I could, I'd take counsel up on the suggestion that the *Allaire* case from Judge Young is a meaningful comparison point.  Indeed, I think it is.  And if you look at that case and what Judge Young had in that case, that he found a case to be adequately particular, there were multiple confidential witness statements from senior people in the complaint.  There were contemporaneous e-mails quoted

in the complaint.  There were references to testimony that the Court considered on evaluating the complaint on the motion to dismiss.

This complaint is the polar opposite of that.  It doesn't provide any answers to the questions posed by 9(b), it just raises the questions.  If you could bring a securities fraud claim on these facts, a product was launched, they said optimistic things about the product, some period later the product is pulled, if that's securities fraud, securities fraud is attempting every time --

THE COURT:  Well, no, they have another fact in addition to those.  They do have that there was not one successful customer data backup before release.

MR. CARROLL:  Let's accept that as true.  The complaint doesn't --

THE COURT:  You have to.

MR. CARROLL:  I do.  I do.  I'm not making any factual arguments here.

THE COURT:  Sure.

MR. CARROLL:  What I'm pointing out, Your Honor, is the absence of facts in terms of what that means, in practice, and whether it was ever communicated to a defendant.  It is not -- respectfully, it is not enough, I submit, to say you must have known.  It's beyond argument that you didn't have known.

Your Honor's case in the *Foundation Medicine* case is the same thing with respect to the Medicare regulations, where the plaintiffs allege, "Well, you had to have known, you're the CEO, that these Medicare regulations wouldn't be good for" --

THE COURT:  Suppose Paragraph 48, which alleges the not one successful customer data backup, there were a second sentence that said, "And Mr. Ali and Mr. Folger, or Mr. Ali, was told this the day before he made the -- released the statements on the date of the class period began."

MR. CARROLL:  I think that would be a tougher circumstance, particularly if there was an allegation -- let's say it's a confidential witness allegation and said they're told that by some senior engineer who's involved in the testing process.  Right?  I think that becomes a more difficult case.  There's nothing --

THE COURT:  The fact that he knew it, knew no successful customer data backup, well, I understand it's not -- not making the case weaker, it makes the case stronger.

MR. CARROLL:  Yeah.

THE COURT:  My question is, though, how significant is -- like is that the end of it?  Then, like, they've stated a claim?

MR. CARROLL:  No, no, not at all.  I think it makes

it a harder case.  But not at all, because then you'd have to consider, all right, let's look at that in the context.  What has Carbonite said to the marketplace with respect to whether or not it's done successful customer backups and how many and when prior to launch?

THE COURT:  So they -- what Carbonite said is what Ali said on the day that he announced it.

MR. CARROLL:  He thinks it's going to be a super strong project.  That's not actionable.  That's statements of optimism and puffery that you think something is going to be a super strong product.  Counsel asked the question, you know -- forgive me --

THE COURT:  He said, "Makes us extremely competitive."

MR. CARROLL:  Right.

THE COURT:  And he says, "We have put something out there that we think is just completely competitive and just a super strong product."

He put it out there.  So Mr. Gerson says, "Well, that's a present-tense statement of fact."

What do you say?

MR. CARROLL:  Well, I say two things.  First of all, I say it falls within the category of statements of corporate optimism and puffery that's not actionable.  And I would rely, indeed, Your Honor, on the *Boston Technology*

case, for example, that says, effectively, the fact that a new product might face problems in the market is obvious to a reasonable investor. If the company hadn't --

You know, candidly, Your Honor, I don't know what the protocol is in terms of how many backups it should have done, according to some standard successfully before launch, and there's nothing in the -- there's nothing in the complaint about that. For example, the complaint doesn't say that Carbonite violated its own protocols by launching the product before there had been some successful product backup and that was known.

This just says, well, some unknown person, of unknown title or rank within the organization, who's not even alleged to have ever spoken with any individual defendant has said that on information and belief. It just doesn't come close to *Allaire* or any of the other cases.

THE COURT: Okay. Thank you.

I don't have any other questions for either of you. This has been very helpful. I really appreciate the argument.

Sorry we can't do this in person, and I thank you very much. I'll take it under advisement, and I will issue a written decision as reasonably promptly as I'm able.

Thank you. Have a good day. Stay healthy.

(Court in recess at 12:04 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 26th day of October, 2020.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter