UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RUBEN A. LUNA, individually and on behalf of :
all others similarly situated,

                                    :

             Plaintiff,           Civil Action
      v.                     : No. 19-11662-LTS
                                  (Consolidated)

CARBONITE, INC., MOHAMAD S. ALI and   :
ANTHONY FOLGER,               **REDACTED PUBLIC VERSION**

                                    :

            Defendants.

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Dated:  June 2, 2023

James R. Carroll
Kurt Wm. Hemr
Alisha Q. Nanda
Nigel Tamton
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800

*Counsel for Defendants*
*Carbonite, Inc., Mohamad S. Ali,*
*and Anthony Folger*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

PROCEDURAL BACKGROUND.............................................................................................2

LEGAL STANDARD.................................................................................................................4

ARGUMENT..............................................................................................................................5

I.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS
AS A MATTER OF LAW BECAUSE THE TRUST CANNOT OFFER ANY
EVIDENCE THAT THE MISREPRESENTATIONS THAT IT ALLEGES
HAD ANY MEASURABLE EFFECT ON CARBONITE'S STOCK PRICE ...................5

     A.     To Prove Its Section 10(b) Claim, The Trust Must Be Able To
Offer Evidence Proving That Its Putative Economic Losses Were
Attributable To Defendants' Alleged Misrepresentations About VME ..................5

     B.     The Trust Cannot Offer Any Evidence
From Events Preceding The Withdrawal Of VME
That Would Show That Any Statement Defendants Made
About VME Had Any Effect On The Price Of The Company's Stock ...................7

     C.     The Drop In Carbonite's Stock Price
Following Its July 25, 2019 Announcement
Of Financial Results And Earnings Call Cannot Show That The
Company's Stock Price Was Inflated By Any Statement Defendants Made
About VME, Including Because The Trust Cannot Exclude The Effect Of
Mr. Ali's Departure And Reduced Revenue Guidance On The Stock Price ...........9

II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS
AS A MATTER OF LAW BECAUSE THE TRUST CANNOT OFFER
ANY EVIDENCE THAT THE MISREPRESENTATIONS THAT IT
ALLEGES WERE ACTUALLY FALSE AND NOT MERE OPTIMISM ......................12

III.   THE COURT SHOULD GRANT SUMMARY
JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW
BECAUSE THE TRUST CANNOT OFFER ANY EVIDENCE THAT THE
MISREPRESENTATIONS IT ALLEGES WERE MADE WITH SCIENTER ...............16

CONCLUSION..........................................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
        512 F.3d 46 (1st Cir. 2008) ............................................................................................16

*Aquinnah/Gay Head Community Ass'n, Inc. v. Wampanoag Tribe of Gay Head
        (Aquinnah)*,
        989 F.3d 72 (1st Cir. 2021) .............................................................................................3

*In re Biogen Inc. Securities Litigation*,
        193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*,
        857 F.3d 34 (1st Cir. 2017) ............................................................................................16

*In re Boston Scientific Corp. Securities Litigation*,
        708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd sub nom.*
        *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
        649 F.3d 5 (1st Cir. 2011) .............................................................................................20

*In re Boston Scientific Corp. Securities Litigation*,
        No. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011),
        *aff'd*, 686 F.3d 21 (1st Cir. 2012) ................................................................................13

*Bricklayers & Trowel Trades International PensionFund v. Credit Suisse First Boston*,
        853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel
        Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*,
        752 F.3d 82 (1st Cir. 2014) .......................................................................1, 5, 6, 11, 12

*Calvary Holdings, Inc. v. Chandler*,
        948 F.2d 59 (1st Cir. 1991) ..............................................................................................4

*Construction Industry & Laborers Joint Pension Trust v. Carbonite, Inc.*,
        22 F.4th 1 (1st Cir. 2021) ..........................................................................................2, 3, 4

*Dura Pharmaceuticals, Inc. v. Broudo*,
        544 U.S. 336 (2005) ....................................................................................................5, 12

*Eaton v. Town of Townsend*,
        No. 18-11824, 2022 WL 952189 (D. Mass. Mar. 30, 2022), *aff'd*,
        Nos. 22-1334, 22-1335, 2023 WL 3317986 (1st Cir. May 9, 2023) ......................4, 5, 10

*Fitzer v. Security Dynamics Technologies, Inc.*,
        119 F. Supp. 2d 12 (D. Mass. 2000) ..............................................................................15

*Greebel v. FTP Software, Inc.*,
        194 F.3d 185 (1st Cir. 1999) ..........................................................................................15

*In re Metris Cos., Inc. Securities Litigation*,
  428 F. Supp. 2d 1004 (D. Minn. 2006)..............................................................16

*Metzler Asset Management GmbH v. Kingsley*,
  928 F.3d 151 (1st Cir. 2019)................................................................................4

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
  523 F.3d 75 (1st Cir. 2008)................................................................................20

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
  649 F.3d 5 (1st Cir. 2011)............................................................................19, 20

*In re Omnicom Group, Inc. Securities Litigation*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*,
  597 F.3d 501 (2d Cir. 2010)................................................................................6

*In re Parametric Technology Corp. Securities Litigation*,
  300 F. Supp. 2d 206 (D. Mass. 2001) ...............................................................16

*Shaw v. Digital Equipment Corp.*,
  82 F.3d 1194 (1st Cir. 1996)..............................................................................13

*In re Smith & Wesson Holding Corp. Securities Litigation*,
  836 F. Supp. 2d 1 (D. Mass. 2011), *aff'd*,
  669 F.3d 68 (1st Cir. 2012)...............................................................................19

*Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*,
  637 F.3d 53 (1st Cir. 2011).................................................................................4

*In re Williams Securities Litigation-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ......................................................................6, 12

**Statutes** s                                                                                          **Page(s)**

Securities Exchange Act of 1934, § 10(b),
  15 U.S.C. § 78j(b) ..................................................................................... *passim*

Securities Exchange Act of 1934, § 20(a),
  15 U.S.C. § 78t(a) ................................................................................................4

## PRELIMINARY STATEMENT

After the market closed on July 25, 2019, Carbonite, Inc. ("Carbonite") made a series of announcements, including that (i) its chief executive officer, Mohamad Ali, was leaving to take another job, (ii) it was reducing expectations of revenue for the year for the second quarter in a row, and (iii) it was withdrawing a new product called Carbonite Server VM Edition ("VME") that it had released the prior fall. By the next day's close of trading, Carbonite's stock price had fallen nearly 25%. One week later, as night follows day, this action was filed. The initial complaint in this action, like the operative Amended Complaint, alleged securities fraud claims based entirely on Defendants' public statements regarding the VME product.

From the outset of this litigation, it has been clear that Lead Plaintiff Construction Industry and Laborers' Joint Pension Trust (the "Trust") would need to address the other disclosures that Carbonite made on July 25, 2019 and be able to show what component of the drop in Carbonite's price, if any, was attributable to VME-related news as opposed to other contemporaneous disclosures unrelated to any alleged fraud. First Circuit precedent is clear that "when proving loss causation in a securities fraud suit, ***plaintiffs bear the burden*** of showing that their losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price."[1] Discovery in this action is now complete, and the Trust cannot carry that burden. To the contrary, the record shows that the market was never particularly interested in VME, and that there is no evidence that any part of the drop in Carbonite's stock price had anything to do with any statement that any Defendant had ever made about VME. Even if some statement about VME had any impact whatsoever on Carbonite's stock price, the Trust cannot show what part of the price drop was attributable to that statement

---

[1] *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) (cleaned up).

and what part was due to other factors.  That failure of proof should bring this action to an end.

That is not the only failure of proof in the Trust's case that requires the entry of summary judgment for Defendants.  The Amended Complaint told a story about a company that touted a new product to investors, which, according to the Trust and its "confidential witnesses," had "never worked."  The Trust told that same story to the First Circuit, which led the First Circuit to reinstate this case on the theory that "a product cannot be 'super strong' if it has never once done what it is supposed to."[2]  The facts now reveal that story was never true.  VME was a promising product for Carbonite ***that worked*** — both before and after it was launched — even though the company eventually decided to withdraw the product.  The Trust's sole living "confidential witness" has been revealed to be an uninformed, low-level former employee who did not do any work on VME after it was launched, did not work with VME customers, and does not have any first-hand knowledge as to whether VME ever worked for those customers.  The Trust thus cannot offer evidence showing that the optimistic remarks that Defendants made about VME shortly after its launch were materially false or misleading, or that those statements were made with scienter.  Those failures of proof also warrant the entry of summary judgment.

## **PROCEDURAL BACKGROUND**

On August 1, 2019, one week after Carbonite's July 25, 2019 disclosures, Lead Counsel filed the initial complaint in this action asserting securities fraud based on purported misstatements and omissions by Defendants regarding VME.  (Doc. No. 1.)  On November 21, 2019, the Court designated the Trust as Lead Plaintiff and the Trust's counsel as Lead Counsel.  (Doc. No. 36.)  The Trust then filed an Amended Complaint asserting claims substantively similar to those made in its counsel's initial complaint, but adding the bold — and ultimately

---

[2]    *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 10 (1st Cir. 2021).

unsupportable — allegations that VME "never worked properly" and "never once successfully backed up a customer's data." (Doc. No. 45 at 5, 17 (¶¶ 6, 52).) On October 22, 2020, this Court granted Defendants' motion to dismiss the Amended Complaint upon determining that the Trust had failed to adequately plead scienter. (Doc. No. 62.)

In its appeal of that dismissal to the First Circuit, the Trust chose to focus on just two of the putative misstatements identified in the Amended Complaint — a November 1, 2018 statement by Mr. Ali and a November 15, 2018 statement by Carbonite's chief financial officer Mr. Folger — and its appeal brief addressed only those putative misstatements.[3] The First Circuit's opinion thus focused on whether those two statements could support a Section 10(b) claim. *Carbonite*, 22 F.4th at 6-7 ("[W]e therefore train our attention on the two November statements that directly discuss VME."). The First Circuit held that those two statements could support a viable claim in view of the Trust's allegation that VME "never worked":

> [I]t does not require a PhD to know that a product cannot be "super strong" ***if it has never once done what it is supposed to.*** Nor does the complaint leave open the possibility that Carbonite management was somehow in the dark about VME's true status. The complaint states that Carbonite employees working on VME had reported internally before the launch that the product was not ready for market. ***And the trial runs for VME, a data-backup product, had allegedly produced not one successful backup.***

*Id.* at 10 (emphasis added). The First Circuit then remanded the action to this Court for further proceedings consistent with its opinion. (Doc. No. 71.)

Over the past 18 months, the parties have conducted discovery and briefed the Trust's

---

[3]   The Trust has elsewhere asserted that it should be permitted to pursue claims based on putative misstatements other than the November 1 and November 15, 2018 statements. (*See* Doc. No. 107 at 12 n.7.) That is wrong. The law of the case doctrine bars the Trust from seeking to recover on claims based on theories that the Trust did not brief on appeal and that the First Circuit did not address. *See Aquinnah/Gay Head Cmty. Ass'n, Inc. v. Wampanoag Tribe of Gay Head (Aquinnah)*, 989 F.3d 72, 79-80 (1st Cir. 2021). (*See also* Doc. No. 111 at 8-9.)

