# EXHIBIT 39

*Carbonite's Form 8-K*
*2/07/2019*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 6, 2019**

# CARBONITE, INC.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-35264 | 33-1111329 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**Two Avenue de Lafayette, Boston, Massachusetts 02111**
**(Address of principal executive offices, including ZIP code)**

**(617) 587-1100**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions

☐  Written communications pursuant to Rule 425 under the Securities Act (17 C.F.R. §230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 C.F.R. §230.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 C.F.R. §14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 C.F.R. §13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01**        **Entry into a Material Definitive Agreement**

On February 7, 2019, Carbonite, Inc., a Delaware corporation (the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), by and among the Company, Matterhorn Acquisitions, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("Acquisition Corp."), Webroot Inc., a Delaware corporation ("Webroot"), and Shareholder Representative Services LLC, solely in its capacity as the Stockholder Representative.

The Merger Agreement provides that, upon the terms and subject to the conditions set forth in the Merger Agreement, Acquisition Corp. will be merged with and into Webroot, with Webroot continuing as the surviving corporation and a wholly owned subsidiary of the Company (the "Merger"). At the effective time of the Merger, each issued and outstanding share of Series A Preferred Stock, par value $0.001 per share (the "Series A Shares"), and each issued and outstanding share of common stock, par value $0.001 per share (the "Common Shares" and, together with the Series A Shares, the "Shares") of Webroot (other than the Shares (i) held in treasury by Webroot or owned by any direct or indirect subsidiary of Webroot or (ii) held by stockholders who did not vote in favor of the Merger, consent thereto in writing or otherwise contractually waive or agree to refrain from exercising their rights to appraisal and who have demanded properly in writing appraisal for such shares in accordance with Section 262 of the General Corporation Law of the State of Delaware) will be converted into the right to receive a portion of the aggregate cash consideration payable in respect of the Merger, which will consist of $618.5 million to be adjusted as provided in the Merger Agreement with respect to cash, debt, transaction expenses and working capital (the "Merger Consideration"). Each outstanding and unexercised stock option of Webroot (other than those described in the following sentence) will be terminated and cancelled upon the consummation of the Merger in exchange for a cash payment based on the Merger Consideration (net of option exercise price and applicable taxes). All options of Webroot that have a per Common Share exercise price equal to or greater than the Merger Consideration per share or which are then unvested will be cancelled without consideration upon the consummation of the Merger.

The consummation of the Merger is subject to certain conditions, including (i) the expiration or termination of any waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, (ii) the absence of any law or order prohibiting consummation of the Merger, (iii) with respect to the Company's obligation to consummate the Merger, the absence of any Material Adverse Effect with respect to Webroot and its subsidiaries, (iv) with respect to the Company's obligation to consummate the Merger, the receipt of the Webroot Stockholder Consent executed by stockholders of Webroot holding not less than 90% of the issued and outstanding Common Shares and Series A Shares of Webroot (voting together as a single class and on an as-converted to Common Shares basis), inclusive of the Common Shares and Series A Shares or exercise of the "Bring Along Right" and waiver of appraisal rights as set forth in Webroot's voting agreement, (iv) the continuing accuracy of each party's representations and warranties, (v) the performance in all material respects by the other party of its obligations under the Merger Agreement, and (vi) the satisfaction of other customary conditions. The consummation of the Merger is not subject to a financing condition. The Merger is expected to be consummated in the first quarter of 2019.

The Merger Agreement also includes customary termination provisions for both Webroot and the Company, including if the Merger has not been consummated by May 8, 2019, which date is subject to extension in certain circumstances with respect to regulatory clearance.

The Merger Agreement contains representations, warranties, and covenants by the parties that are customary for a transaction of this nature. Webroot's stockholders will have no obligation to indemnify the Company under the Merger Agreement for breaches of Webroot's representations or warranties (with the exception of breaches related to Webroot's fundamental representations and other than in the case of fraud), and the Company's recourse for any such breaches of Webroot's representations and warranties will be limited to a representations and warranties insurance policy to be purchased by the Company prior to the Closing.

On February 7, 2019, following execution of the Merger Agreement, Webroot delivered the irrevocable written consent of stockholders holding (i) approximately 87% of the outstanding Common Shares and Series A Shares (voting together as a single class and on an as-converted to Common Shares basis) and (ii) all of the outstanding Series A Shares, approving and authorizing the Merger pursuant to the Merger Agreement and adopting the Merger Agreement, waiving any applicable notice provisions in accordance with the General Corporation Law of the State of Delaware, the Company's governing documents and the stockholders agreements and waiving any applicable appraisal rights in accordance with the DGCL (the "Webroot Stockholder Consent"). The Webroot Stockholder Consent is sufficient to satisfy the stockholder vote requirement for the Merger under applicable law and Webroot's governing documents.

Concurrently with the execution of the Merger Agreement, the Company entered into a financing commitment letter (the "Commitment Letter") with Barclays Bank PLC, Citizens Bank, N.A. and Royal Bank of Canada for (i) a seven-year senior

secured term loan facility of $550 million (the "Term Loan Facility") and (ii) a five-year senior secured revolving credit facility (the "Revolving Facility" and, together with the Term Loan Facility, the "Facilities"). The Company will fund the transaction with existing cash and the Term Loan Facility. The Facilities will be subject to certain customary representations, warranties and covenants. The funding of the Facilities is subject to the Company's compliance with customary terms and conditions precedent as set forth in the Commitment Letter, including the execution and delivery of definitive documentation consistent with the Commitment Letter and the substantially simultaneous consummation of the Merger on terms consistent with the Merger Agreement.

Concurrently with the execution of the Merger Agreement, certain members of Webroot's management team have entered into employment agreements and restrictive covenant agreements with the Company which will become effective upon consummation of the Merger.

The foregoing summary of the Merger Agreement is summary in nature and is qualified in its entirety by reference to the full and complete terms of the Merger Agreement. A copy of the Merger Agreement will be filed as an exhibit to the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2019, if not otherwise filed prior to that. When filed, the Form 10-Q or other form or report will also be available on the Company's website at carbonite.com. The above description of the Merger Agreement is not intended to provide any other factual information about Webroot, the Company, or their respective subsidiaries or affiliates. The representations, warranties, and covenants contained in the Merger Agreement were made only for purposes of the Merger Agreement and only as of specific dates, were solely for the benefit of the parties to the Merger Agreement, and may be subject to limitations agreed upon by the parties in connection with negotiating the terms of the Merger Agreement, including being qualified by confidential disclosures made by each party to the other for the purposes of allocating contractual risk between them. In addition, certain representations and warranties may be subject to a contractual standard of materiality different from those generally applicable to investors and may have been used for the purpose of allocating risk between the parties rather than establishing matters as facts. Information concerning the subject matter of the representations, warranties, and covenants may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in public disclosures by Webroot or the Company. Investors should not rely on the representations, warranties, or covenants or any description thereof as characterizations of the actual state of facts or condition of Webroot, the Company, or any of their respective subsidiaries, affiliates, or businesses.

**Item 2.02        Results of Operations and Financial Condition**

On February 7, 2019, the Company issued a press release announcing its financial results for the quarter and full year ended December 31, 2018. A copy of the press release is furnished as Exhibit 99.2 to this Current Report on Form 8-K and is incorporated herein by reference.

The information furnished under this Item 2.02, including Exhibit 99.2 incorporated by reference herein, shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 5.02        Departures of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Appointment of Director*

On February 6, 2019, Ms. Linda Connly was appointed to serve as a director on the Board of Directors (the "Board") of the Company. Ms. Connly will serve, subject to the terms of the Company's Amended and Restated Certificate of Incorporation, as Amended, and Restated Bylaws, as a Class II director and hold office until the Company's 2019 Annual Meeting of Stockholders.

