# EXHIBIT 91

*Carbonite's Form 8-K July 25, 2019*
*7/25/2019*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): July 25, 2019**

# CARBONITE INC
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-35264 | 33-1111329 |
|---|---|---|
| **(State or other jurisdiction** | **(Commission** | **(IRS Employer** |
| **of incorporation)** | **File Number)** | **Identification No.)** |

**Two Avenue de Lafayette, Boston, Massachusetts** 02111
**(Address of principal executive offices, including ZIP code)**

**(617) 587-1100**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions

☐ Written communications pursuant to Rule 425 under the Securities Act (17 C.F.R. §230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 C.F.R. §230.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 C.F.R. §14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 C.F.R. §13e-4(c))

☐ Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

☐ If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Common Stock, par value $0.01 per share | CARB | The NASDAQ Stock Market LLC |
|---|---|---|
| **(Title of each class)** | **(Trading symbol)** | **(Name of each exchange on which registered)** |

**Item 2.02**          **Results of Operations and Financial Condition**

On July 25, 2019, the Company issued a press release announcing its financial results for the quarter ended June 30, 2019. A copy of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

The information furnished under this Item 2.02, including Exhibit 99.1 incorporated by reference herein, shall not be deemed "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 5.02**          **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On July 25, 2019, the Company issued a press release announcing that Stephen Munford, Chairman of the Company's Board of Directors (the "Board"), has been named Interim Chief Executive Officer and President of the Company, effective immediately. A copy of the press release is attached as Exhibit 99.2 to this Current Report on Form 8-K and incorporated herein by reference. In connection with his appointment as Interim Chief Executive Officer, Mr. Munford will continue to serve as Chairman of the Board, but will no longer serve on the Nominating and Corporate Governance, Information Security Risk or Compensation Committees of the Board.

Mr. Munford, aged 54, has nearly two decades of executive leadership experience in the security software industry. He has served as a member of the Company's Board since 2014 and Chairman of the Board since 2016. Mr. Munford served as Interim Chief Executive Officer of Absolute Software Corporation from January 16, 2018 until November 26, 2018. Mr. Munford also serves on the board of directors of Alterlogic, Inc., Netmotion, Inc. and Apica, Inc. He also served as Chief Executive Officer of Sophos Holdings Limited from May 2005 to September 2012 and was on the board of directors from September 2012 to February 2019. Mr. Munford does not have any family relationships with any director or executive officer of the Company, and there are no arrangements or understandings with any person pursuant to which he was selected as an officer of the Company. In addition, there have been no transactions involving Mr. Munford that would be required to be disclosed pursuant to Item 404(a) of Regulation S-K under the Securities Exchange Act of 1934.

The Company entered into an employment agreement with Mr. Munford on July 25, 2019 setting forth the terms and conditions of his employment as the Company's Interim Chief Executive Officer and President. The employment agreement provides for an annual base salary of $448,761, and a target incentive bonus of 130% of his base salary.

Pursuant to the employment agreement, Mr. Munford will also be granted equity in the form of $2,500,000 in value of restricted stock units which will vest on (i) the earlier of the eighteen (18) month anniversary of Mr. Munford's appointment as Chief Executive Officer and President or (ii) the date on which a permanent successor Chief Executive Officer and President commences employment with the Company. Such grant is contingent upon Mr. Munford's continued employment with the Company through the applicable vesting date and shall vest in full in the event of a change of control of the Company.

The foregoing summary of Mr. Munford's employment agreement is summary in nature and is qualified in its entirety by reference to the employment agreement, a copy of which is attached hereto as Exhibit 10.1 and incorporated herein by reference.

On July 25, 2019, the Company announced that Mr. Mohamad Ali has stepped down and resigned from his position as President and Chief Executive Officer of the Company and has resigned from the Company's Board of Directors, in each case, effective immediately, in order to pursue other professional opportunities in the media industry. Mr. Ali will continue as an executive of the Company through July 31, 2019.

**Item 7.01**          **Regulation FD Disclosure**

In connection with the issuance of the press release attached hereto as Exhibit 99.1, the Company is holding a public conference call and webcast on July 25, 2019, at 5:30 p.m. ET, during which the Company will provide the investor presentation attached as Exhibit 99.3 to this Current Report. The presentation will also be posted on the investor relations portion of the Company's website.

The information furnished under this Item 7.01, including Exhibit 99.1 and Exhibit 99.3 incorporated by reference herein, shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01**        **Exhibits**

(d)    Exhibits.

10.1  Executive Employment Agreement with Stephen Munford, dated as of July 25, 2019

99.1  Financial Results Press Release, dated July 25, 2019

99.2  Management Press Release, dated July 25, 2019

99.3  Investor Presentation, dated July 25, 2019

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized on July 25, 2019.

CARBONITE, INC.

By: /s/ Danielle Sheer

Name: Danielle Sheer

Title: General Counsel

**EXECUTIVE EMPLOYMENT AGREEMENT**

This **EXECUTIVE EMPLOYMENT AGREEMENT** (this "Agreement") is made and entered into as of **July 25, 2019**, by and between **Carbonite, Inc.** (the "Company") and **Stephen Munford** ("Executive" or "you"). This Agreement supersedes all previous agreements, promises, representations, understandings and negotiations between the parties, whether written or oral, with respect to the subject matter hereof.

WHEREAS, the Company desires to employ Executive as Interim Chief Executive Officer and President of the Company on the terms set forth herein and Executive desires to be so employed.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties hereto agree to enter into this Executive Employment Agreement as of the date hereof as follows:

**1. Employment Term**. Your start date will be July 25, 2019 ("Start Date"). Your employment with the Company shall continue until the date on which a permanent successor Chief Executive Officer and President commences employment with the Company, or your employment is terminated in accordance with Section 9 hereof. The term of your employment with the Company will be referred to as your "Employment Term." The Company anticipates that you will remain on the Board as a non-employee director following the end of the Employment Term, under similar terms and conditions as are in effect for other non-employee directors from time to time.

**2. Position and Duties**. During the Employment Term, you will be employed as Interim Chief Executive Officer and President of the Company, reporting directly to the Board of Directors of the Company (the "Board"), with such customary responsibilities, duties and authority of an Interim Chief Executive Officer of a company of similar size and nature and such other duties and responsibilities as may be assigned to you by the Board from time to time that are reasonably consistent with your position. During the Employment Term, and excluding any periods of Disability (as defined in Section 9(c)), vacation, holidays or sick leave to which you are entitled, you will devote substantially all of your business time and attention to the business and affairs of the Company and its subsidiaries; provided, however, you may serve as a member of the board of directors or advisory boards (or their equivalents in the case of a non-corporate entity) for up to three (3) additional boards for which you serve on as of immediately prior to the Start Date,, or in an advisory capacity to other companies and organizations at your discretion , in all cases provided that such roles do not materially interfere with your duties to the Company or violate the terms of the Confidentiality, Invention Assignment and Restrictive Covenant Agreement attached hereto as Exhibit A. The Company's Boston, Massachusetts office shall be your primary work location, and you shall also devote significant time in Broomfield, Colorado. You and the Company shall cooperate to obtain and maintain a valid and current visa and/or work authorization that authorizes you to be employed by the Company in the United States and provide the services hereunder during the Employment Term.

