UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

RUBEN A. LUNA, Individually and on
Behalf of All Others Similarly
Situated, et al.                         Civil Action No.
                                         1:19-cv-11662-LTS
        Plaintiffs,

    v.

Carbonite, Inc., et al.,

        Defendants.

_____


     BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


                        MOTION



                 Tuesday, July 11, 2023
                      9:59 a.m.




John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff and Lead Plaintiff:

    HUTCHINGS, BARSAMIAN, CROSS AND MANDELCORN, LLP
    BY:   THEODORE M. HESS-MAHAN
    110 Cedar Street
    Wellesley Hills, Massachusetts  02481
    (781) 431-2231
    thess-mahan@hutchingsbarsamian.com


On behalf of the Lead Plaintiff:

    ROBBINS GELLER RUDMAN & DOWD LLP
    BY:   ROBERT D. GERSON AND DAVID A. ROSENFELD
    58 South Service Road
    South 200
    Melville, New York  11747
    (631) 367-7100
    rgerson@rgrdlaw.com
    drosenfeld@rgrdlaw.com


On behalf of the Defendants:

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    BY:   JAMES R. CARROLL, ALISHA QUINTANA NANDA, NIGEL
    TAMTON, AND KURT HEMR
    500 Boylston Street
    Boston, Massachusetts  02116
    (617) 573-4800
    james.carroll@skadden.com
    alisha.nanda@skadden.com
    nigel.tamton@skadden.com
    kurt.hemr@skadden.com

**P R O C E E D I N G S**

(In open court.)

THE DEPUTY CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

THE COURT:  Please be seated.

THE DEPUTY CLERK:  Today is July 11, 2023, and we are on the record in civil case number 19-cv-11662, Ruben A. Luna, et al. versus Carbonite, Inc., et al.

Will counsel please state your name for the record.

MR. GERSON:  Good morning, Your Honor.  Robert Gerson, from Robbins Geller Rudman & Dowd, on behalf of lead plaintiff and the proposed class.

MR. ROSENFELD:  Good morning, Your Honor.  David Rosenfeld, also from Robbins Geller, on behalf of the lead plaintiff.

THE COURT:  Good morning.

MR. HESS-MAHAN:  Good morning, Your Honor. Theodore Hess-Mahan, from Hutchings, Barsamian, on behalf of lead plaintiff.

THE COURT:  Good morning.

MR. GERSON:  And, Your Honor, I just want to introduce, this is Mr. Thomas Clement, who is the third-party administrator for the plaintiff.

THE COURT:  All right.  Good morning, Mr. Clement.

Welcome.

MR. CARROLL:  Good morning, Your Honor.  James Carroll on behalf of Carbonite and the individual defendants; With me, my colleagues, Nigel Tamton, Alisha Nanda, and Kurt Hemr.

THE COURT:  Oh, wait.  One more time, a little bit more slowly for me, so I can get it down.  I got your name, and I got Mr. Tamton's.

MR. CARROLL:  Nigel Tampton.  Alisha Nanda.

MS. NANDA:  Alisha Nanda.

THE COURT:  Nice to meet you.  Welcome.  Good morning.

MS. NANDA:  Thank you.  Good morning, Your Honor.

MR. HEMR:  Kurt Hemr, Your Honor.

THE COURT:  Say it again?

MR. HEMR:  Kurt Hemr.

THE COURT:  Hemr.  Thank you.  Good morning.

MR. HEMR:  Good morning, Your Honor.

THE COURT:  All right.  I have read the papers.  I apologize it's taken a little while to get to this point.

I will hear you.  I see you have a slide deck, hopefully reminding me why we're here.  So it's the plaintiff's motion.  Why don't you go first.  I'm happy to -- I'll take the slide deck, and you're welcome to use it, but I'm not promising that you get to go through the whole deck

from slide 1 to slide 32.

MR. GERSON:  I wouldn't expect anything different, Your Honor.  Understood.

THE COURT:  Okay.  No problem.

MR. GERSON:  All right.  So good morning again. And I am Robert Gerson, from Robbins Geller, on behalf of the lead plaintiff and the proposed class.

My colleague, Mr. Rosenfeld, will be handling the motion to compel this morning.

THE COURT:  Okay.

MR. GERSON:  As you will soon see in our opposition to defendants' motion for summary judgment, plaintiff's allegations have been borne out on discovery.  This is a very strong case on the merits.  Nonetheless, I recognize we're here today to discuss plaintiff's motion for class certification, appointment of class representative, and appointment of class counsel, pursuant to Rule 23.

This case is ideally suited for class certification, Your Honor.  Securities fraud cases in particular are ideal for class certification treatment, because it may be the only practical means of enforcing investors' rights.

Your Honor, I recognize there's a lot of elements to go through, and I'll do my best to get through them as quickly as possible.

First, as to Rule 23(a) --

THE COURT:  Why don't you jump to the first issue that the defendants raise, which is that the trust, through its investment advisor, had other information that the average investor didn't have, and it creates a unique defense for them that would become, their position is, the focus of litigation.

MR. GERSON:  Certainly, Your Honor.  So that challenge is made pursuant to Rule 23(a)(3).  Defendants challenge that --

THE COURT:  I should also -- let me just say for all of you -- it occurs to me now, I often remind people of this.  But from my perspective, if you both -- if you sat down now, and, Mr. Carroll, you and your team said nothing -- although I find that unlikely -- none of you have waived anything.

MR. CARROLL:  Okay.

THE COURT:  My view is unless you say, "I waive," -- if you say, "I waive," everything that follows is gone.  But short of saying, "I waive," you haven't waived anything.  So you don't -- don't feel --

I have read all the papers.  I'm going to take it under advisement.  I'm not ruling from the bench.  And you won't have waived anything by not talking about it.  You're only going to waive it if you say, "I waive."

So I say that because there are -- I'm likely to be bouncing around, and there are questions, and I don't -- sometimes people worry about, "Well, I didn't say this, and I don't want the judge to think I waived that."  I won't. That's why I say it on the record.

Okay.  With respect to the meetings with the executives and the information that they say they had -- that the defendants raised that the plaintiffs had and say that creates this sort of unique defense, what about that?

MR. GERSON:  Certainly, Your Honor.  So that challenge is just completely erroneous.  They challenge that the trust is subject to a unique defense, given that its investment manager, specifically Bernzott Capital Advisors, and Mr. Ryan Ross met with Carbonite management during the class period.  But Your Honor, there was nothing remarkable about an institutional investor, such as the trust, meeting with company management.  In fact, this court has recognized that such meetings are routine.

THE COURT:  So at what point does research, acquisition of information, what kinds of things become the kind of unique defenses that could become the focus of the litigation?  You're saying meeting between the investment advisor and the executives once, talk about the issues, where there's no material, nonpublic information.  Not so.  What would be the kind of thing that would touch upon that?

MR. GERSON:  Sure.  So the type -- sort of what things are over the line?

THE COURT:  Yeah.  Yeah.

MR. GERSON:  So those are things that are not -- that -- not only can't be gleaned from publically available sources, but sort of that were not even hinted at or discussed in any way in any publically filed materials.

So I think, very tellingly, the court in *Howard vs. Liquidity Services* addressed this issue and held that, if the plaintiff received information from the company insiders that confirms, reflects, repeats, or even digests publically available information, that plaintiff is an appropriate class representative.

Here there is nothing to suggest that Mr. Ross received any nonpublic material information.  I asked him directly, under oath, "Did you receive any material, nonpublic information from Carbonite or its officers?"  He said "No."  You take out the material information; they say, "Well, it's nonpublic information."  But that's just speculation.  He never said he received any nonpublic information.

And, again, if the conversation sort of digests and discusses information that, you know -- these companies have loads of information that they put out to the market, and a central aim of the Private Securities Litigation Reform Act

was to ensure that institutional investors, such as the trust, serves as lead plaintiffs in class actions.  So it's inevitable that this case -- this issue arises quite frequently.

So, again, what they really do is they challenge that Mr. Ross's meeting with communications challenged the trust's ability to utilize the fraud on the market theory of reliance.  Very briefly, the Supreme Court said in *Basic vs. Levinson*, and reintegrated in *Halliburton II*, the market price of shares traded on well-developed markets reflects all publically available information and, hence, any material misrepresentations; such that when an investor buys or sells a stock at the market price, his reliance on any public material misrepresentations may be resumed for purposes of Rule 10(b)(5) action.

I'll get into defendants' misguided efforts to rebut the presumption of reliance shortly in the context of price impact, for typicality purposes, they essentially argue that the trust may not be able to show it relied on the integrity of the market because of information that he received from management.  But there is nothing here to suggest that any material, nonpublic information was communicated.

THE COURT:  What about the argument that the trust is insufficiently supervised in the litigation?

MR. GERSON:  Well, Your Honor, that argument is just not correct.  So here, the trust maintains its own external counsel to supervise us.  And courts have found that sort of that extra layer only helps approve adequacy.

THE COURT:  What evidence do I have about what that law firm does?  I have evidence -- I have before me that they have that law firm and that they have that law firm for purpose of supervising.  But do I have anything that says that they review -- I have that -- the evidence that the draft pleadings are sent to the trust.  Do I have evidence that that law firm is reviewing the draft pleadings?

MR. GERSON:  You have evidence, as Mr. Clement testified, that the firm Brownstein Hyatt is involved and fields any questions that come up during the course of the litigation.  And Mr. Clement submitted a sworn declaration to this Court in connection with this motion, demonstrating the trust's deep commitment to the class and understanding of its duties.

In connection with the -- flipping over to the adequacy prong, now that we've sort of meandered there a bit, Mr. Clement testified about all the details of this case.  The cases that defendants cite that found proposed class investigators, proposed class representatives inadequate involved these egregious circumstances where they didn't know they were securities fraud cases; they didn't know the name

of the company or who the defendant was.

