UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RUBEN A. LUNA, individually and on behalf of : all others similarly situated,

                            :   Civil Action
           Plaintiff,         No. 19-11662-LTS
        v.               :   (Consolidated)

CARBONITE, INC., MOHAMAD S. ALI and : ANTHONY FOLGER,

                            :
           Defendants.
                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION TO DECERTIFY

Dated:  September 11, 2023

                                  James R. Carroll
                                  Kurt Wm. Hemr
                                  Alisha Q. Nanda
                                  Nigel Tamton
                                  SKADDEN, ARPS, SLATE,
                                      MEAGHER & FLOM LLP
                                  500 Boylston Street
                                  Boston, Massachusetts 02116
                                  (617) 573-4800

                                  *Counsel for Defendants*
                                  *Carbonite, Inc., Mohamad S. Ali,*
                                  *and Anthony Folger*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT PROCEDURAL BACKGROUND .........................................................................3

APPLICABLE LEGAL STANDARD ..........................................................................................5

ARGUMENT .................................................................................................................................6

I.     IN *GOLDMAN*, THE SECOND CIRCUIT REVERSED
       A DISTRICT COURT'S GRANT OF CLASS CERTIFICATION
       BECAUSE OF THE "MISMATCH" BETWEEN GENERIC FRONT-END
       STATEMENTS AND FAR MORE SPECIFIC BACK-END DISCLOSURES .................6

       A.     On Reviewing The Class Certification
              Order In *Goldman*, The Supreme Court Admonished
              That Courts Should Be Wary Of A "Mismatch" Between A
              Generic Front-End Statement And A More Specific Back-End Disclosure ............6

       B.     The Second Circuit Reversed The
              Southern District's Post-Remand Class Certification
              Order In *Goldman*, Holding That It Was "Clear Error" To Rely On A
              Specific Back-End Disclosure As Evidence Of Price Impact When The
              Front-End Disclosure Was Not "Sufficiently Detailed In The First Place" ............8

II.    THE SECOND CIRCUIT'S *GOLDMAN* ANALYSIS SHOWS THAT THE
       MARKET'S REACTION TO THE JULY 25, 2019 REVENUE GUIDANCE
       REDUCTION CANNOT BE RELIED ON TO INFER THAT THE NOVEMBER
       2018 STATEMENTS HAD A PRICE IMPACT DURING THE CLASS PERIOD ........10

       A.     The November 2018 Statements Which Made No
              Reference To Revenue Do Not "Stand On Equal Footing" With The
              July 2019 Corrective Disclosures, And Accordingly The Stock Price
              Drop Following The July 2019 Disclosures Cannot Be Evidence That The
              November 2018 Statements Had A Price Impact During The Class Period..........10

       B.     Pre- And Post-Disclosure Discussion In The
              Market Made No Reference To The November 2018
              Statements And Almost No Reference At All To VME, Which
              Confirms That The November 2018 Statements Had No Price Impact.................11

CONCLUSION............................................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
    77 F.4th 74 (2d Cir. 2023) ....................................................................1, 3, 6, 9, 11, 15

*Construction Industry & Laborers Joint Pension Trust v. Carbonite, Inc.*,
    22 F.4th 1 (1st Cir. 2021)....................................................................................3

*Ellis v. Elgin Riverboat Resort*,
    217 F.R.D. 415 (N.D. Ill. 2003)..........................................................................5

*General Telephone Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982)............................................................................................5

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
    141 S. Ct. 1951 (2021) ...................................................................................1, 7, 9

*In re Goldman Sachs Group, Inc. Securities Litigation*,
    No. 10 Civ. 3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015),
    *vacated and remanded sub nom.*
    *Arkansas Teachers Retirement System v. Goldman Sachs Group., Inc.*,
    879 F.3d 474 (2d Cir. 2018)................................................................................7

