UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RUBEN A. LUNA, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:19-cv-11662-LTS **(Consolidated)** |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| CARBONITE, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |
| | ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   ARGUMENT.................................................................................................................3

      A.    Legal Standard .................................................................................................3

      B.    The *Goldman* Second Circuit Decision Is Not Newly Announced Legal
            Precedent...........................................................................................................4

      C.    This Court Has Already Considered – and Rejected – Defendants'
            Challenge to Price Impact Within the Contours Set Forth by the Supreme
            Court in Its *Goldman* Decision .......................................................................5

            1.    Defendants' Motion Is a Thinly Veiled Attempt to Have the Court
                  Revisit Their *Goldman*-Related Arguments Under the Guise of a
                  Motion to Decertify.............................................................................5

            2.    The *Goldman* Second Circuit Decision Also Does Not Entitle
                  Defendants to Raise New Arguments They Could Have Made, but
                  Chose Not to Make, in the First Place .........................................7

      D.    The Factual Circumstances and Statements Here Do Not Remotely
            Resemble Those Present in *Goldman* .........................................................9

      E.    The Remainder of Defendants' Recycled – and Rejected – Arguments Are
            Without Merit.................................................................................................11

III.  CONCLUSION............................................................................................................16

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
  77 F.4th 74 (2d Cir. 2023) ...................................................................... *passim*

*Baker v. Equity Residential Mgmt., L.L.C.*,
  390 F. Supp. 3d 246 (D. Mass. 2019) ...................................................................4

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................................................14

*Connor B. v. Patrick*,
  278 F.R.D. 30 (D. Mass. 2011)...............................................................7, 16

*Donovan v. Philip Morris USA, Inc.*,
  2012 WL 957633
  (D. Mass. Mar. 21, 2012)....................................................................3, 4, 7, 16

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
  141 S. Ct. 1951 (2021)............................................................................. *passim*

*In re Goldman Sachs Group, Inc. Securities Litigation*,
  579 F. Supp. 3d 520 (S.D.N.Y. 2021)...............................................................4, 5

*In re Munce's Superior Petroleum Prods., Inc.*,
  736 F.3d 567 (1st Cir. 2013)....................................................................4

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016)....................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
  2009 WL 855799
  (S.D.N.Y. Mar. 31, 2009) ....................................................................3

*Lebrón-Yero v. Lebrón-Rodriguez*,
  2022 WL 611589
  (1st Cir. Mar. 2, 2022) ....................................................................4

*Loef v. First Am. Title Ins. Co.*,
  2012 WL 6113844
  (D. Me. Dec. 10, 2012) ....................................................................1, 7

**Page**

*Luna v. Carbonite*,
2023 WL 4539855
(D. Mass. July 14, 2023)........................................................................ *passim*

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013).................................................................13

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).............................................................16

*Nolen v. Fairshare Vacation Owners Ass'n*,
2021 WL 6125521
(M.D. Fla. Oct. 15, 2021)........................................................................8

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) .............................................................14

*Portillo v. National Freight, Inc.*,
2023 WL 1794873
(D.N.J. Feb. 7, 2023)..............................................................................5

*United States v. Toth*,
33 F.4th 1 (1st Cir. 2022)........................................................................15

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2016 WL 4138613
(E.D. Pa. Aug. 4, 2016)...........................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
131 S.Ct. 2541 (2011)..............................................................................7

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 23(a)(2)..............................................................................................7
Rule 23(c)(1)(C).................................................................................1, 2, 3
Rule 23(f)..................................................................................................1

Lead Plaintiff Construction Industry and Laborers' Joint Pension Trust ("Plaintiff") respectfully submits its opposition to Defendants' Motion to Decertify (Doc. No. 165).[1]

## I.      INTRODUCTION

Although Rule 23(f) gives litigants 14 days to petition for an appeal of a class certification order, Defendants chose not to seek the First Circuit's review of this Court's Order dated July 14, 2023, granting Plaintiff's motion for class certification and appointment of class representative and class counsel (the "July 14 Order").  Now, however, apparently regretting that decision, Defendants point to a recent but entirely distinguishable case – from a different federal circuit – to ask this Court to reverse its class certification ruling.  But in so doing, they repeat exactly the same arguments the Court expressly rejected in the July 14 Order.  While Rule 23(c)(1)(C) does permit an order granting class certification to be altered before final judgment – where there are "developments of the factual record" or "any newly announced legal precedent," *Loef v. First Am. Title Ins. Co.*, 2012 WL 6113844, at *1 (D. Me. Dec. 10, 2012), Def. Br. at 5 – Defendants have presented no legitimate basis for seeking that relief here, as there have been no relevant factual developments nor any newly announced legal precedent.  In essence, this is a motion for reconsideration masquerading as a Rule 23(c)(1)(C) petition.