3

motion for class certification.  Fact discovery concluded on February 3, 2023.[4]  (*See* Doc. No.

79.)  Expert discovery concluded on May 8, 2023.  (*See* Doc. No. 112.)

## LEGAL STANDARD

To prove a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b), the

Trust must establish "(1) a material misrepresentation or omission; (2) scienter; (3) a connection

with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."

*Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019).[5]  Summary judgment

is appropriate if the Trust "fails to make a showing sufficient to establish the existence" of any of

those elements.  *See Eaton v. Town of Townsend*, No. 18-11824, 2022 WL 952189, at *12 (D.

Mass. Mar. 30, 2022) (Sorokin, J.), *aff'd*, Nos. 22-1334, 22-1335, 2023 WL 3317986 (1st Cir.

May 9, 2023).  Because the Trust bears the burden of proof on its claims, "it must point to

'competent evidence' and 'specific facts' to stave off summary judgment."  *Tropigas de P.R, Inc.

v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citation omitted).

In evaluating that proffer, "the Court is to ignore 'conclusory allegations, improbable inferences,

---

[4]    On February 3, 2019, the last day of fact discovery in this action, the Trust filed a motion to compel further discovery (Doc. No. 115) that is pending at this writing.  As Defendants' opposition to that motion (Doc. No. 121) explains, that motion is not just procedurally defective but entirely meritless.  In any event, the pendency of that motion should not preclude the entry of summary judgment, because there is no reason to believe that any discovery sought by that motion would remedy any of the failures of proof identified here.  The Trust's discovery motion seeks material that is at best cumulative of the ample discovery that Defendants have already provided (*e.g.*, documents hyperlinked in already-produced documents, the reproduction of chat messages in a different format, and documents from two additional former Carbonite employees).  Summary judgment can and should be granted despite the Trust's discovery motion.  *See Calvary Holdings, Inc. v. Chandler*, 948 F.2d 59, 65-66 (1st Cir. 1991) (affirming grant of summary judgment against party that had a pending motion to compel).

[5]    The Trust's Section 20(a) claim is entirely derivative of its Section 10(b) claim.  *See* Am. Compl., Doc. No. 45 at 44 (¶ 156).  Accordingly, if summary judgment is entered in Defendants' favor on the Trust's Section 10(b) claim, summary judgment should likewise enter in Defendants' favor on the Trust's Section 20(a) claim.  *Metzler*, 928 F.3d at 158 n.3.

and unsupported speculation.'" *Eaton*, 2022 WL 952189, at \*12 (citation omitted).

<u>**ARGUMENT**</u>

I.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW BECAUSE THE TRUST CANNOT OFFER ANY EVIDENCE THAT THE MISREPRESENTATIONS THAT IT ALLEGES <u>HAD ANY MEASURABLE EFFECT ON CARBONITE'S STOCK PRICE</u>**

    A.    **To Prove Its Section 10(b) Claim, The Trust Must Be Able To Offer Evidence Proving That Its Putative Economic Losses Were <u>Attributable To Defendants' Alleged Misrepresentations About VME</u>**

To establish the "loss causation" element of its § 10(b) claim, the Trust must be able to offer proof that its putative economic losses were actually attributable to Defendants' alleged fraud — here, the alleged November 1 and 15, 2018 misstatements — rather than to "the tangle of other factors" that may have led to a drop in Carbonite's stock price, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Put even more directly, "[t]o sustain this suit," the Trust "need[s] to show a connection" between those alleged misstatements and the drop in Carbonite's stock price. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 97 (1st Cir. 2014). If the Trust cannot offer that proof — and, as shown below, it cannot — entry of summary judgment in Defendants' favor is warranted.

For example, in *Bricklayers*, investors alleged that research analysts reporting on the merger between AOL and Time Warner withheld relevant information from their reports, thereby inflating the price of AOL's stock. However, the investors could not exclude from their analysis the effects that the many other public reports on that merger may have had on AOL's stock price. *Id.* at 89. The First Circuit therefore affirmed Judge Gorton's grant of summary judgment for the analysts, holding that the investors "did not show that [the defendants']

statements, as opposed to some other news story, moved the stock price on any given day." *Id.*

Similarly, in *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009), on which the First Circuit relied in *Bricklayers*, investors alleged that a telecommunications company had misrepresented various facts about a corporate transaction. The Tenth Circuit affirmed the district court's grant of summary judgment for the defendants, noting that the investors "have failed to present evidence suggesting that the declines in price were the result of the revelation of the truth" — that is, the truth about the matters putatively misrepresented —"and not some other factor":

> The scenarios that Plaintiffs offered to explain loss causation failed to identify a causal nexus between the revelation of the previously-concealed truth and the decline in value of [the company's] securities.  Because loss causation demands that plaintiffs show that their losses were caused by a revelation of the fraud ***and not some non-compensable cause***, these scenarios do not adequately address the issue of loss causation.

*Id.* at 1143 (emphasis added).

The Second Circuit reached a similar result in *In re Omnicom Group., Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010).  There, investors in an advertising and marketing company alleged that the company's transaction with a subsidiary and its accounting for that subsidiary were fraudulent, and alleged that the resignation of the chair of the company's audit committee constituted a disclosure of that putative fraud.  The Second Circuit affirmed the entry of summary judgment for the defendants on the ground that investors had failed to offer evidence of loss causation, holding that the market reaction following the audit chair's resignation was "far too tenuously connected — indeed, by a metaphoric thread — to the [subsidiary] transaction to support liability." *Id.* at 514.