In connection with her appointment to the Board, the Company entered into an offer letter with Ms. Connly (the "Offer Letter") whereby the Company agreed to grant Ms. Connly restricted shares with respect to $200,000 of the Company's Common Stock, which restricted shares shall vest ratably in quarterly installments over three years contingent upon Ms. Connly's continued service as a director of the Company, and shall automatically vest in full and become exercisable immediately prior to a change in control of the Company. In addition, Ms. Connly shall receive compensation in accordance with the terms of the Company's director compensation program for non-employee directors, the terms of which are disclosed in the Company's definitive proxy statement on Schedule 14A as filed with the SEC on March 29, 2018. The

Company also entered into its standard form of indemnification agreement with Ms. Connly. The foregoing summary of the Offer Letter is summary in nature and is qualified in its entirety by reference to the full and complete terms of the Offer Letter. A copy of the Offer Letter is attached hereto as Exhibit 10.1 to this Current Report on Form 8-K and is incorporated herein by reference.

The Company has had no transaction since the beginning of its last fiscal year, and has no currently proposed transaction, in which Ms. Connly has a direct or indirect material interest. There are no family relationships required to be disclosed pursuant to Item 401(d) of Regulation S-K or transactions with related persons required to be disclosed pursuant to Item 404(a) of Regulation S-K involving Ms. Connly.

*Amendment to Mr. Mohamad Ali's Employment Agreement*

Also on February 6, 2019, the Company and Mr. Mohamad Ali, the President and Chief Executive Officer of the Company and a member of the Company's Board, entered into a second amendment (the "Amendment") to the Executive Employment Agreement, dated as of December 3, 2014, as amended on January 8, 2015 (the "Ali Employment Agreement"), between the Company and Mr. Ali. The Amendment was entered into in order to align certain definitions between the Ali Employment Agreement and the Company's standard compensation documents, as well as provide certain new Change in Control severance provisions to Mr. Ali. In the event Mr. Ali is terminated by the Company without Cause (as defined in the Ali Employment Agreement) or he resigns for Good Reason (as defined in the Amendment), in either case within twelve (12) months following a Change of Control (as defined in the Amendment), Mr. Ali shall be entitled to (i) severance equal to twenty-four (24) months of his base salary, (ii) his total target bonus as if it had been achieved at 100% for the fiscal year in which the Change of Control occurred, and (iii) a lump-sum equal to eighteen (18) times the Company's portion of his monthly premium payments for COBRA coverage elected by Mr. Ali and his eligible dependents, if applicable, in each instance payable in one lump sum payment within sixty (60) days following the date of termination. The foregoing summary of the Amendment is summary in nature and is qualified in its entirety by reference to the full and complete terms of the Amendment. A copy of the Amendment is filed as Exhibit 10.2 to this Current Report on Form 8-K and is incorporated herein by reference.

*Director Resignation*

On February 7, 2019, Mr. Peter Gyenes resigned as a member of the Board of the Company to focus more on his other board responsibilities. At the time of his resignation, Mr. Gyenes was serving as chairman of the Nominating and Governance Committee and as a member of the Compensation Committee. The Company and the Board expressed sincere gratitude to Mr. Gyenes for his years of service.

**Item 7.01        Regulation FD Disclosure**

On February 7, 2019, the Company issued a press release announcing its agreement to acquire Webroot. A copy of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

In connection with the issuances of the press releases attached hereto as Exhibit 99.1 and Exhibit 99.2, the Company is holding a public conference call and webcast on February 7, 2019, at 5:30 p.m. ET, during which the Company will provide the investor presentation attached as Exhibit 99.3 to this Current Report. The presentation will also be posted on the investor relations portion of the Company's website.

The information furnished under this Item 7.01, including Exhibit 99.1, Exhibit 99.2 and Exhibit 99.3 incorporated by reference herein, shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01        Exhibits**

(d)    Exhibits.

10.1 Offer Letter Agreement with Linda Connly
10.2 Second Amendment to Employment Agreement with Mohamad Ali, dated February 6, 2019
99.1 Webroot Press Release, dated February 7, 2019
99.2 Financial Results Press Release, dated February 7, 2019
99.3 Investor Presentation, dated February 7, 2019

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized on February 7, 2019.

CARBONITE, INC.

By:    /s/ Danielle Sheer

Name:    Danielle Sheer

Title:    General Counsel



**Exhibit 10.1**

**OFFER LETTER**

Dear Linda:

It is a pleasure to offer you a position on the Carbonite team! This Offer Letter serves to confirm the details of our offer as follows:

| | |
|---|---|
| **Position**: | **Non-Executive Director** |
| **Class**: | You will be appointed to serve as a Class II Director and will be eligible for election at Carbonite's 2019 Annual Meeting of Stockholders. |
| **Compensation**: | You will be eligible to receive cash compensation of $35,000 annually for your service as a Non-Executive Director. |
| **Initial Equity Award:** | You will receive restricted stock units with respect to $200,000 in value of Restricted Stock Awards, vesting over a three-year period. In the event of a change-of-control of Carbonite, these options will be subject to full acceleration. |
| **Annual Equity Award for Continued Service:** | Pursuant to Carbonite's current director compensation policy, upon each annual meeting of Carbonite's stockholders, you will receive $200,000 in value of Restricted Stock Awards, vesting on the earlier of the one year of the date of grant or the next annual meeting of stockholders. In the event of a change-of-control, these Restricted Stock Awards will be subject to full acceleration. The provisions of this section are subject to change by the Board at any time and from time to time. |
| **Additional Compensation:** | As roles change, if you are elected to a committee of the board, or elected as chairwoman of a committee, your compensation may increase as provided in Carbonite's director compensation policy as in effect from time to time, or as otherwise determined by the Board. Carbonite's current Board of Directors Compensation Package is attached hereto at <u>Appendix A</u>. |
| **Indemnification Agreement:** | You are eligible to enter into Carbonite's standard Indemnification Agreement, attached hereto at <u>Appendix B</u>. |
| **Expiration and Modification:** | Except as set forth herein, this Offer Letter may not be modified or amended except by a written agreement, signed by the Chairman of the Nominating & Governance Committee and by you. |
| **Orientation:** | A new Board member package and a Board/Management Orientation schedule will be delivered to you to help you orient to Carbonite Board service. |

The terms of the offer set forth above are subject to the approval of the Board, which will establish an effective date of appointment.

**Sincerely,**

/s/ Peter Gyenes

Peter Gyenes
Chairman of the Nominating & Governance Committee

---

### ACCEPTANCE AND ACKNOWLEDGMENT

I accept the offer to join the Board of Directors from Carbonite as set forth in the Offer Letter.

Signature:    /s/ Linda Connly

Name:         Linda Connly

**Exhibit 10.2**

**SECOND AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT**

This SECOND AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT (this "Second Amendment") is made and entered into as of February 6, 2019 (the "Amendment Date"), by and between Carbonite, Inc. (the "Company") and Mohamad Ali ("Executive").

WHEREAS, in connection with the appointment of Executive as President and Chief Executive Officer of the Company, the Company and Executive entered into an Executive Employment Agreement, dated as of December 3, 2014 (as amended by the Amendment to Executive Employment Agreement, dated as of January 8, 2015, the "Agreement").

WHEREAS, on July 27, 2018, the Company's board of directors (the "Board") amended the Company's 2011 Equity Award Plan and Senior Executive Severance Plan to implement consistency in defined terms across the Company's compensation plans and agreements.

WHEREAS, the Board desires to amend the Agreement to complete the alignment of definitions for consistency across the Company's compensation and employment documentation and agreements, as well as to adjust Executive's severance compensation to better align with similarly situated individuals at peer companies.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties hereto hereby enter into this Second Amendment as of the Amendment Date as follows:

1. **Section 9(e) Termination of Employment**. Section 9(e) of the Agreement is hereby amended and restated as follows:

*(e) Good Reason*. For the purposes of this Agreement, "Good Reason" shall have the meaning set forth in the Company's 2011 Equity Award Plan, as amended on July 26, 2018, and as reflected herein to include the italics:

"Good Reason" means that the Participant has complied with the Good Reason Process following the occurrence of any of the following events:

*(*i) a material diminution in the Participant's responsibilities, authority or duties, *including, without limitation, being the chief executive officer*;

(ii) a material diminution in the Participant's base salary or annual bonus opportunity;

(iii) a relocation of more than 25 miles from the office at which the Participant provides services to the Company, or

(iv) any failure by the Company to obtain the written assumption of this Plan by any successor to the Company.