**3. Base Salary**. During the Employment Term, the Company will pay you an annualized base salary of $448,761 ("Base Salary"), payable bi-weekly in accordance with the Company's regular payroll practices. During the Employment Term, you will not earn any non-employee director cash retainers, new equity grants or other compensation provided to the Company's non-employee directors (including as Chairman), however you will continue to vest in any previously granted restricted shares received in respect of your service on the Board.

**4. Incentive Target Bonus**. During the Employment Term, you will be eligible to receive an annual incentive cash bonus, or a pro-rata bonus for partial fiscal years, with a target of 130% of Base Salary, based on the achievement of certain annual performance objectives and goals as further defined in the Company's Bonus Plan (the "Incentive Target Bonus"). In the event of a Change of Control, as defined in

the 2011 Equity Award Plan, as amended on July 26, 2018 (the "Plan"), the Incentive Target Bonus shall be accelerated such that (i) if the Change of Control occurs in fiscal year 2019, your total Incentive Target Bonus shall be due as if the target had been achieved at 100% and payable on a pro-rata basis as of your Start Date and (ii) if the Change of Control occurs in fiscal year 2020 or thereafter, your total Incentive Target Bonus shall be due and payable as if the target had been achieved at 100% for the fiscal year in which the Change of Control occurred, payable in cash, in one lump-sum payment within sixty (60) days following such Change of Control.

The foregoing payment date is designed to exempt the incentive cash bonus from the application of Section 409A of the Internal Revenue Code (the "Code").

**5. Equity Compensation**.

      *(a) Restricted Stock Units.* In connection with the commencement of the Employment Term and subject to Board approval, the Company will, as soon as practicable following the Start Date and pursuant to the Plan and Equity-based Compensation Grant Policy, grant you $2,500,000 in value of Restricted Stock Units (the "RSUs"). The RSUs shall vest in full on the earlier of (i) the eighteen (18) month anniversary of the Start Date, or (ii) the date on which a permanent successor Chief Executive Officer and President commences employment with the Company, subject to your continued employment through such date. The RSUs shall be further subject to all the terms and conditions of the Plan and the applicable award documents.

**6. Employee Benefits**.

      *(a) Benefit Plans*. During the Employment Term, you shall not participate in the health insurance benefits of the Company, however you remain entitled to participate in the other employee benefit programs as may from time to time be made available to senior executives or other employees of the Company. The Company's benefits programs, compensation programs and policies are reviewed from time to time and may be modified, amended or terminated at any time by the Company.

      *(b) Holidays*. During the Employment Term, you will be entitled to participate in the paid holidays observed by the Company.

      *(c) Vacation.* It is the policy of the Company to not accrue paid days off for exempt employees, rather, you may take time off as your discretion. It is expected that you will ensure you are meeting all job responsibilities, objectives, and commitments to the Company.

      *(d) Insurance*. The Company will purchase travel and keyman insurance policies to be effective during your Employment Term with respect to which you will be the beneficiary.

      *(e) Expense Reimbursement*. During the Employment Term, the Company will reimburse you for all reasonable business expenses incurred by you in the performance of your duties to the Company, including business class airfare between your home and Boston and Broomfield, reasonable accommodations while in Boston and Broomfield, immigration and U.S. tax counsel, and other business expenses.

**7, Tax Withholding**. All payments and benefits provided by the Company to you hereunder shall be subject to applicable U.S. and Canadian federal, state and local tax withholding as reasonably determined by the Company pursuant to applicable law and regulation.

**8. Indemnification/D&O Insurance**. With respect to your service during the Employment Term, the Company shall: (a) indemnify you to the maximum extent allowed under Delaware law and the Company's by-laws, and (b) provide coverage for you under a directors' and officers' liability insurance policy on terms that are no less favorable than provided to any other officer or director of the Company.

9. **Termination of Employment**.

   ***(a) By the Company***.  The Company may terminate your employment immediately upon delivering written notice to you with or without Cause. For purposes of this Agreement, "Cause" shall have the meaning set forth in the Plan.

   ***(b) By the Executive.*** You may terminate your employment hereunder at any time upon thirty (30) days advance written notice to the Company; provided, that once you have provided such notice, the Company reserves the right to terminate your employment prior to the end of such notice period.

   ***(c) Death or Disability***.  Your employment will automatically terminate upon your death or "Disability." Disability shall mean your inability to perform, with reasonable accommodation, the essential functions of your position for a period of 90 consecutive days or a total of 180 days in any 360 consecutive day period due to mental or physical incapacity, as determined by an independent physician, selected by joint agreement by you and the Company.

10. **Obligations of the Company Upon Termination**.  You shall not be eligible for severance, including participation in the Senior Executive Severance Plan, in the event of any termination of employment pursuant to Section 9 above or otherwise, including following a Change of Control. For the purposes of this Agreement, "Change of Control" shall have the meaning set forth in the Plan.

11. **Return of Materials**. Upon termination of your employment with the Company, you shall, except as may be necessary for the continued performance of your duties on the Board,  promptly return all the Company property, including all copies of written or electronic (including, but not limited to, computer software, video and audio) material or documents in your possession obtained as a result of your employment with the Company that relate to the business activities of the Company including, without limitation, all client related information, and materials furnished to you during your employment (including but not limited to keys, computers, electronic communication devices, files and identification cards), and agree not to destroy or delete any the Company property. In addition, you agree that upon the termination of your employment, you will provide the Company with access to all passwords (including with respect to protected files) and similar information which will be necessary for the Company to access materials on which you worked or which you received, or to otherwise continue in its business.  Notwithstanding the foregoing, nothing in here shall prohibit you from retaining, at any time, your personal correspondence, personal rolodex and documents related to your own personal benefits, entitlements and obligations.

12. **Restrictive Covenants**. As a condition to the effectiveness of this Agreement, you must sign and return the Company's standard Confidentiality, Invention Assignment and Restrictive Covenant Agreement attached hereto as Exhibit A.

13. **No Other Agreements/Obligations**. You represent to the Company that you are under no obligation or agreement that would prevent you from becoming an employee of the Company or adversely impact your ability to perform the expected services. Additionally, you have disclosed the relevant restrictive covenant provisions of any current employment agreement to the Company.

14. **Successors and Assigns**. The Company may assign its rights under this Agreement to any successor to its business (by acquisition of substantially all of the Company's assets or otherwise), provided that such successor entity expressly assumes in writing this Agreement and all obligations and undertakings of the Company hereunder. You may not assign your rights or delegate your duties under this Agreement without the prior written consent of the Company. You understand and agree that this Agreement shall be binding upon and inure to the benefit of the Company and its legal representatives, successors and assigns. You also understand and agree that this Agreement shall be binding upon and inure to the benefit of your heirs and executors or administrators.