Mr. Clement talked about how Carbonite did, knew the defendants or the class periods.  They even said that at the beginning of the meeting, how much the stock went down. He also knew about the procedural posture of the case, it's pending here, remembered even Your Honor's name.  And he knew about Your Honor's dismissal of the complaint and then the First Circuit's reversal.

So all of that information just helps to show that the trust -- the trust is adequate here.  The trust is committed to the class.  The trust has been vigorously prosecuting this case since day 1, and it will continue to do so if it is appointed the class representative.

The defendants would have this Court believe that the standard for a proposed class representative is to be all-knowing.  They're essentially asking the Court to find the trust inadequate, because he didn't recall every single factual development of this four-year-old case.  Frankly, Your Honor, they're playing a game of gotcha.  They said he didn't remember how much the expert was charging in class certification.

But as Judge Zobel noted in another securities fraud case, quote, "In complex actions such as this one, named plaintiffs are not required to have expert knowledge of all details of the case, and a great deal of reliance on the

expertise of counsel is to be expected."  And that was in the *In re Transkaryotic* case.  It's 2005 Westlaw 3178162 at page 4.  That's cited in our reply brief.

THE COURT:  What about their assertion that they rebutted the presumption of the *Basic* presumption?

MR. GERSON:  Certainly, Your Honor.  I'll flip over to that.

So I've briefly touched on and explained what the *Basic* presumption is.  So we've moved over to the prominence -- the predominance factor.

With respect to predominance, each of the factual and legal elements of liability are common to all members of the proposed class.  And the Supreme Court has held that the other elements -- so that's falsity, scienter, materiality, and loss causation -- those are each common questions of law and fact that predominate over individual ones.

So to invoke the presumption of reliance, first, plaintiffs have to show three things:  That the alleged mission representation was publically known; that the stock traded in an efficient market; and that the plaintiff traded in the stock between the time the misrepresentation was made and the truth was revealed.

I'll note, there's also a fourth prong of materiality, but the Supreme Court has said as most recently as *Halliburton II*, that materiality is left for the merits

stage.

So defendants do not challenge any of those factors, including Mr. Steinholt's finding of inefficient market. So as to the efficient market prerequisite, plaintiff submitted an expert report --

THE COURT: The question that I'm wondering about is not whether the stock market was efficient, but whether their assertion that they have rebutted the presumption of reliance that arises under *Basic*, when you meet those prerequisites, by appointing to the various evidence that they point to and the assertion that other -- there are causes -- well, it's not causes, but that there's -- that you -- that the evidence that they point to is sufficient to rebut the presumption of reliance.

MR. GERSON: Certainly, Your Honor. So in *Halliburton II*, the Supreme Court held that to rebut the presumption in a class cert., a defendant must show that the asserted correction -- asserted misstatement or its correction did not effect the market price as the defendants thought. And that's known as price impact. It's their burden, which they failed to satisfy.

Before reaching the Supreme Court, the Second Circuit in the *Goldman* Sachs case said, quote, "The defendants must prove by a preponderance of the evidence that the entire price decline on the corrective disclosure date

was due to something other than the alleged misstatements." And then the case went up to the Supreme Court, and the court ruled on a few things.

It said, first, the generality of a statement can be considered at class certification. Second, it said the defendants bear the burden of persuasion by a preponderance of the evidence. And, third, the Court remanded down to the Second Circuit, with instructions to consider all price impact evidence, sort of direct and indirect. But the Supreme Court did not alter what defendants actually have to show, which is a total absence of price impact.

On their sur-reply brief, the defendants contend that we were misreading the *Goldman* standard. They're construing the whole thing as being a preponderance of the evidence, suggesting that they simply need to show it's more likely than not that there was no price impact. Yes, there has to be a preponderance of the evidence, but, first, they have to show that 100 percent of the price decline was due to something other than the alleged misstatements. They're taking the preponderance of the evidence language and misapplying it. They have to show no price impact whatsoever.

And numerous courts post *Goldman* have reiterated the standard. Significantly, Judge Crotty, of the Southern District of New York, in *Goldman*, on remand from the Supreme

Court, quote, "Defendants must show a complete lack of price impact."  Defendants' burden is not merely to prove that the alleged misstatements were one of several sources of price impact, nor even that the other source's loomed larger.  They must show by a preponderance that the alleged misstatements had no price impact whatsoever.

Now, critically, Your Honor --

And I apologize for those trying to follow through by hardcopy.  This is 29 in the hardcopy, but it's 23 here. And I'll get everyone a clean set after the hearing.

Defendants acknowledge that some of the stock decline was due to VME's withdrawal.  They say, quote, "A fraction of that reduction," of the guidance reduction that took place on July 25, 2019, was due to VME's control.  That dooms their efforts.  They have to demonstrate that the other events explained the entire drop.

So in the face of this burden, defendants submitted an expert report.  They hired someone on these issues who tellingly submitted a declaration that contains no event study, no empirical evidence, or any analysis of his own on the issues of market efficiency, price impact, or damages. Numerous courts have held that defendants failure to conduct such analyses alone destroys any attempt to show a lack of price impact.

Indeed, Mr. Mayhew does acknowledge, but does not

challenge, Mr. Steinholt's conclusion that there was a statistically significant stock drop on that day.  Carbonite stock fell 24 percent following the disclosure.

And defendants raise no challenge to that, either. Other courts have held that such a concession ends the inquiry regarding back-end price impact.

So as one would expect, instead of being of an empirical explanation why there's no price impact, they take the unremarkable position that Mr. Steinholt's event study can't determine the price impact of any -- of each piece of company specific information that Carbonite released.  But, again, Mr. Steinholt's report was submitted on the issue of market efficiency.

So without a hint of any empirical evidence, defendants' effort to rebut price impact amounts to a few scattershot arguments, none of which show an absence of price impact, let alone a complete absence of price impact.

So just to briefly remind the Court here, this is what the defendant said.  There's other issues at issue in this case.  The two statements that had been focused on are the statements on November 1, '18, and --

THE COURT:  What's the significance of the other statements?

MR. GERSON:  Sure.  The significance of the other statements is that during the class period, Carbonite issued

revenue guidance, that, as we allege, was materially false and misleading, given all the issues that were taking place with VME.  And they issued other sort of -- I don't want to say more generalized statements, but they issued other statements that didn't necessarily call VME out by name, but had to --

THE COURT:  The question that I have about it is this.  In the briefs, the two of you take differing positions on the significance of the statements, other than the two the circuit focused on.

MR. GERSON:  Uh-huh.

THE COURT:  And how do those statements make a difference -- do I need to resolve that dispute?  Does that matter to class certification?

MR. GERSON:  Well, it doesn't matter to class certification, Your Honor.  And particularly, because what defendants are really --

THE COURT:  What does it matter to?

MR. GERSON:  I'm sorry?

THE COURT:  What does it matter to?

MR. GERSON:  It could matter at the summary judgment stage, sort of assessing the merits of what's left in this case.

But, in particular, because defendants are advocating for a mirror image requirement, meaning this is

what they said, and unless defendants said the exact same thing or the opposite of it, then there's no correct disclosure.

But, Your Honor, even in the arguably more complex area of loss causation, courts around the country, including the First Circuit itself in the *CVA Caremark* case, said that does not require a mirror image between the misstatements and the corrective disclosure.

So the guidance statements would matter if there was a class -- at class certification, if there was a mirror image, because defendants could say they issued guidance, and then they changed the guidance.

But here, you have something that's essentially a mirror image. They said, "We've got this new VME. It makes us extremely competitive. It's super strong."

Fast forward nine months, "VME didn't work right. We had quality issues. We're taking the product off the market. We're pulling it. We're taking out all revenue guidance associated with that product."

So, really, that mirror image requirement is here.

But to answer your question, Your Honor, those statements have not been sort of kicked out of the case. The First Circuit trained its attention on the other two. They sort of -- I think we all agree that those are the most egregious statements, the most germane statements. But they

are all relevant.  They are all still here.  The rest of them sort of rise and fall with the other two.

The Court didn't need to go through a separate analysis for each statement.  It reversed the judgment in its entirety.  There was no carve-outs, no caveats, no in-parts. So we maintain that all of the statements are in play.

But back to price impact, relying on two articles and three analyst reports --

THE COURT:  When you say they're "in play" --

MR. GERSON:  Yes.

THE COURT:  -- what do you mean by that?

MR. GERSON:  That we allege that they are actionable, false statements.

THE COURT:  Okay.  That in and of -- not that they're pieces of evidence that are relevant that could be considered in evaluating whether or not there was scienter or materiality or fraud or misrepresentation or any of the other elements of the claims, but that, in and of themselves, they're statements that could support liability on their own.

MR. GERSON:  Absolutely, Your Honor.  And as the evidence will show when we get to summary judgment, just as an example, they're statements, "Our technology works really, really well."

THE COURT:  So if -- if the other statements are statements that you're asserting can support liability,

then -- let me rephrase that.

One theory of class certification, through which you framed all the issues, are the two statements from November 1st, and I think it's the 15th or the 18th.

MR. GERSON:  Yes.

THE COURT:  And then the follow-on press release at the end.

If -- and that's how I've thought about the class certification motion, thought about it in terms of, like, those statements and measured -- and have been measuring and thinking about all of the elements that you need to meet with respect to that.

So if -- it's a somewhat binary question.  Either you satisfy that, all the elements, and then you get class cert., or you don't.  Right?

MR. GERSON:  Right.

THE COURT:  If I do find you satisfy it, do I need to think about the other statements?  And if I decide you don't satisfy it, do I need to think about the other statements?  And either way, if I have to think about the other statements now -- not asking about class -- not yet asking about summary judgment, but then how do I think about them?