*In re Goldman Sachs Group, Inc. Securities Litigation*,
    No. 10 Civ. 3461 (PAC), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018), *aff'd sub*
    *nom. Arkansas Teacher Retirement System v. Goldman Sachs Group., Inc.*,
    955 F.3d 254 (2d Cir. 2020), *vacated and remanded*,
    141 S. Ct. 1951 (2021), *vacated and remanded*,
    11 F.4th 138 (2d Cir. 2021). ...............................................................................7

*In re Goldman Sachs Group, Inc. Securities Litigation*,
    579 F. Supp. 3d 520 (S.D.N.Y. 2021), *rev'd and remanded sub nom.*
    *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
    77 F.4th 74 (2d Cir. 2023) ..........................................................................1, 4, 9

*Loef v. First American Title Insurance Co.*,
    No. 2:08-cv-311-GZS, 2012 WL 6113844 (D. Me. Dec. 10, 2012)...................5

*Luna v. Carbonite, Inc.*,
    No. 19-11662-LTS, 2023 WL 4539855 (D. Mass. July 14, 2023)....................1

*United States v. McLellan*,
    959 F.3d 442 (1st Cir. 2020).............................................................................1

**Rule**                                                                                              **Page(s)**

Federal Rule of Civil Procedure 23 ...............................................................................................5

**PRELIMINARY STATEMENT**

On July 14, 2023, this Court certified the Trust[1] as representative of a plaintiff class in this action generally consisting of "[a]ll persons and entities who purchased or otherwise acquired Carbonite Inc. [] common stock during the period from October 18, 2018 through July 25, 2019." (Doc. No. 148 at 24.)[2] Among Defendants' principal objections to the Trust's motion for certification was that the record evidence shows that the November 1 and 15, 2018 statements that form the basis for the Trust's putative claim (*see id.* at 2) did not have any effect on Carbonite's stock price during the proposed class period. The lack of any price impact during the proposed class period rebutted any class-wide presumption of reliance and rendered class certification improper under the Supreme Court's recent decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021).

On August 10, 2023, just four weeks after this Court issued its class certification order, the U.S. Court of Appeals for the Second Circuit issued a new decision in the *Goldman* case, overturning the post-remand decision of the Southern District of New York (Crotty, J.) that certified a class in *Goldman*. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023), *rev'g In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520 (S.D.N.Y. 2021). The First Circuit and district courts in this Circuit frequently look to the decisional law of the Second Circuit as informative on questions of securities law that the First Circuit has not yet had the opportunity to address.[3] The Second Circuit's decision directly implicates issues that are

---

[1]  Capitalized terms have the meanings ascribed to them in the briefing on Lead Plaintiff's Motion For Class Certification (Doc. Nos. 96, 101, 107, 111). References to "TD Ex." herein refer to exhibits submitted with the Transmittal Declaration of Nigel Tamton, Esq. In Support Of Defendants' Motion For Summary Judgment (Doc. No. 134).

[2]  Available on Westlaw as *Luna v. Carbonite, Inc.*, No. 19-11662-LTS, 2023 WL 4539855 (D. Mass. July 14, 2023).

[3]  *E.g.*, *United States v. McLellan*, 959 F.3d 442, 461 (1st Cir. 2020).

central to this Court's July 14, 2023 class certification order in this action.  That decision makes

clear that when assessing a proposal to certify a securities fraud class action based on a "price

maintenance" theory — as the Trust seeks to do here — a district court cannot rely on a mere

"subject-matter" match between (i) an alleged "front end" misstatement framed in general terms

and (ii) a more specific "back end" disclosure to conclude that the "front end" misstatement must

have had an impact on the company's stock price throughout the proposed class period.

That holding goes to the core of this Court's analysis in its July 14, 2023 Order.

There, this Court found that the price drop that followed Carbonite's July 25, 2019 revenue

guidance revision (the more specific, back-end disclosure) was "evidence bearing on the price

impact issue" because "[t]he alleged misstatements promoted VME, and the 2019 guidance was

lowered in part due to the withdrawal of that same VME."  (Doc. No. 148 at 20 n. 9.)  The

Second Circuit's decision makes clear, however, that a finding of price impact cannot be

premised solely on a "subject-matter" match between (i) the November 2018 statements —

which generically characterized VME as "extremely competitive" and "super strong," but did not

make any revenue projections for the product — and (ii) Carbonite's July 2019 disclosures,

which did not just withdraw VME but also disclosed the company's VME-specific revenue

expectations for the first time.