More than a year before Defendants mounted their challenge to Plaintiff's class certification motion, the Supreme Court decided *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021) ("*Goldman*"), clarifying how a court considering a motion for class

---

[1]   "Defendants" refers to Carbonite, Inc. ("Carbonite" or the "Company"), Mohamad Ali, and Anthony Folger.  Unless otherwise noted: (i) "¶_" or "¶¶_" are references to the Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "CAC," Doc. No. 45); and (ii) in quoted material, all emphasis is added and internal citations are omitted.  Undefined capitalized terms are as defined in the CAC. "Ex. _" refers to the exhibits in the Declaration of David A. Rosenfeld, dated October 16, 2023, filed herewith.  Defendants' memorandum (Doc. No. 166) is cited as "Def. Br."

certification should assess a defendant's challenge to the issue of price impact.  Citing the guidelines set forth in *Goldman*, Defendants challenged price impact here, arguing that "[u]nder *Goldman*, certification should be denied[.]"  Doc. No. 101 at 10.  Ultimately, however, the Court rejected Defendants' *Goldman*-based challenges to price impact, finding Defendants had not met their burden, and concluding: "'it is more likely than not that the alleged misrepresentations had a price impact.' *Goldman Sachs Grp.*, 141 S. Ct. at 1963."

Then, on August 10, 2023, the Second Circuit in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2d Cir. 2023) (the "*Goldman* Second Circuit Decision") – following additional proceedings in the District Court – applied the Supreme Court's analysis on price-impact to the particular statements in that case, concluding "that the alleged misstatements did not in fact impact the price of the stock." *Id*. at 103.  Although they waited a month, Defendants seized upon the recent *Goldman* Second Circuit Decision to file this Rule 23(c)(1)(C) motion.  But Defendants already made their *Goldman*-based challenge and failed.  Defendants do not get a do-over based on a different circuit's application of the *Goldman* guidelines – the same guidelines on which they based their earlier opposition – to the very different facts and statements at issue in *Goldman*.

Indeed, this case is nothing like *Goldman*.  Here, Defendants made express (and false) statements praising a specific product, VME, on the "front-end," while admitting the complete futility of that product on the "back-end," requiring Carbonite to both pull the product from the market and reduce its revenue guidance.  Here, Defendants' front-end misstatements were just as specific as the back-end corrective disclosure.  Thus, the *Goldman* Second Circuit Decision – where there was "a considerable gap in front-end–back-end genericness[,]" *Goldman* Second Circuit Decision, 77 F.4th at 102 – does not apply here.

Yet, with outright disregard for this Court's July 14 Order, and still without a hint of empirical evidence, Defendants are trying to use the *Goldman* Second Circuit Decision as an excuse to rehash their self-serving interpretation of the same analyst reports, conference call transcripts, and news articles the parties and this Court have already addressed. Defendants also inappropriately use the Second Circuit's decision to raise *new* arguments about the purported generic nature of the statements at issue here – which they indisputably could have raised in the first instance following the Supreme Court's *Goldman* decision.

Plaintiff respectfully submits the Court should reject Defendants' brazen attempt to use the Second Circuit's ruling as a basis for revisiting the already-decided price-impact issue.

## II.    ARGUMENT

### A.    Legal Standard

A motion to decertify a class is governed by Rule 23(c)(1)(C), which states that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). "Decertification may be justified by post-certification developments such as the discovery of new facts or changes in the parties or in the substantive or procedural law." *Donovan v. Philip Morris USA, Inc.*, 2012 WL 957633, at *4 (D. Mass. Mar. 21, 2012). "A decision to decertify a previously certified class is not taken lightly, and, as other courts have noted, should only be done where defendants have met their heavy burden of proving the necessity of taking such a drastic step." *Id.* at *4 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 855799, at *3 (S.D.N.Y. Mar. 31, 2009)). Indeed, "[o]n a motion to decertify a previously certified class, '[d]oubts regarding the propriety of class certification should be resolved in favor of certification.'" *Id*. Defendants, relying on a case from the Northern District of Illinois, assert that Plaintiff bears the burden on this motion. Def. Br. at 5. In this district, however, "[t]he question of who bears the burden on a motion

to decertify is not settled." *Baker v. Equity Residential Mgmt., L.L.C.*, 390 F. Supp. 3d 246, 259 (D. Mass. 2019).