Here, the Trust bears the burden of isolating the impact of Defendants' purported statements regarding VME from confounding factors that may have contributed to the July 2019

6

stock drop — particularly the simultaneous disclosures regarding Mr. Ali's departure and

Carbonite's reduction in its revenue guidance.  The Trust cannot carry that burden.

> **B.      The Trust Cannot Offer Any Evidence From Events Preceding The Withdrawal Of VME That Would Show That Any Statement Defendants Made About VME Had Any Effect On The Price Of The Company's Stock**

There is no evidence from any event preceding the July 25, 2019 withdrawal of

VME that might show that investors ever attributed any part of the value of Carbonite stock to

Defendants' public statements about VME.  Indeed, all of the record evidence is to the contrary:

> (i)     On the morning of **October 18, 2018**, Carbonite announced the company's initial release of VME.  That announcement had no statistically significant effect on the company's stock price:  at the end of the trading day, the company's stock was trading just 2¢ above the previous day's close.  (SMF[6] ¶¶ 30-31, 39-40; TD Ex. 6; TDC Ex. 146, Steinholt Dep. Tr. 41:16-42:8.)

> (ii)    After the close of trading on the NASDAQ (the "market close") on **November 1, 2018**, Carbonite released its financial results for the third quarter of 2018 and held an "earnings call" with analysts.  During that earnings call, Mr. Ali reviewed with analysts a series of developments at the company, including the company's recent release of VME.  In the question and answer session that Mr. Ali and Mr. Folger held on that call, *no* analyst even asked about VME.  Just two of the 13 analyst reports on Carbonite that were issued in the days following that earnings call mentioned VME at all, and no media report on the call mentioned VME.  There is no evidence that anything about the discussion of VME on that call inflated the price of Carbonite's stock:  to the contrary, the company's stock price plunged the next day, likely because of Mr. Ali's announcement on that call that the company was reducing its estimates of its 2019 revenue ("revenue guidance").  (SMF ¶¶ 51-58; TD Exs. 12, 13; TDC Ex. 146, Steinholt Dep. Tr. 48:9-16.)

> (iii)   On **November 15, 2018**, Mr. Folger, Carbonite's chief financial officer, spoke at an industry conference regarding a number of issues related to Carbonite's business, including its recent release of VME.  No analyst report or media report commented on Mr. Folger's remarks at that conference.  The changes in the company's stock price on November 15 and 16, 2018 were not statistically significant.  (SMF ¶¶ 59-61, 63-68; TD Ex. 28; TDC Ex. 146, Steinholt Dep. Tr. 62:11-63:5, 63:13-18.)

---

[6]   Citations to "SMF," "TD," and "TDC" refer respectively to (i) Defendants' Local Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried, (ii) the Transmittal Declaration of Nigel Tamton, Esq.; and (iii) the Transmittal Declaration of Nigel Tamton, Esq. (Confidential Discovery Documents), all filed herewith.

(iv)    After the market close on **February 7, 2019**, Carbonite released its financial results for the fourth quarter of 2018 and held an earnings call with analysts. Mr. Ali and Mr. Folger did not mention VME on that earnings call. No analyst asked about VME and no analyst report or media report relating to that call commented on VME. (SMF ¶¶ 70, 72-76; TD Exs. 39, 40.)

(v)    After the market close on **May 2, 2019**, Carbonite released its financial results for the fourth quarter of 2018 and held an earnings call with analysts. Once again, Mr. Ali and Mr. Folger did not mention VME in their prepared remarks. No analyst asked about VME, although Mr. Folger's answer to one analyst's question included a list of new products that included VME. No analyst report or media report on that call commented on VME. (SMF ¶¶ 78-84; TD Exs. 64, 65.)

(vii)    In **June 2019**, before the Trust made its own purchase of Carbonite stock through an independent professional investment adviser, that investment adviser prepared a memorandum documenting its rationale for a potential investment in Carbonite. That memorandum did not mention VME at all. (SMF ¶¶ 85-90; TD Ex. 79.) That adviser's subsequent report to its clients on its purchase of Carbonite stock also did not mention VME. (SMF ¶ 91; TD Ex. 86.)

(vi)    Throughout all of the time from the initial release of VME until the company withdrew the product from the market, Carbonite never released any projection of revenues, profits, or cash flows that it hoped to obtain through sales of VME, and the company never reported any revenues, profits, or cash flows that it specifically attributed to sales of VME. Nor did any analyst covering Carbonite ever publish any estimate of the revenues, profits, or cash flows that Carbonite might earn from sales of VME. (SMF ¶¶ 27, 41, 46.)

In short, there is no evidence that the Trust can offer from any event that occurred prior to the July 25, 2019 withdrawal of VME which would show that any statement that Defendants had made about VME — including the November 1 and 15, 2018 statements at issue in this action — affected the market price of Carbonite's stock. That should not be in any way surprising: Carbonite already had many products on the market and the introduction of VME merely complemented the company's existing suite of data protection offerings. (SMF ¶¶ 5, 7.) Carbonite never presented any financial projections for VME, and it is well known in the software industry that new products are sometimes unsuccessful for a host of reasons (and indeed Carbonite's risk disclosures in its Forms 10-K expressly identified and highlighted that risk). (SMF ¶¶ 8-11, 41.)