2. **Section 9(f) Termination of Employment**. A new Section 9(f) is hereby added to the Agreement, as follows:

*(f) Change of Control*. For the purposes of this Agreement, "Change of Control" shall have the meaning set forth in the Company's 2011 Equity Award Plan, as amended on July 26, 2018.

3. **Section 10. Obligations of the Company Upon Termination**. Section 10 of the Agreement is hereby amended and restated as follows:

**10. Obligations of the Company Upon Termination.**

(a) *Accrued Obligations.* Within thirty (30) days following termination of your employment for any reason, you (or your estate) shall be entitled to receive a lump sum payment equal to your earned but unpaid Base Salary through the date of termination, any bonus if declared or earned but not yet paid for a completed fiscal year, any expenses owed to you, and any amount arising from your participation in, or benefits under any employee benefit plans, programs or arrangements, which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements (collectively, "Accrued Obligations").

(b) *Termination without Cause or for Good Reason*. In addition to the Accrued Obligations, if at any time following the date of this Agreement your employment or this Agreement is terminated by the Company without Cause or you resign your employment for Good Reason (other than under the circumstances described in Section 10(c)), you will be entitled to receive: (i) severance equal to twelve (12) months of your Base Salary, payable in cash, in one lump sum payment within sixty (60) days following the date of termination, and (ii) in the event that you timely elect to continue health, vision and/or dental coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), the Company will pay a lump sum payment equal to twelve (12) times the Company's portion of your monthly premium payments for each such coverage elected by you and your eligible dependents, if applicable, in one lump sum payment within sixty (60) days following the date of termination.

(c) *Termination following a Change of Control*. If at any time following the date of this Agreement, your employment or this Agreement is terminated by the Company without Cause or you resign your employment for Good Reason, in either case within twelve (12) months following a Change of Control, in addition to the Accrued Obligations (but in lieu of the payments described in Section 10(b)), you will be entitled to receive: (i) severance equal to twenty-four (24) months of your Base Salary, (ii) your total target bonus as if it had been achieved at 100% for the fiscal year in which the Change of Control occurred, in each case payable in cash, in one lump-sum payment within sixty (60) days following your termination date, and (iii) in the event that you timely elect to continue health, vision and/or dental coverage pursuant to COBRA, the Company will pay eighteen (18) times the Company's portion of your monthly premium payments for each such coverage elected by you and your eligible dependents, if applicable, in one lump sum payment to you within sixty (60) days following the date of termination.

(d) *Release*. The foregoing and any rights you have under the equity compensation provisions of this Agreement or the Plan shall be your sole and exclusive remedy and in lieu of any other rights or remedies to which you may otherwise be entitled, whether at law, tort or contract, in equity or under this letter agreement upon or with respect to such termination of employment. Further, the receipt of any payment pursuant to Section 10(b) or 10(c) will be subject to you signing and not revoking a waiver of claims and general release in substantially the form attached hereto as Exhibit A (the "Release"), as such waiver may be modified from time to time to provide the broadest form of release and waiver of claims given the current state of the law. If within forty-five (45) days following your termination date, you do not either (i) execute the Release or (ii) you are solely responsible for the Release not becoming effective and irrevocable, you will forfeit all rights to any severance payments hereunder. In no event will severance payments be paid or provided unless and until the Release becomes effective. Except as otherwise expressly provided herein or in the Plan, you shall not be entitled to any other salary, bonuses, employee benefits or compensation from the Company after the termination of employment and all of your rights to salary, bonuses, employee benefits and other compensation hereunder which would have accrued or become payable after the date of termination of employment shall cease and be forfeited upon such termination, other than those expressly required under applicable law (such as COBRA).

4. **Governing Law; Jurisdiction**. This Amendment shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principle of conflicts of laws. Each of the parties agrees that any dispute between the parties shall be resolved only in the courts of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts and the appellate courts having jurisdiction of appeals in such courts.

5. **Effect of Amendment**. Except as modified hereby, the Agreement is reaffirmed in all respects, and all references therein to "the Agreement" shall mean the Agreement, as modified hereby.

6. **Execution in Counterparts**. This Second Amendment may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Signatures delivered via facsimile or electronic file shall be the same as original signatures.

**IN WITNESS WHEREOF**, the parties have executed this Second Amendment as of the date first set forth above.


CARBONITE, INC.

/s/Todd Krasnow
By: Todd Krasnow
Its: Director


MOHAMAD ALI

/s/Mohamad Ali

**Exhibit 99.1**



**Carbonite to Acquire Webroot, Creating a Leader in Endpoint Data Protection and Security**

*Combination of backup and recovery with cloud-based cybersecurity delivers a new approach to protecting endpoints*

*Complementary sales channels reach customers with a complete solution that's powerful, yet simple*

*Transaction valued at $618.5 million; expected to be immediately accretive on an earnings and cash flow basis*

**Boston, Ma. and Broomfield, Co., February 7, 2019** - Carbonite, Inc. (Nasdaq: CARB) ("Carbonite" or the "Company"), a leading cloud-based data protection provider, and Webroot Inc. ("Webroot"), a leading cybersecurity company, today announced that they have entered into a definitive agreement under which Carbonite will acquire Webroot for approximately $618.5 million in cash. Carbonite will fund the transaction with existing cash on hand and funds secured under a new credit facility. The combined business will address a top vulnerability of businesses - the endpoint - with a comprehensive approach to protection through cloud-based cybersecurity, paired with cloud-based backup and recovery. The transaction is expected to be immediately accretive on an earnings and cash flow basis, following the close of the transaction.

Founded in 1997, Webroot is a private company that secures endpoints and provides network protection, security awareness training and threat intelligence services. With its best-in-class technology, experienced team, and extensive go-to-market capabilities, including a powerful network of Managed Service Providers ("MSP") and Remote Monitoring and Management ("RMM") relationships, Webroot has established itself as a leader in the cybersecurity space. Webroot's fiscal year 2018 revenue was approximately $215.0 million.

"The acquisition of Webroot dramatically accelerates our progress towards becoming the leading data protection company," said Mohamad Ali, President and Chief Executive Officer of Carbonite. "With threats like ransomware evolving daily, our customers and partners are increasingly seeking a more comprehensive solution that is both powerful and easy to use. Backup and recovery, combined with endpoint security and threat intelligence, is a differentiated solution that provides one, comprehensive data protection platform."

Ali continued, "The Webroot team has a passion for building technology to simplify the way customers protect their important data, and we are excited to welcome them."

"Carbonite and Webroot have a common focus on making data protection and cybersecurity solutions accessible and easy to use, as well as a dedication to customer success, and we are thrilled to become part of their team," said Mike Potts, Webroot CEO. "Together we can deliver tremendous value to our customers and partners."

<u>Compelling Strategic and Financial Benefits</u>

- **Next-Generation Technology Platform:** Combining Carbonite's cloud-based data protection solutions and Webroot's cloud-based machine learning technology will create a next-generation security platform to serve growing customer needs.

- **A Comprehensive Solution, Delivering Better Results:** A common set of customers will benefit from an easy-to-use, cloud-based, integrated offering, which includes a unique ransomware prevention and recovery solution.

- **Consistent Routes to Market and Expansion of Addressable Market:** Webroot and Carbonite share a go-to-market focus and a complementary ecosystem of channel partners. Webroot's leading MSP partners and RMM relationships provide Carbonite with a new channel for increased scale and market expansion.

- **Immediately Accretive:** Based on Webroot's current operating plan and existing customer contracts, the transaction is expected to be immediately accretive on an earnings and cash flow basis following the close of the transaction.

<u>Transaction Details</u>

Carbonite will finance the acquisition with fully committed financing and existing cash on hand.

The transaction is expected to close in the first quarter of 2019, subject to the receipt of regulatory clearance and other customary closing conditions.

The transaction has been unanimously approved by the Boards of Directors of both companies and by the requisite percentage of stockholders of Webroot.

For further information on the transaction, please visit http://CarboniteWebroot.transactionannouncement.com.