**15.** **Notices**. All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party, by overnight courier, or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to you:

at such home address as most currently appears in the records of the Company.

If to the Company:

Carbonite, Inc.
2 Avenue de Lafayette, 6th Floor
Boston, MA 02110
Attn: General Counsel

or to such other address as any of the parties shall have furnished to the other in writing in accordance herewith. Notices and communications shall be effective upon the earlier of actual receipt by the addressee or the fifth day following placement with the United States postal service or overnight courier.

**16.** **Entire Agreement**. This Agreement, and the agreements expressly referred to herein, contain the entire understanding of the parties with respect to the subject matter hereof and may be amended only in a writing signed by the parties.

**17.** **Severability**. If any provision, clause or part of this Agreement, or the applications thereof under certain circumstances, is held invalid or unenforceable for any reason, the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby.

**18.** **Governing Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principles of conflicts of laws. Each of the parties agrees that any dispute between the parties shall be resolved only in the courts of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts and the appellate courts having jurisdiction of appeals in such courts.

**19.** **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Signatures delivered via facsimile or electronic file shall be the same as original signatures.

**20.** **Survival of Provisions**. Notwithstanding any other provision of this Agreement, the parties' post-termination obligations, including, without limitation, the provisions of Sections 8, 9, 10, 11 and 12 shall survive any termination or expiration of this Agreement or the termination of your employment for any reason whatsoever.

**21.** **Section 280G**. In the event that the benefits provided for in this Agreement or otherwise payable to you (i) constitute "parachute payments" within the meaning of Section 280G of the Code, and (ii) but for this Section 21, would be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), your payments and benefits under this Agreement will be either:

(a) delivered in full, or

(b) delivered as to such lesser extent as necessary which would result in no portion of such benefits being subject to the Excise Tax,

whichever of the foregoing amounts, taking into account the applicable federal, state and local income taxes and the Excise Tax, results in the receipt by you on an after-tax basis, of the greatest amount of benefits, notwithstanding that all or some portion of such benefits may be taxable under Section 4999 of the Code. For purposes of determining the after-tax value of the benefits, you shall be deemed to pay federal income

taxes and employment taxes at the highest marginal rate in the calendar year in which the determination is to be made and state and local income taxes at the highest marginal rates of taxation in the state and locality of your domicile for income tax purposes on the date on which the determination is to be made. If a reduction in severance and other benefits constituting "parachute payments" is necessary so that benefits are delivered to a lesser extent, reduction will occur in the following order: (1) reduction of cash payments in reverse chronological order (i.e., the cash payment owed on the latest date following the occurrence of the event triggering the excise tax will be the first cash payment to be reduced), (2) cancellation of equity awards granted within the twelve-month period prior to a "change of control" (as determined under Code Section 280G) that are deemed to have been granted contingent upon the change of control (as determined under Code Section 280G), in the reverse order of date of grant of the awards (i.e., the most recently granted equity awards will be cancelled first), (3) cancellation of accelerated vesting of equity awards in the reverse order of date of grant of the awards (i.e., the vesting of the most recently granted equity awards will be cancelled first) and (4) reduction of continued employee benefits in reverse chronological order (i.e., the benefit owed on the latest date following the occurrence of the event triggering the Excise Tax will be the first benefit to be reduced). In no event will you have any discretion with respect to the ordering of payment reductions.

Unless the Company and you otherwise agreeing in writing, then any determination required under this Section 21 will be made in writing by a nationally recognized firm of independent public accountants selected by the Company (the "Accountants"), whose determination will be conclusive and binding upon you and the Company for all purposes. For purposes of making the calculations required by this Section 21, the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Section 280G and 4999 of the Code, including, without limitation, the impact of all post-employment restrictive covenants applicable to you. The Company and you will furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under this Section 21. The Company will bear all costs for fees related to the Accountants' services in connection with any calculations contemplated by this Section 21.

    **22. Code Section 409A**.

    (a) It is intended that this Agreement will comply with Code Section 409A (and any regulations and guidelines issued thereunder) to the extent this Agreement is subject thereto, and this Agreement shall be interpreted on a basis consistent with such intent. In no event shall the Company or its affiliates be liable for any interest, tax or penalty imposed on you for a failure to comply with Code Section 409A.

    (b) Notwithstanding any provision to the contrary in this Agreement, if you are deemed on the date of your "separation from service" (within the meaning of Treas. Reg. Section 1.409A-1(h)) to be a "specified employee" (within the meaning of Treas. Reg. Section 1.409A-1 (i)), then with regard to any payment that is required to be delayed pursuant to Code Section 409A(a)(2)(B) (the "Delayed Payments"), such payment shall not be made prior to the earlier of (i) the expiration of the six (6) month period measured from the date of your "separation from service" and (ii) the date of your death. Any payments due under this Agreement other than the Delayed Payments shall be paid in accordance with the normal payment dates specified herein. In no case will the delay of any of the Delayed Payments by the Company constitute a breach of the Company's obligations under this Agreement.

    (c) For all purposes under this Agreement, reference to your "termination of employment" (and corollary terms) with the Company shall be construed to refer to your "separation from service" (as determined under Treas. Reg. Section 1.409A-1 (h), as uniformly applied by the Company) with the Company.

(d) For purposes of Section 409A, your right to receive installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company. Any other provision of this Agreement to the contrary notwithstanding, in no event shall any payment or benefit under this Agreement that constitutes nonqualified deferred compensation for purposes of Section 409A be subject to offset by any other amount unless otherwise permitted by Section 409A.

(e) To the extent that any reimbursement or in-kind benefit under this Agreement or under any other reimbursement or in-kind benefit plan or arrangement in which you participate during the term of your employment under this Agreement or thereafter provides for a "deferral of compensation" within the meaning of Code Section 409A, (i) the amount eligible for reimbursement or in-kind benefit in one calendar year may not affect the amount eligible for reimbursement or in-kind benefit in any other calendar year (except that a plan providing medical or health benefits may impose a generally applicable limit on the amount that may be reimbursed or paid), (ii) the right to reimbursement or an in-kind benefit is not subject to liquidation or exchange for another benefit, and (iii) subject to any shorter time periods provided herein, any such reimbursement of an expense or in-kind benefit must be made on or before the last day of the calendar year following the calendar year in which the expense was incurred.

If the sixty (60)-day period following a "separation from service" begins in one calendar year and ends in a second calendar year (a "Crossover 60-Day Period"), and if there are any payments due to you that are (i) nonqualified deferred compensation subject to Code Section 409A, (ii) conditioned on you signing and not revoking the Release, and (iii) otherwise due to be paid during the portion of the Crossover 60-Day Period that falls within the first year, then such payments will be delayed and paid in a lump sum during the portion of the Crossover 60-Day Period that falls within the second year.