MR. GERSON:  Right.  Well, Your Honor, I don't think that a statement-by-statement analysis is required

here.  What's required here is do we meet the elements of Rule 23(a) --

THE COURT:  Right.

MR. GERSON:  -- and 23(b)(3).

THE COURT:  Right.  But the framework of the theory of the case is that they made statements in November that in short version said the product is great; it works; it's, like, important; along those lines.  And then fast forward to the -- summertime, I think it was?

MR. GERSON:  Yes.

THE COURT:  And they say, "We're pulling the product, because it doesn't meet our quality control."  And they make some other statements that day, too.

And your theory is:  Look, we've got an efficient market.  We have the presumption of reliance.  The question of whether the price drop is for other reasons is for -- essentially, they haven't rebutted it, is your petition, and, plus, that's a question for later.

But if -- if it's a different statement, if it's not -- if it's not those two statements, you have a different timeframe, you have a different -- potentially, I'm not sure, you would have to think about the issues a little bit differently.  That's what I'm wondering about.

And I'm wondering why do I -- you framed it in terms of these two statements.  I'm not sure why I need to

consider those.  The circuit says you said that if you win on those -- if you don't win on those two, you can't win on the others.  That was in the context of 12(b)(6).

So I guess all of that is a long way of saying I'm trying to figure out the significance of this dispute between the two of you right now, like why does this bear on -- why now does this bear on class certification?

MR. GERSON:  Well, frankly, Your Honor, we don't believe it really does bear on this motion.

THE COURT:  Okay.

MR. GERSON:  As I mentioned, it would just really bear if there was a mirror image requirement, which there's not.  What matters here is the Rule 23 framework.

And, again, on price impact, for example, it's the alleged misstatement or it's corrective disclosure.  They all fell.  They all are tied to the corrective disclosure.  It's the same unifying moment in time, where they say, "Remember that VME product that we told you was so awesome?  Yeah, it doesn't work, and we're taking it off the market."  So they all go and are tied to July 25, 2019.

So two articles, three analyst reports, that's all their evidence that they have shown, that they have submitted to the Court.

And in fact, if you actually look at these materials, they help show our point.  Defendants' Exhibit 15

is an analyst report from JMP Securities that says, quote, "Carbonite's new virtual server backup product did not work correctly; therefore, management does not expect it to generate revenues it was previously projecting."

So what the defendants tried to do in their brief is divorce the issues of the lower revenue guidance and pulling VME.  But it simply cannot be disputed that they are one and the same.  Mr. Folger literally said, "We have removed any growth expectations associated with virtual server addition from our short-term outlook."  So VME had quality issues, we're pulling it off the market, and so we're taking out all the guidance.

Now, how much of that guidance is a question for another day that I'm writing right now for Your Honor in our loss causation brief.  That's not before the Court today. It's whether or not there is a connection -- and there most certainly is.  But those two issues are one and the same.

So putting all of that together, that's all the evidence that they muster.  They cite a few -- the three analyst reports they cite, one of them is dated July 25th, which is the day before the stock drop here.  That announcement was made after the market closed.  The other two analyst reports talk about after-hours trading, which is, again, that's before the market even opened on July 26th.

But if you look at what those documents say, they

say that, "The stock is declined 18 percent in after-hours trading on Carbonite's fiscal '19 sales outlook and the surprise step down of Mr. Ali."  The sales outlook is VME.  It's spot on.  Again, it's pretty much a mirror image.

So altogether, the defendants have not met their burden here.

I can flip to the damages --

THE COURT:  Let me see what the defendants have to say.

MR. GERSON:  Okay.

THE COURT:  Thanks.

I'll hear you.

MR. CARROLL:  Thank you, Your Honor.  And thank you in particular for also having this hearing happen, because the issues here do require distinct attention.

I have gone old school and have just a couple of demonstratives that I think will add some structure to the discussion.

THE COURT:  Fine.

MR. CARROLL:  And I'll hand those around, if I may.

THE COURT:  Sure.

MR. CARROLL:  May I hand them to the clerks, Your Honor?

THE COURT:  Yes.

Really old school, even legal-length paper.

MR. CARROLL:  It may be that just you and I are the only ones who can recall when business was done on that paper.

THE COURT:  Yeah, it could be.

MR. CARROLL:  So I'd like to start, respectfully, with framing the question that we have here, because it's gotten a little bit lost, I think, respectfully, with regard to what's the key issue.  Right?  And I'll quote it right from *Goldman*, couldn't be clearer from the Supreme Court.  Right?

The Supreme Court, particularly in the last two decades, has changed the way class certification works in a very material way.  When I started practicing, it was effectively a 12(b)(6) standard, to be done immediately after the case or as quick practical.  That has changed tremendously, particularly in securities cases.

So what *Goldman* says, it says, "The district court's task is to simply assess all the evidence of price impact, direct and indirect, and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  And the Supreme Court has taught that that has to be done in this rigorous analysis standard, considering all kind of evidence.  It doesn't matter if something also goes to materiality or something also goes to causation.  You got to put it all in the mix and figure it

out, and you have to do it now.

What we can't lose focus of is what are the alleged misrepresentations as to which there has to be a price impact?  Okay?  And in this case, it's clear, there are two, November 1st and November 15th.  We deal with this in our sur-reply in a footnote.  The others have been waived by not having been raised in the First Circuit.

And we deal with that -- I don't think you have to contend with it today, but we will need to contend with it if the case moves forward.  But for purposes on the entire briefing in this motion, and, frankly, everything that's happened in the case subsequent to the First Circuit, that's what remains.  And it's critical that that's what remains because those are the alleged misrepresentations as to which price impact must be shown.

This is a securities fraud case, and it's a securities fraud case where the fundamental nature of the case is that the plaintiff is saying that those misrepresentations in the fall of 2018 caused the price to be artificially inflated such that everybody else who bought, until the so-called truth was disclosed, paid too much.  They were defrauded into paying too much for the stock.  So it's those statements that have to have caused the artificial inflation.  That's the price impact, the artificial inflation of those statements.  And I dwell on it because it really

matters, and it's getting a little bit lost, respectfully, in the conversation.

If you look at my Demonstrative A, the one on the big paper, Your Honor --

THE COURT:  Yes.

MR. CARROLL:  -- take a look at what I put as Example 1.  Example 1 is a classic example of price impact in a securities fraud case where, as here, the allegation is premised on an affirmative misrepresentation.  Right?  As this case is, two affirmative misrepresentation.

In the simple example, company says, "Oh, we discovered gold."  Price shoots up.  Some time goes buy, the price is inflated at an artificial level.  And then they say, "Oh, the truth is no gold," the price comes down.

That first upward line there on the discovery of gold, that's price impact.  That's what happened.  That's the price impact of the alleged misstatement.  And then at the back end, when the truth is revealed, it comes down.  This is the classic format of the use of price impact to try and support the presumption of reliance under *Basic*.  Right?

That's not this case.  All right.  In this case, in November 1, after that November 1 statement, the stock price dropped 24 percent. Okay?  24 percent it dropped.  Not only was it inflated, the stock price went down dramatically. Now, that's because there were other announcements at that

time, including that they were revising revenue guidance down at that time.  Okay?

Now, so the plaintiffs can't show, with respect to November 1st, any price inflation, zero price impact at the critical front end.  The front end is where you should expect to see price impact, positive price impact in this kind of case, based on affirmative misrepresentation.

With respect to November 15, the price also didn't go up.  It essentially stayed the same, bounced around a little bit in a manner that is statistically insignificant.  Right?

So the critical question in an affirmative misrepresentation case of price impact -- and here, the Supreme Court has urged us to use common sense.  How about that for guidance from the Supreme Court in the *Goldman* decision:  Go use your common sense.  The common sense tells you, you should see the artificial inflation at the front end never happened here.  That's critical.

So the plaintiffs then go to a different theory, because they can't satisfy what you would normally expect to see.  So they go to what I put as Example 2, something called the inflation maintenance theory.  So they try to do this instead.

Theory hasn't been endorsed by the Supreme Court, as *Goldman* specifically calls out.  I suspect we'll see more

Supreme Court decisions on that in years to come. But they specifically call out, "Hey, we haven't endorsed this, either the theory or the contours of it." First Circuit also hasn't spoken on it. But this is what the plaintiffs are relying on.

And they say, "Well, the stock didn't move at the front end, but it came on down at the back end," when they said there's no gold, "So that ought to be sufficient price impact."

Now, keep in mind here, the statements at issue are in November of '18, and the so-called corrective statement doesn't come for eight months later. Okay? That's a long time away to try and argue that this back-end price impact somehow ties back such that the stock price was artificially inflated starting in November. But that's the case the plaintiffs have to make. Right?

Now, that's what they're going for here, but they can't do it because the facts won't allow it. And that's what we're depicting in number 3. Right? Number 3 is what really happened here. You see the statements plotted in November of 2018; stock price sales go up. It goes down on November 1st; it stays the same around the 15th. A lot of time goes by, and then the stock price, when it goes down in July of 2019, there's three announcements there.

One is, they've lost the CEO. The CEO abruptly

resigned.  They weren't ready for it.  They didn't have a new CEO picked out.  The CEO resigned.  And the evidence in the record is this guy was regarded as rock star CEO, went and took a job at another Boston-based technology company, a much bigger company.  The market reacted to that.

The other thing, of course, that was announced is they reduced the guidance.  They took the guidance down, telling the market, "Well, we don't expect to do as well financially as we thought we were going to do before," and they took that guidance down.

And the third thing is the VME withdrawal.  Right?

Now, how do you unpack those?  How do you unpack those?  Plaintiffs cannot do it.  There is nothing, zero in the record to suggest any amount of the decline that is attributable to the VME.  None.