Accordingly, Defendants respectfully request that this Court decertify the class in

light of the Second Circuit's new and clarifying decision, as this Court is entitled to do under

Rule 23(c)(1)(C).  Under the Second Circuit's analysis, a stock price drop following Carbonite's

July 25, 2019 revenue guidance revision should not be treated as evidence that the earlier

November 2018 statements had a price impact throughout the class period.  Even though the

disclosures touch on the same subject matter, the November 2018 statements made no comment

on VME's likely contribution to 2019 revenue — indeed, Carbonite had not offered *any* revenue guidance for 2019 at that time — while the July 2019 statements provided for the first time specific information about VME's anticipated contribution to 2019 revenue guidance.  The November 2018 statements and the July 2019 statement simply do not stand on an "equal footing."  *Goldman*, 77 F.4th at 102.  It is accordingly not appropriate to infer from a July 2019 stock price movement that the November 2018 statements had any impact on stock price during the proposed class period.  Decertification is therefore warranted.

### RELEVANT PROCEDURAL BACKGROUND

This securities action challenges November 2018 statements[4] that generically characterized Carbonite's just-released VME product as "extremely competitive" and "super strong."  According to the Trust, those statements caused artificial inflation in Carbonite's stock price from October 18, 2018 until July 25, 2019, when Carbonite's stock price dropped following multiple announcements made following market close on that day.  Those disclosures included the news that (i) Carbonite's well-respected CEO, Mr. Ali, was leaving for another job, (ii) Carbonite was reducing its 2019 revenue guidance for multiple reasons, including loss of hoped-for revenue from VME (a projection that Carbonite had not previously made public), and (iii) Carbonite was withdrawing VME from the market.  (TD Ex. 94, at 4, 6-8.)

On September 16, 2022, the Trust moved for class certification.  (Doc. No. 94.) The Trust asserted that it met the predominance requirement of Rule 23(b)(3) because the

---

[4]    This Court's Order on class certification follows the First Circuit's prior opinion in this action in focusing on the November 1 and 15 statements regarding VME.  *See* Doc. No. 148 at 17; *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 6-7 (1st Cir. 2021).  At the hearing on its class certification motion, the Trust focused its argument on the purported price impact of those November 2018 statements regarding VME, arguing that other statements referenced in its complaint "are still here," but acknowledging that to the extent they are, those other statements "rise and fall with the other two."  (Doc. No. 157 at 19.)

putative class was "entitled to the 'fraud-on-the-market' presumption of class-wide reliance under *Basic*." (Doc. No. 96 at 8 (citation omitted).) Defendants opposed the Trust's motion, contending, *inter alia*, that the *Basic* presumption had been rebutted because a preponderance of evidence showed the alleged misrepresentations did not have a price impact. (*See* Doc. Nos. 101, 111.) As summarized by Defendants, the evidence showed that no investor had attributed any significance to the November 2018 statements before July 2019:

(i)    there was no statistically significant front-end inflation in Carbonite's stock price following the alleged November 2018 misrepresentations about VME;

(ii)    market participants uniformly ascribed the drop in Carbonite's stock price following the July 25, 2019 earnings release to disclosures made on July 25, 2019 *other* than the withdrawal of VME — specifically, to the departure of Mr. Ali and the company's reduction in revenue guidance (TD Exs. 95-107); and

(iii)    there is no evidence that before VME's withdrawal was announced, investors had attributed any part of the company's revenue guidance to VME, let alone on the basis of the November 2018 statements regarding VME. Indeed, Carbonite had not even issued 2019 revenue guidance at the time the November 2018 statements were made. (TD Exs. 7-11, 14-25, 27, 29-38, 41-53, 55-63, 66-76, 78, 80, 83-85, 87-90.)