Regardless, given that Defendants' entire motion consists of another round of arguments challenging price impact, it is important to note that ***Defendants*** bear the burden of persuasion to prove a lack of price impact. *See Luna v. Carbonite*, 2023 WL 4539855, at *9 (D. Mass. July 14, 2023).

### B.    The *Goldman* Second Circuit Decision Is Not Newly Announced Legal Precedent

The *Goldman* Second Circuit Decision did not, in any way, represent a change in controlling "substantive or procedural law," which is what would be necessary to support a motion to decertify. *Donovan*, 2012 WL 957633, at *4. Thus, at the outset, Defendants' effort to decertify the Class should be denied for this simple reason. *See, e.g.*, *In re Munce's Superior Petroleum Prods., Inc.*, 736 F.3d 567, 573 (1st Cir. 2013) ("We are not bound by the precedent of our sister circuits, and the out-of-circuit cases on which [the appellant] relies are too factually dissimilar to influence the outcome here."); *see also Lebrón-Yero v. Lebrón-Rodriguez*, 2022 WL 611589, at *3 (1st Cir. Mar. 2, 2022) ("These out-of-circuit authorities are of course not binding on us[.]").

The irony of Defendants' motion cannot be ignored. In their summary judgment reply brief, Defendants repeatedly criticized Plaintiff for its reliance on cases "***outside the First Circuit***" and "***citations to out-of-Circuit authority***," and the supposed failure to "***substantively rely on a single summary judgment case from this Circuit***" on a particular issue. Doc. No. 163 at 4 n.3, 15 n.18. But now, in Defendants' eyes, an out-of-Circuit ruling is so important that it warrants the undoing of a certified class of thousands of Carbonite investors. Defendants cannot have their cake and eat it too.[2]

---

[2]    Defendants are correct that Plaintiff highlighted Judge Crotty's post-remand decision in *In re*

The recent decision in *Portillo v. National Freight, Inc.*, 2023 WL 1794873 (D.N.J. Feb. 7, 2023), is particularly instructive.  In that case, pending in a district court in the Third Circuit, the defendants filed a decertification motion based upon a then-recent decision by the Court of Appeals for the Seventh Circuit.  *Id.* at \*1-\*2.  The district court denied the motion to decertify, finding that, *inter alia*, "because [the Seventh Circuit case] is an ***out-of-circuit decision that is non-binding in this jurisdiction, the Court does not find it to constitute an intervening change in circumstances or controlling law that would occasion decertification of the class*."  *Id.* at \*2.  The same conclusion is warranted here.

<blockquote>

**C.    This Court Has Already Considered – and Rejected – Defendants' Challenge to Price Impact Within the Contours Set Forth by the Supreme Court in Its *Goldman* Decision**

<blockquote>

**1.    Defendants' Motion Is a Thinly Veiled Attempt to Have the Court Revisit Their *Goldman*-Related Arguments Under the Guise of a Motion to Decertify**

</blockquote>

</blockquote>

This Court has already ruled on Defendants' price impact argument under the guidance of the Supreme Court's *Goldman* decision.  In fact, Defendants' entire challenge to price impact in this case was premised on the Supreme Court's *Goldman* decision.  For example, in their brief opposing Plaintiff's motion for class certification, Defendants declared:

> Just last year, in *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021), the Supreme Court clarified how a court considering a motion for class certification should assess [the price impact] question.

*    *    *

> In *Goldman*, the Supreme Court observed that the chain of inferences underlying Basic's fraud-on-the-market presumption "starts to break down" when there is a

---

*Goldman Sachs Group, Inc. Securities Litigation*, 579 F. Supp. 3d 520 (S.D.N.Y. 2021), at the class certification hearing.  Def. Br. at 4.  They omit, however, that Plaintiff solely referred to the decision in the context of clarifying the heavy burden that Defendants faced (and still face) following the Supreme Court's decision in *Goldman*.  *See, e.g.*, Ex. 1, Hrg. Tr., at 14:24-15:6.  Plaintiff never suggested or argued that the underlying facts of that case were relevant here.