8

**C.**    **The Drop In Carbonite's Stock Price Following Its July 25, 2019 Announcement Of Financial Results And Earnings Call Cannot Show That The Company's Stock Price Was Inflated By Any Statement Defendants Made About VME, Including Because The Trust Cannot Exclude The Effect Of Mr. Ali's Departure And Reduced Revenue Guidance On The Stock Price**

Because no event prior to Carbonite's July 25, 2019 withdrawal of Carbonite shows that any statement by Defendants about VME affected the price of Carbonite's stock, the Trust, in *post hoc, ergo propter hoc* fashion, relies solely on the drop in Carbonite's stock price following the company's July 25, 2019 announcements as evidence that the company's stock price must have been inflated by some statement that Defendants made about VME.  But that price drop does not show that any statement that Defendants had previously made about VME had any measurable impact on the price of Carbonite stock:

(i)    After the market close on **July 25, 2019**, Carbonite released its financial results for the second quarter of 2019 and held an earnings call with analysts.  Carbonite made a number of announcements about its business, including, among others: (a) Mr. Ali's departure to take a chief executive officer position at another company, which led Carbonite to appoint its Board chair as interim CEO while the company conducted a search for Mr. Ali's replacement; (b) the company's further reduction in its 2019 revenue guidance; (c) a recent acquisition; (d) a recent executive hire and a recent executive promotion; (e) a new product unrelated to VME; and (f) the withdrawal of VME.  (SMF ¶¶ 97-98, 100; TD Exs. 91, 94.)

(ii)    In the question and answer session held on the earnings call following those announcements, analysts asked over fifty questions.  Only seven of those questions touched on VME in any way.  (SMF ¶ 101; TD Ex. 94.)

(iii)    Of the 13 analyst reports commenting on the company's release of financial results and the earnings call, four suggested that the drop in the company's stock price following those announcements was attributed to Mr. Ali's departure and/or the company's reduction in revenue guidance.  ***None*** of those reports attributed the price drop to the withdrawal of VME.  (SMF ¶ 106.)

(iv)    Media reports also attributed the stock price drop to Mr. Ali's departure and the company's reduction in revenue guidance, ***not*** VME.  (SMF ¶ 107; TD Ex. 108.)  According to the Boston Globe:

"So just how much is a chief executive worth?  If you invest in Carbonite Inc., you might be wondering about the answer to that question today.  The Boston-based data protection company's

9

> shares plunged nearly 25 percent on Friday after Mohamad Ali announced he was leaving . . . .  Ali's abrupt departure wasn't the only unexpected news weighing on shareholders:  Carbonite also pared back its revenue guidance for the year, and forecast only modest growth in 2020.  Carbonite investors had been betting on Ali's strategic approach."

(v)      Following Carbonite's July 25, 2019 announcements, the Trust's investment advisor requested a call with Carbonite's interim CEO and Mr. Folger "in light of last night's quarterly results and [Mr. Ali's] resignation."  He did not mention VME.  (SMF ¶ 108; TDC Ex. 130.)

Accordingly, the Trust cannot offer any evidence that any part of the decline in Carbonite's stock price that followed its July 25, 2019 post-market close announcements was attributable to any statement that any Defendant had previously made about VME, as opposed to Mr. Ali's departure, the company's further reduction in its current year revenue guidance, or any other subject discussed in Carbonite's announcements on that date.

Defendants raised these issues in connection with the Trust's motion for class certification, noting that the Trust's proffered damage expert Bjorn Steinholt did not propose a method for excluding confounding factors from the July 2019 price drop in quantifying the purported price impact of Defendants' statements regarding VME.  (*See* Doc. No. 101 at 16-18.) In reply, the Trust represented that "if confounding information exists," Mr. Steinholt "would refine his model to address such issues."  (Doc. No. 107 at 16.)  ██████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

On a motion for summary judgment, the Court must look past such "improbable inferences" and "unsupported speculation."  *Eaton*, 2022 WL 952189, at *12.  ████████████

██████████████████████████████████

██████████████████████████████████

10

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████.[7]  That failure of proof is another respect in which this case resembles

*Bricklayers*, where the First Circuit affirmed summary judgment after the plaintiff's expert failed

to adequately address confounding factors in his expert report.  *Bricklayers*, 752 F.3d at 89-90.

The Trust has also contended that because part of Carbonite's July 25, 2019

revenue guidance reduction was attributed to the withdrawal of VME on Carbonite's earnings

call, the Trust can claim all of the price impact of that revenue guidance reduction as damages.

But there is no evidence that all of that revenue guidance reduction was attributable to VME.

And even assuming *arguendo* that the market price of Carbonite stock might have incorporated

the market's expectations for Carbonite's revenue, there is no evidence that any market

participant associated any part of Carbonite's revenue forecast with VME *before* that July 25,

2019 earnings call.  Carbonite had never provided any financial forecast for VME, nor had any

analyst ever published any estimate of VME's contribution to the company's financials.  (SMF

¶¶ 41, 46.)  It is anachronistic and illogical to suggest that Carbonite's new July 25, 2019

disclosure about its revenue expectations for VME is evidence that statements made on

November 1 and 15, 2018 that did not address revenue had any contemporaneous impact on

investors' revenue expectations for VME (or on the company's stock price).  The company's

---

[7] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

11

post-withdrawal disclosure of its (modest) revenue expectations for VME was an entirely new fact that could not have caused Carbonite's stock price to be inflated in the past. *See Dura*, 544 U.S. at 343 (a "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, **new industry-specific or firm-specific facts**, conditions, or other events, which taken separately or together account for some or all of that lower price" (emphasis added)); *Bricklayers*, 752 F.3d at 95 (citing and quoting *Dura*).