**Advisors**

RBC Capital Markets, LLC is serving as financial advisor to Carbonite, and Barclays is serving as financial advisor to Carbonite. Skadden, Arps, Slate, Meagher & Flom LLP is serving as Carbonite's legal counsel. Barclays, Citizens Banks, and RBC Capital Markets, LLC have provided committed financing in support of the transaction and Simpson Thacher & Bartlett LLP is serving as financing counsel. William Blair & Company, L.L.C. is serving as exclusive financial advisor to Webroot and Goodwin Procter LLP and Holland & Hart LLP are serving as legal counsel.

**Conference Call and Webcast Details**

Carbonite will host a live conference call on Thursday, February 7th at 5:30 p.m. ET to discuss the transaction and the Company's financial results for the fourth quarter and full year 2018. This call will be webcast live and can be found in the investor relations section of the Company's website at http://investor.carbonite.com.

The conference call can also be accessed by dialing 877-303-1393 in the United States or 315-625-3228 internationally, with the passcode 9768609.

**About Carbonite**

Carbonite provides a robust Data Protection Platform for businesses, including backup, disaster recovery, high availability and workload migration technology. The Carbonite Data Protection Platform supports global businesses with secure cloud infrastructure. To learn more visit www.Carbonite.com.

**About Webroot**

Webroot harnesses the cloud and artificial intelligence to protect businesses and individuals against cyber threats. Webroot is a leading cybersecurity provider for managed service providers and small businesses, who rely on Webroot for endpoint protection, network protection, and security awareness training. Webroot BrightCloud® Threat Intelligence Services are used by market-leading companies like Cisco, F5 Networks, Citrix, Aruba, A10 Networks, and more. Leveraging the power of machine learning to protect millions of businesses and individuals, Webroot secures the connected world. Headquartered in Colorado, Webroot operates globally across North America, Europe, and Asia. Discover Smarter Cybersecurity® solutions at www.Webroot.com.

**Cautionary Language Concerning Forward-Looking Statements**

Certain matters discussed in this press release, including under "Business Outlook," have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to consummate the Webroot acquisition, integrate the Webroot acquisition and other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefits, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2017 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

**<u>Contacts</u>**

**Carbonite**

Investor Relations:

Jeremiah Sisitsky
781-928-0713
<u>investor.relations@carbonite.com</u>

or

Media:

Sarah King
617-421-5601
<u>Media@Carbonite.com</u>

MJ Baker, Weber Shandwick (for Carbonite)
617-520-7128
<u>wswnacarbonite@webershandwick.com</u>

**Exhibit 99.2**

**Carbonite Announces Fourth Quarter and Full Year 2018 Financial Results**

**BOSTON, MA - February 7, 2019** - Carbonite, Inc. (NASDAQ: CARB), a global leader in data protection, today announced financial results for the quarter and full year ended December 31, 2018. Carbonite also announced that Linda Connly, a sales and marketing veteran, has joined its Board of Directors.

**Full Year 2018 Highlights:**

- Revenue of $296.4 million increased 24% year-over-year.
- Non-GAAP revenue of $301.9 million increased 23% year-over-year.[1]
- Net income was $7.6 million, compared to net loss of ($4.0) million in 2017.
- Net income (loss) per share was $0.24 (basic) and $0.22 (diluted), as compared to ($0.14) in 2017 (basic and diluted).
- Non-GAAP net income per share was $1.80 (basic) and $1.66 (diluted), as compared to $0.82 (basic) and $0.79 (diluted) in 2017.[2]
- Adjusted EBITDA of $77.0 million, or 26% of non-GAAP revenue, compared to $38.9 million, or 16% of non-GAAP revenue in 2017.[3]

"We delivered on our strategic priorities in 2018," said Mohamad Ali, CEO of Carbonite. "We significantly strengthened our product platform and introduced one of the most complete Software-as-a-Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability. In 2019 we plan to build upon these efforts, further expanding our data protection platform and delivering a broader set of solutions to our customers, while we invest aggressively in our distribution channels with a focus on driving continued growth and profitability."

**Recent Highlights:**

- In a separate announcement, Carbonite today announced that it has entered into a definitive agreement to acquire Webroot, Inc., a leading cybersecurity company, for approximately $618.5 million in cash. The Company will fund the transaction with existing cash on hand and funds secured under a new credit facility. Following closing, expected in the first quarter of 2019, the transaction is expected to be immediately accretive on an earnings and cash flow basis.
- Linda Connly, a sales and marketing veteran with more than 25 years of experience, was appointed to the Carbonite Board of Directors as a Class II director.

The Company uses a variety of operational and financial metrics, including non-GAAP financial measures, to evaluate its performance and financial condition. The accompanying financial data includes additional information regarding these metrics and a reconciliation of non-GAAP financial information to GAAP. The presentation of non-GAAP financial information should not be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

**Fourth Quarter 2018 Results:**

- Revenue for the fourth quarter was $77.0 million, an increase of 25% from $61.7 million in the fourth quarter of 2017. Non-GAAP revenue for the fourth quarter was $78.0 million, an increase of 24% from $62.8 million in the fourth quarter of 2017.[1]
- Bookings for the fourth quarter were $78.8 million, an increase of 31% from $60.2 million in the fourth quarter of 2017.[4]
- Net income for the fourth quarter was $0.7 million, compared to net loss of ($1.6) million in the fourth quarter of 2017. Non-GAAP net income for the fourth quarter was $16.2 million, compared to non-GAAP net income of $8.8 million in the fourth quarter of 2017.[2]
- Net income per share for the fourth quarter was $0.02 (basic and diluted), compared to net loss per share of ($0.06) (basic and diluted) in the fourth quarter of 2017. Non-GAAP net income per share was $0.47 (basic) and $0.45 (diluted) for the fourth quarter, compared to non-GAAP net income per share of $0.31 (basic) and $0.30 (diluted) in the fourth quarter of 2017.[2]
- Adjusted EBITDA for the fourth quarter was $20.8 million, compared to $13.0 million in the fourth quarter of 2017.[3]
- Gross margin for the fourth quarter was 71.2%, compared to 72.8% in the fourth quarter of 2017. Non-GAAP gross margin was 77.9% in the fourth quarter, compared to 77.6% in the fourth quarter of 2017.[5]

- Cash flow from operations for the fourth quarter was $19.8 million, compared to $13.9 million in the fourth quarter of 2017. Adjusted free cash flow for the fourth quarter was $17.1 million, compared to $9.7 million in the fourth quarter of 2017.[6]

**Full Year 2018 Results:**

- Revenue for the full year was $296.4 million, an increase of 24% from $239.5 million in 2017. Non-GAAP revenue for the full year was $301.9 million, an increase of 23% from $246.1 million in 2017.[1]
- Bookings for the full year were $307.0 million, an increase of 25% from $245.9 million in 2017.[4]
- Net income for the full year was $7.6 million, compared to net loss of ($4.0) million in 2017. Non-GAAP net income for the full year was $55.9 million, compared to non-GAAP net income of $22.8 million in 2017.[2]
- Net income per share for the full year was $0.24 (basic) and $0.22 (diluted), compared to net loss per share of ($0.14) (basic and diluted) in 2017. Non-GAAP net income per share was $1.80 (basic) and $1.66 (diluted) for the full year, compared to non-GAAP net income per share of $0.82 (basic) and $0.79 (diluted) in 2017.[2]
- Adjusted EBITDA for the full year was $77.0 million, compared to $38.9 million in 2017.[3]
- Gross margin for the full year was 71.2%, compared to 70.7% in 2017. Non-GAAP gross margin for the full year was 77.4%, compared to 75.5% in 2017.[5]
- Cash flow from operations for the full year was $53.6 million, compared to $31.2 million in 2017. Adjusted free cash flow for the full year was $50.1 million, compared to $20.1 million in 2017.[6]

---

[1] Non-GAAP revenue excludes the impact of purchase accounting adjustments for acquisitions.

[2] Non-GAAP net income and non-GAAP net income per share excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, intangible asset impairment charges, non-cash convertible debt interest expense and the income tax effect of non-GAAP adjustments.

[3] Adjusted EBITDA is calculated by excluding the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense, intangible asset impairment charges and acquisition-related expense from net income (loss).

[4] Bookings represent the aggregate dollar value of customer subscriptions and software arrangements, which may include multiple revenue elements, such as software licenses, hardware, professional services and post-contractual support, received during a period and are calculated as revenue recognized during a particular period plus the change in total deferred revenue, excluding deferred revenue recorded in connection with acquisitions, divestitures and the adoption impact of Topic 606, net of foreign exchange and the change in unbilled revenue during the same period.