*    *    *    *

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

CARBONITE, INC.

By:      /s/ Todd Krasnow

Name:    Todd Krasnow

Title:   Chair, Compensation Committee


/s/ Stephen Munford

Stephen Munford

**Exhibit 99.1**

**Carbonite Announces Second Quarter 2019 Financial Results**

**BOSTON, MA - July 25, 2019** - Carbonite, Inc. (NASDAQ: CARB), a global leader in data protection, today announced financial results for the second quarter ended June 30, 2019.

**Second Quarter 2019 Highlights:**

- Revenue of $121.5 million increased 56% year-over-year.
- Non-GAAP revenue of $135.0 million increased 69% year-over-year.[1]
- Net loss was ($11.3) million, compared to net loss of ($5.7) million in 2018.
- Net loss per share was ($0.33) (basic and diluted), as compared to ($0.20) (basic and diluted) in 2018.
- Non-GAAP net income per share was $0.58 (basic) and $0.56 (diluted), as compared to $0.50 (basic) and $0.45 (diluted) in 2018.[2]
- Adjusted EBITDA of $39.1 million, or 29% of non-GAAP revenue, compared to $20.9 million, or 26% of non-GAAP revenue in 2018.[3]

"Carbonite delivered second quarter non-GAAP revenue of $135 million, up 69% year-over-year, while delivering an adjusted EBITDA margin of 29%," said Steve Munford, chairman of the board and interim CEO of Carbonite. "Our security software business performed well during the quarter, however, we continued to experience challenges in parts of our data protection business. We remain committed to capitalizing on the opportunity of combining data protection and security, while we improve the effectiveness of our go-to-market efforts and deliver on our profitability targets."

Munford added, "During the quarter we executed on our previously stated plans and made approximately $55 million in accelerated principal payments on our outstanding term loan; we remain committed to leveraging our strong and growing free cash flow to aggressively pay down outstanding debt."

The Company uses a variety of operational and financial metrics, including non-GAAP financial measures, to evaluate its performance and financial condition. The accompanying financial data includes additional information regarding these metrics and a reconciliation of non-GAAP financial information to GAAP. The presentation of non-GAAP financial information should not be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

**Second Quarter 2019 Results:**

- Revenue for the second quarter was $121.5 million, an increase of 56% from $77.7 million in the second quarter of 2018. Non-GAAP revenue for the second quarter was $135.0 million, an increase of 69% from $79.9 million in the second quarter of 2018.[1]
- Net loss for the second quarter was ($11.3) million, compared to net loss of ($5.7) million in the second quarter of 2018. Non-GAAP net income for the second quarter was $19.8 million, compared to non-GAAP net income of $14.2 million in the second quarter of 2018.[2]
- Net loss per share for the second quarter was ($0.33) (basic and diluted), compared to net loss per share of ($0.20) (basic and diluted) in the second quarter of 2018. Non-GAAP net income per share was $0.58 (basic) and $0.56 (diluted) for the second quarter, compared to non-GAAP net income per share of $0.50 (basic) and $0.45 (diluted) in the second quarter of 2018.[2]
- Adjusted EBITDA for the second quarter was $39.1 million, compared to $20.9 million in the second quarter of 2018.[3]
- Gross margin for the second quarter was 72.4%, compared to 70.3% in the second quarter of 2018. Non-GAAP gross margin was 82.3% in the second quarter, compared to 77.1% in the second quarter of 2018.[4]
- Cash flow from operations for the second quarter was $20.3 million, compared to $13.6 million in the second quarter of 2018. Adjusted free cash flow for the second quarter was $24.3 million, compared to $13.3 million in the second quarter of 2018.[5]

---

[1]    Non-GAAP revenue excludes the impact of purchase accounting adjustments for acquisitions.

[2]    Non-GAAP net income and non-GAAP net income per share excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, non-cash convertible debt interest expense and the income tax effect of non-GAAP adjustments.

[3]    Adjusted EBITDA is calculated by excluding the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense, and acquisition-related expense from net (loss) income.

[4]    Non-GAAP gross margin excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, and acquisition-related expense.

[5]    Adjusted free cash flow is calculated by subtracting the cash paid for the purchase of property and equipment and adding the payments related to acquisitions, restructuring, and litigation to net cash provided by operating activities.

**CEO Transition**

In a separate press release issued today, Carbonite announced that Steve Munford has been named interim CEO of Carbonite, effective immediately. Mr. Munford succeeds Mohamad Ali, who has stepped down as president and CEO and as a member of the Carbonite Board, also effective immediately.

**Business Outlook**

Based on the information available as of July 25, 2019, Carbonite expects the following for the third quarter and full year of 2019:

Third Quarter 2019:

|  | Current Guidance (7/25/2019) |
| --- | --- |
| GAAP Revenue | $117 - $119 million |
| Non-GAAP Revenue | $131 - $133 million |
| Adjusted EBITDA | $34 - $37 million |

Full Year 2019:

|  | Prior Guidance (5/2/2019) | Current Guidance (7/25/2019) |
| --- | --- | --- |
| GAAP Revenue | $457 - $471 million | $443.5 - $448.5 million |
| Non-GAAP Revenue | $491 - $505 million | $477.5 - $482.5 million |
| Non-GAAP Gross Margin | 80.5% - 81.5% | 80.5% - 81.5% |
| Adjusted EBITDA | $132 - $137 million | $132 - $137 million |

Carbonite's expectations of adjusted EBITDA for the third quarter and full year of 2019 excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense and acquisition-related expense from net income (loss).

The Company is assuming an effective annual tax rate of approximately 22% and 35.5 million shares outstanding for the full year of 2019.

**Conference Call and Webcast Information**

Carbonite will host a conference call on Thursday, July 25, 2019 at 5:30 p.m. ET to review these results. This call will be webcast live and can be found in the investor relations section of the Company's website at http://investor.carbonite.com. The conference call can also be accessed by dialing (877) 303-1393 in the United States or (315) 625-3228 internationally with the passcode: 8188460.

Following the completion of the call, a recorded replay will be available on the Company's website, http://investor.carbonite.com, under "Events & Presentations".

**Non-GAAP Financial Measures**

To supplement our consolidated financial statements presented in accordance with GAAP, this press release contains non-GAAP financial measures, including non-GAAP revenue, non-GAAP gross margin, non-GAAP net income and non-GAAP net income per share, non-GAAP operating expense, adjusted EBITDA and adjusted free cash flow.

The Company believes that these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and ordinary results of operations. The Company's management uses these non-GAAP measures to compare the Company's performance to that of prior periods and uses these measures in financial reports prepared for management and the Company's board of directors. The Company believes that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing the Company's financial measures with other software-as-a-service companies, many of which present similar non-GAAP financial measures to investors.