They put forward an event study, as you heard discussed.  That's Mr. Steinholt's work.  And our expert, Mayhew, has commented on that.  That's a tool, an analytical tool that can tell you if there's been unusual trading relative to what's happening in the market and the peer group and such.  It can't distinguish between contemporaneously issued statements in terms of attributing amount of movement.  It just can't.  It's not a tool that can do that.  The best study in the world doesn't do that.

So what's the record?  Well, the record, then, on

the back end -- because there's no dispute about the front end.  There's no price impact on the front end.  On the back end, you've got to look and see, well, what do the market participants say?  And we have put into the record on this motion --

THE COURT:  How do I know that there's no price impact on the front end?

MR. CARROLL:  You know there's no price impact on the front end because you look at what the stock price did.  Right?  And the stock prices are all, helpfully, they're attached to Mr. Steinholt's report.  And you see you've got the date and the closing price of the stock.  What you would expect to see if you have a misrepresentation that artificially improved the price of stock, some exciting announcement, "Oh, this is going to be a great product," you'd expect to see the stock go up, right?

In cases in this district, you commonly see it in pharmaceutical cases, right?  "We've got a new drug" -- "We're going to make a new drug application to the FDA," stock goes up because there's a lot of optimism about that.  That's what you don't see in this case, because the stock doesn't go up.  So that's how you know there's no front-end price inflation, by looking at the prices.  That, I don't think, is disputed on this motion.

THE COURT:  Is that true?

MR. GERSON:  Yes.

THE COURT:  You're not disputing that there's no price impact on the front end?

MR. GERSON:  Well, Your Honor, this is an inflation maintenance case, where --

THE COURT:  I know you're not disputing what the price was each day of the stock?

MR. GERSON:  Right.

THE COURT:  I get that.

What Mr. Carroll is saying is you're not disputing that the statements on November 1st and November 18th had no effect on the price at that point.

MR. GERSON:  Well, their effect was, under the inflation maintenance theory, that they maintained an already artificially inflated stock price.  The inflation maintenance theory --

I won't take Mr. Carroll's time, I realize --

-- while the Supreme Court didn't endorse it --

THE COURT:  So your -- you are not contending that it caused an increase in price those days, you are -- are you contending that it affected the price or not?

MR. GERSON:  We're contending that because it's an inflation maintenance case, that the price impact must be measured via the stock price reaction at the end of the class period.

THE COURT:  Okay.  Go ahead, Mr. Carroll.

MR. CARROLL:  Thank you.

So with respect to the inflation maintenance case that the plaintiffs confirmed moments ago that that's what they're relying on, because they can't show the front-end impact, they're trying to show the back-end impact.  They can't do it because they have no ability to disaggregate the -- the economists call them confounding disclosures.

There's three big things that were discussed according to the plaintiffs, and so what we have done is said, okay, what did market participants say about that?

And that's, if I could, direct you to my handout B.

And plaintiffs respectfully misspoke.  They said, "Well, we only rely on three analyst reports."  We put all of the analyst reports into the record on this motion, Your Honor, every one.  You can find them attached to Mr. Tamton's declaration.  We put them all in.  We just dwell on three of them for space reasons in the briefing, but they're all in there.

And, respectfully, I think you consider all of that evidence as part of your rigorous analysis, and it will be plain as day that market participants regarded the departure of Mr. Ali.

THE COURT:  So you're saying -- everybody agrees that after the statement about the three things, the price

went down.  Right?  No dispute about what the stock price was on each day.  You're saying that they have to -- let me start over.

They're saying, I think, that because they've shown the elements of the presumption, they get the benefit of a presumption that people relied on the statements.  And they say you bear the burden then, by preponderance, to prove that it wasn't the statement about withdrawing VME.  It was one of the other things, or something else, that caused the price drop, and, therefore, there wasn't reliance.

MR. CARROLL:  That's right.  I acknowledge defendants have the burden of showing by a preponderance that there wasn't that price impact.  No question about that.  But as the Supreme Court noted, that preponderance is just a 51/49.  It's not a heavy burden.  And it's only going to matter, to use the words of the Supreme Court in *Goldman*, where the evidence is at equipoise.

And here, the evidence is at anything but equipoise.

THE COURT:  That was one of their experts.

MR. CARROLL:  Pardon me?

THE COURT:  That sentence refers to when there's competing experts.  It does say what you say.

MR. CARROLL:  It's in that context, but I think it's more broadly true in a preponderance of the evidence

standard, who happens to have the burden of coming forward only really is going to matter if it's a close call.  Because it's just a more likely than not standard.

THE COURT:  Well, but it matters in the sense that if they have a presumption that -- if they have a presumption that the change in price on that day in the summertime comes from the alleged misrepresentation -- I'm sorry, they have a presumption of reliance on the market, and that then you have to defeat that, it puts you, the burden on you to show that the confounding -- that the other factors are caused.

If it's not the burden on you, then maybe they have the burden to show.

MR. CARROLL:  Sure.  As far as that goes.  But keep in mind, I've already come forward and demonstrated no front-end price impact, in a case where -- in a case where the plaintiffs are saying this price of Carbonite stock was fraudulently inflated starting in November of 2018.  I've already shown, and the evidence is in the record, there's no price impact, no artificial inflation shown by the stock price going up in November.

Now, with the back end, the way I'm dealing with that is saying, okay, sure, the price went down following July 25th.  That's why we're here, right?  Without the price decline, there's no case.

THE COURT:  Sure.

MR. CARROLL:  But now we have to look and see, what evidence is available to the Court to determine if there's price impact that somehow ties back to the statements from November?  That's what can't be lost here.  This is all about trying to ascertain whether there's evidence of artificial inflation from those statements in November.  That's the part that's critical here.

Now --

THE COURT:  They don't have to prove the merits.

MR. CARROLL:  Pardon me?

THE COURT:  They don't have to prove the merits now.

MR. CARROLL:  They don't have to prove the merits of the case; however, once I demonstrate and rebut that there's nothing in the record that shows that, that shows that connection and lots that shows that it is not true, then unless the plaintiffs have come forward with something, the preponderance of the evidence will show no price impact.

THE COURT:  So is it your position that there's no class certification because they can't show that the alleged misrepresentations affected the price, or is your position that the reliance -- you've defeated the reliance presumption by submitting all of the analysts' statements and highlighting three, but saying, "Look, all of them talk about other things."  And that at that -- that's enough to rebut

the -- to rebut the presumption of reliance that comes out of *Basic*, and they haven't come forward with anything to defeat that.

MR. CARROLL:  Yeah, I think you've got it.  I might use slightly different words, but I think we're fully aligned, except it's not just the market analyst statements.  That's part of it, but there is more.  There's the front end, right?  The absence of stock moving up on the front end.  Absolutely no evidence in this case, as I think was fairly conceded of front-end impact, which is exactly the impact that you would expect to see in an affirmative misrepresentation case.

Second, the market statements -- and you can -- I would respectfully ask that you do so.  We've put them all in.  It's not that much.  Read them all.  Take your own read on it.  They overwhelmingly attribute the decline in the stock to the resignation of Ali and the reduction in guidance.

THE COURT:  What about the fact that VME is part of the guidance?

MR. CARROLL:  Let me get to that directly.  Because that's the argument that I think they think gets them over it, and it doesn't.  Here's the thing:

To have an argument that the back-end price impact can be used to show -- think about it.  This is eight months

later.  You're going to use that back-end price impact to show that the price in November was inflated, the disclosures have to match.  Okay?  The guidance that Mr. Folger is quoted as attributing a part of the reduction in guidance, that guidance didn't exist when the statements were made in November.  It didn't exist.  The guidance he's talking about is the guidance for financial year 2019.  It didn't exist. It was never part of any information in the markets as of November of 2018.  It was published for the first time in February of 2019.

That's the mismatch.  Right?  You can't say Mr. Folger said something about the guidance in July.  And that has something to do with showing price being artificially inflated in November, when that guidance never existed.

Carbonite never said that the VME product would earn a nickel.  They never said it was part of any guidance until the end, until Mr. Folger's comments in July.  You can't match them up.  That's the mistach that the *Goldman* case warns us specifically.  Right?

So all of that shows why we've rebutted the notion that you can attribute any part of that stock drop -- and the plaintiff's expert, with the events, he doesn't do it.  And all the evidence in the market shows that it is not.  It is attributable to other factors.

That's the second category of my evidence, Your Honor.  It's all of that stuff that's attached to Mr. Tamton's.  And I know you'll read it.  But there's more.

And if I could direct your attention to the third, Exhibit C.

In this case, we are gifted with documentary evidence of what the very plaintiff thought.  Right?  So here in this case, there's one representative plaintiff.  It's a -- a union pension trust.  Right?  Now, that union pension trust has given complete discretion over the -- over its investments to an investment advisor, complete discretion. Mr. Clement has no idea why they invest in what they invest in.  Complete discretion about that is given over to this third party.

THE COURT:  Those aren't quite the same -- but in any event.  Complete discretion and having no idea why they do what they do or what they do are a little bit different. One can have complete discretion and say, "You have complete description, but you're supposed to invest in US equities. We're only a publically traded thing, so we have certain objectives we're supposed to accomplish."

I presume they -- this wasn't a blind trust.  I assume that they said to them certain things.  But in any event, I understand.  They had complete discretion, and they weren't checking with Mr. Clement as whether to buy or sell.

MR. CARROLL:  That's really my point.

THE COURT:  Yes.

MR. CARROLL:  That's really my point.

And we have -- and it's part of the record attached to Mr. Tamton's, and I've quoted a piece of it.  We've got the memo that they wrote to explain why they were investing in Carbonite in the first place.  Right?  And you can read that whole memo.