On July 11, 2023, this Court held a hearing on the Trust's motion for certification. (Doc. No. 147.) At the hearing, the Trust leaned into its position that Carbonite's reduction in 2019 guidance and withdrawal of VME were "one and the same," arguing that because the July 25, 2019 revenue guidance reduction was a likely cause of the drop in Carbonite's stock price, that "dooms [Defendants'] efforts" to show that the alleged misrepresentations had a price impact on Carbonite's stock during the proposed class period. (Doc. No. 157 at 15, 23.) In support of its argument, the Trust relied on Judge Crotty's analysis certifying a class post-remand in *In re Goldman Sachs Group, Inc. Securities Litigation*, 579 F. Supp. 3d 520 (S.D.N.Y. 2021), referring to that opinion twice during argument as well as in a slide deck that the Trust presented to this Court.

4

On July 14, 2023, the Court granted the Trust's motion for class certification. Four weeks later, on August 10, 2023, Judge Crotty's order certifying a class in *Goldman* was reversed by the Second Circuit.

## APPLICABLE LEGAL STANDARD

An order granting class certification is not set in stone.  Under Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it . . . .").  On a motion to decertify, "[i]n assessing whether class certification remains viable, the Court must consider not only developments of the factual record but also any newly announced legal precedent."  *Loef v. First Am. Title Ins. Co.*, No. 2:08-cv-311-GZS, 2012 WL 6113844, at *1 (D. Me. Dec. 10, 2012) (granting motion to decertify based on newly-issued case law).  The party seeking to maintain class certification — here, the Trust —bears the burden on such a motion of "demonstrating the continued propriety of maintaining the class action."  *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 430 (N.D. Ill. 2003) (granting motion to decertify).

For the reasons set forth below, the Second Circuit's *Goldman* decision warrants decertification of this class.  This is an opportune time for decertification for numerous reasons. Although notice to class members is required after a Rule 23(b)(3) class, *see* Fed. R. Civ. P. 23(c)(2)(B), no arrangements have yet been made for the notification of members of the class in this action.[5]  Further, the class as currently defined includes persons who purchased Carbonite stock as early as October 18, 2018 — before the November 1 and 15, 2018 statements were even

---

[5]    On the morning of September 11, 2023, Defendants informed the Trust that they intended to file this Motion To Decertify.  It was only later that afternoon — shortly before this Motion was filed — that the Trust first provided a proposed notice of pendency to Defendants' counsel.

made — and accordingly no logistical arrangements should be made to provide class members with notice until the propriety of certification is examined in light of the Second Circuit's new *Goldman* decision.

**ARGUMENT**

I.    **IN *GOLDMAN*, THE SECOND CIRCUIT REVERSED A DISTRICT COURT'S GRANT OF CLASS CERTIFICATION BECAUSE OF THE "MISMATCH" BETWEEN GENERIC FRONT-END STATEMENTS AND FAR MORE SPECIFIC BACK-END DISCLOSURES**

      A.    **On Reviewing The Class Certification Order In *Goldman*, The Supreme Court Admonished That Courts Should Be Wary Of A "Mismatch" Between A Generic Front-End Statement And A More Specific Back-End Disclosure**

The theory of the securities claim asserted in the *Goldman* action is that an investment bank and its former executives made material misstatements about the bank's "approach to conflicts-of-interest management."  77 F.4th at 81.  The plaintiffs asserted that the bank's annual reports on Form 10-Ks filed in 2007 and subsequent years falsely stated that the bank had "extensive procedures and controls that are designed to identify and address conflicts of interest."  *Id.* at 82.  These statements were putatively shown to be false in April 2010 when it was announced that the U.S. Securities & Exchange Commission was pursuing an enforcement action against the bank based on an alleged conflict of interest, at which point the bank's stock price dropped significantly.  *Id.* at 83.   The plaintiffs asserted that the bank's stock price had been maintained at an artificially high level during the proposed class period by the alleged misstatements, and that the amount of that inflation could be inferred from the price drop that followed the April 2010 announcement of the SEC enforcement action.  *Id.*  The defendants argued that such an inference was not warranted, including because the bank's prior statements regarding its conflicts of interest policies were so generic that there was no reason to believe that they had any impact at all on the bank's stock price.  *Id.* at 86.