"mismatch" between the alleged misrepresentation and the disclosure that putatively corrected it. 141 S. Ct. at 1961. That is precisely the situation here.

Doc. No. 101 at 4, 5. Defendants leaned in even harder in their sur-reply, citing the Supreme Court's *Goldman* decision on almost every page of that eight-page brief. *See* Doc. No. 111 at 1, 2, 3, 4, 5, and 7. And, at the hearing on Class certification, defense counsel urged this Court to uphold Defendants' price impact arguments under the rubric set by the Supreme Court in its *Goldman* decision:

> So what *Goldman* says, it says, "The district court's task is to simply assess all the evidence of price impact, direct and indirect, and determine whether it is more likely than not that the alleged misrepresentations had a price impact." And the Supreme Court has taught that that has to be done in this rigorous analysis standard, considering all kind of evidence.
>
> \*       \*       \*
>
> So the critical question in an affirmative misrepresentation case of price impact – and here, the Supreme Court has urged us to use common sense. How about that for guidance from the Supreme Court in the *Goldman* decision: Go use your common sense.
>
> \*       \*       \*
>
> You can't match them up. That's the mismatch that the *Goldman* case warns us specifically. Right?

Ex. 1, Hrg. Tr. at 25:17-23; 28:12-16; 38:18-20. This Court then expressly analyzed – and rejected – Defendants' price impact arguments within the contours set by the Supreme Court in *Goldman*. *See Carbonite*, 2023 WL 4539855, at \*8-\*10; *id*. at \*10 ("The Court finds for purposes of this Motion that 'it is more likely than not that the alleged misrepresentations had a price impact.' *Goldman Sachs Grp.*, 141 S. Ct. at 1963. Thus, the presumption applies.").

The Second Circuit's subsequent application of the Supreme Court's guidance to the particular facts and statements at issue in *Goldman* does not entitle Defendants to another bite at the

- 6 -

apple here.[3]    As Judge Ponsor found under analogous circumstances, "Defendants seek the substantive equivalent of an appeal—*though under the label of a motion to decertify*—by asking the court to reconsider the original order.  Allowing litigants to file a motion to decertify at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless." *Connor B. v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. 2011).

Defendants' unabashed effort to use the Second Circuit's recent decision to give them a re-do must be rejected.  *See Donovan*, 2012 WL 957633, at *9 ("At base, Philip Morris relies on *Dukes* less as a post-certification change in controlling law that makes any material difference in the analysis in this case and more as the basis for resurrecting an argument that was argued and considered by the Court in *Donovan II*[.]").

### 2.    The *Goldman* Second Circuit Decision Also Does Not Entitle Defendants to Raise New Arguments They Could Have Made, but Chose Not to Make, in the First Place

As this Court is well-aware (and as set forth more fully below), the issue at the heart of the *Goldman* case at the class certification stage was the purported generic nature of the alleged misrepresentations.  As described by the Supreme Court, "Plaintiffs allege that Goldman maintained an artificially inflated stock price *by making generic statements* . . . On the first question, the parties now agree, as do we, that the *generic nature of a misrepresentation* often is important evidence of price impact." *Goldman*, 141 S. Ct. at 1957-58.  The Supreme Court noted that "[t]he *generic nature* of a misrepresentation often will be important evidence of a lack of price impact" and ultimately vacated the Second Circuit's decision because it was "unclear whether the Second Circuit

---

[3]    The "newly announced legal precedent" the court in *Loef*, 2012 WL 6113844, at *1, based its decertification ruling on was the Supreme Court's binding decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), which provided new guidance on satisfying the commonality requirement of Rule 23(a)(2).  That is a far cry from the posture before the Court on this motion.

properly considered the ***generic nature*** of Goldman's alleged misrepresentations in reviewing the District Court's price impact determination." *Id*. at 1961, 1963.