Further, even if one were to assume for sake of argument that the withdrawal of VME was responsible for some part of that stock price drop **and** that that part of the price drop reflected prior inflation in the stock price that was caused by some statement that a Defendant had made about VME, the Trust cannot meet its burden of proving *what part* of the drop was caused by the withdrawal of VME as opposed to other factors — *e.g.*, Mr. Ali's departure, or portions of the revenue guidance reduction unrelated to VME. That failure of proof is fatal to the Trust's claim here. *Williams*, 558 F.3d at 1137 (plaintiffs "bear[ ] the burden of showing that [their] losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price") (cited and quoted in *Bricklayers*). The entry of summary judgment for Defendants is therefore warranted.

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW BECAUSE THE TRUST CANNOT OFFER ANY EVIDENCE THAT THE MISREPRESENTATIONS THAT IT ALLEGES WERE ACTUALLY FALSE AND NOT MERE OPTIMISM

To prove the "material misrepresentation or omission" element of its claims, the Trust must present evidence that Defendants' November 2018 statements were materially false or misleading, not merely statements of corporate optimism. That is because "loose optimism about both a company's current state of affairs and its future prospects" cannot give rise to Section 10(b) liability as a matter of law. *See In re Bos. Sci. Corp. Sec. Litig.*, No. 10-10593-

12

DPW, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011) (citation omitted), *aff'd*, 686 F.3d 21 (1st Cir. 2012); *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996).

Here, the First Circuit permitted the Trust to proceed into discovery on its claim on the basis of the Amended Complaint's allegations that VME "never worked properly" and "never once successfully backed up a customer's data." (Doc. No. 45 at 5, 17 (¶¶ 6, 52).) Discovery has revealed that the Trust cannot support those allegations with facts. They are simply not true. Indeed, the record shows that by November 2018:

(i) Carbonite's engineering team had reported that VME received positive feedback during demonstrations and beta testing (SMF ¶ 22; TDC Ex. 116):



### VM Edition: Feedback to date

"*This **does improve over what is in EVault** for sure. We've taken notes about quite a few scenarios to test out*" —RedCentric

"*The **backup is faster** than refreshing your vCenter*" —Wortmann

(ii) VME had passed pre-launch tests, including a pre-launch requirement that the product run stably for three days (SMF ¶ 24; TDC Exs. 123, 124):

### We are GO for Launch!!! Congrats team!
**Status:** GREEN

- **Stress Testing:** PASS
- **Production / Stage Final Validations:** PASS
- **Next Step:** Publish website material, etc starting around 8AM EST Monday.

(iii) Carbonite personnel had circulated reports of positive customer feedback stating the VME product was "working" (SMF ¶¶ 47-48; TDC Ex. 126):

Couple of things:

- Love that the backup solution is in place and working
- Love that the backups were available to us for the drive failures
- Love that we were able to restore them

13

Contrary to the Trust's allegations, the factual record now shows that VME worked for customers and successfully backed up customer data (SMF ¶ 48), as *every witness* who worked with VME customers has confirmed:

(i)    Rob Beeler, Carbonite's senior vice president for engineering, recalled positive feedback from customers on VME:

> "In general, the customers found that it did a better job of backing up virtual machines than our Carbonite Server Backup product.  And they liked the fact that we could back up both physical and virtual products — servers in a single product, which was not available from competitors in the industry, and they liked the fact that we had a single-user interface to manage both physical and virtual backups." (Beeler Dep. Tr. 211:11-212:2, TDC Ex. 137.)

(ii)   Deepak Mohan, Carbonite's senior vice president for engineering during VME's development, also recalled positive feedback from customers:

> "[W]e did get a bunch of customer feedback, you saw, you know, from our other teams, from partner sales, et cetera. So generally the feedback was very good. They were liking what they saw."  (Mohan Dep. Tr. 161:7-11, TDC Ex. 139.)

(iii)  Paul Mellinger, Carbonite's vice president for global sales, recalled feedback from customers who were pleased with VME's performance:

> "[W]e had customers who were unhappy or dissatisfied in some way, but we also had customers who were satisfied with how it was running."  (Mellinger Dep. Tr. 130:7-20, TDC Ex. 136.)

> "Customers were delighted that they could finally back up their virtual machines in a way leveraging what I referred to earlier as the 'hypervisor,' and that would allow them to do what's called 'agentless backup,' which they couldn't do with Carbonite previously, and that's really what they were striving for."  (*Id.* 177:20-178:5.)

(iv)   Paddy Sreenivasan, Carbonite's vice president for engineering, also recalled positive feedback from customers on VME:

> "Definitely there were customers who were doing backups, using it, and actually praising some of the features that we were offering." (Sreenivasan Dep. Tr. 149:21-150:3, TDC Ex. 138.)

The Trust will not be able to point to any deposition testimony that supports its allegation that VME "never worked."  Indeed, the Trust's sole living "confidential witness" who supposedly

14

provided the information supporting the Trust's allegation that VME "never worked," was revealed to be unable to so testify.  That individual did not do ***any work*** on VME after it was launched, did not work with VME customers, did not work on tracking VME's performance in customer environments and does not have any firsthand knowledge as to whether VME ever worked for Carbonite's customers (and the record now shows that it did work).  (SMF ¶ 16; Dep. Tr. 33:19-24, 34:1-3, 40:5-7, TDC Ex. 135.)

In view of those undisputed facts, the Trust cannot offer evidence that Defendants' highly subjective November 1 and 15, 2018 statements that VME was "extremely competitive" and "super strong" were actually false on the theory VME "never worked" — VME ***did*** work.  Subjective statements of optimism about VME and its competitive prospects cannot provide the basis of a viable Section 10(b) claim, and summary judgment is therefore warranted.