[5] Non-GAAP gross margin excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, acquisition-related expense, and intangible asset impairment charges.

[6] Adjusted free cash flow is calculated by subtracting the cash paid for the purchase of property and equipment and adding the payments related to acquisitions, restructuring, and litigation to net cash provided by operating activities.

**About Linda Connly**

Ms. Connly has extensive experience leading go-to-market transformations within technology organizations. She currently serves as the interim Managing Director, Americas, at Rackspace, a managed cloud computing company, and is the Founder and CEO of The Connly Advisory Services, a consulting practice that provides go-to-market advisory services. Prior to these roles, she led the sales integration for Dell and EMC, the largest tech merger in history, and led EMC's Global Inside Sales.

In addition to her corporate leadership experience, Ms. Connly has been awarded a number of industry accolades, including the Boston Chamber of Commerce Pinnacle Award for "Achievement in Management," and VAR Business Magazine's "50 Most Powerful Women in Technology."

"Ms. Connly is an exceptional addition to our board and brings a powerful combination of sales, marketing, and technology experience to Carbonite," said Mohamad Ali, President and CEO at Carbonite. "She has expertise in optimizing the go-to-market strategies for some of the most successful technology organizations today and she will play a key role in helping Carbonite execute on our long-term vision."

**Business Outlook**

Based on the information available as of February 7, 2019, Carbonite expects the following for the first quarter and full year of 2019:

First Quarter 2019:

|  | Current Guidance (2/7/2019) |
| --- | --- |
| GAAP Revenue | $76.5 - $77.5 million |
| Non-GAAP Revenue | $77.0 - $78.0 million |
| Adjusted EBITDA | $20.0 - $21.5 million |

Full Year 2019:

|  | Current Guidance (2/7/2019) |
| --- | --- |
| GAAP Revenue | $468 - $482 million |
| Non-GAAP Revenue | $488 - $502 million |
| Non-GAAP Gross Margin | 80.5% - 81.5% |
| Adjusted EBITDA | $129 - $134 million |

Carbonite's expectations of adjusted EBITDA for the first quarter and full year of 2019 excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense and acquisition-related expense from net income (loss). The "Business Outlook" above assumes nine months of contribution from Webroot.

**Conference Call and Webcast Information**

Carbonite will host a conference call on Thursday, February 7, 2018 at 5:30 p.m. ET to review these results and discuss its agreement to acquire Webroot, announced separately today. This call will be webcast live and can be found in the investor relations section of the Company's website at http://investor.carbonite.com. The conference call can also be accessed by dialing (877) 303-1393 in the United States or (315) 625-3228 internationally with the passcode 9768609.

Following the completion of the call, a recorded replay will be available on the Company's website, http://investor.carbonite.com, under "Events & Presentations".

**Non-GAAP Financial Measures**

To supplement our consolidated financial statements presented in accordance with GAAP, this press release contains non-GAAP financial measures, including bookings, non-GAAP revenue, non-GAAP business revenue, non-GAAP consumer revenue, non-GAAP gross margin, non-GAAP net income and non-GAAP net income per share, non-GAAP operating expense, adjusted EBITDA and adjusted free cash flow.

The Company believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and ordinary results of operations. The Company's management uses these non-GAAP measures to compare the Company's performance to that of prior periods and uses these measures in financial reports prepared for management and the Company's board of directors. The Company believes that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing the Company's financial measures with other software-as-a-service companies, many of which present similar non-GAAP financial measures to investors.

The Company does not consider these non-GAAP measures in isolation or as an alternative to financial measures determined in accordance with GAAP. The principal limitation of these non-GAAP financial measures is that they exclude significant items that are required by GAAP to be recorded in the Company's financial statements. In addition, they are subject to inherent limitations as they reflect the exercise of judgments by management. The Company urges investors to review the reconciliation of its non-GAAP financial measures to the comparable GAAP financial measures provided in the tables at the end of this press release, and not to rely on any single financial measure to evaluate the Company's business.

With respect to our expectations under "Business Outlook" above, the Company has not reconciled non-GAAP gross margin to gross margin or adjusted EBITDA to net income (loss) in this press release because we do not provide guidance for amortization expense on intangible assets, depreciation expense, stock-based compensation expense, litigation-related expense, income tax expense, restructuring-related expense, interest expense, and acquisition-related expense as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors.

**Cautionary Language Concerning Forward-Looking Statements**

Certain matters discussed in this press release, including under "Business Outlook," have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to consummate the Webroot acquisition, integrate the Webroot acquisition and other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefits, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2017 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

**About Carbonite**

Carbonite provides a robust Data Protection Platform for businesses, including backup, disaster recovery, high availability and workload migration technology. The Carbonite Data Protection Platform supports global businesses with secure cloud infrastructure. To learn more visit www.Carbonite.com.

**Investor Relations Contact:**

Jeremiah Sisitsky
Carbonite
781-928-0713
investor.relations@carbonite.com

**Media Contact:**

Sarah King
Carbonite
617-421-5601
media@carbonite.com

Carbonite, Inc.
Consolidated Statement of Operations (unaudited)
(In thousands, except share and per share amounts)

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Revenue: | | | | |
| Services | $ 69,406 | $ 53,272 | $ 263,084 | $ 207,403 |
| Product | 7,560 | 8,420 | 33,324 | 32,059 |
| Total revenue | 76,966 | 61,692 | 296,408 | 239,462 |
| Cost of revenue: | | | | |
| Services | 17,242 | 14,036 | 68,024 | 59,212 |
| Product | 382 | 549 | 1,730 | 2,676 |
| Amortization of intangible assets | 4,562 | 2,226 | 15,629 | 8,179 |
| Total cost of revenue | 22,186 | 16,811 | 85,383 | 70,067 |
| Gross profit | 54,780 | 44,881 | 211,025 | 169,395 |
| Operating expenses: | | | | |
| Research and development | 14,315 | 12,125 | 57,467 | 46,160 |
| General and administrative | 11,468 | 9,463 | 50,547 | 42,862 |
| Sales and marketing | 22,507 | 21,134 | 85,637 | 89,299 |
| Amortization of intangible assets | 3,922 | 557 | 12,437 | 2,092 |
| Restructuring charges | 10 | 1,047 | 1,270 | 1,047 |
| Total operating expenses | 52,222 | 44,326 | 207,358 | 181,460 |
| Income (loss) from operations | 2,558 | 555 | 3,667 | (12,065) |
| Interest expense | (2,662) | (2,436) | (11,556) | (7,447) |
| Interest income | 1,074 | 217 | 1,877 | 581 |
| Other income (expense), net | 179 | 123 | 227 | 1,252 |
| Income (loss) before income taxes | 1,149 | (1,541) | (5,785) | (17,679) |
| Provision (benefit) for income taxes | 430 | 73 | (13,347) | (13,677) |
| Net income (loss) | $ 719 | $ (1,614) | $ 7,562 | $ (4,002) |
| Net income (loss) per share: | | | | |
| Basic | $ 0.02 | $ (0.06) | $ 0.24 | $ (0.14) |
| Diluted | $ 0.02 | $ (0.06) | $ 0.22 | $ (0.14) |
| Weighted-average shares outstanding: | | | | |
| Basic | 34,213,859 | 27,971,459 | 31,036,237 | 27,779,098 |
| Diluted | 36,374,151 | 27,971,459 | 33,672,686 | 27,779,098 |

Carbonite, Inc.
Consolidated Balance Sheets (unaudited)
(In thousands)