The Company does not consider these non-GAAP measures in isolation or as an alternative to financial measures determined in accordance with GAAP. The principal limitation of these non-GAAP financial measures is that they exclude significant items that are required by GAAP to be recorded in the Company's financial statements. In addition, they are subject to inherent limitations as they reflect the exercise of judgments by management. The Company urges investors to review the reconciliation of its non-GAAP financial measures to the comparable GAAP financial measures provided in the tables at the end of this press release, and not to rely on any single financial measure to evaluate the Company's business.

With respect to our expectations under "Business Outlook" above, the Company has not reconciled non-GAAP gross margin to gross margin or adjusted EBITDA to net income (loss) in this press release because we do not provide guidance for amortization expense on intangible assets, depreciation expense, stock-based compensation expense, litigation-related expense, income tax expense, restructuring-related expense, interest expense, and acquisition-related expense as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors.

**Cautionary Language Concerning Forward-Looking Statements**

Certain matters discussed in this press release, including under "Business Outlook," have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to integrate the Webroot acquisition and other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefits, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

**About Carbonite**

Carbonite provides a robust Data Protection Platform for businesses, including backup, disaster recovery, high availability and workload migration technology. The Carbonite Data Protection Platform supports businesses on a global scale with secure cloud infrastructure. To learn more, visit www.carbonite.com and follow us on Twitter at @Carbonite.

Carbonite, Inc. serves customers through three brands: Carbonite data protection, Webroot cybersecurity, and MailStore email archiving.

**Investor Relations Contact:**

Jeremiah Sisitsky
Carbonite
781-928-0713
investor.relations@carbonite.com

**Media Contact:**

Sarah King
Carbonite
617-421-5601
media@carbonite.com

Carbonite, Inc.
Consolidated Statement of Operations (unaudited)
(In thousands, except share and per share amounts)

| | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| **Revenue:** | | | | |
| Services | $ 114,431 | $ 68,814 | $ 185,934 | $ 123,388 |
| Product | 7,079 | 8,920 | 16,791 | 18,372 |
| Total revenue | 121,510 | 77,734 | 202,725 | 141,760 |
| **Cost of revenue:** | | | | |
| Services | 23,956 | 18,358 | 41,058 | 33,688 |
| Product | 440 | 374 | 823 | 931 |
| Amortization of intangible assets | 9,081 | 4,325 | 12,375 | 6,750 |
| Total cost of revenue | 33,477 | 23,057 | 54,256 | 41,369 |
| Gross profit | 88,033 | 54,677 | 148,469 | 100,391 |
| **Operating expenses:** | | | | |
| Research and development | 27,879 | 15,719 | 43,686 | 28,238 |
| General and administrative | 17,567 | 13,460 | 38,556 | 27,920 |
| Sales and marketing | 36,945 | 22,086 | 58,710 | 41,946 |
| Amortization of intangible assets | 9,765 | 3,652 | 14,065 | 4,591 |
| Restructuring charges | 702 | 41 | 702 | 903 |
| Total operating expenses | 92,858 | 54,958 | 155,719 | 103,598 |
| Loss from operations | (4,825) | (281) | (7,250) | (3,207) |
| Interest expense | (11,844) | (3,420) | (15,855) | (6,021) |
| Interest income | 418 | 169 | 1,383 | 413 |
| Other income (expense), net | 175 | 183 | 387 | 195 |
| Loss before income taxes | (16,076) | (3,349) | (21,335) | (8,620) |
| (Benefit) provision for income taxes | (4,802) | 2,338 | (12,064) | (14,877) |
| Net (loss) income | $ (11,274) | $ (5,687) | $ (9,271) | $ 6,257 |
| **Net (loss) income per share:** | | | | |
| Basic | $ (0.33) | $ (0.20) | $ (0.27) | $ 0.22 |
| Diluted | $ (0.33) | $ (0.20) | $ (0.27) | $ 0.20 |
| Weighted-average shares outstanding: | | | | |
| Basic | 34,459,359 | 28,628,173 | 34,312,971 | 28,485,695 |
| Diluted | 34,459,359 | 28,628,173 | 34,312,971 | 30,885,633 |

Carbonite, Inc.
Consolidated Balance Sheets (unaudited)
(In thousands)

|  | | June 30, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 83,378 | $ | 198,087 |
| Trade accounts receivable, net | | 47,110 | | 31,569 |
| Prepaid expenses and other current assets | | 22,573 | | 10,409 |
| Total current assets | | 153,061 | | 240,065 |
| Property and equipment, net | | 45,961 | | 34,101 |
| Right-of-use lease assets | | 48,299 | | - |
| Other assets | | 24,176 | | 13,876 |
| Acquired intangible assets, net | | 417,827 | | 117,963 |
| Goodwill | | 543,524 | | 155,086 |
| Total assets | $ | 1,232,848 | $ | 561,091 |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 7,787 | $ | 2,114 |
| Accrued compensation | | 20,919 | | 11,620 |
| Accrued expenses and other current liabilities | | 29,947 | | 15,844 |
| Current portion of deferred revenue | | 180,053 | | 121,553 |
| Total current liabilities | | 238,706 | | 151,131 |
| Long-term debt | | 598,301 | | 118,305 |
| Long-term lease liabilities | | 46,750 | | - |
| Deferred revenue, net of current portion | | 43,727 | | 29,151 |
| Long-term deferred tax liabilities | | 43,052 | | 1,456 |
| Other long-term liabilities | | 3,140 | | 3,838 |
| Total liabilities | | 973,676 | | 303,881 |
| Stockholders' equity | | | | |
| Common stock | | 374 | | 366 |
| Additional paid-in capital | | 461,633 | | 451,618 |
| Treasury stock, at cost | | (47,850) | | (48,522) |
| Accumulated other comprehensive income | | 2,188 | | 1,650 |
| Accumulated deficit | | (157,173) | | (147,902) |
| Total stockholders' equity | | 259,172 | | 257,210 |
| Total liabilities and stockholders' equity | $ | 1,232,848 | $ | 561,091 |