The VME is out there.  It's been announced.  This is June of 2019.  The letters "VME" are nowhere mentioned.  Right?  They talk about why they invest.  It's a great company.  They've got good products.  They've got established senior management that's invested in the company.  No suggestion whatsoever that, "Well, we think this VME is going to be the greatest thing since sliced bread.  Let's get in at the ground floor."  Nothing like that.

And then we got in the middle of the page, we see, contemporaneous with the bad news, what their reaction was.  So the investment advisor, that's Mr. Ryan Ross here, he sends an e-mail into Carbonite.  Now, these were people, as Your Honor noted when he was questioning plaintiffs at the beginning of the argument, who have direct access and get information directly from Carbonite.  So what do they do?  They reach out and they want to have a meeting.

They want to talk about the VME withdrawal?  No.

Of course not.  No one is paying attention to that.  They're paying attention to this, "In light of last night's quarterly results," which included the reduction in the forward-looking guidance, "and Mohammed's resignation, can we please have a call?"  They want a call with the fellow who is the interim CEO and with the CFO.  That's what's important to them.

These are not just random market participants.  This is the plaintiff -- the plaintiff's agent, if you will, not the plaintiff itself, of course.  And that shows you what they're thinking.

Now, their testimony, Mr. Ross's testimony as their agent, confirms the same thing.  He wasn't familiar with the VME.  We've excerpted some of it here.  But more tellingly -- and this crosses over both with respect to price impact and with respect to typicality.  And this is critical.

"QUESTION:  Did, at any later point in time, following a meeting or phone call, did you feel you had been deceived or misled by anyone at Carbonite?"

This is the person making the investment decisions on behalf of the plaintiff, and he says no.  "No."

I am unaware of any case that has ever been certified, where an agent authorized to make decisions on the investments on behalf of the plaintiff fundamentally contradicts the entirety of the plaintiff's case.  He is the guy who is making the decisions.  He doesn't think he was

misled.

And it's not just his testimony.  He keeps buying the Carbonite stock.  The trust, the plaintiff, after allegations of fraud have been made, buys more stock, invests further money into the people they say cheated them.  That is not a defense that is typical of class members.  That is incredibly unusual for the plaintiffs to do that, having been -- having faced an allegation of fraud and continuing to buy more.

Mr. Folger is still the CFO, and they're buying more.  This is highly atypical, and if they were certified as a representative are subject to unique defenses, which would take over the trial.  And they're inappropriate for that reason, as well, wholly apart from the failure to meet the requirements necessary to take advantage of the presumption of reliance under *Basic*.  They've got unique defenses.

So think about it.  Counsel said, "Well, the whole point of the PSLRA in '95 was to have institutional investigators take over."  Respectfully that's not quite right.  The point of it wasn't just for it to be institutional investors; it was for the cases to not be handed over to plaintiff's lawyers but to be run by people who had an interest and cared and paid attention.

The record in this case is that they didn't even read the amended complaint, and there was an offer to settle

the case made that they didn't even know about.

THE COURT:  "They," or Mr. Clement?

MR. CARROLL:  Mr. Clement was the 30(b)(6) witness for the plaintiff.  The plaintiff, speaking through Mr. Clement, didn't even know about it.  That's not consistent with the purposes of the PSLRA.

THE COURT:  All right.  Let me see what they have to say.

Mr. -- how do you say your name again?

MR. GERSON:  Gerson.

THE COURT:  First, what do you say about the fact that the investment advisor says he didn't feel misled?

MR. GERSON:  Well, if I can go back over there, Your Honor.

THE COURT:  Yeah.

MR. GERSON:  To answer that question, Mr. Ross is not representing the class here.  Mr. Clement never said that.  Mr. Clement and the trust are the plaintiffs in this case.

And I think, critically, what Mr. Carroll is trying to inject here is an actual reliance requirement.  This is not a case brought under Section 18 of the Securities Exchange Act of 1934, which has an actual reliance requirement.  Did you actually rely on what they said.  This, as we've been discussing for the majority of this hearing, is

a case involving a class-wide presumption of reliance.

THE COURT:  Right.  But he says with respect to the presumption of reliance that the guidance that they changed in the summer-time --

What was the date of that?  July?

MR. GERSON:  It was July 25, 2019.

THE COURT:  On July 25th, that the guidance that they changed was guidance that had been issued in February; that is, the guidance for fiscal year 2019, that that guidance had been issued in February, and they changed it in the summer.  And so in November -- back in November, when they made the alleged -- when they made the statements which are alleged to be misrepresentations, that guidance wasn't in the mix.  And so the change in guidance, even though it involved a change related to VME, at least in part, doesn't matter.

And that's not his only argument, but it's a piece of it.  And he says that, plus all of the analysts' statements, that all of that is enough, plus the no effect on the price on the front end, is enough to support his assertion that he's met his burden of proof that the price drop didn't arise from -- or the misstatements didn't have an effect on the price.

MR. GERSON:  Sure.  Your Honor, again, as I spoke about on opening, there is not a mirror image requirement.  I

mean, that is precisely what they are demanding this Court apply here.  There is no mirror image requirement.  They are saying they literally had to say this, and unless they literally corrected that on the back end, there's no price impact here.

THE COURT:  Well, what is -- how do you understand the issue?

MR. GERSON:  So how I understand the issue is that the market reaction talked about these issues in tandem.  For example -- and I apologize if I misspoke.  The three analysts' reports were in their brief.  They absolutely submit all of the market commentary that they can find and we could find on those issues.

So here's an example, right?  This is July 26, 2019.  RBC Capital Markets.  Look at the title of this report, "Product Challenges Lead to Reduced Outlook."

So what product is that?  Quote, "Essentially, the virtual server edition of the server backup product," and it goes on, "a product that was expected to meaningfully contribute to revenue second half of '19 and in 2020 was determined to be lacking in quality and removed from the outlook, while the company assessed the best approach from here."  That is prototypical back-end price impact.

We are not focused -- as I said, we are not focused on the front end.  We are focused here on the back end.

They're saying, "This product didn't work; that VME product specifically that we told you about, RBC said it's going to meaningfully contribute to revenues," not anymore.

In addition, Your Honor, the dis --

THE COURT:  So it's enough, you say, to identify a statement that is allegedly a misrepresentation, right?  We have that here, too, at least.  And then later identify that when the statement is withdrawn, the price drops.  And the drop -- well, I guess the question is, don't you have to show at some point -- and maybe this is loss causation, but don't you have to show at some point that it went up or it was maintained up, the inflation maintenance because of the misrepresentation?

MR. GERSON:  Certainly, Your Honor.  But as to at some point, that's loss causation.  When I get on the Delta shuttle back to New York and work on my loss causation section, I'm going to write stuff just on that topic.  That is not an issue for today.

This is what --

THE COURT:  Because all you have to show is --

MR. GERSON:  No, Your Honor, respectfully, this is Mr. Carroll's burden.  He has to show Your Honor that absolutely, 100 percent of the decline -- Mr. Carroll used the term "overwhelmingly."  Overwhelmingly is not enough.

Again, the slide in front of the Court right here,

Judge Crotty, following *Goldman*, not merely that other sources loomed larger.  They have to show no price impact whatsoever.  And they have not met this burden.

THE COURT:  Don't you have to prove reliance on material misrepresentation?

MR. GERSON:  No.  There's a class-wide -- we've successfully invoked --

THE COURT:  Well, the way you do it.  You have to prove it, and the way you do it is the presumption, right?

MR. GERSON:  Correct.

THE COURT:  So you have to do it, and you do it by the presumption.

MR. GERSON:  That's correct.

THE COURT:  And so the presumption is that people -- that gives you the presumption that people relied on the material misrepresentation, right?

MR. GERSON:  Right.

THE COURT:  So he's saying that he defeats the presumption.  He concedes he bears the burden of that -- by, the following:

One, no price impact when the statements -- the misrepresentations are made;

Two, that everybody -- as he puts it, his words, not mine -- all the analysts are talking about other things.  You say, "Well, not quite so."  You pointed in your last

slide to an analyst talking about products;

And he says, three, there were other things going on.

I think that's everything, right?

MR. CARROLL:  The third category the evidence has to do with the evidence that we got from the individual plaintiff.

THE COURT:  And the individual.

MR. CARROLL:  And the fourth is just the absence of the plaintiff's expert's study to address it.

THE COURT:  So he points to those things and says, okay, that's enough to rebut the presumption of reliance that on the alleged misrepresentation that arises out of *Basic*.

So what about that?

MR. GERSON:  Sure.  Your Honor, that's not enough. It's not enough.  There's no empirical evidence.  There's no showing that 100 percent of the drop was due to something other than what we're talking about here.

They're conceding even, sure, a part of this is related to VME.  It's all part of the same thing.  This is related to VME.  They haven't shown anything that their market was focused on something else.

And talking about Mr. Ross in particular at Bernzott, the post class period purchase, the fact that the trust made a single post class period purchase did not, in

any way, render it atypical.  Courts routinely certify a class with representatives who purchase during and after a period.  Purchasing after the class period does not undercut the argument that they relied on the integrity of the market price during the class period.

THE COURT:  Do you agree that the guidance that is being withdrawn wasn't the guidance that was in play at the time of the misrepresentations?

MR. GERSON:  I mean, again, the mirror image requirement?  Yes, there wasn't a mirror image to the -- but the question that I have here is -- the reason that we are in this courtroom is because defendants launched a new product in the fall of 2018 that was super strong, supposedly made them extremely competitive.  It was released with much fanfare.  Were investors supposed to believe that, oh, they didn't actually think that Carbonite was going to make any money from this product?  I mean, that's essentially what defendants are trying to have this Court would believe:  This is a pro bono product.  That's not just what the case is here.