6

The Southern District's initial order of class certification was vacated by the Second Circuit and remanded for further proceedings.  *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015), *vacated and remanded sub nom. Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018).  On remand, the Southern District again certified a class:  that order was affirmed by the Second Circuit but then further appealed to the Supreme Court.  *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018), *aff'd sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020).

The Supreme Court did not finally resolve the certification question, but vacated the Southern District's certification order and remanded the action with instructions to give further consideration to the "generic nature" of the misstatements alleged in the *Goldman* action:

> ***The generic nature of a misrepresentation often will be important evidence of a lack of price impact***, particularly in cases proceeding under the inflation-maintenance theory.  Under that theory, price impact is the amount of price inflation maintained by an alleged misrepresentation — in other words, the amount that the stock's price would have fallen "without the false statement."  Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.

*Goldman*, 141 S. Ct. at 1961 (emphasis added) (citations omitted).  The Court went on to explain that where there is a "mismatch" between the generic front-end statement and a more specific corrective disclosure, the inference that the back-end price drop reflects price inflation during the class period is not reliable:

But that final inference — that the back-end price drop equals front-end inflation — starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure. That may occur when the earlier misrepresentation is generic (e.g., "we have faith in our business model") and the later corrective disclosure is specific (e.g., "our fourth quarter earnings did not meet expectations"). Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation — that is, price impact — from the back-end price drop.

*Id.*

As the Supreme Court noted, the "price impact" that is significant for purposes of the class certification analysis is *not* a back-end stock drop following disclosure. Rather, it means the "the amount of price inflation" (if any) "maintained by an alleged misrepresentation" during the proposed class period. *Id.* A stock price drop following a disclosure may or may not be evidence that prior statements had a "price impact" during a proposed class period, but the post-disclosure drop itself is not the "price impact" that *Goldman* asks courts to assess. That is consistent with application of Rule 23(b)(3)'s predominance requirement to a Section 10(b) securities fraud claim based on a "fraud on the market" theory: investors who purchased a company's stock during a class period can only be said to have relied on alleged misstatements if the misstatements had a "price impact" on the stock price *during* the class period.

**B.      The Second Circuit Reversed The Southern District's Post-Remand Class Certification Order In *Goldman*, Holding That It Was "Clear Error" To Rely On A Specific Back-End Disclosure As Evidence Of Price Impact When The Front-End Disclosure Was Not "Sufficiently Detailed In The First Place"**

Following remand from the Supreme Court, Judge Crotty of the Southern District granted class certification for a third time. Judge Crotty found that the substantial drop in the bank's stock price following the April 2010 news of the SEC enforcement action was sufficient to suggest that the bank's prior statements about its conflicts management policies had some price impact:

8

> [T]he alleged misstatements are not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record. . . . [T]he corrective disclosures, although somewhat more detailed and narrow in scope than the corresponding alleged misstatements, implicate these same conflicts and Goldman's infrastructure for managing them.

*Goldman*, 579 F. Supp. 3d at 534, 537-38.

On August 10, 2023, the Second Circuit reversed Judge Crotty's order.  In a lengthy opinion, the Second Circuit framed its key inquiry as follows:

> The question remains whether, in light of the Supreme Court's guidance in *Goldman*, it was clear error for the district court to rely on that subject-matter match to use the back-end price drop as a proxy for front-end inflation allegedly maintained by what the district court acknowledged were comparatively generic misstatements.

*Goldman*, 77 F.4th at 93.  The Second Circuit determined the Southern District's ruling was indeed "clear error":

> In cases based on the theory plaintiffs press here [*i.e.*, price maintenance], a plaintiff cannot (a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud, unless the front-end disclosure is sufficiently detailed in the first place. ***The central focus, in other words, is ensuring that the front-end disclosure and back-end event stand on equal footing; a mismatch in specificity between the two undercuts a plaintiff's theory that investors would have expected more from the front-end disclosure.***

*Id.* at 102 (emphasis added).