Despite this reality, here, Defendants' challenge to price impact came and went without a whisper on the purported generality of the alleged misstatements.  Defendants ***never once argued*** that their prior statements were generic.[4]  Indeed, the word "generic" is nowhere to be found in either of Defendants' briefs challenging Plaintiff's class certification motion, or the hearing transcript.  *See generally* Doc. Nos. 101, 111; Ex. 1.  Yet now – in a rather obvious attempt to ride the coattails of the *Goldman* Second Circuit Decision – Defendants shift gears and attack the purported generality of their statements.  *See* Def. Br. at 3 (the "November 2018 statements [] generically characterized Carbonite's just-released VME product as 'extremely competitive' and 'super strong'"); *id* at 10 ("Here, Defendants made generic statements"); *see id*. at 6, 7, 8, 9, 11, 13, 14 (characterizing the statements here and/or in *Goldman* as generic).

The Supreme Court's *Goldman* decision was handed down sixteen months before Defendants filed their class certification opposition.  Doc. No. 101; *see Goldman*, 141 S. Ct 1951.  Defendants were armed with the price impact rulebook at that time.  This Court should not countenance their *ex-post* attempt to "alter or amend a certified class as a result of new arguments which were omitted yet could have been raised." *Nolen v. Fairshare Vacation Owners Ass'n*, 2021 WL 6125521, at \*2-\*3 (M.D. Fla. Oct. 15, 2021).

Defendants already made their *Goldman*-based "mismatch" arguments.  *See supra*, §C.1. Insofar as they now try to reframe that argument in terms of the "genericness," of their false statements about VME, they could have done that previously.  The present motion is not the proper place to do so.

---

[4]    Presumably, Defendants did not previously raise this argument because it lacked any merit (and continues to lack merit).

**D.    The Factual Circumstances and Statements Here Do Not Remotely Resemble Those Present in *Goldman***

Even putting aside all of the many procedural issues with Defendants' motion, decertification is not warranted here because this case is ***nothing*** like *Goldman*.

Here, on the "front-end," Defendants trumpeted one specific product to investors.  On the "back-end," Defendants revealed problems with that one specific product, pulled that one specific product from the market and reduced their revenue guidance in light of the fact that this one specific product was no longer for sale.  In accordance with the Supreme Court's guidance in its *Goldman* decision, "a good dose of common sense" supports the obvious conclusion that Defendants' false statements about VME and Carbonite's July 25, 2019 disclosures do not merely "touch[] upon only the same subject matter," they are inextricably intertwined.  Def. Br. at 15; *Goldman*, 141 S. Ct. at 1960.

More specifically, and in summary, Defendants' actionable statements about VME included, among others, the following:

- On October 18, 2018, Carbonite issued a press release announcing the launch of VME, in which Mr. Ali was quoted stating the "***delivery of Carbonite Server VM Edition***," along with Carbonite's Data Protection Console, was a "culmination" for the Company.  ¶73;

- On November 1, 2018, Ali declared on a Carbonite earnings call that "***Carbonite Server, which includes new purpose-built server backup for virtual machines***, is the first Carbonite solution directly integrated into the new platform. This ***significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market***." ¶77; and

- On November 15, 2018 at a conference hosted by Craig-Hallum Capital Group, Folger stated, "One of the products that we did deliver also that is integrated with the console is our ***Server VM Edition***.  So think about this as protecting your server infrastructure, but it is specifically targeting virtual machines.  This is a market that we haven't been particularly strong in, in the past, we've been okay.  I think we have completely overhauled the product and we have put something out that we think is ***just completely competitive and just a super strong product*** in a streamline user management, it's got a

ton of APIs for monitoring."  ¶79.

The falsity of these statements is detailed at length in numerous filings before this Court, including Plaintiff's summary judgment opposition brief and accompanying Statement of Additional Material Facts.  Doc. Nos. 154, 155.  For present purposes, however, these statements each quite literally concerned VME.

The truth regarding Defendants' statements came to light on July 25, 2019, when Carbonite revealed on an earnings call that VME was being withdrawn from the market.  In particular, Defendant Folger stated:

> So what happened? Well, in the second quarter, we experienced challenges in our data protection business related to products and go-to-market effectiveness. Towards the end of the quarter, ***we determined that the virtual server edition of our server backup product*** was ***not at the level of quality that customers have come to expect from Carbonite***.

> Many of you will remember that this was newly launched in Q3 of 2018 and something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020. ***While we assessed the best path forward, we have removed any growth expectations associated with virtual server edition from our short-term outlook***.