The First Circuit affirmed such a grant of summary judgment in *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999), where investors sued a software company and its CEO alleging that statements that "[s]ales continue to be strong" and the company's "products should help us achieve our revenue objective" were false because customers had cancelled planned purchases of the company's products due to the impending release of Windows 95.  In affirming Judge Tauro's grant of summary judgment for the defendants, the First Circuit characterized the CEO's comments as "upbeat statements of optimism and puffing about the company's prospects," and held that as such, "they are not actionable."  *Id.* at 207 (citing cases); *accord Fitzer v. Sec. Dynamics Techs., Inc.,* 119 F. Supp. 2d 12 (D. Mass. 2000) (optimistic statements about future prospects were "nonactionable" in view of "the risk that every investor takes when investing in a high-technology company whose new products may not succeed"); *In re Parametric Tech. Corp. Sec. Litig.*, 300 F. Supp. 2d 206, 217-18 (D. Mass. 2001) (company

15

statement touting "strong competitive position" was nonactionable).

Similarly, in *In re Metris Cos., Inc. Securities Litigation*, 428 F. Supp. 2d 1004 (D. Minn. 2006), investors sued a financial services company for having made positive statements about the company's business, arguing that the statements were false in view of an ongoing regulatory investigation and other obstacles that the business faced. The court granted summary judgment for the defendants, holding (*inter alia*) that given the company had some "positive prospects," such generalized statements could not create an issue of fact as to whether the defendants had spoken falsely:

> Plaintiffs' allusion to generalized statements regarding guidances, overall profitability, and financial well-being are, as discussed above, simply insignificant in the marketplace. But plaintiffs' major argument is that defendants, aware of their business practices and the on-going OCC investigation, should have known the business was in trouble. Plaintiffs claim that, with this knowledge, defendants should not have made positive statements about the company's condition. This argument fails. The fact that a company may have hit a rocky patch does not mean it has no positive prospects. The Court finds these allegations too general to pose a triable issue of fact.

*Id.* at 1043. So too here: the Trust cannot establish that Defendants spoke falsely simply by offering evidence that VME's prospects were uncertain.

**III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW BECAUSE THE TRUST CANNOT OFFER ANY EVIDENCE THAT THE MISREPRESENTATIONS IT ALLEGES WERE MADE WITH SCIENTER**

To prove scienter, the Trust must show that Defendants made the November 2018 statements with a "conscious intent to defraud" or "a high degree of recklessness," *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008), meaning "not merely simple, or even inexcusable negligence," "but an extreme departure from the standards of ordinary care." *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 44 (D. Mass. 2016) (citation omitted), *aff'd*, 857 F.3d 34 (1st Cir. 2017). The Trust cannot offer evidence sufficient to meet that high burden.

16

The Amended Complaint alleges that Mr. Ali and Mr. Folger described VME as "extremely competitive" and "super strong" at a time when they knew (or were reckless in not knowing) that it "never worked." Discovery has not provided any support for that theory. To the contrary, at the time Mr. Ali and Mr. Folger made their November 2018 statements:

(i)     Mr. Ali and Mr. Folger were not working at Carbonite in an engineering capacity. They were members of Carbonite's executive leadership team. Their engineering colleagues worked on technical aspects of VME. Accordingly, Mr. Ali and Mr. Folger reasonably deferred to their engineering colleagues' views regarding technical matters related to VME. (SMF ¶¶ 17-20; TDC Ex. 140, Ali Dep. Tr. 148:20-149:8; TDC Ex. 141, Folger Dep. Tr. 88:1-6.)

(ii)    Mr. Ali and Mr. Folger had been told by their engineering team that VME received positive feedback from prospective customers during pre-launch demonstrations and beta testing. (SMF ¶¶ 19, 22; TDC Ex. 116.)

(iii)   Mr. Ali and Mr. Folger had been told that VME passed its pre-launch tests, including "stress testing" and "final validations," information which came after Carbonite delayed VME's initial intended launch date to ensure pre-release criteria were met. (SMF ¶¶ 21, 24; TDC Exs. 121, 124.)

(iv)    Carbonite's lead engineers working on VME believed the product was ready for launch at the time of its October 18, 2018 launch. (SMF ¶ 34; TDC Ex. 137, Beeler Dep. Tr. 210:12-211:10; TDC Ex. 139, Mohan Dep. Tr. 160:4-161:3; TDC Ex. 138, Sreenivasan Dep. Tr. 365:8-24.)

(v)     Carbonite's head of engineering and his predecessor believed VME was a competitive product at the time of its launch. (SMF ¶ 35; TDC Ex. 137, Beeler Dep. Tr. 209:22-210:10; SMF ¶ 38; TDC Ex. 139, Mohan Dep. Tr. 161:4-18.)

(vi)    The Carbonite sales team had expressed excitement about selling VME and believed it had competitive advantages. (SMF ¶ 23; TDC Ex. 120.)

Mr. Ali and Mr. Folger's statements about VME in November 2018 could not have been reckless in view of these facts. Accordingly, the Trust cannot offer evidence that Mr. Ali and Mr. Folger's statements were made with "a conscious intent to defraud" or "an extreme departure from the standards of ordinary care," as is required to prove scienter.