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 198,087 | $ | 128,231 |
| Trade accounts receivable, net | | 31,569 | | 22,219 |
| Prepaid expenses and other current assets | | 10,409 | | 6,823 |
| Total current assets | | 240,065 | | 157,273 |
| Property and equipment, net | | 34,101 | | 28,790 |
| Other assets | | 13,876 | | 804 |
| Acquired intangible assets, net | | 117,963 | | 44,994 |
| Goodwill | | 155,086 | | 80,958 |
| Total assets | $ | 561,091 | $ | 312,819 |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 2,114 | $ | 10,842 |
| Accrued compensation | | 11,620 | | 9,892 |
| Accrued expenses and other current liabilities | | 15,844 | | 11,783 |
| Current portion of deferred revenue | | 121,553 | | 100,241 |
| Total current liabilities | | 151,131 | | 132,758 |
| Long-term debt | | 118,305 | | 111,819 |
| Deferred revenue, net of current portion | | 29,151 | | 24,273 |
| Other long-term liabilities | | 5,294 | | 5,704 |
| Total liabilities | | 303,881 | | 274,554 |
| Stockholders' equity | | | | |
| Common stock | | 366 | | 301 |
| Additional paid-in capital | | 451,618 | | 233,343 |
| Treasury stock, at cost | | (48,522) | | (26,616) |
| Accumulated deficit | | (147,902) | | (169,344) |
| Accumulated other comprehensive income | | 1,650 | | 581 |
| Total stockholders' equity | | 257,210 | | 38,265 |
| Total liabilities and stockholders' equity | $ | 561,091 | $ | 312,819 |

Carbonite, Inc.
Consolidated Statement of Cash Flows (unaudited)
(In thousands)

| | Twelve Months Ended December 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Operating activities** | | |
| Net income (loss) | $ 7,562 | $ (4,002) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Depreciation and amortization | 41,786 | 21,731 |
| Amortization of deferred costs | 2,166 | - |
| Gain on disposal of equipment | (191) | (907) |
| Intangible asset impairment charges | - | 352 |
| Impairment of capitalized software | 653 | 1,048 |
| Stock-based compensation expense | 17,607 | 12,742 |
| Benefit for deferred income taxes | (16,625) | (15,392) |
| Non-cash interest expense related to amortization of debt discount | 6,340 | 4,434 |
| Other non-cash items, net | (139) | (533) |
| Changes in assets and liabilities, net of acquisition: | | |
| Accounts receivable | (5,996) | 1,786 |
| Prepaid expenses and other current assets | (3,718) | 254 |
| Other assets | (5,241) | (580) |
| Accounts payable | (7,359) | 5,035 |
| Accrued expenses and other current liabilities | 5,636 | (995) |
| Other long-term liabilities | (236) | 53 |
| Deferred revenue | 11,345 | 6,169 |
| Net cash provided by operating activities | 53,590 | 31,195 |
| **Investing activities** | | |
| Purchases of property and equipment | (13,132) | (17,351) |
| Proceeds from sale of property and equipment and businesses | 860 | 1,250 |
| Proceeds from maturities of derivatives | 4,017 | 534 |
| Purchases of derivatives | (1,428) | (5,040) |
| Payment for intangibles | (5,750) | (1,250) |
| Payment for acquisition, net of cash acquired | (144,597) | (69,798) |
| Net cash used in investing activities | (160,030) | (91,655) |
| **Financing activities** | | |
| Proceeds from exercise of stock options | 1,260 | 4,987 |
| Proceeds from issuance of common stock for secondary offering | 199,279 | - |
| Proceeds from issuance of treasury stock under employee stock purchase plan | 2,586 | 1,052 |
| Payments of withholding taxes in connection with restricted stock unit vesting | (2,862) | (2,050) |
| Proceeds from long-term borrowings, net of debt issuance costs | 88,068 | 177,797 |
| Payments on long-term borrowings | (90,000) | (39,200) |
| Repurchase of common stock | (21,501) | (14,964) |
| Net cash provided by financing activities | 176,830 | 127,622 |
| Effect of currency exchange rate changes on cash | (534) | 1,782 |
| Net increase in cash, cash equivalents and restricted cash | 69,856 | 68,944 |
| Cash, cash equivalents and restricted cash, beginning of period | 128,231 | 59,287 |
| Cash, cash equivalents and restricted cash, end of period | $ 198,087 | $ 128,231 |

Carbonite, Inc.
Reconciliation of GAAP to Non-GAAP Measures (unaudited)
(In thousands, except share and per share amounts)

Reconciliation of GAAP Revenue to Non-GAAP Revenue

|  | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
| --- | --- | --- | --- | --- |
|  | 2018 | 2017 | 2018 | 2017 |
| GAAP revenue | $ 76,966 | $ 61,692 | $ 296,408 | $ 239,462 |
| Add: | | | | |
| Fair value adjustment of acquired deferred revenue | 1,066 | 1,130 | 5,491 | 6,628 |
| Non-GAAP revenue | $ 78,032 | $ 62,822 | $ 301,899 | $ 246,090 |

Reconciliation of GAAP Gross Margin to Non-GAAP Gross Margin

|  | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
| --- | --- | --- | --- | --- |
|  | 2018 | 2017 | 2018 | 2017 |
| Gross profit | $ 54,780 | $ 44,881 | $ 211,025 | $ 169,395 |
| Gross margin | 71.2% | 72.8% | 71.2% | 70.7% |
| Add: | | | | |
| Fair value adjustment of acquired deferred revenue | 1,066 | 1,130 | 5,491 | 6,628 |
| Amortization of intangibles | 4,562 | 2,226 | 15,629 | 8,179 |
| Stock-based compensation expense | 391 | 274 | 1,545 | 1,061 |
| Acquisition-related expense | 12 | 92 | 73 | 401 |
| Intangible asset impairment charges | - | 127 | - | 127 |
| Non-GAAP gross profit | $ 60,811 | $ 48,730 | $ 233,763 | $ 185,791 |
| Non-GAAP gross margin | 77.9% | 77.6% | 77.4% | 75.5% |

Reconciliation of GAAP Net Income (Loss) and Net Income (Loss) per Share to Non-GAAP Net Income and Net Income per Share

| | Three Months Ended December 31, | | Twelve Months Ended, December 31 | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| GAAP net income (loss) | $ 719 | $ (1,614) | $ 7,562 | $ (4,002) |
| Add: | | | | |
| Fair value adjustment of acquired deferred revenue | 1,066 | 1,130 | 5,491 | 6,628 |
| Amortization of intangibles | 8,484 | 2,783 | 28,066 | 10,271 |
| Stock-based compensation expense | 4,146 | 3,523 | 17,607 | 12,742 |
| Litigation-related expense | 7 | 181 | 92 | 374 |
| Restructuring-related expense | 10 | 1,047 | 1,270 | 1,047 |
| Acquisition-related expense | 698 | 430 | 6,894 | 6,794 |
| Intangible asset impairment charges | - | 352 | - | 352 |
| Non-cash convertible debt interest expense | 1,628 | 1,491 | 6,340 | 4,434 |
| Less: | | | | |
| Income tax effect of non-GAAP adjustments | 514 | 566 | 17,458 | 15,807 |
| Non-GAAP net income | $ 16,244 | $ 8,757 | $ 55,864 | $ 22,833 |
| GAAP net income (loss) per share: | | | | |
| Basic | $ 0.02 | $ (0.06) | $ 0.24 | $ (0.14) |
| Diluted | $ 0.02 | $ (0.06) | $ 0.22 | $ (0.14) |
| Non-GAAP net income per share: | | | | |
| Basic | $ 0.47 | $ 0.31 | $ 1.80 | $ 0.82 |
| Diluted | $ 0.45 | $ 0.30 | $ 1.66 | $ 0.79 |
| GAAP weighted-average shares outstanding: | | | | |
| Basic | 34,213,859 | 27,971,459 | 31,036,237 | 27,779,098 |
| Diluted | 36,374,151 | 27,971,459 | 33,672,686 | 27,779,098 |
| Non-GAAP weighted-average shares outstanding: | | | | |
| Basic | 34,213,859 | 27,971,459 | 31,036,237 | 27,779,098 |
| Diluted | 36,374,151 | 29,322,013 | 33,672,686 | 29,079,105 |