Carbonite, Inc.
Consolidated Statement of Cash Flows (unaudited)
(In thousands)

| | | Six Months Ended June 30, 2019 | |
| --- | --- | --- | --- |
| | | 2019 | 2018 |
| **Operating activities** | | | |
| Net (loss) income | $ | (9,271) $ | 6,257 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | | 34,214 | 17,763 |
| Amortization of right-of-use lease assets | | 3,556 | - |
| Amortization of deferred costs | | 1,413 | 931 |
| Gain on disposal of equipment | | (17) | (141) |
| Impairment of capitalized software | | - | 653 |
| Stock-based compensation expense | | 9,717 | 8,478 |
| Benefit for deferred income taxes | | (12,241) | (16,317) |
| Non-cash interest expense related to amortization of debt discount | | 3,955 | 3,101 |
| Other non-cash items, net | | (262) | 64 |
| Changes in assets and liabilities, net of acquisition: | | | |
| Accounts receivable | | 3,401 | (6,437) |
| Prepaid expenses and other current assets | | (394) | (1,541) |
| Other assets | | (1,512) | (3,771) |
| Accounts payable | | 4,553 | (3,895) |
| Accrued expenses and other current liabilities | | (6,254) | 2,549 |
| Other long-term liabilities | | (6,858) | 53 |
| Deferred revenue | | 15,020 | 9,099 |
| Net cash provided by operating activities | | 39,020 | 16,846 |
| **Investing activities** | | | |
| Purchases of property and equipment | | (6,023) | (7,795) |
| Proceeds from sale of property and equipment and businesses | | 77 | 534 |
| Proceeds from maturities of derivatives | | 1,340 | 1,680 |
| Purchases of derivatives | | (6) | (1,403) |
| Payment for intangibles | | - | (1,250) |
| Payment for acquisition, net of cash acquired | | (622,009) | (144,597) |
| Net cash used in investing activities | | (626,621) | (152,831) |
| **Financing activities** | | | |
| Proceeds from exercise of stock options | | 263 | 942 |
| Proceeds from issuance of treasury stock under employee stock purchase plan | | 1,582 | 1,215 |
| Payments of withholding taxes in connection with restricted stock unit vesting | | (905) | (1,184) |
| Proceeds from long-term borrowings, net of debt issuance costs | | 529,483 | 88,068 |
| Payments on long-term borrowings | | (55,000) | (10,000) |
| Net cash provided by financing activities | | 475,423 | 79,041 |
| Effect of currency exchange rate changes on cash | | (92) | (305) |
| Net decrease in cash, cash equivalents and restricted cash | | (112,270) | (57,249) |
| Cash, cash equivalents and restricted cash, beginning of period | | 198,087 | 128,231 |
| Cash, cash equivalents and restricted cash, end of period | $ | 85,817 $ | 70,982 |

Carbonite, Inc.
Reconciliation of GAAP to Non-GAAP Measures (unaudited)
(In thousands, except share and per share amounts)

Reconciliation of GAAP Revenue to Non-GAAP Revenue

|  | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
|  | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| GAAP revenue | $ 121,510 | $ 77,734 | $ 202,725 | $ 141,760 |
| Add: | | | | |
| Fair value adjustment of acquired deferred revenue | 13,537 | 2,116 | 15,290 | 2,998 |
| Non-GAAP revenue | $ 135,047 | $ 79,850 | $ 218,015 | $ 144,758 |

Reconciliation of GAAP Gross Margin to Non-GAAP Gross Margin

|  | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
|  | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Gross profit | $ 88,033 | $ 54,677 | $ 148,469 | $ 100,391 |
| Gross margin | 72.4% | 70.3% | 73.2% | 70.8% |
| Add: | | | | |
| Fair value adjustment of acquired deferred revenue | 13,537 | 2,116 | 15,290 | 2,998 |
| Amortization of intangibles | 9,081 | 4,325 | 12,375 | 6,750 |
| Stock-based compensation expense | 478 | 413 | 902 | 738 |
| Acquisition-related expense | - | 3 | 14 | 57 |
| Non-GAAP gross profit | $ 111,129 | $ 61,534 | $ 177,050 | $ 110,934 |
| Non-GAAP gross margin | 82.3% | 77.1% | 81.2% | 76.6% |

Reconciliation of GAAP Net Income and Net Income per Share to Non-GAAP Net Income and Net Income per Share

| | Three Months Ended June 30, 2019 | | | | Six Months Ended June 30, 2019 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | 2019 | | 2018 |
| GAAP net (loss) income | $ | (11,274) | $ | (5,687) | $ | (9,271) | $ | 6,257 |
| Add: | | | | | | | | |
| Fair value adjustment of acquired deferred revenue | | 13,537 | | 2,116 | | 15,290 | | 2,998 |
| Amortization of intangibles | | 18,846 | | 7,977 | | 26,440 | | 11,341 |
| Stock-based compensation expense | | 5,512 | | 4,741 | | 9,717 | | 8,478 |
| Litigation-related expense | | 73 | | 46 | | 171 | | 63 |
| Restructuring-related expense | | 702 | | 41 | | 702 | | 903 |
| Acquisition-related expense | | 872 | | 2,357 | | 10,735 | | 5,977 |
| Non-cash debt interest expense | | 2,243 | | 1,558 | | 3,955 | | 3,101 |
| Less: | | | | | | | | |
| Income tax effect of non-GAAP adjustments | | 10,664 | | (1,027) | | 22,455 | | 16,818 |
| Non-GAAP net income | $ | 19,847 | $ | 14,176 | $ | 35,284 | $ | 22,300 |
| GAAP net (loss) income per share: | | | | | | | | |
| Basic | $ | (0.33) | $ | (0.20) | $ | (0.27) | $ | 0.22 |
| Diluted | $ | (0.33) | $ | (0.20) | $ | (0.27) | $ | 0.20 |
| Non-GAAP net income per share: | | | | | | | | |
| Basic | $ | 0.58 | $ | 0.50 | $ | 1.03 | $ | 0.78 |
| Diluted | $ | 0.56 | $ | 0.45 | $ | 1.00 | $ | 0.72 |
| GAAP weighted-average shares outstanding: | | | | | | | | |
| Basic | | 34,459,359 | | 28,628,173 | | 34,312,971 | | 28,485,695 |
| Diluted | | 34,459,359 | | 28,628,173 | | 34,312,971 | | 30,885,633 |
| Non-GAAP weighted-average shares outstanding: | | | | | | | | |
| Basic | | 34,459,359 | | 28,628,173 | | 34,312,971 | | 28,485,695 |
| Diluted | | 35,277,653 | | 31,718,232 | | 35,285,788 | | 30,885,633 |