This product was released with much fanfare.  Of course investors thought it was going to make money.  The precise numbers, were they there in the fall of 2018?  No.  But this motion that this product was out there and was going to be the next big thing --

Your Honor, I can't wait to show you the documents about this product and how important it was to the company. This was their moment. This is VME. The market is shifting to these virtual servers, and here we've got this product. We're telling investors in the market. This is ready to go.

And that's what they did. It was released with this big press release. They were so excited about it to the public. And the discovery has born out, that was not the case.

But, again, to answer your question, again, of course investors thought they were going to make money from this product. And they don't need to have that mirror image requirement. I would point Your Honor in the loss causation context to the First Circuit's decision in the *CVS Caremark* case of 2015.

THE COURT: Okay.

MR. GERSON: Briefly, on the disaggregation point, which I think is very important, that is a loss causation argument. Courts routinely hold, I set forth in our papers, that the disaggregation pointing to which factor was most responsible or more responsible is not for today. We cite in our papers not only cases discussing that issue, but cases in particular where Mr. Bjorn Steinholt was the expert, and the court states that those are loss causation issues. The disaggregation component is not required. Mr. Steinholt's

report was a market efficiency report, and he says, "I may have to modify this for price impact."

So again, their burden.  Not our burden to show lack of price impact; it is their burden.

THE COURT:  Got it.  Thank you.

I got a quick question on the motion to compel. With respect to the chats --

MR. ROSENFELD:  Yes, Your Honor.

THE COURT:  What are the -- I guess maybe this is for both of you.  But what are the -- I'm not really clear what they look like in the -- as disclosed.  Do they have time stamps?  Do they have --

MR. ROSENFELD:  Your Honor, if you have our exhibits to our motion to compel, it's Exhibit J.

THE COURT:  Yes.

MR. ROSENFELD:  It looks like an e-mail, and that's part of the problem.  No one could figure out what those e-mails were.  We asked deponents what they were during depositions, and they thought they were e-mails, as well.

If you look, for example, at Exhibit J, it looks like an e-mail, the subject being, "IM."

THE COURT:  Oh.  Okay.

MR. ROSENFELD:  So essentially, you can't tell that it's a chat.  And surprisingly --

THE COURT:  Can you bring that up for a second?

Can I take a look at that?

MR. ROSENFELD:  Oh, sure.

THE COURT:  Okay.  And what will be the difference in native format?

MR. ROSENFELD:  Give me one second, Your Honor.  I'll show you.

THE COURT:  I take it they don't appear sequentially?

MR. ROSENFELD:  They don't appear sequentially, which is kind of odd, Your Honor.

THE COURT:  So all the ones -- for example, this is one to Rob Beiler from Paddy --

MR. ROSENFELD:  Exactly.  Sreenivasan.

THE COURT:  Sreenivasan.  Thank you.

Do all the ones from that person or to that person appear together?

MR. ROSENFELD:  I don't believe so.  I think there are definitely instances where it is consecutive.  But overall, it is not consecutive.  And I don't know if it was mixed up or what happened, but if it was consecutive, Your Honor, we would be able to figure it out on our own.  It's not consecutive, which is why we were not able to figure it out on our own.

And, Your Honor, importantly, defendants have not said there's any burden in producing these chats.  They just

declined to produce them in native format.  And you see, Your Honor, that document that I just handed up, says "Tiger Team" on top, and it looks like it's a reproduction of a chat.

THE COURT:  And this comes from where?

MR. ROSENFELD:  The one I just handed up, Your Honor?

THE COURT:  Yes.

MR. ROSENFELD:  That's reproduced in an e-mail. That's a screen shot, reproduced in an e-mail, or so it looks.

THE COURT:  What about this question about producing them in native format?

MS. NANDA:  Thank you, Your Honor.

So those chats that we have, that we produced in pdf, we produced them in pdf because that was agreed upon in our original protocol which is why we did it.  The chats were from Microsoft Teams, and that's how the natives look.  They look like the exhibit that you just saw.  That's how we have them in our system; that's how they're reviewed.  I know they look like an e-mail, but that's how they're maintained on the system.  And so they don't look the way --

THE COURT:  The way they do when you --

MS. NANDA:  So they look -- they look like this, and this is how you search them and you review them.  And

they come out this way.

So we did meet-and-confer with them and try to explain that the natives that we have for these look the same.  They look the same.  And we actually -- we did offer to produce any natives to them that they wanted to identify to us by Bates number, and we sent that offer to them.  But they didn't respond to it, and they filed their motion.  But in any event, I don't think that it would change what they have.

THE COURT:  Do you have an example of what it looks like in native?  So you're saying native format is not --

For example, we use Teams, one of the rare things where the government and the private sector use the same thing.  And it -- Teams chats looks just like chats on my iPhone, back and forth.  You're saying the native format production, when it's drawn from the database, doesn't look like that.

MS. NANDA:  Yes.  When we asked the IT to export them, they were brought to our vendor, this is how they look.  They look like --

THE COURT:  Which this?

MS. NANDA:  On Exhibit J.

THE COURT:  The same exhibit that he's referring to.

MS. NANDA:  Yes, referring to the same Exhibit J.

The native would look like this.  But this was a pdf that had ocular text recognition in it.  But if we were to give it to them in a native, it would just be -- it would be native.  It wouldn't have a Bates number on it because it would be the native version.  But it would look the same as this.

THE COURT:  What would be the difference, besides there's no Bates number?

MR. ROSENFELD:  Your Honor, I believe the chronological order would be important.  In other words, there are some chats that simply say "no." We have no idea what that corresponds to.

MS. NANDA:  Well, they have metadata that's associated with each of these chats.  We've produced the metadata with these pdfs.  I mean, it's not just the pdf, there's also metadata that's associated with each of them.

THE COURT:  But if somebody wants to assemble the chats to look like the -- to visually replicate the appearance as they appeared when they occurred or on the person's device, if the person went back and looked at the chat on their device, Teams displays it in a certain way.  Right?  Just the way the iPhone displays it in a certain way.  So how would they do that from the pdfs?

In other words, they would have to assemble them.  And to understand them, even if you didn't want the beautiful visual display, you would have to assemble them in

chronological order and associate --

MS. NANDA:  Yes.

THE COURT:  -- not just all chats in chronological order, but associate not just all chat messages, but associate messages to threads.

MS. NANDA:  Right.  And I think the way they would do it with the native, because this is really -- what we have in native looks just like this.  So if we gave it to them in native, I suppose they could sort it by the time sent, the date stamped, the group that's on it.  But that's sort of what they would have to do in the pdf using metadata.

I understand that it would be -- they're wondering why we don't have it in the way that you would see it like if you were actually in Teams and texting with each other, but it's literally not the way we have it from Microsoft Teams.  That's all.

THE COURT:  My experience is typically that the presentation to look like it appears on your device or my device is a transformation done by counsel.  So, for example, I recently tried a case, and they gave me two exhibits for each text thread.  One is a printout that has various, like, from, to, phone number, phone number, date, time, message in chronological order of the thread.  It's readable, but it's not ideal.  And then the other was then they created an image of the text going back and forth, one color for the sender

and one for the recipient.  And that is what one is used to reading, right, when one reads chats.

But the first version is what they extracted from the database, but it had the thread.  The thread is in chronological order there, and it's all presented and it's just that thread.  And I'm wondering how they get that from the pdfs.

Because I assume, if they get it in native format, the native format extraction is going to be -- you're extracting -- I'm guessing, but you would know better than I, you're extracting from a sender all of the sender's threads, all of the messages, and they're extracted by thread.  And so I'm assuming that they come out in some way, in chronological order, but grouped by thread.  And that -- and I don't know if the pdfs may lend themselves to the same thing.  I don't know.  That's what I'm trying to figure out.

MS. NANDA:  It's a very fair question, and there's so many different ways in which chats that are used through things like Teams and text messages on phones and the way that they're kept and the way that they're shown.

Respectfully, all I understand is that the way that open texts keeps and preserves these Microsoft Teams messages is in a way where the data comes out like this, with one per -- one line per communication with the sent and received on it.  And the natives that we have and we've reviewed look

like this.

THE COURT:  But are they in a larger order that's comprehensible or not?  Like the particular pdf that counsel handed up to me, I can understand that pdf.  I can read it and get it, but I don't know what it responded to and what responses are to it.  And if they're all presented by thread in the pdfs, then you can read them and understand them.  I'm accepting that he says they're not and they don't.

So then the question is, is there, like -- how does one put them in a comprehensible way to understand them?

MS. NANDA:  Right.  So my understanding is that these chats are preserved within custodian -- or associated with custodian's mailboxes and other things.  So this is the only form in which we have them, I believe.

I mean, I -- I wish I could solve this problem, but I don't seem to -- I do not have --

THE COURT:  But presumably you're reading the chats, too, you or someone in your law firm or some outsourced lawyer, right?

MS. NANDA:  Yes.  And this is how we see them.  So a document reviewer would see it like this and say, "Is this responsive?  Is it privileged?  Is it confidential?"  They're looking at it.  They're looking at the to and the from and the dates and the subject.

THE COURT:  All right.  But chat number one comes

from the CEO, let's just suppose hypothetically.  And it says, "We're about to have an earnings call to talk about VME.  Should we lie?"  Okay?  And the response is from the CFO, "Yes."  Okay?  The reviewer who sees "yes" is going to think that's nonresponsive, because it doesn't say anything about the topic.  But presumably, if they're tied together, the reviewer would understand that both are responsive, right?  The question and the answer would go together.

I'm obviously not suggesting that --

MS. NANDA:  No, and I couldn't even answer this hypothetical about what that would look like.

THE COURT:  But what I'm wondering is, like, how does -- what they are saying is they can't -- they have no ability to read the chats and understand them or put them together in any practical, comprehensive way, to read them and understand them short of sitting down on their front lawn and laying out 188,000 documents and sorting through them and then matching them up.  And that is a task that's long past, right?  It died even more firmly than legal sized paper.