The Second Circuit noted that in making this determination, "pre- or post-disclosure discussion in the market regarding a generic front-end misstatement can be a useful indicator of its inflation-maintaining capacity."  *Id.* at 102-03.  That advice is consistent with the Supreme Court's admonition that courts assessing whether a misstatement had a price impact during the class period should use "a good dose of common sense."  *Goldman*, 141 S. Ct. at 1960 (citation omitted).  If a company's alleged misstatement is remarked upon by market participants when it is made, and recalled to mind by market participants at the time it is corrected, then there

9

may be some reason to believe that the statement affected market participants' views of the

company's stock price in the interim.  On the other hand, if market participants gave no attention

to the statement either at the time it was made or subsequently when it was putatively corrected,

that suggests that the statement was not influential in determining the company's stock price.

**II.    THE SECOND CIRCUIT'S *GOLDMAN* ANALYSIS SHOWS THAT
THE MARKET'S REACTION TO THE JULY 25, 2019 REVENUE GUIDANCE
REDUCTION CANNOT BE RELIED ON TO INFER THAT THE NOVEMBER
2018 STATEMENTS HAD A PRICE IMPACT DURING THE CLASS PERIOD**

**A.    The November 2018 Statements Which Made No Reference
To Revenue Do Not "Stand On Equal Footing" With The July 2019
Corrective Disclosures, And Accordingly The Stock Price Drop
Following The July 2019 Disclosures Cannot Be Evidence That The
November 2018 Statements Had A Price Impact During The Class Period**

The relevance of the Second Circuit's *Goldman* analysis to this action is evident.

Here, Defendants made generic statements in November 2018 about the "super strong" quality

and "extremely competitive" position of VME.  Those statements did not offer *any* revenue

expectations associated with the brand-new VME product, let alone suggest the specific amount

of any such expectations.  By contrast, Carbonite's July 2019 statement that it was withdrawing

VME was not equally generic:  it was accompanied by a highly specific disclosure that Carbonite

was reducing its 2019 revenue guidance, and that "maybe a third" (TD Ex. 94, at 13) of that

reduction reflected an amount Carbonite had anticipated receiving in connection with VME (a

prediction Carbonite had never previously disclosed).  There is a clear mismatch in specificity

between those statements.  It would therefore be error to rely on the price drop associated with

Carbonite's revenue guidance reduction to infer price inflation during the class period from

generic statements about VME that were *not* accompanied by any revenue predictions (and

which in fact substantially predated the 2019 guidance).  The November 2018 and July 2019

statements simply do not "stand on equal footing."

**B.      Pre- And Post-Disclosure Discussion In The Market Made No Reference To The November 2018 Statements And Almost No Reference At All To VME, Which Confirms That The November 2018 Statements Had No Price Impact**

As noted *supra*, the Second Circuit advised that to determine whether alleged misstatements had a price "inflation-maintaining capacity," a court should consider "pre- or post-disclosure discussion in the market regarding a generic front-end misstatement" (or a comparatively generic back-end equivalent). *Goldman*, 77 F.4th at 102-03.  Here, that evidence overwhelmingly shows that both before and after the July 25, 2019 disclosure, the market had paid no attention to Defendants' generic November 2018 statements regarding the quality and competitive position of VME, and that those statements were thus not "important to investor decision-making":

*Pre-Disclosure (October 2018 through July 25, 2019)*:  Throughout the class period, there was *no* analyst or media commentary on the November 1 and 15, 2018 statements at issue here, and indeed virtually no analyst commentary on VME at all.

*(i) October 18, 2018.*  Carbonite announced VME on October 18, 2018.  Only one analyst report on Carbonite mentioned the release, simply repeating statements from the company's press release without commentary.  (TD Ex. 8; *see also* Doc. No. 155 ¶ 45 (admitted by the Trust).)  No media reports mentioned VME.