¶66.  This disclosure revealed to investors that the same VME product Defendants had boasted about just months earlier, through very specific statements, actually did not work properly and was therefore being removed from market.

The statements at issue in *Goldman* consisted of the following:

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard";

- "Most importantly, and the basic reason for our success, is our extraordinary focus on our clients";

- "Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow";

- "Integrity and honesty are at the heart of our business"; and

- 10 -

- "Risk Factors" filed in Goldman's Form 10-Ks filed during the relevant period stating, *inter alia*, "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest, including those designed to prevent the improper sharing of information among our businesses . . . ."

*Goldman* Second Circuit Decision, 77 F.4th at 82-83. The alleged corrective disclosures in *Goldman* concerned the following:

- The SEC initiated an enforcement action against Goldman and one of its employees regarding a CDO transaction, accusing Goldman and the employee of committing securities fraud in connection with the alleged failure to disclose a particular hedge fund that played an active role in the CDO's asset selection process, and for telling those investors that the hedge fund held a long interest in the CDO when it was short;

- Then, *The Wall Street Journal* reported that Goldman was under investigation by the Department of Justice for its purported role in unspecified CDOs; and

- Finally, various media sources announced the SEC was investigating Goldman's conduct in a separate transaction.

*Id.* at 83. Declines in the price of Goldman stock followed each disclosure. *Id.*

Given the "considerable gap in front-end-back-end genericness," the Second Circuit ultimately concluded that there was "an insufficient link between the corrective disclosures and the alleged misrepresentations." *Id*. at 104, 105. Here, there is no such gap – Defendants' positive statements about VME and the ultimate revelation that VME was an abject failure most certainly "stand on equal footing." *Id.* at 102.

### E.    The Remainder of Defendants' Recycled – and Rejected – Arguments Are Without Merit

After the parties and this Court spent dozens – if not hundreds – of hours litigating and/or deciding the issue of price impact in this case, the Court issued the July 14 Order. The *Goldman* Second Circuit Decision does not support changing any aspect of the July 14 Order.

To avoid burdening the Court with repeating here all of its responses to Defendants' arguments on the issue of price impact (*see* Def. Br. generally and at 10-15), Plaintiff respectfully refers the Court to its prior responses to Defendants' identical arguments on this issue, which are incorporated herein by reference. *See* Plaintiff's Class Certification Reply Brief (Doc. No. 107) at 1-8; Class Certification Hrg. Tr. (Ex. 1). Nonetheless, there are certain matters that Plaintiff feels compelled to address.

To begin with, Defendants disregard the Court's analysis in the July 14 Order by contending – again – that the November 2018 Statements "did not offer *any* revenue expectations associated with the brand-new VME product, let alone suggest the specific amount of any such expectations" and therefore "there is a clear mismatch in specificity" between their statements and the July 25, 2019 disclosures. Def. Br. at 10 (emphasis in original). Defendants made this argument nearly word-for-word at the Class certification hearing:

> The guidance that Mr. Folger is quoted as attributing a part of the reduction in guidance, that guidance didn't exist when the statements were made in November. It didn't exist. The guidance he's talking about is the guidance for financial year 2019. It didn't exist. It was never part of any information in the markets as of November of 2018. It was published for the first time in February of 2019. That's the mismatch…

Ex. 1, Hrg. Tr. at 38:3-11; *see id.* at 38:16-17 ("Carbonite never said that the VME product would earn a nickel."). This Court then expressly rejected that contention in the July 14 Order:

> The Court rejects the argument Defendants asserted at the hearing on this Motion that the ***lowering of the revenue guidance based on VME cannot possibly be viewed as evidence of a price impact*** from the misstatements because this 2019 guidance was not issued until after the alleged misstatements were made in November 2018. ***The alleged misstatements promoted VME, and the 2019 guidance was lowered in part due to the withdrawal of that same VME product***.

*See Carbonite*, 2023 WL 4539855, at *10 n.9.