The Trust will no doubt point to internal Carbonite documents where Carbonite employees were critical of VME at various points in its life cycle. Those documents are

17

insufficient to raise a disputed issue of material fact as to Mr. Ali or Mr. Folger's state of mind. The Trust can offer no evidence that shows Mr. Ali or Mr. Folger received information patently contrary to their November 2018 statements. There is no evidence that anyone ever told Mr. Ali or Mr. Folger that VME was not competitive prior to their November 2018 statements. There is no evidence that anyone ever told Mr. Ali or Mr. Folger that VME was not strong prior to their November 2018 statements. There is no evidence that anyone ever told Mr. Ali or Mr. Folger that VME did not work prior to their November 2018 statements (because it did). And there is certainly no evidence that either Mr. Ali or Mr. Folger ever had any intention or expectation that their isolated remarks about a single new product in November 2018, presented without any promise of anticipated revenue from VME, would have any effect on Carbonite's stock price (and indeed they had no effect).

The Trust may point to internal Carbonite documents that are critical of VME. (*E.g.*, TDC Exs. 129, 131, 133.) Many of those documents will be from different points in the product's development, weeks or months removed from Defendants' November 2018 statements, and accordingly are not probative of what Mr. Ali and Mr. Folger thought of VME in November 2018. Nor can the Trust offer evidence that those informal discussions between engineers — complaining about "corner cutting" or "code quality" that "sucked" — were raised to Mr. Ali or Mr. Folger before they made their November 2018 statements. (*E.g.* TDC Exs. 119, 132.) Even if they had been brought to the attention of Mr. Ali and Mr. Folger, such statements would not change the facts that VME passed its pre-launch tests, had the support of Carbonite's head of engineering, and had received positive feedback from customers.

The discovery record demonstrates that the news Mr. Ali and Mr. Folger received about VME was, at worst, mixed. Mr. Ali and Mr. Folger were indisputably told positive things

18

about VME — *e.g.*, that VME received positive feedback from prospective customers and that it passed internal tests.  Evidence that they may also have been told some less positive things as well does not create a dispute of material fact on scienter.  For example, in *In re Smith & Wesson Holding Corp. Securities Litigation*, 836 F. Supp. 2d 1 (D. Mass. 2011), *aff'd*, 669 F.3d 68 (1st Cir. 2012), investors alleged that a gun manufacturer and its executives misrepresented the level of demand for their products.  In opposing summary judgment, the investors produced "evidence of communications among the individual Defendants that might be interpreted as showing their knowledge of [a] . . . drop in sales" that was inconsistent with their public statements.  836 F. Supp. 2d at 15.  Judge Ponsor granted summary judgment for the defendants, holding that that showing was not sufficient to create an issue of material fact on scienter:

> It is a rare company that is not facing difficulties at almost every point in its corporate life.  Executives inevitably will be communicating their concerns about these challenges.  It would be grossly unfair to Defendants, and contrary to law, in assessing whether a company and its management acted with a culpable state of mind, to fix exclusively upon expressions of anxiety while ignoring simultaneous expressions of hopeful anticipation. The picture that emerges from a comprehensive look at the communications among Defendants at the relevant time period is decidedly mixed, and far below the standard of proof for scienter.

*Id.* at 16.  The First Circuit affirmed, agreeing that evidence that the executives could have spoken more completely did not create a material issue of fact on scienter:

> Scienter is inherently a fact-intensive inquiry, and courts are normally cautious about granting summary judgment for the defense on this issue. But this hesitancy assumes that there is either some evidence of subjective bad intent, or, alternatively, misstatements or omissions so blatantly improper that bad intent or recklessness can be inferred. There is no evidence of the former in this case and, at best, a thin and debatable case as to misstatements or omissions.

669 F.3d at 77 (citations omitted).  The same is true of this case.

Similarly, in *Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 649 F.3d 5 (1st Cir. 2011), investors alleged that a medical device manufacturer had misrepresented the risk that a product would be recalled.  Judge Tauro dismissed that

19

complaint, holding that the investors had failed to plausibly allege scienter, but the First Circuit reversed. *Mississippi Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75 (1st Cir. 2008). Following discovery, defendants moved for summary judgment.  Judge Tauro granted that motion, holding that company documents showing that defendants were aware of the issues that ultimately resulted in a recall of the product — and particularly post-recall documents expressing "Monday morning remorse" — did not suffice to show that defendants acted with scienter. *In re Bos. Sci. Corp. Sec. Lit.*, 708 F. Supp. 2d 110, 126 & n.15 (D. Mass. 2010) *aff'd sub nom.* 649 F.3d 5 (1st Cir. 2011).  Once again, the investors appealed.  On that appeal, the First Circuit observed that "as is common in litigation, the shape of the case has changed since we last reviewed it." *Mississippi*, 649 F.3d at 8.  The First Circuit then proceeded to affirm Judge Tauro's grant of summary judgment, holding that the investors "did not produce evidence that would support a reasonable inference that defendants intentionally or recklessly misled the public."  *Id.* at 29.  Here, too, the Trust cannot offer any contemporaneous evidence that Mr. Ali or Mr. Folger affirmatively knew their November 2018 statements were wrong (or that they were reckless in making those statements), and the Trust cannot fill that evidentiary gap with engineers' expressions of "Monday morning remorse" many months later.  That failure of proof requires entry of summary judgment in Defendants' favor.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of Defendants dismissing the Amended Complaint (Doc. No. 45) in its entirety and with prejudice.

20

Dated: June 2, 2023
      Boston, Massachusetts

Respectfully submitted,

/s/  *James R. Carroll*

James R. Carroll (BBO #554426)
Kurt Wm. Hemr (BBO #638742)
Alisha Q. Nanda (BBO #657266)
Nigel Tamton (BBO #696396)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
kurt.hemr@skadden.com
nigel.tamton@skadden.com

*Counsel for Defendants*
*Carbonite, Inc., Mohamad S. Ali,*
*and Anthony Folger*

21