Reconciliation of GAAP Operating Expense to Non-GAAP Operating Expense

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2018 | 2017 |
| Research and development | $ 14,315 | $ 12,125 | $ 57,467 | $ 46,160 |
| Less: | | | | |
| Stock-based compensation expense | 536 | 665 | 3,292 | 1,969 |
| Acquisition-related expense | 9 | 77 | 49 | 1,249 |
| Non-GAAP research and development | $ 13,770 | $ 11,383 | $ 54,126 | $ 42,942 |
| | | | | |
| General and administrative | $ 11,468 | $ 9,463 | $ 50,547 | $ 42,862 |
| Less: | | | | |
| Stock-based compensation expense | 2,423 | 2,027 | 9,697 | 7,827 |
| Litigation-related expense | 7 | 181 | 92 | 374 |
| Acquisition-related expense | 666 | 145 | 6,685 | 4,448 |
| Non-GAAP general and administrative | $ 8,372 | $ 7,110 | $ 34,073 | $ 30,213 |
| | | | | |
| Sales and marketing | $ 22,507 | $ 21,134 | $ 85,637 | $ 89,299 |
| Less: | | | | |
| Stock-based compensation expense | 796 | 557 | 3,073 | 1,885 |
| Acquisition-related expense | 11 | 116 | 87 | 696 |
| Intangible asset impairment charges | - | 225 | - | 225 |
| Non-GAAP sales and marketing | $ 21,700 | $ 20,236 | $ 82,477 | $ 86,493 |
| | | | | |
| Amortization of intangible assets | $ 3,922 | $ 557 | $ 12,437 | $ 2,092 |
| Less: | | | | |
| Amortization of intangible assets | 3,922 | 557 | 12,437 | 2,092 |
| Non-GAAP amortization of intangible assets | $ - | $ - | $ - | $ - |
| | | | | |
| Restructuring charges | $ 10 | $ 1,047 | $ 1,270 | $ 1,047 |
| Less: | | | | |
| Restructuring-related expense | 10 | 1,047 | 1,270 | 1,047 |
| Non-GAAP restructuring charges | $ - | $ - | $ - | $ - |

Reconciliation of Revenue to Bookings

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| GAAP revenue | $ 76,966 | $ 61,692 | $ 296,408 | $ 239,462 |
| Add: | | | | |
| Change in deferred revenue | 1,390 | (1,191) | 26,190 | 16,923 |
| Deferred revenue divested | - | - | 288 | 373 |
| Impact of Topic 606 adoption | - | - | 3,998 | - |
| Impact of foreign exchange | 248 | - | 272 | - |
| Less: | | | | |
| Impact of foreign exchange | - | 324 | - | 1,474 |
| Beginning deferred revenue from acquisitions | - | - | 19,740 | 9,420 |
| Change in unbilled revenue | (267) | - | 376 | - |
| Change in deferred revenue and adjustments | 1,905 | (1,515) | 10,632 | 6,402 |
| Bookings | $ 78,871 | $ 60,177 | $ 307,040 | $ 245,864 |

Calculation of Adjusted Free Cash Flow

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Net cash provided by operating activities | $ 19,776 | $ 13,864 | $ 53,590 | $ 31,195 |
| Subtract: | | | | |
| Purchases of property and equipment | 3,205 | 5,407 | 13,132 | 17,351 |
| Free cash flow | 16,571 | 8,457 | 40,458 | 13,844 |
| | | | | |
| Add: | | | | |
| Acquisition-related payments | 219 | 864 | 7,438 | 5,707 |
| Restructuring-related payments | 341 | 359 | 1,927 | 359 |
| Litigation-related payments | 7 | 51 | 282 | 188 |
| Adjusted free cash flow | $ 17,138 | $ 9,731 | $ 50,105 | $ 20,098 |

Reconciliation of EBITDA and Adjusted EBITDA to Net Income (Loss)

| | Three Months Ended December 31, | | Twelve Months Ended December 31, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Net income (loss) | $ 719 | $ (1,614) | $ 7,562 | $ (4,002) |
| Adjustments: | | | | |
| Interest expense, net | 1,588 | 2,219 | 9,679 | 6,866 |
| Income tax provision (benefit) | 430 | 73 | (13,347) | (13,677) |
| Depreciation and amortization | 12,164 | 5,692 | 41,786 | 21,731 |
| EBITDA | 14,901 | 6,370 | 45,680 | 10,918 |
| | | | | |
| Adjustments to EBITDA: | | | | |
| Fair value adjustment of acquired deferred revenue | 1,066 | 1,130 | 5,491 | 6,628 |
| Stock-based compensation expense | 4,146 | 3,523 | 17,607 | 12,742 |
| Litigation-related expense | 7 | 181 | 92 | 374 |
| Restructuring-related expense | 10 | 1,047 | 1,270 | 1,047 |
| Intangible asset impairment charges | - | 352 | - | 352 |
| Acquisition-related expense | 698 | 430 | 6,894 | 6,794 |
| Adjusted EBITDA | $ 20,828 | $ 13,033 | $ 77,034 | $ 38,855 |



# Webroot Acquisition Creates a Leader in Endpoint Data Protection and Security
## Q4 and FY 2018 Financial Results

February 7, 2019

---

## Safe Harbor Statement

Certain matters discussed in these slides and accompanying oral presentation have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should, " "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to consummate the Webroot Inc. transaction, integrate the Webroot Inc. acquisition or other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefit, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2017 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

This presentation contains non-GAAP financial measures including, but not limited to, Bookings, non-GAAP Revenue, non-GAAP Gross Margin, non-GAAP Net Income and non-GAAP Net Income Per Share, Adjusted EBITDA and Adjusted Free Cash Flow. A reconciliation to GAAP can be found in the financial schedules included in our most recent earnings press release located on Carbonite's website, http://investor.carbonite.com, in the Company's filings or with the SEC at www.sec.gov. The presentation of non-GAAP financial information should not be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

**CARBONITE**

## Conference Call Details

- When:                          Thursday, February 7, 2019
- Time:                          5:30 p.m. ET
- Live Call:                     877-303-1393 (U.S.)

                                 315-625-3228 (International)
- Conference ID:                 9768609
- Live / Recorded Webcast:       http://investor.carbonite.com

**CARBONITE** 3

# Agenda

- Carbonite to Acquire Webroot
  - Transaction Overview
  - Webroot Overview
  - Strategic & Financial Rationale
- Q4 and FY 2018 Financial Results
- Q1 and FY 2019 Guidance
  - Webroot Financial Impact



**Mohamad Ali**
President and CEO



**Anthony Folger**
CFO

**Jeremiah Sisitsky**
VP Investor Relations

**CARBONITE** 4

# Transaction Highlights

- ✓ Creates a <u>new approach</u> to protecting endpoints: <u>a top vulnerability</u>

- ✓ Combines leader in <u>endpoint backup and recovery</u> with leader in <u>endpoint security</u>

- ✓ Targets <u>similar customers</u> with powerful yet simple solutions

- ✓ Adds large and growing <u>MSP channel</u> to Carbonite's VAR channel

- ✓ Provides compelling <u>financial</u> benefits in both near and long–term

- ✓ Accelerates Carbonite's <u>vision</u> to become the leading data protection company

**CARBONITE**  5

## Transaction Overview

| | |
|---|---|
| Value | • Transaction valued at approximately $618.5 million |
| Financing | • Financed by:<br>  – $550 million in fully committed term loan financing from Barclays, Citizens Bank, and RBC Capital Markets, LLC<br>  – Existing cash on hand<br>  – Aggressive de-levering plan through strong combined free cash flow |
| Accretive Following Close | • Immediately accretive on an earnings and cash flow basis |
| Timing and Approval | • Expected to close in Q1 2019<br>• Subject to the receipt of regulatory clearance and other customary closing conditions |
| Post-Close Structure | • John Post, Webroot's current Chief Financial Officer, will be taking general management responsibilities for the Webroot business upon the close of the transaction |



**CARBONITE** 6

# Webroot Overview

Founded in 1997, Webroot is one of the leading cybersecurity platforms for managed service providers ("MSPs") and small and medium-sized businesses ("SMBs")

| >14,000 MSP Partners | Company Highlights |
|---|---|
| | • Approximately $215m in FY 2018 revenue (FY ended June 30, 2018)<br>• Business (~40%) - Rapidly growing, driven by success with MSP and RMM channels<br>• Consumer (~60%) - Growing and profitable, driven by direct/online and through retail channel<br>• 600+ employees<br>• Global company headquartered in Broomfield, CO |
| >300,000 protected businesses | Competitive Offerings & Advantages |
| Integrated with leading Remote Monitoring and Management ("RMM") vendors | • Threat intelligence services powered by millions of endpoints<br>• Endpoint and network protection<br>• Security awareness training<br>• Cloud-architected and fully-integrated platform<br>• Highly-automated and scaled 5th generation machine learning |