Reconciliation of GAAP Operating Expense to Non-GAAP Operating Expense

| | Three Months Ended June 30, 2019 | | | | Six Months Ended June 30, 2019 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2019 | | 2018 | | 2019 | | 2018 |
| Research and development | $ | 27,879 | $ | 15,719 | $ | 43,686 | $ | 28,238 |
| Less: | | | | | | | | |
| Stock-based compensation expense | | 1,611 | | 1,047 | | 2,557 | | 1,734 |
| Acquisition-related expense | | - | | 2 | | 83 | | 37 |
| Non-GAAP research and development | $ | 26,268 | $ | 14,670 | $ | 41,046 | $ | 26,467 |
| | | | | | | | | |
| General and administrative | $ | 17,567 | $ | 13,460 | $ | 38,556 | $ | 27,920 |
| Less: | | | | | | | | |
| Stock-based compensation expense | | 2,290 | | 2,494 | | 4,248 | | 4,618 |
| Litigation-related expense | | 73 | | 46 | | 171 | | 63 |
| Acquisition-related expense | | 768 | | 2,321 | | 10,246 | | 5,811 |
| Non-GAAP general and administrative | $ | 14,436 | $ | 8,599 | $ | 23,891 | $ | 17,428 |
| | | | | | | | | |
| Sales and marketing | $ | 36,945 | $ | 22,086 | $ | 58,710 | $ | 41,946 |
| Less: | | | | | | | | |
| Stock-based compensation expense | | 1,133 | | 787 | | 2,010 | | 1,388 |
| Acquisition-related expense | | 104 | | 31 | | 392 | | 72 |
| Non-GAAP sales and marketing | $ | 35,708 | $ | 21,268 | $ | 56,308 | $ | 40,486 |
| | | | | | | | | |
| Amortization of intangible assets | $ | 9,765 | $ | 3,652 | $ | 14,065 | $ | 4,591 |
| Less: | | | | | | | | |
| Amortization of intangible assets | | 9,765 | | 3,652 | | 14,065 | | 4,591 |
| Non-GAAP amortization of intangible assets | $ | - | $ | - | $ | - | $ | - |
| | | | | | | | | |
| Restructuring charges | $ | 702 | $ | 41 | $ | 702 | $ | 903 |
| Less: | | | | | | | | |
| Restructuring-related expense | | 702 | | 41 | | 702 | | 903 |
| Non-GAAP restructuring charges | $ | - | $ | - | $ | - | $ | - |

Calculation of Adjusted Free Cash Flow

| | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Net cash provided by operating activities | $ 20,276 | $ 13,555 | $ 39,020 | $ 16,846 |
| Subtract: | | | | |
| Purchases of property and equipment | 3,265 | 4,507 | 6,023 | 7,795 |
| Free cash flow | 17,011 | 9,048 | 32,997 | 9,051 |
| | | | | |
| Add: | | | | |
| Acquisition-related payments | 7,182 | 3,681 | 10,853 | 5,328 |
| Restructuring-related payments | - | 461 | - | 1,125 |
| Litigation-related payments | 137 | 85 | 138 | 212 |
| Adjusted free cash flow | $ 24,330 | $ 13,275 | $ 43,988 | $ 15,716 |

Reconciliation of EBITDA and Adjusted EBITDA to Net (Loss) Income

| | Three Months Ended June 30, 2019 | | Six Months Ended June 30, 2019 | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Net (loss) income | $ (11,274) | $ (5,687) | $ (9,271) | $ 6,257 |
| Adjustments: | | | | |
| Interest expense, net | 11,426 | 3,251 | 14,472 | 5,608 |
| Income tax (benefit) provision | (4,802) | 2,338 | (12,064) | (14,877) |
| Depreciation and amortization | 23,065 | 11,686 | 34,214 | 17,763 |
| EBITDA | 18,415 | 11,588 | 27,351 | 14,751 |
| | | | | |
| Adjustments to EBITDA: | | | | |
| Fair value adjustment of acquired deferred revenue | 13,537 | 2,116 | 15,290 | 2,998 |
| Stock-based compensation expense | 5,512 | 4,741 | 9,717 | 8,478 |
| Litigation-related expense | 73 | 46 | 171 | 63 |
| Restructuring-related expense | 702 | 41 | 702 | 903 |
| Acquisition-related expense | 872 | 2,357 | 10,735 | 5,977 |
| Adjusted EBITDA | $ 39,111 | $ 20,889 | $ 63,966 | $ 33,170 |

**Exhibit 99.2**

**Carbonite Names Steve Munford Interim Chief Executive Officer**

**BOSTON, MA - July 25, 2019** - Carbonite, Inc. (NASDAQ: CARB), a global leader in data protection, today announced that Steve Munford, Chairman of the Company's Board of Directors, has been named Interim Chief Executive Officer and Executive Chairman of the Board, effective immediately. This appointment follows Mohamad Ali's decision to step down as President, CEO and member of the Company's Board in order to pursue other professional opportunities in the media and research industry.

Mr. Munford has nearly two decades of executive leadership experience in the security software industry, with a strong track record of driving operational execution. He has served as a member of the Carbonite Board since January 2014, and as Chairman of the Board since March 2016. Most recently, Mr. Munford served as Interim CEO of Absolute Software Corporation, a leading computer and network security company, where he helped refocus the company's growth strategy and oversaw the transition to a permanent CEO. Prior to that, he served as CEO of Sophos Group plc, a developer and vendor of security software, where he led the company through a period of rapid expansion and firmly established Sophos as a leading provider of security solutions to the mid-market. Mr. Munford also served on Sophos' Board of Directors from September 2012 to February 2019.

"We are confident that Steve's experience as a leader in the security software industry will empower him to hit the ground running as Interim CEO," said Mr. Charles Kane, director and member of the Nominating and Governance Committee of the Board. "Steve understands both the Carbonite data protection business and our recently acquired Webroot security business. We expect his proven executive experience will make this a seamless transition."

"I look forward to working with our talented management team to continue to advance Carbonite's position in data protection and security software," said Mr. Munford. "Carbonite is uniquely positioned to offer customers the integrated and robust data protection solutions they need to protect their essential business data, especially at the endpoint. The combination of Carbonite's product portfolio and Webroot security software creates unique opportunities to deliver enhanced value to all of our stakeholders."

Mr. Munford continued, "On behalf of the Board, I want to thank Mohamad for his contributions as CEO and for establishing Carbonite as a leader in the data protection and security space. We all wish him success in his new role."

Mr. Ali said, "I am incredibly proud of all that we have accomplished together. Carbonite has a great team in place, and I believe that now is the right time to make a transition. I look forward to following the Company's continued success."

The Carbonite Board is conducting a thorough and comprehensive search, with the assistance of an international executive search firm, to identify the best candidate to serve as the Company's next CEO.

**Second Quarter Financial Results and 2019 Outlook**

In a separate press release issued today, Carbonite announced its financial results for the second quarter and its outlook for 2019. The press release is available on Carbonite's Investor Relations website at http://investor.carbonite.com.

The Company will host a conference call today, Thursday July 25, 2019, at 5:30 p.m. ET to discuss the leadership transition, financial results and forward guidance. This call will be webcast live and can be found in the Investor Relations section of the Company's website at http://investor.carbonite.com. The conference call can be accessed by dialing (877) 303-1393 in the United States or (315) 625-3228 internationally with the passcode 8188460.

Following the completion of the call, a recorded replay will be available on the Company's Investor Relations website, http://investor.carbonite.com, under "Events & Presentations."

**About Carbonite**

Carbonite provides a robust Data Protection Platform for businesses, including backup, disaster recovery, high availability and workload migration technology. The Carbonite Data Protection Platform supports businesses on a global scale with secure cloud infrastructure. To learn more, visit www.carbonite.com and follow us on Twitter at @Carbonite.

Carbonite, Inc. serves customers through three brands: Carbonite data protection, Webroot cybersecurity, and MailStore email archiving.