And how do -- and you must face the same challenge, because I'm not sure that you do not want to be surprised by a chat thread that you couldn't figure out what the thread was.

So how does one put it together?  Is there software that reads the pdfs that can put it -- they could do that.

MS. NANDA:  Yeah, I don't know if there's such a software.  I only know that the documents are maintained and the way that they are produced to us for review.  So I wish I could -- I wish I could be more helpful.

THE COURT:  So they're incomprehensible to you, as well.

MS. NANDA:  To a degree, they are.  The same burden that we would go through in figuring out the chats is what we're left with, as well.  Because this is the way in which they are maintained and the way that they are provided and the only form in which we understand that they can be provided to us.

They haven't pointed to any particular chat that is of particular relevance or interest.  We said please refer to and identify.

THE COURT:  Well, how do you point to something with particular relevance if you can't read them?  Like, in other words, the "yes" in my hypothetical, you don't know, like -- you need to be able to read the whole thread, or a meaningful portion of it, in order to understand whether you care about it or not.

MS. NANDA:  I understand, Your Honor.  But we can only work with the way in which the data is maintained at the company and how it's provided.  And maybe it's the case --

THE COURT:  So beside which one would look the same

if they were produced in native format --

MS. NANDA:  We offered to produce chats in native to them if they identified them by Bates number.  If they think it would be helpful for them to have them in native, we can go and do the work to reproduce all of the chats in native.  But I just -- I don't think that it gets at the issue that you've raised.  But we can do that, if that would be helpful.  We're capable of doing it.  It's possible.  We think it's burdensome and it's really not going to change the situation --

THE COURT:  Right.

MS. NANDA:  -- but, of course, we'd do it if you would like us to.

THE COURT:  I understand that.  I'm trying to figure out, like, how useful it is and how much work it is. I mean how many custodians are there from whom chats were produced?  Or at least -- or sought, whether or not they had any?

MS. NANDA:  Yes, so we have all the chats.  I'd have to confirm with IT, but I think that there are a couple of different ways in which we can search the production to identify those that are chats and produce them natively.

THE COURT:  Okay.  Anything else you want to add?

MR. ROSENFELD:  Your Honor, in particular there are two chats that we had referenced.  One is called the Tiger

Team chat, in which the engineers discussed issues arising with the product.  And that's a group chat, so I imagine that chat can just be --

I know we've reviewed chats in other cases where they just produce them as a giant text file, and it's a running document of all the texts together.  I'm not sure why that can't be done in this instance.

And the other one is, "Get VME healthy," which is a similar type of chat, which that is not attached to it.

Just to briefly touch on a couple of other items we asked for, Your Honor, one is hyperlinks.  So Your Honor, we have a protocol in this case, which defendants agreed to, and in that protocol it says that the parties shall use their best efforts to collect and produce documents that are links in e-mails.  And that's really the modern way of doing e-mail attachments, instead of just actually attaching a physical -- clicking on the link attached and attaching the document, what you do is you include a link to a document on the system.

There are a number of documents that we've asked for in letters and correspondence with the defendants.  In particular, there is one that we've asked for, which is a retrospective survey of the VME launch.  That is a critical document here, and we really don't understand why we're not getting it, especially since it was agreed to.

And there are a number of documents associated with that:  There are responses to the survey.  There's an analysis of the survey.  To the extent those documents exist, as well as others that we've asked for in our correspondence with the defendants, they've agreed -- these are not new document requests.  They've agreed to this protocol.  There's no reason we're not getting these.

They say, "Oh, these are located in servers that are offline."  That's their responsibility, when this case started, Your Honor, was to preserve those documents and to preserve the bridge between the link in those e-mails and the documents themselves.  They say they still have those servers.  They have access to these documents.  They're just offline.

In my experience, Your Honor, when you scroll over and e-mail that has a link in it, it tells you where the document is located.  So they should certainly be able to identify where those documents are stored offline.  And if they're offline, they should have access to where those documents are.

And we're entitled to them and we should get them. I don't understand why we're not getting them and why they're pushing back on that.  But certainly that is one of the documents, as well as others that we've asked for, that are relevant from -- from the hyperlink documents, Your Honor.

And just briefly, they do rely on one case.  It's *Nichols vs. Noom* case.  And that, Your Honor, is a case in which the parties did not have an agreement on hyperlinks, whereas we do.  We distinguished the case otherwise in our papers; I won't go through it.  But at the end of the day, the Court did allow plaintiff there to ask for specific documents.

The defendants' only response to this really is, "Well, plaintiff didn't really thing that we had to give hyperlinks because they produced a document in this case that has hyperlinks and we didn't produce the documents."  And of course, they're referring to the links in our signature block, to the firm's website, to the firm's LinkedIn profile, et cetera, you know, the social media handles, which obviously even the court in *Noom* said those are not links that are relevant to anything.  So, I mean, that's their best reason for not giving us the documents; that's certainly not a valid basis.

Just a couple more points, Your Honor, quickly.  With regard to text messages, we were told all along that text messages were not important to this case, it was not the primary method of communication, and really nothing material was discussed with that.  We have an e-mail, Your Honor, from Paul Mellinger, to the Defendant Ali, and others, in which he talks about problems with VME.  And in it, he starts off

saying, "All, there have been lots of texts/conversations in the last 24 hours."  So certainly there are e-mails with regard to Defendant Ali that are relevant to this case.

I can pass a copy of this up to Your Honor.  It's 461131d --

THE COURT:  I don't need that.  You quoted it. It's fine.

MR. ROSENFELD:  Okay.  And in it, Your Honor, there's a discussion talking about how they talk about VME, "we can show fancy chart-ware and paint a vision all we want. We have not yet delivered.  We have fallen victim to believing our own propaganda."  And this what is being discussed in a text.  So certainly the texts that relate to this e-mail, at the very least, we should be entitled to, the texts that discuss the topics being addressed around this time in this document we think are appropriate to be produced.

And I think lastly, Your Honor, has to do with some document preservation issues.  There are a number of individuals in this case whose documents for some reason were not preserved.  We've asked why not.  We've asked when they stopped preserving them, and we have not gotten answers.

We do know that there does not seem to have been a document preservation policy in place or a document destruction policy in place because we've asked for it, and

the defendants have told us on several occasions that they have not been able to find it.  So the reasonable conclusion from that is it doesn't exist.  Which means there was no protocol in place, no formal protocol in place for the destruction of documents.

In our motion, we identify two individuals, Deepak Mohan, who is the person who is basically in charge of the entire VME production until he left.  Now, he left before this case was filed, and he left before the class period started.  So I understand there was no duty to preserve documents at that point in time, but we've asked defendants, and we have not got an answer, at what point did you stop preserving those documents.  Were they destroyed after this litigation was commenced or reasonably anticipated?  That's a reasonable question, Your Honor.  If they don't exist, we understand you have an obligation to preserve them.  But you're not allowed to destroy them, and we want to know at what point in time that took place.

Scott Haines, who is another program manager who left in July of 2019, right before this complaint was filed, again, when were the documents destroyed?  He is the person who conducted the retrospective survey that we were discussing a moment ago.  When were his documents destroyed?  Why were they not preserved?

We understand that if he left before the complaint,

before litigation was anticipated, you didn't preserve the documents, okay, there's nothing you can do about that.  But if he left shortly after -- sorry, if the documents were destroyed after litigation in this case was anticipated, then that's a problem, Your Honor.  And we just want to know the answer to that question.  That's a reasonable question, again, that we're not getting answers to.

And recently, we have also identified there's another individual, a person by the name of Michael Onessimo, who is a Carbonite --

THE COURT:  He's not in your motion.

MR. ROSENFELD:  He's not in our motion, Your Honor, but it goes to the issues of what documents were preserved and destroyed in the case because he's a person who left in 2021, and yet his documents are not being preserved in his case.  And he was an engineer who was critical of the entire VME process.

So it's a question of we don't understand why documents were being destroyed.

And, of course, we have Jane Sajak, who was discussed almost a year ago, where her documents were destroyed inadvertently.

So again, these are all things that we certainly want answers to, Your Honor.  I think we're entitled to, at the very least, an explanation of when these documents were

no longer being preserved or if they were affirmatively destroyed and why.

THE COURT:  Anything you want to say in response to his various arguments?

MS. NANDA:  I'm sorry?

THE COURT:  What do you want to say in response?

MS. NANDA:  Yes.  Thank you, Your Honor.  And I'm prepared to respond to each of those points.  I just was hoping I could hand up a demonstrative that might be useful to you.

THE COURT:  Sure.

MS. NANDA:  This is just a select chronology of relevant events in the case.

THE COURT:  Mr. Carroll, apparently you're not actually the only person at your firm who uses legal length paper.  I think that was a misrepresentation.

MR. GERSON:  Your Honor, all of my slides were on legal paper, too.

THE COURT:  Well, they are, indeed.  But they're the other way.

MR. GERSON:  Right.

THE COURT:  That's a modern innovation.

Go ahead.

MS. NANDA:  So, Your Honor, I just would like to level set that fact discovery in this case has been

extensive.  We've produced 188,000 documents from an agreed-upon list of custodians.  We've talked to Carbonite personnel and identified shared document repositories that were likely to contain VME-related documents.  We went to those and searched those.  And all of our discovery document productions were substantially complete in August of last year.

We arranged the depositions of each and every fact witness that plaintiff wanted to depose, including five former employees who haven't worked at Carbonite in many, many years and aren't parties to this case.

And the document issues that have been raised by the plaintiff could have been raised and resolve, if they needed to be resolved, a year ago in this case, before we took fact depositions, before expert work was done and all the like.  I mean, reopening discovery now and requiring even more from us at this late stage would be nothing but burdensome, cumulative of all of the productions that we've already made, and really --

THE COURT:  Just as a practical matter, suppose I gave you everything that you wanted -- that's what you want, right?  Everything that you want.