*(ii) November 1, 2018.*  During an earnings call covering a variety of topics, Mr. Ali stated that VME "significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market."  (TD Ex. 13, at 5.)  Following that earnings call, 13 analyst reports on Carbonite were issued.  (TD Exs. 14-25, 27.)  None of them mentioned Mr. Ali's November 1 statement about VME, and only two of the 13 mentioned VME at all.  (TD Exs. 19, 25; *see also* Doc. No. 155 ¶ 57 (admitted by the Trust).)  No media reports mentioned VME.  (*See id.* ¶ 58 (admitted by the Trust).)

11

(iii) *November 15, 2018.*  Carbonite's CFO Mr. Folger made remarks at an investor conference concerning many aspects of the company's business, stating as to VME that "we have put something out that we think is just completely competitive and just a super strong product."  (TD Ex. 28, at 3.)  Over the next three months, nine analyst reports on Carbonite were issued.  (TD Exs. 29-37.)  None of those analyst reports mentioned Mr. Folger's November 15 statement about VME, or indeed mentioned VME at all.  (*See* Doc. No. 155 ¶ 67 (admitted by the Trust).)  No media reports mentioned Mr. Folger's statement regarding VME.[6]  (*See id.* ¶ 68 (admitted by the Trust).)

(iv) *February 7, 2019.*  Carbonite conducted its earnings call for the fourth quarter of 2018.  (TD Ex. 40.)  Mr. Ali and Mr. Folger spoke on a variety of topics, but neither mentioned VME during their prepared remarks.  (*Id.*; *see also*  Doc. No. 155 ¶ 72 (admitted by the Trust).)  Analysts in attendance asked questions, but not a single question or answer addressed VME.  (TD Ex. 40; *see also* Doc. No. 155 ¶ 73 (admitted by the Trust).)  Following that call and in the months thereafter, 22 analyst reports on Carbonite were issued.  (TD Exs. 38, 41-53, 55-62.)  None mentioned VME at all.  (*See id.* ¶ 75 (admitted by the Trust).)  No media reports mentioned VME.  (*See id.* ¶ 76 (admitted by the Trust).)

(v) *May 2, 2019.*  Carbonite conducted its earnings call for the first quarter of 2019.  (TD Ex. 65.)  Mr. Ali and Mr. Folger spoke on a variety of topics, but neither mentioned VME during their prepared remarks.  (*Id.*; *see also* Doc. No. 155 ¶ 80 (admitted by the Trust).)  Analysts asked questions, but not a single question mentioned VME.  (TD Ex. 65 at 8-16; *see*

---

[6]    At the July 11, 2023 hearing on the Trust's motion for class certification, the Trust characterizes VME as having been "released with much fanfare."  (Doc. No. 157, Hrg. Tr. 49:14-15.)  A press release and two passing mentions in remarks by company executives hardly constitutes "much fanfare," and indeed it appears that analysts hardly noticed VME's release.

*also* Doc. No. 155 ¶ 81 (admitted by the Trust).)  In response to one question, Mr. Folger did refer to VME in passing:

> [W]e did put a lot of products in the market last year.  A new DRaaS offering, the Carbonite Server virtual edition [(VME)], new data protection console, the new version of our endpoint products, there was a lot that we did.

(TD Ex. 65 at 9.)   Following that call, at least 20 analyst reports on Carbonite were issued.  (TD Exs. 66-76, 78, 80, 83-85, 87-90.)  None mentioned VME at all.  (*See* Doc. No. 155 ¶ 83 (admitted by the Trust).)  No media reports mentioned VME.  (*See id.* ¶ 84 (admitted by the Trust).)

In sum, there were 70 securities analyst reports on Carbonite issued between VME's release on October 18, 2018 and the market close on July 25, 2019.  None of those 70 — *not a single one* — referenced either Mr. Ali's November 1 statement or Mr. Folger's November 15 statement regarding VME.  67 of the 70 did not reference VME at all.  No media reports addressed Mr. Ali's or Mr. Folger's November 2018 statements about VME.