Defendants further argue that "*[t]he guidance disclosure moved the stock price. The VME withdrawal disclosure, standing alone, did not*." Def. Br. at 15. But the Court has already found

this very argument unpersuasive.  *See Carbonite*, 2023 WL 4539855, at \*10 (rejecting Defendants' effort to separate these items because "it is indisputable that Carbonite lowered its revenue guidance in part because it pulled its VME product from the market, as Carbonite's CFO stated directly to analysts at the beginning of the July 25, 2019 earnings call").  Besides, Defendants expressly concede that Carbonite's revenue guidance reduction, at least in part, "***was attributable to VME***." Def. Br. at 14.  Analysts covering Carbonite felt the same way.  *See, e.g.*, Doc. No. 102-19 (RBC Capital Markets report dated July 26, 2019, titled, "***Product challenges lead to reduced outlook***," stating that "[e]ssentially the virtual server edition of the server backup product, a product that was expected to meaningfully contribute to revenue in 2H/19 and CY/20, was determined to be lacking in quality and removed from the outlook . . . .").

Defendants' demand for a 1-for-1 verbatim match between the misstatements and the corrective disclosure is based on a misreading of the *Goldman* Second Circuit Decision.  The Second Circuit did not in any way mandate a "mirror-image" requirement – that is, that a disclosure is not "corrective" unless it admits fraud or precisely mirrors the alleged misrepresentation.  In fact, the Second Circuit explicitly clarified in the *Goldman* Second Circuit Decision that ***"[w]e do not suggest that the inflation-maintenance theory requires a precise match***.  It may frequently be the case that what is corrective about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure."  *Goldman* Second Circuit Decision, 77 F.4th at 98.  And, importantly, under binding First Circuit precedent, "a corrective disclosure need not be a 'mirror-image' disclosure—a direct admission that a previous statement is untrue." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013).[5]  Regardless, here, there is a

---

[5]    Similarly ill-founded is Defendants' suggestion that price impact could only exist here if analysts and/or journalists had expressly stated that Carbonite's withdrawal of VME "was inconsistent with [the November 2018] statements."  Def. Br. at 14.  For all their heavy reliance on the *Goldman*

palpable link between Defendants' positive statements about Carbonite's newly-released VME and revealing shortly thereafter that the product was so poor that Carbonite had to pull it from the market.[6]

Furthermore, in holding that Defendants failed to rebut the *Basic* presumption, this Court found it significant that "***Defendants have not submitted any event study or other expert report or analysis to support their claim that the alleged misrepresentation had no price impact***." *Carbonite*, 2023 WL 4539855, at \*10; *see id.* ("Defendants cite no direct evidence of a lack of price impact from the alleged misstatements.").[7] This remains an unavoidable roadblock for Defendants, as ***they*** bear the burden on the issue of price impact, not Plaintiff, and they have still not submitted any event study (which would be untimely in any event). *See id.* at \*9. Defendants cannot satisfy their burden of proving a complete lack of price impact by simply having this Court take their word for it. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) (defendant's failure to submit its own event study "alone would arguably support rejection" of its price impact argument); *Compare, e.g.*, *Goldman* Second Circuit Decision, 77 F. 4th at 104 ("[D]efendants

---

Second Circuit Decision, Defendants conveniently fail to mention the Second Circuit's discussion of its own prior decision in *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 258 (2d Cir. 2016). As explained by the panel in the *Goldman* Second Circuit Decision, in *Vivendi*, the back-end "corrective disclosures directly rendered false the company's affirmative misrepresentations" despite the fact that "***not all the corrective disclosures in Vivendi expressly referenced the alleged misrepresentations***." *See Goldman* Second Circuit Decision, 77 F.4th at 98.

6    To that end, this Court's price impact holding cannot be fairly characterized as being "premised solely on a 'subject-matter' match" between the alleged misstatements and the July 25, 2019 disclosures. Def. Br. at 2, 14-15 (quoting *Goldman* Second Circuit Decision).

7    As this Court correctly held, "'simply pointing to other potential causes for a stock price change following a corrective disclosure is . . . not enough to rebut the *Basic* presumption.'" *Carbonite*, 2023 WL 4539855, at \*10 (quoting *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at \*14 (E.D. Pa. Aug. 4, 2016)).

managed to sever the link between back-end price drop and front-end misrepresentation.  Goldman

introduced Dr. Starks' analysis of 880 analyst reports published during the Class Period[.]").[8]

For example, without any supporting empirical analyses, Defendants tabulate the number of

analyst reports, earnings call statements and questions, as well as media reports focusing on VME

"pre-disclosure" (*i.e.*, during the Class Period) as their evidence that the market supposedly "paid no

attention" to the November 2018 statements.  Def. Br. at 11-14; *see also* Doc. No. 132 at 7-8