**CARBONITE** 7

## Carbonite's Vision

To be the world's leading **data protection company**, enabling businesses to operate continuously in the face of every threat





# Successful Acquisition and Integration Track Record

M&A continues to be core competency



## Strategically Compelling

| | |
|---|---|
| **Next Generation Business Model** | • Modern cloud-based platform for data protection<br>• Cloud architected platform powered machine learning for security |
| **Comprehensive Solution Delivering Better Results** | • Similar customer base that benefits from powerful, yet easy-to-use, cloud-based bundled offering<br>• Comprehensive Ransomware offering purpose-built for SMBs<br>• Upgrade cycle from legacy anti-virus software creates potential for accelerated growth |
| **Consistent Routes to Market and Expansion of Addressable Market** | • Ability to leverage Webroot's strong go-to-market resources<br>• Webroot's leading MSP partners provide Carbonite with significant expansion opportunities alongside its Value-Added-Reseller ("VAR") channel<br>• Increased scale and market penetration opportunity |



**CARBONITE**  11

# Combined Offering Directly Aligns with Customer Needs

### Carbonite and Webroot Offerings & MSP / SMB Security Needs Align[1]...



- Backup/Disaster Relief — 84%
- Endpoint Protection — 80%
- Network Monitoring Services — 70%
- Virtual Private Network/Secure Wifi — 69%
- Patch Management — 62%
- Password Management/Reset — 59%
- Premium Technical Support — 55%
- Security Audit & Consulting Services — 52%
- Security Awareness Training — 48%
- DNS Protection — 47%

■ Webroot  ■ Carbonite

### ...With a Growing Desire for Integrated Solutions

- MSPs and SMBs are looking to consolidate vendors and manage services through a single console

  - 66% of surveyed IT professionals are actively consolidating the number of security vendors with whom they conduct business[2]

- MSPs and SMBs are not happy with existing enterprise options that have been forced downstream (i.e. OpenDNS, etc.) and are looking for alternatives

[1]Hanover Research – MSP Consumer Needs Study, April 2018; [2]ESG Research – Enterprise-class Cybersecurity Vendor Sentiment Survey - 2018

 **CARBONITE**  12

# Opportunity for Integrated Offering Targeting Broader Market



* Select SMB competitors

# Financially Compelling

FY 2018 Non-GAAP Revenue Growth and Operating Margin

|  | Carbonite FY 2018 Ended 12/31/2018 | Webroot FY 2018 Ended 6/30/2018* |
|---|---|---|
| Consumer | +14% | +6% |
| Business | +27% | +30% |
| **Total Growth** | **+23%** | **+14%** |
| **Operating Margin** | **21%** | **19%** |

\* Webroot FY 2018 financial results are recorded in accordance with ASC 605

 **CARBONITE** 14

## Accretive Transaction



* includes 2017 convertible note

# Transaction Summary

- ✓ Creates a <u>new approach</u> to protecting endpoints: <u>a top vulnerability</u>

- ✓ Combines leader in <u>endpoint backup and recovery</u> with leader in <u>endpoint security</u>

- ✓ Targets <u>similar customers</u> with powerful yet simple solutions

- ✓ Adds large and growing <u>MSP channel</u> to Carbonite's VAR channel

- ✓ Provides compelling <u>financial</u> benefits in both near and long–term

- ✓ Accelerates Carbonite's <u>vision</u> to become the leading data protection company

*Transaction creates value for customers, partners, and shareholders*

**CARBONITE** 16



## Summary Q4 Financial Results

| | Q4 2018 Outlook (11/1/2018) | Q4 2018 Results |
|---|---|---|
| GAAP Revenue | $77.6 M to $80.6 M | $77.0 M (+25% YoY) |
| Non-GAAP Revenue | $78.6 M to $81.6 M | $78.0 M (+24% YoY) |
| GAAP Net Income Per Share (Diluted) | Not guided | $0.02 |
| Non-GAAP Net Income Per Share (Diluted) | $0.40 to $0.44 | $0.45 (+50% YoY) |
| Consumer Bookings | Not guided | $23.9 M (+23% YoY) |
| Business Bookings | Not guided | $54.9 M (+35% YoY) |
| Non-GAAP Gross Margin | Not guided | 77.9% (+30 Bps YoY) |
| Adjusted Free Cash Flow | Not guided | $17.1 M (+76% YoY) |

*With respect to expectations under "Q4 2018 Outlook" above, the Company has not reconciled non-GAAP net income per share to net income per share because we do not provide guidance for stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, amortization expense on intangible assets and the income tax effect of non-GAAP adjustments as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors.

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE** 18

# Summary FY 2018 Financial Results

| | FY 2018 Outlook (11/1/2018) | FY 2018 Results |
|---|---|---|
| GAAP Revenue | $297.0 M to $300.0 M | $296.4 M (+24% YoY) |
| Non-GAAP Revenue | $302.5 M to $305.5 M | $301.9 M (+23% YoY) |
| GAAP Net Income Per Share (Diluted) | *Not guided* | $0.22 |
| Non-GAAP Net Income Per Share (Diluted) | $1.61 to $1.65 | $1.66 (+110% YoY) |
| Consumer Bookings | 15% - 20% growth | $98.3 M (+20% YoY) |
| Business Bookings | $205.0 M to $210.0 M | $208.7 M (+27% YoY) |
| Non-GAAP Gross Margin | 76.5% to 77.5% | 77.4% (+190 Bps YoY) |
| Adjusted Free Cash Flow | $43.0 M to $46.0 M | $50.1 M (+149% YoY) |

*With respect to expectations under "FY 2018 Outlook" above, the Company has not reconciled non-GAAP net income per share to net income per share because we do not provide guidance for stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, amortization expense on intangible assets and the income tax effect of non-GAAP adjustments as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors.

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE** 19





# Driving Operating Leverage

*(% of non-GAAP revenue)*









Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor
relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE** 22

# Business Outlook (as of February 7, 2019)*

|  | Q1 2019 Outlook | FY 2019 Outlook |
|---|---|---|
| GAAP Revenue | $76.5 M - $77.5 M | $468 M – $482 M |
| Non-GAAP Revenue | $77 M - $78 M | $488 M – $502 M |
| Non-GAAP Gross Margin | *Not guided* | 80.5% – 81.5% |
| Adjusted EBITDA | $20.0 M - $21.5 M | $129 M – $134 M |

*With respect to our expectations under "Business Outlook" above, the Company has not reconciled non-GAAP gross margin to gross margin or adjusted EBITDA to net income (loss) in this press release because we do not provide guidance for amortization expense on intangible assets, depreciation expense, stock-based compensation expense, litigation-related expense, income tax expense, restructuring-related expense, interest expense, and acquisition-related expense as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE**  23

# Financial Highlights



CARBONITE 24

# Definitions of non-GAAP measures

- **Bookings**: Bookings represent the aggregate dollar value of customer subscriptions and software arrangements, which may include multiple revenue elements, such as software licenses, hardware, professional services and post-contractual support, received during a period and are calculated as revenue recognized during a particular period plus the change in total deferred revenue, excluding deferred revenue recorded in connection with acquisitions, divestitures and the adoption impact of Topic 606, net of foreign exchange and the change in unbilled revenue during the same period.

- **Non-GAAP revenue**: Excludes the impact of purchase accounting adjustments for acquisitions.

- **Non-GAAP gross margin**: Excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, and acquisition-related expense.

- **Non-GAAP net income and non-GAAP net income per share**: Excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, non-cash convertible debt interest expense and the income tax effect of non-GAAP adjustments.

- **Adjusted EBITDA:** Excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense, intangible asset impairment charges, and acquisition-related expense from net income (loss).

- **Adjusted free cash flow**: Calculated by subtracting the cash paid for the purchase of property and equipment and adding the payments related to acquisitions, restructuring, and litigation from net cash provided by operating activities.

 **CARBONITE** 25