**Cautionary Language Concerning Forward-Looking Statements**

Certain matters discussed in this press release, including under "Business Outlook," have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to integrate the Webroot acquisition and other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefits, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

**Investor Relations Contact:**

Jeremiah Sisitsky
Carbonite
781-928-0713
investor.relations@carbonite.com

**Media Contact:**

Sarah King
Carbonite
617-421-5601
media@carbonite.com



# Carbonite Financial Results
## Q2 2019

July 25, 2019

---

# Safe Harbor Statement

Certain matters discussed in these slides and accompanying oral presentation have "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements may generally be identified as such because the context of such statements will include words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should, " "will," "would" or words of similar import. Similarly, statements that describe the Company's future plans, objectives or goals are also forward-looking statements. Such forward-looking statements are subject to risks, uncertainties and other important factors that could cause actual results and the timing of certain events to differ materially from future results expressed or implied by such forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, our ability to integrate the Webroot Inc. acquisition or other acquisitions into our operations and achieve the expected operational and financial benefits of such acquisitions and the timing of such benefit, our ability to profitably attract new customers and retain existing customers, our dependence on the market for cloud backup services, our ability to manage growth, changes in economic or regulatory conditions or other trends affecting the Internet and the information technology industry, and those discussed in the section titled "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018 filed with the Securities and Exchange Commission (the "SEC"), which is available on www.sec.gov, and elsewhere in any subsequent periodic or current reports filed by us with the SEC. Except as required by applicable law, we do not undertake any obligation to update our forward-looking statements to reflect future events, new information or circumstances.

This presentation contains non-GAAP financial measures including, but not limited to, non-GAAP Revenue, non-GAAP Gross Margin, non-GAAP Net Income and non-GAAP Net Income Per Share, Adjusted EBITDA and Adjusted Free Cash Flow. A reconciliation to GAAP can be found in the financial schedules included in our most recent earnings press release located on Carbonite's website, http://investor.carbonite.com, in the Company's filings or with the SEC at www.sec.gov. The presentation of non-GAAP financial information should not be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.



## Conference Call Details

| | |
|---|---|
| **What:** | Carbonite Q2 2019 Financial Results Conference Call |
| **When:** | Thursday, July 25th , 2019 |
| **Time:** | 5:30 p.m. ET |
| **Live Call:** | 877-303-1393 (U.S.) |
| | 315-625-3228 (International) |
| **Conference ID:** | 8188460 |
| **Live / Recorded Webcast:** | http://investor.carbonite.com |

**CARBONITE** 3

## Summary Results

- Steve Munford, chairman of the Carbonite board of directors named as interim CEO

- Delivered non-GAAP revenue of $135 million, up 69% year-over-year

- Delivered adjusted EBITDA margin of 29%

- First full quarter of contribution from Webroot

- Made $55 million in accelerated principal payments on outstanding term loan

- Adjusted FY 2019 guidance

**CARBONITE** 4

# Summary Q2 2019 Financial Results

| | Q2 2019 Outlook (5/2/2019) | Q2 2019 Results |
|---|---|---|
| GAAP Revenue | $119 M - $123 M | $121.5 M (+56% YoY) |
| Non-GAAP Revenue | $133 M - $137 M | $135 M (+69% YoY) |
| GAAP Net Loss Per Share (Diluted) | *Not guided* | ($0.33) (-65% YoY) |
| Non-GAAP Net Income Per Share (Diluted) | *Not guided* | $0.56 (+26% YoY) |
| Non-GAAP Gross Margin | *Not guided* | 82.3% (+523 Bps YoY) |
| Adjusted EBITDA | $34 M - $36 M | $39.1 (+87% YoY) |
| Adjusted Free Cash Flow | *Not guided* | $24.3 M (+83% YoY) |

*With respect to expectations under "Outlook" above, the Company has not reconciled non-GAAP net income per share to net income per share because we do not provide guidance for stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, amortization expense on intangible assets and the income tax effect of non-GAAP adjustments as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors.

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

 **CARBONITE** 5

## Quarterly Non-GAAP Revenue Growth



- *First full quarter of contribution from the Webroot acquisition.
- Approximate, may not foot due to rounding.  Source: SEC Filings and company estimates; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com



# Driving Operating Leverage
*(% of non-GAAP revenue)*









Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor
relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE**  7

# Business Outlook (as of July 25th , 2019)*

|  | Q3 2019 Outlook (7/25/2019) | | FY 2019 Outlook (5/2/2019) | FY 2019 Outlook (7/25/2019) |
|---|---|---|---|---|
| GAAP Revenue | $117 M – $119 M | | $457 M – $471 M | $443.5 M – $448.5 M |
| Deferred Revenue Haircut Assumption | $14 M | | $34 M | $34 M |
| Non-GAAP Revenue | $131 M – $133 M | | $491 M – $505 M | $477.5 M – $482.5 M |
| Non-GAAP Gross Margin | *Not Guided* | | 80.5% – 81.5% | 80.5% – 81.5% |
| Adjusted EBITDA | $34 M – $37 M | | $132 M – $137 M | $132 M – $137 M |

*With respect to our expectations under "Outlook" above, the Company has not reconciled non-GAAP gross margin to gross margin or adjusted EBITDA to net income (loss) in this press release because we do not provide guidance for amortization expense on intangible assets, depreciation expense, stock-based compensation expense, litigation-related expense, income tax expense, restructuring-related expense, interest expense, and acquisition-related expense as we are unable to quantify certain of these amounts that would be required to be included in the GAAP measure without unreasonable efforts. In addition, the Company believes such reconciliations would imply a degree of precision that would be confusing or misleading to investors

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

 **CARBONITE** 8

## Financial Highlights



- Strong and consistent total revenue driven by combination of organic and inorganic
- High quality revenue base and highly recurring revenue model
- Consistently improving margins through operational efficiencies
- Track record of successful acquisition integration and synergy achievement
- Delivering meaningful earnings per share and free cash flow growth
- Disciplined capital allocation strategy

**CARBONITE** 9

## Definitions of non-GAAP measures

- **Non-GAAP revenue**: Excludes the impact of purchase accounting adjustments for acquisitions.

- **Non-GAAP gross margin**: Excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, and acquisition-related expense.

- **Non-GAAP net income and non-GAAP net income per share**: Excludes the impact of purchase accounting adjustments on acquired deferred revenue, amortization expense on intangible assets, stock-based compensation expense, litigation-related expense, restructuring-related expense, acquisition-related expense, non-cash convertible debt interest expense and the income tax effect of non-GAAP adjustments.

- **Adjusted EBITDA:** Excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense, intangible asset impairment charges, and acquisition-related expense from net income (loss).

- **Adjusted free cash flow**: Calculated by subtracting the cash paid for the purchase of property and equipment and adding the payments related to acquisitions, restructuring, and litigation from net cash provided by operating activities.

Source: SEC Filings; For a full reconciliation of GAAP to non-GAAP, please visit the investor relations portion of the Carbonite web site – investor.carbonite.com

**CARBONITE** 10