MR. ROSENFELD:  Your Honor, we're willing to be reasonable.

THE COURT:  Well, but you want everything that you

want, right?  I don't mean that in a bad way, but you've asked for all of these things.  Suppose I give you everything that you want, right?

MR. ROSENFELD:  Yes.

THE COURT:  Then what happens to summary judgment? Your summary judgment brief, he's working on the Delta shuttle.  So it's due -- it's due, what?

MR. TAMTON:  August 10th.

THE COURT:  August 10th.  So if I order all of this -- if I give you everything that you want and I order all of this discovery, you're unlikely to have it all by August 10th.

MR. ROSENFELD:  Right.

THE COURT:  Especially the depositions that you want.  But what happens?  Does August 10th stick, or does August 10th get delayed?

MR. ROSENFELD:  Your Honor, we could stick with August 10th, and then supplement if necessary.

THE COURT:  All right.  So then you get the discovery, and then we have a second round.  They would need to do a further round of briefing, too, right?  Because there would be more -- if you thought the discovery that you got was irrelevant, then presumably they don't.  But if you thought it was relevant, then you have -- they would do that. And so one way or another, the summary judgment would have to

presumably incorporate the additional information whenever you got it?

MR. ROSENFELD:  At some point I would think it would, right?

THE COURT:  Okay.

MR. ROSENFELD:  It would make sense from our perspective.

THE COURT:  Right.  Okay.

Go ahead.

MS. NANDA:  And, I mean, that's not to mention the fact that we've already had expert reports.  We've had five of them and five expert depositions, as well, that have been based on many of the documents in this case.  So it would really up-end much of the work that we've done in this case.

THE COURT:  Would the experts have to revise their reports?

MR. ROSENFELD:  Again, there might be a short supplement.  Again, I don't know --

THE COURT:  It depends on what you get.  But at least it's in the cards, potentially.

MR. ROSENFELD:  Yeah, there's no reason not to, Your Honor.

And again, Your Honor, this was not our burden to call out defendants on what they haven't produced.  They knew what they had to produce.  They're aware of it.  That's their

burden.  They had an agreement in this case about what's going to be produced.  They chose not to produce it.  And we tried to meet with them earlier and meet-and-confer on this motion earlier.  They refused to meet with us until the Friday of the last day of fact discovery.

THE COURT:  Right.  But, look, the deadline in my scheduling order for motions to compel is seven days after the end of fact discovery.

MR. ROSENFELD:  Exactly, Your Honor.

THE COURT:  Your motion is timely under that.

MR. ROSENFELD:  Exactly.

THE COURT:  But there are practical realities, right?  Like typically what people do -- like, for example, in my entire career as a judge, I don't think I've ever seen a case where a lawyer elected to do all the depositions first, and then chose to serve the document requests and interrogatories after he or she was done with the depositions.

MR. ROSENFELD:  Right.

THE COURT:  Now, I assume there's a reason that no one ever does it that way.  The reason is you want to get the documents first, because you get one crack at the witness, right?

So what I often typically see is that people get the documents, and then they review all of the documents

with -- and then there's follow-up with the documents. And people come in and say, "Judge, we want you to extend the schedule. We don't want to do the depositions yet, because we want to get all of these other documents. We want to iron that out so we can ask everybody about it."

So that is a practical consideration, I'll be honest with all of you, is in my mind. The more significant -- the more significant the information is that you get, the more it up-ends. And potentially you're redoing all the expert reports, all the expert depositions, and their summary judgment -- theirs, at least, and possibly yours, are out the window, conceivably.

Possibly, the flip side is, the other end of the spectrum, is you get all that, whatever discovery, and it doesn't make any difference at all. We just keep going. And it just rounded out some things or maybe the difference is tiny and it only has a small effect. But that's the --

MR. ROSENFELD: Your Honor, based on what we've seen so far in the case, we don't think we are going to need to throw out any of the briefing because we already have strong support for our claims. But we think there is additional information out there that we're certainly entitled to and could certainly bolster our claims. We don't think it's going to require anything more than a supplement. And I don't know if we're going to require depositions or

not.  Again, we haven't seen the documents to know.

THE COURT:  Okay.  Go ahead.

MS. NANDA:  So I'd like to briefly just address each of the categories of documents.

THE COURT:  Yes.

MS. NANDA:  And I would start by saying that we did point out that their motion was procedurally deficient, and they said, "Oh, it doesn't matter that we didn't do a certification pursuant to the local rule."  And they put a footnote in their reply saying, you know, "It's very clear what our requests are.  They're individually itemized. They're the hyperlink documents, the Mohan and Haines documents, and the native chats."

And now I come to court today and we're hearing for the first time text messages and a custodian who now they have preservation questions about that was not briefed and is not here.  This is the reasons why rules matter and certifications matter.

But in any event, I'll focus on the items that they focused on in principle, which is we'll start with hyperlink documents.  And when we talk about hyperlinks -- and forgive me if this is basic, but I needed to really think about this. We're talking about embedded text in an e-mail that at one point pointed to another location where you could find a website or a file.  And a lot of people call them pointers,

because that's what they are, they're pointers.

Now, the e-mail exists totally independently from the thing that it was pointed to at one point.  That file or that website could be changed, modified, moved, et cetera. And when those changes or moves happen, oftentimes the pointer no longer works.  It's inoperable.  Some people call them dead links.  They don't go anywhere.

Now, contrary to plaintiff's suggestion, here finding and mechanically sort of clicking on every single embedded hyperlink in our production of 188,000 documents would not only be grossly burdensome, but really a waste of resources and time.  And if you bear with me, I'll explain why.

So during the meet-and-confer process, we explained that most of the pointers to internal Carbonite files no longer work, because there have been changes to Carbonite's IT infrastructure since it was acquired by OpenText in December of 2019.  And as a result, it means that those pointers no longer point to actual documents.  That's not to say that the documents don't exist.  They exist.  It's just that the pointers no longer point to them anymore.

Now, by way of example, during the meet-and-confer process, they did identify eight documents of the 188,000 --

THE COURT:  Eight.

MS. NANDA:  Eight that they I wanted us to look

into that they cared about.  They wanted us to look into.
And we did look into each and every one of those, and it was
actually a lot of work, and I'll explain why.

Usually in big document cases like this one, you
have to export thousands and thousands of documents from a
company to a third-party vendor to host on a document review
platform, where teams of attorneys will go through and click,
you know, responsiveness and privilege, and the like.  And
document productions are made from those.

When you open up a document in that environment and
there's a hyperlink that once pointed to an internal file in
the company's system, those links don't work.  They're dead,
because they're in a different environment, right?

THE COURT:  I understand.

MS. NANDA:  So when we got the eight documents, we
couldn't just go and do a review of them in the tool.  We had
to go and work with OpenText, have somebody at OpenText with
authority go in and click on the documents, click on the
links in their environment to see if the pointers worked.
And out of all eight documents, we tested all of the
hyperlinks, and all but one were dead links.  They just
didn't work.

And the reason for that was that most of them had
what are called "globally unique identifiers," and it's a bit
of code that shows where on the Carbonite's former Microsoft

Office 365 environment these files once were.

Now, Carbonite's Office 365 environment no longer exists.  It's not in operation.  So the links didn't work, and they don't -- you can't trace the documents.  They don't have information in them where it's like, oh, it's a file name where we can go and find the document very easily.  For these, there wasn't that information.  We could not trace the documents into the system.

And by the way, we did find one.  We did find one document that was still pointed to.  We produced that right away to them.  It's a totally unremarkable document, but -- it's cumulative of all the other documents that we produced, but we produced it.

Now, as you can imagine, clicking tracking down hyperlinks one by one in the company's computer system is a totally unworkable process for a case like this with large-scale document reviews.  And we've never undertaken to undertake, like, such a burdensome and largely fruitless exercise.

What we did here was we did agree to use our best efforts to collect and produce documents that are links in e-mails.  And that's exactly what we did, we used our best efforts.

First, if a potentially responsive e-mail contained an attachment or had an attachment to it, we reviewed that.

We produced those attachments.  And this is a case where lots and lots of attachments were produced.  People at the company were attaching documents to e-mails.

We also spoke with Carbonite personnel who worked on VME to try and find those shared document repositories at the company.  Where company files related to VME would exist, we went there, we did searchs, we produced documents for those files with the understanding that if people were sending hyperlinks around regarding VME documents, that likely we'd capture many of those by going to these VME-related repositories.

We think that's a very sensible and reasonable way of going about doing discovery in this case.  We think the new --

THE COURT:  The last question.  What about the retrospective survey?

MS. NANDA:  So the retrospective survey that they're referencing, it's an e-mail from Scott Haines where he talks about that.  It's unclear whether that document was ever put together, actually, and if it was, where it is.  Because we've looked for it.  We've not identified it.  One would think that it would be within the VME repositories we've searched, if they existed, or would have been exchanged in an e-mail at least once with somebody.  But we've not actually found the existence of that document.

Mr. Haines left the company years ago.  So we haven't been able to identify where it is.  But we've searched for it, if it -- to the extent it -- we don't even know if it exists.

THE COURT:  Okay.  All right.  This has all been really helpful on both motions, and I really appreciate the time that you've all taken and the arguments that you've made.  I'm going to take them both under advisement, and I promise that I will resolve them promptly.

And I'm sorry, again, that it has taken me so long from the filing of the motions to reach this point, but it will not take nearly as long to get to the next step.

So thank you very much, I really appreciate it.  It was very helpful from all of you.

We stand in recess.

(Court in recess at 11:40 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of August, 2023.


/s/ RACHEL M. LOPEZ



_____
Rachel M. Lopez, CRR
Official Court Reporter