If Defendants' generic statements regarding VME were important to investor decision-making, one would expect securities analysts and business journalists covering Carbonite — whose job it is to provide commentary relevant to investment decisions — to mention those statements.  But they did not.  Indeed, it does not appear that anyone even noticed those November 2018 statements until the Trust's counsel seized on them as putative predicates for a claim of securities fraud.  That is consistent with the analysis of the Trust's own investment adviser, whose June 2019 pre-investment memorandum on Carbonite did not mention VME (TD Ex. 79; *see also* Doc. No. 155 ¶ 91 (admitted by the Trust)) and whose report to investors on the portfolio's investment in Carbonite did not mention VME (TD Ex. 86; *see also* Doc. No. 155 ¶ 91 (admitted by the Trust)).  The Trust's speculation that "[o]f course investors thought [VME] was going to make money" (Doc. No. 157, Hrg. Tr. 49:15-22)  is not supported by any

analyst or media report commenting on Mr. Ali's and Mr. Folger's November 2018 statements. Nor did the Trust depose any analyst that identified those statements as important or whose financial modeling of Carbonite might have been affected by those statements.

*Post-Disclosure (after July 25, 2019)*:  Carbonite's stock price dropped after the company's July 25, 2019 post-market-close announcements.  Analysts and media outlets uniformly ascribed that price drop to the departure of Carbonite's CEO and the reduction in revenue guidance, and *not* to the generic disclosure that Carbonite was withdrawing VME from the market.  (TD Exs. 95-107.)  If Carbonite's withdrawal of VME — which is the *only* July 25, 2019 disclosure that is arguably on an equal footing with the November 2018 statements — was a cause of Carbonite's July 2019 stock drop, one would expect analysts and journalists who were reporting on Carbonite to connect the disclosure *directly* to the stock drop.  But they did not. Nor did any analyst or journalist mention Mr. Ali's or Mr. Folger's November 2018 statements regarding VME, much less suggest that Carbonite's withdrawal of VME was inconsistent with either of those statements.

To be sure, as this Court observed, multiple post-disclosure analyst reports did "discuss VME's withdrawal in relation to the lowered revenue guidance."  (Doc. No. 148 at 19.) That makes sense, as the topics are indeed factually linked by Carbonite's July 25, 2019 disclosure that "maybe a third" (TD Ex. 94, at 11) of the guidance reduction was attributable to VME.  However, that is not evidence that the November 2018 statements regarding VME that provided no revenue projections of any kind had a price impact during the class period.  No analyst covering Carbonite attributed any part of Carbonite's July 2019 stock drop to the withdrawal of VME except with reference to the new July 2019 disclosure regarding the revenue expectations for VME.  And although the guidance disclosure touches on the same subject matter

14

(*i.e.*, VME), as the Second Circuit noted, "commentary touching upon only the same subject matter . . . cannot be enough" to show price impact. *Goldman*, 77 F.4th at 104. The guidance disclosure moved the stock price. The VME withdrawal disclosure, standing alone, did not.

In short, that pre- and post-disclosure market commentary confirms that the November 2018 statements at issue did not inflate Carbonite's stock price during the class period. Accordingly, the Trust cannot rely on *Basic's* presumption of reliance to establish the predominance prong of Rule 23(b)(3). Decertification is therefore warranted.

## CONCLUSION

For the foregoing reasons, the Court should decertify the Class certified by its July 14, 2023 Order.

Dated: September 11, 2023
       Boston, Massachusetts

Respectfully submitted,

*/s/ James R. Carroll*
James R. Carroll (BBO #554426)
Kurt Wm. Hemr (BBO #638742)
Alisha Q. Nanda (BBO #657266)
Nigel Tamton (BBO #696396)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
kurt.hemr@skadden.com
nigel.tamton@skadden.com

*Counsel for Defendants
Carbonite, Inc., Mohamad S. Ali,
and Anthony Folger*

15