(counting the same reports).  Attempting to freshen up this already-rejected argument, Defendants

cherry pick from the *Goldman* Second Circuit Decision for the proposition that "a court should

consider 'pre- or post-disclosure discussion in the market . . . .'"  Def. Br. at 11 (quoting *Goldman*

Second Circuit Decision, 77 F.4th at 102-03).  But the Second Circuit made clear that this analysis is

to be performed only *if* a court first finds, *inter alia*, that "there is a considerable gap in front-end–

back-end genericness[.]"  *Goldman* Second Circuit Decision, 77 F.4th at 102.  Here, as discussed

above, the front-end misstatements were just as specific as the back-end corrective disclosure.  *See*

*supra*, §D.  The *Goldman* Second Circuit Decision therefore affords no basis for Defendants to

rehash their self-serving interpretation of market commentary.

Finally, Defendants' self-serving and erroneous interpretation of the "post disclosure" market

reaction to Carbonite's July 25, 2019 disclosures need not be revisited.  Def Br. at 14-15.  This Court

examined the very same materials on which Defendants now rely and concluded, *inter alia*, that "***10***

***out of 11 of these analyst reports [] specifically discuss VME's withdrawal in relation to the***

---

[8]    In connection with their response to Plaintiff's class certification motion, Defendants submitted a boilerplate declaration from Stewart Mayhew, an economic and financial consultant, who offered commentary on event studies in general, and did not conduct any empirical analysis on, *inter alia*, the issue of price impact.  Doc. No. 102-30.  In an admission of the futility of that declaration, Defendants now abandon it entirely, ***making no reference*** to Mr. Mayhew in support of their effort to decertify the Class.  *See generally* Doc. No. 166.  Nor can they later rely on it on reply.  *See* *United States v. Toth*, 33 F.4th 1, 19 (1st Cir. 2022) ("New arguments, however, may not be made in reply briefs.").

*lowered revenue guidance*." *Carbonite*, 2023 WL 4539855, at *10; *see id*. ("**As the Trust notes, however, several analysts did question Carbonite representatives on the same call about the VME withdrawal and its relationship to the lowered guidance**.").[9] The factually distinguishable, out-of-circuit, *Goldman* Second Circuit Decision provides no reason to re-open this settled issue. *See, e.g.*, *Connor B.*, 278 F.R.D. at 34, 36 (denying decertification where the defendants' argument was "largely identical to the argument this court rejected in its original certification order"); *Donovan*, 2012 WL 957633, at *9 (denying certification because "[t]he argument raised here in support of the decertification motion is an echo of the argument made in opposition to the plaintiffs' certification motion.").

## III.    CONCLUSION

The *Goldman* Second Circuit Decision provides no basis whatsoever for this Court to undo its decision to certify the Class.  For the foregoing reasons, Defendants' motion should be denied in its entirety.[10]

---

[9]    *See also* Doc. No. 102-17 (July 26, 2019 Northland Capital Market analyst report, titled "**Server Protection Disappoints again; Lowering Numbers**," stating, *inter alia*, "**[b]lame was laid on the new Virtual Server Backup product**").  In addition, Defendants also raise no challenge to, and thus concede, Steinholt's event study showing that the alleged July 25, 2019 corrective disclosure was followed by a nearly **25% decline** in Carbonite's stock price that was statistically significant at the 1% level."  Steinholt Rpt. ¶43 (Doc. No. 95-1).  *See, e.g.*, *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) (concession that stock decline following corrective disclosure was statistically significant "dooms Defendants' attempt to rebut the presumption of reliance").

[10]    While Defendants point out that they were first provided with a copy of the proposed notice of pendency hours after they informed Lead Plaintiff of this motion, Def. Br. at 5, n.5, the sheer number of documents that are part of the notice of pendency and accompanying motion make clear that they were not simply prepared in response to Defendants' anticipated motion.

DATED:  October 16, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD (admitted *pro hac vice*)
ROBERT D. GERSON (admitted *pro hac vice*)

_____
          */s/ David A. Rosenfeld*
          DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
rgerson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JONAH H. GOLDSTEIN (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jonahg@rgrdlaw.com

*Counsel for Lead Plaintiff and the Class*

HUTCHINGS BARSAMIAN
  MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA  02481
Telephone:  781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

*Local Counsel*

- 17 -

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on October 16, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD