UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUBEN A. LUNA, Individually and on Behalf ) of All Others Similarly Situated, ) ) Plaintiff, ) ) vs. ) ) CARBONITE, INC., et al., ) ) Defendants. ) ) ) | No. 1:19-cv-11662-LTS **(Consolidated)** <u>CLASS ACTION</u> |

**DECLARATION OF ROBERT D. GERSON IN SUPPORT OF: (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES, CHARGES AND COSTS AND AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

I, Robert D. Gerson, declare as follows:

1.      I am an attorney duly licensed to practice before the courts of the State of New York, and I have been admitted *pro hac vice* to appear before this Court in the above-captioned action (the "Action").[1]  I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), Lead Counsel for Lead Plaintiff Construction Industry and Laborers' Joint Pension Trust (the "Pension Trust" or "Lead Plaintiff").  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active participation and supervision of all material aspects of the Action.

---

[1]      All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement (ECF 175) (the "Stipulation" or "Settlement Agreement").

- 1 -

2.        Pursuant to Federal Rule of Civil Procedure ("Rule") 23, I submit this declaration in support of Lead Plaintiff's motion for approval of the proposed Settlement, which provides for a $27,500,000 all-cash recovery on behalf of the Class (the "Settlement") and for approval of the proposed Plan of Allocation, as well as Lead Counsel's application for an award of attorneys' fees and expenses and an award to Lead Plaintiff for its time representing the Class pursuant to 15 U.S.C. §78u-4(a)(4).

3.        Because of the Court's familiarity with this Action, this declaration does not seek to detail each and every event during the Action.  Rather, this declaration provides the Court with a summary of the prosecution of the Action, highlights of the events leading to the Settlement, and the bases upon which Lead Plaintiff and Lead Counsel recommend the Settlement's approval.

## I.        PRELIMINARY STATEMENT

4.        The $27,500,000 proposed Settlement is the culmination of over four years of hard-fought litigation.  As detailed below, Lead Counsel zealously prosecuted Lead Plaintiff's claims throughout this Action.  The proposed Settlement was only achieved after Lead Plaintiff and Lead Counsel, *inter alia*:

(a)        conducted a comprehensive, wide-ranging, investigation into the facts, circumstances, and potential claims and defenses that included analysis of SEC filings, media and analyst reports, press releases, shareholder communications, relevant case law and authorities, and other publicly-available information, and interviewed former Carbonite employees;

(b)        used the materials obtained from its investigation to prepare the detailed, 156-paragraph CAC,[2] then prepared an extensive brief in opposition to Defendants' motion to dismiss the

---

[2]        "CAC" refers to the Consolidated Amended Complaint for Violations of the Federal Securities Laws.  ECF 45.

CAC, which, following oral argument, the Court granted;

(c)    drafted opening and reply briefs in support of Lead Plaintiff's appeal of this Court's dismissal of the Action to the United States Court of Appeals for the First Circuit, which, following oral argument, was reversed in its entirety;

(d)    drafted and then met and conferred regarding: (i) document requests and subpoenas served on Defendants and multiple non-parties and, as a result, obtained and analyzed over 484,000 pages of documents; and (ii) interrogatories served on Defendants;

(e)    prepared for and attended multiple status conferences with the Court to discuss discovery issues and case status;

(f)    responded to Defendants' various discovery requests and interrogatories and produced documents to Defendants;

(g)    successfully moved for certification of the Class, following extensive briefing, expert reports, a deposition of Lead Plaintiff's representative, a deposition of Defendants' expert, and oral argument;

(h)    took the depositions of seven former Carbonite employees;

(i)    retained and consulted with experts who submitted merits reports on: (1) economics, market efficiency, materiality, loss causation, and damages issues; and (2) the features, functionality, and development process of Carbonite's Server VM Edition ("VME");

(j)    took and/or defended six expert witness depositions;

(k)    fully briefed and argued Lead Plaintiff's motion to compel the production of certain documents;

(l)    fully briefed Defendants' motion for summary judgment, supported by a 100-page document containing Lead Plaintiff's Responses to Defendants' Local Rule 56.1 Statement

4863-0396-6130.v1

of Material Facts as to Which There Is No Genuine Issue to Be Tried, and Lead Plaintiff's Statement of Additional Material Facts, both containing extensive citations to the record evidence;

(m)    filed a response brief to Defendants' motion to decertify the Class; and

(n)    from May 9, 2023 through November 30, 2023, Lead Counsel participated in (and Lead Plaintiff received updates regarding) settlement negotiations, including an in-person mediation session with David M. Murphy of Phillips ADR, which included the exchange of mediation statements, presentations, and evidence supporting the parties' respective positions on liability and damages.

5.    As further detailed herein, given Lead Counsel's comprehensive prosecution of this Action, Lead Plaintiff fully understood the strengths of the case as well as the substantial risks in proceeding with the litigation at the time that the Settlement was reached. And, while Lead Counsel and Lead Plaintiff were confident that the evidence developed through fact and expert discovery supported the CAC's allegations, Lead Plaintiff understood that proceeding to a decision on Defendants' pending motions for summary judgment and to decertify the Class, other pretrial motions, and then a jury trial (and possible appeal) presented substantial risks.

6.    Lead Plaintiff alleges that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, by making materially false and misleading statements concerning Carbonite's VME software product. Defendants, on the other hand, have consistently argued that: (i) none of their alleged statements about VME were materially false or misleading; (ii) Lead Plaintiff would be unable to prove scienter because Defendants lacked the requisite intent and had a good faith belief in the truth of their statements; (iii) Lead Plaintiff's theory of loss causation was not sustainable; and (iv) Class Members suffered little to no damages resulting from the alleged conduct. There is no doubt that

- 4 -

4863-0396-6130.v1

Defendants would have continued to vigorously pursue these defenses throughout the Action and at trial.

7.      Accordingly, the proposed Settlement avoids the substantial additional costs and risks of further litigating liability and damages if this case were to continue.  In agreeing to settle the Action now, Lead Counsel and Lead Plaintiff concluded that the $27,500,000 Settlement was in the Class's best interest.

8.      In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation.  The Plan of Allocation, which is set forth in the Notice made available on the case-designated website (www.CarboniteSecuritiesLitigation.com), provides for the distribution of the Net Settlement Fund to Class Members who submit Proof of Claim and Release forms that are approved for payment by the Court on a *pro rata* basis based on their Class Period purchases or acquisitions and any sales of Carbonite common stock.

9.      Lead Counsel prosecuted this Action on a fully contingent basis, and incurred significant litigation expenses, thus bearing all of the financial risk of an unfavorable result.  For our considerable and successful efforts in prosecuting this Action and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees of 33-1/3% of the Settlement Amount, which is fair and reasonable in light of the result achieved, and the risks and complexity of the litigation, and is within the range of fee percentages frequently awarded in this type of action.

10.      Both the Settlement and Lead Counsel's fee request have been approved by Lead Plaintiff, an institutional investor with a significant financial interest in the outcome of the case, and which actively monitored the Action and was well informed during settlement negotiations.  *See* Declaration of Thomas Clement in Support of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (2) Lead Counsel's Motion for an

- 5 -

Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) ("Clement Decl."), ¶¶5-6, submitted herewith. Because this is the type of involvement envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq.* (the "PSLRA"), Lead Plaintiff's approval of the relief sought here is entitled to significant weight by the Court in awarding fees to Lead Counsel.

11.    Lead Counsel also seeks an award of $475,395.89 in expenses that were reasonably and necessarily incurred by counsel in the prosecution of this Action. These expenses include: (a) fees and expenses of Lead Plaintiff's experts and consultants whose services were necessary for the prosecution and analysis of the case; (b) hosting and managing the database of documents produced in the course of discovery; (c) the costs associated with taking or defending fact and expert depositions, such as court reporter and videographer and transcript fees; and (d) mediation expenses. In addition, as provided by the PSLRA, Lead Plaintiff seeks an award for its time expended in representing the Class in the amount of $14,000.

12.    The following summarizes the primary events that occurred during the course of the litigation and the legal services provided by Lead Counsel.

## II.    HISTORY OF THE LITIGATION

### A.    Commencement of Litigation and Appointment of the Pension Trust as Lead Plaintiff and Robbins Geller as Lead Counsel

13.    On August 1, 2019, the initial class action complaint was filed against Carbonite, Mohamad S. Ali, and Anthony Folger, alleging violations of the Exchange Act. *See Luna v. Carbonite, Inc., et al.*, No. 1:19-cv-11662-LTS, ECF 1.

14.    On September 30, 2019, the Pension Trust moved to be appointed lead plaintiff and for approval of its selection of Robbins Geller as lead counsel. ECF 10. On November 21, 2019, the Court appointed the Pension Trust as Lead Plaintiff and Robbins Geller as Lead Counsel. ECF 36.

B.    **Lead Plaintiff's Factual Investigation and Filing of the CAC**

15.    Lead Counsel undertook an extensive investigation in connection with this Action and in preparing the CAC, including: (a) a review and analysis of Defendants' public disclosures, including: (i) transcripts of Carbonite's quarterly conference calls held to discuss the Company's financial results and other presentations made by Defendants at investor conferences; (ii) the Company's periodic SEC filings, including reports on Forms 10-K, filed annually, and Forms 10-Q, filed quarterly; and (iii) Carbonite press releases and media reports; (b) a thorough review and analysis of relevant third-parties' public disclosures, such as analyst reports; (c) an examination of records reflecting the Individual Defendants' and other Company insiders' Carbonite stock trades in Forms 4 filed with the SEC; (d) an analysis of industry and Company stock price reactions to Defendants' alleged misstatements and corrective disclosure, including detailed reports discussing Carbonite and its public disclosures issued by industry analysts on a regular basis; and (e) conducting interviews of former Carbonite employees.

16.    Lead Counsel used in-house investigators to assist in gathering detailed and specific information critical to pleading facts sufficient to meet the heightened pleading standards mandated by the PSLRA, including helping to identify, locate, and interview former Carbonite employees likely to have information pertinent to Lead Plaintiff's claims.

17.    Following the foregoing extensive research, investigation, and analysis, Lead Plaintiff filed the CAC on January 15, 2020.  ECF 45.

C.    **Lead Plaintiff Opposed Defendants' Motion to Dismiss**

18.    On March 10, 2020, Defendants moved to dismiss the CAC.  ECF 52.  The motion raised numerous legal issues aimed at undermining Lead Plaintiff's allegations.  On the issue of falsity, these arguments included, among other things, that the CAC failed to allege any material

4863-0396-6130.v1

misrepresentations because Defendants' alleged statements were either truthful statements, non-actionable opinions, general statements of corporate optimism, and/or forward-looking statements protected by the PSLRA's safe harbor.

19.    Defendants also contended that the CAC's allegations failed to give rise to a strong inference of scienter, including by arguing that: (a) the CAC's allegations based on the Individual Defendants' positions as senior Carbonite executives were unavailing; and (b) the insider stock sales by the Individual Defendants and other senior executives were neither unusual nor suspicious. Defendants also argued that Lead Plaintiff failed to meet the pleading requirements required for a §20(a) control person claim.

20.    On May 4, 2020, Lead Plaintiff filed its opposition to Defendants' motion to dismiss. ECF 56.   Lead Plaintiff countered each of Defendants' arguments in favor of dismissal and explained the reasons why Defendants' alleged misstatements concerning VME were materially false and misleading.   Lead Plaintiff's opposition also highlighted key indicia of Defendants' scienter, including the CAC's confidential source allegations, the announced departure of defendant Ali as Carbonite's CEO on the same day VME was withdrawn from the market, and the Class Period stock sales by the Individual Defendants and other senior Carbonite executives of their personally-held Carbonite stock.   Lead Counsel spent significant time and resources performing the legal research and factual analysis necessary to draft an effective opposition and satisfy the strict pleading burden imposed by the PSLRA.

21.    On June 3, 2020, Defendants filed their reply in support of their motion to dismiss. ECF 58.

22.    On October 15, 2020, the Court remotely heard oral argument on Defendants' motion to dismiss.  ECF 61.

4863-0396-6130.v1

23.     On October 22, 2020, the Court issued an order granting Defendants' motion to dismiss in its entirety.  ECF 62.

**D.     Lead Plaintiff's Successful Appeal of this Court's Decision Dismissing the Action**

24.     On November 20, 2020, Lead Plaintiff filed a notice of appeal of this Court's dismissal of the Action to the United States Court of Appeals for the First Circuit.  ECF 66.

25.     On February 24, 2021, Lead Plaintiff filed its opening appellate brief with the First Circuit.  Entry ID: 6404011.

26.     On March 26, 2021, Defendants filed their responsive appellate brief with the First Circuit.  Entry ID: 6411684.

27.     On May 7, 2021, Lead Plaintiff filed its reply appellate brief with the First Circuit. Entry ID: 6420715.

28.     Oral argument on Lead Plaintiff's appeal was held before a three-judge panel on July 29, 2021.

29.     On December 22, 2021, the First Circuit reversed this Court's decision dismissing the Action.  Entry ID: 6467330.

**E.     Following the Action's Return to This Court, Lead Plaintiff Conducted Significant Discovery from Defendants and Third Parties**

30.     Following remand of the case, the parties met-and-conferred regarding the submission of a pre-trial schedule, pursuant to Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.1(f), which the parties filed on January 27, 2022.  ECF 74-1.  On February 3, 2022, the parties attended a virtual preliminary pre-trial conference before the Court, which endorsed the proposed pre-trial schedule previously submitted by the parties.  ECFs 78, 79.

4863-0396-6130.v1

31.     Lead Plaintiff then promptly commenced fact discovery.  As set forth herein, Lead Plaintiff's discovery efforts included: (i) requesting, negotiating for, obtaining, and reviewing close to half a million pages of documents; (ii) engaging in an exhaustive meet-and-confer process related to electronic discovery; and (iii) seeking discovery from numerous third parties.

### 1.     Document Requests and Interrogatories to Defendants

32.     On February 24, 2022, Lead Plaintiff propounded its first request for the production of documents to Defendants.  The request included over 30 discrete requests seeking documents on a variety of relevant topics, including the development process for VME, the decision to launch VME, and the Individual Defendants' Rule 10b5-1 trading plans.  Defendants submitted their responses and objections to the document requests to Lead Plaintiff on March 28, 2022.  Lead Counsel engaged in numerous meet-and-confer discussions with Defendants' counsel to address their responses and objections to the document requests, to negotiate the scope and manner of the discovery, and to arrange for the production of responsive documents.

33.     On March 22, 2022, Lead Plaintiff served its First Set of Interrogatories on Defendants, seeking information on several relevant topics aimed at obtaining the identities of the Carbonite employees who worked on the VME project, and the customers who received, tested, and/or purchased VME during the relevant time period.  Defendants submitted their responses and objections to the First Set of Interrogatories on April 21, 2022.

34.     The parties discussed and negotiated a stipulation for the protection and exchange of confidential information in this Action, which was So-Ordered by the Court on March 23, 2022. ECF 82.

4863-0396-6130.v1

35.    The parties also discussed and negotiated a Form-of-Production agreement, governing, among other things, the manner in which hard copy and electronically stored information ("ESI") would be produced in this case.

36.    In connection with fact discovery, the parties discussed the relevant data sources that could be searched and retrieval methodologies for obtaining relevant ESI.  The parties conducted numerous meet-and-confers to identify the custodians whose files would be searched, the relevant time frames and search terms to be used, and the protocol for the format of the production, including the production of metadata.  The negotiations led to the production of ESI from Carbonite's databases.

37.    As a result of Lead Plaintiff's discovery requests and efforts, Defendants made 13 rolling productions over a 14-month period (May 2022 to July 2023), comprised of over 192,000 documents, totaling over 471,000 pages.  The careful examination and analysis of the documents produced by Defendants required a massive undertaking by a large team of attorneys.  For example, the attorneys organized and analyzed the documents, selected those that helped prove or might undermine the CAC's allegations, identified relevant witnesses and issues, and established procedures to identify additional documents and information that had not been produced.  Lead Counsel then reviewed and analyzed the documents to determine what information the documents conveyed and how they were relevant to Lead Plaintiff's claims.  Lead Counsel also applied that understanding to other documents that had been produced.  Further, because Defendants' production included complex documents, presentations, and excel spreadsheets regarding the technical development of VME, Lead Counsel, aided by its industry expert, performed a painstaking review and specialized analysis of these dense communications, PowerPoint presentations, and spreadsheets.

4863-0396-6130.v1

38.     On June 23, 2022, Lead Plaintiff served its Second Set of Interrogatories on Defendants, primarily aimed at document preservation issues.  Defendants submitted their responses and objections to the Second Set of Interrogatories on July 25, 2022.

39.     Following extensive discussions between the parties regarding the production of certain documents and/or information to Defendants that Lead Plaintiff maintained were protected under the attorney work-product doctrine, the parties negotiated a Joint Stipulation and Consent Order Governing the Limited Disclosure of Certain Documents and Information Pursuant to Federal Rules of Evidence 502(D)-(E), which was So-Ordered by this Court on July 26, 2022.  ECF 90.

### 2.     Document Requests and Interrogatories to Lead Plaintiff

40.     On February 17, 2022, Defendants served their first request for the production of documents on Lead Plaintiff, seeking 28 categories of documents.  Lead Plaintiff made five productions of responsive, non-privileged documents on Defendants.

41.     On February 17, 2022, Defendants served their First Set of Interrogatories on Lead Plaintiff.  Lead Plaintiff, through Lead Counsel, served its Responses and Objections on March 21, 2022.

### 3.     Third Party Discovery

42.     Beginning on May 9, 2022, Lead Plaintiff began issuing document subpoenas to numerous entities who were identified by Defendants as having received, tested, and/or purchased VME during the relevant time period.  Lead Plaintiff also issued a document subpoena to Joele Frank, Wilkinson Brimmer Katcher, a public relations firm that assisted Carbonite in connection with the announcement of defendant Ali's departure from the Company in July 2019.

43.     Following service of the third-party document subpoenas, Lead Counsel engaged in numerous meet-and-confers with the third parties to discuss written objections to the subpoenas,

negotiate the scope of production, and arrange for the production of responsive documents. This required extensive coordinated efforts and expenditures of time and resources on Lead Counsel's part. In all, the document productions from the third parties subpoenaed by Lead Plaintiff exceeded 13,000 pages.

### F.    Lead Plaintiff's Motion for Class Certification

44.    On September 16, 2022, Lead Plaintiff filed its motion for class certification, supported by a memorandum of law, the report of Lead Plaintiff's expert Bjorn I. Steinholt, CFA, and a declaration demonstrating the Pension Trust's adequacy to serve as Class Representative. ECFs 94, 95-1, 95-2, 96. Lead Plaintiff sought certification of a class of all purchasers and/or acquirers of Carbonite common stock between October 18, 2018 and July 25, 2019, inclusive.

45.    Lead Plaintiff's motion set forth the relevant facts in the case, detailed the reasons why the Pension Trust was an appropriate class representative, and explained how the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy – were met, as were the predominance and superiority requirements of Rule 23(b)(3). With respect to the Rule 23(a) requirements, Lead Plaintiff's motion explained, *inter alia*, that the Pension Trust's injury was typical of the other members of the Class, the Pension Trust had been harmed by the same alleged course of conduct as had the other Class Members, and would fairly and adequately protect the interests of the Class. Through Mr. Steinholt's detailed report that included an event study and a proposed damages methodology, Lead Plaintiff demonstrated that the market for Carbonite common stock was efficient during the Class Period and that the Class was entitled to the fraud-on-the-market presumption of reliance and that damages could be measured on a class-wide basis at the time of trial.

4863-0396-6130.v1

46.     As part of class certification discovery, Defendants noticed the deposition of the Rule 30(b)(6) designee for the Pension Trust.  On September 20, 2022, Lead Counsel defended a deposition of the Rule 30(b)(6) designee for the Pension Trust, Thomas Clement.  Lead Counsel met with Mr. Clement in advance of his deposition.

47.     Additionally, Defendants issued document subpoenas to the Pension Trust's investment manager and investment consultant for records relating to the Pension Trust's transactions in Carbonite common stock.  On October 26, 2022, Defendants deposed a former employee of the Pension Trust's investment manager, Bernzott Capital Advisors, in Westlake Village, California.  Lead Counsel reviewed the documents produced by the investment manager in preparation for this deposition, as well as documents produced by Lead Plaintiff, and participated in the deposition.

48.     On November 4, 2022, Defendants filed their opposition to Lead Plaintiff's motion for class certification.  ECF 101.  In opposing Lead Plaintiff's motion, Defendants retained finance expert Stewart Mayhew to opine on certain economic features of the event study methodology set forth in Mr. Steinholt's report.  Defendants argued in their opposition papers that the Pension Trust's claims had no price impact and that they had therefore rebutted the fraud-on-the-market presumption of reliance.  In addition, Defendants argued that Lead Plaintiff's proposed damage model failed to satisfy the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), defeating the predominance requirements of Rule 23(b)(3).  Defendants also challenged the Pension Trust's ability to represent the Class by claiming: (a) that the Pension Trust was an atypical class representative, as it did not suffer the same injury as other Class Members and was subject to unique defenses; and (b) that the Pension Trust had abdicated control of the action to its lawyers and would therefore be an inadequate class representative.

4863-0396-6130.v1

49.     In preparing to respond to Defendants' opposition brief, Lead Counsel reviewed and researched the briefing and evidentiary material, including Dr. Mayhew's declaration, that Defendants submitted in support of their opposition.  Lead Counsel also prepared extensively for and, on December 7, 2022, took the deposition of Defendants' expert, Dr. Mayhew, which allowed Lead Counsel to question Dr. Mayhew on the bases for his expert conclusions and declaration.  In preparing for the deposition of Dr. Mayhew, as well as for briefing the reply brief in support of class certification, Lead Counsel consulted with its economics and market efficiency expert.

50.     On December 20, 2022, Lead Plaintiff filed its reply brief in support of its motion for class certification.  ECF 107.

51.     The Court held oral argument on Lead Plaintiff's motion for class certification on July 11, 2023.  ECF 147.

52.     On July 14, 2023, the Court granted Lead Plaintiff's motion for class certification: (a) certifying a class of "All persons and entities who purchased or otherwise acquired [Carbonite] common stock during the period from October 18, 2018 through July 25, 2019 and were damaged thereby"; (b) appointing the Pension Trust as Class Representative; and (c) appointing Robbins Geller as Class Counsel.  ECF 148 at 24.

**G.     Depositions**

53.     Discovery in the Action involved 10 fact depositions, including depositions of multiple former Carbonite executives, Lead Plaintiff's representative, and third-party witnesses.

54.     The chart below identifies the fact depositions that were taken in the Action, categorized by deponent, the witness' affiliation or title during the Class Period, deposition date, and location:

- 15 -

| Deponent | Witness Affiliation or Title | Date | Location |
| --- | --- | --- | --- |
| Thomas Clement | 30(b)(6) Witness for Lead Plaintiff | September 20, 2022 | Boston, MA |
| Ryan Ross | Portfolio Manager at Bernzott Capital Advisors, Inc. | October 26, 2022 | Westlake Village, CA |
| Confidential Witness | Carbonite Employee | December 16, 2022 | Remote |
| Paul Mellinger | Carbonite's SVP of Sales | January 10, 2023 | New York, NY |
| Robert Beeler | Carbonite's SVP of Products and Engineering | January 12, 2023 | Boston, MA |
| Norman Guadagno | Carbonite's SVP of Marketing | January 16, 2023 | Boston, MA |
| Padmanabhan Sreenivasan | Carbonite's VP of Engineering | January 19, 2023 | Palo Alto, CA |
| Deepak Mohan | Carbonite's SVP of Engineering | February 1, 2023 | Palo Alto, CA |
| Mohamad Ali | Carbonite's CEO | February 6, 2023 | Boston, MA |
| Anthony Folger | Carbonite's CFO | February 9, 2023 | Boston, MA |

55.     Lead Counsel spent significant time determining key witnesses to be deposed, and negotiating with Defendants the schedule for depositions.  Lead Plaintiff and Defendants exchanged numerous emails and met and conferred numerous times.  In preparation for these depositions, Lead Counsel reviewed approximately 485,000 pages of documents produced during the litigation from the parties and various non-parties.

**H.     Discovery Disputes with Defendants**

56.     Over the course of this litigation, numerous fact discovery disputes arose between the parties and non-parties, requiring extensive written correspondence, countless telephonic conferrals, and many hours of negotiations between counsel.  The vast majority of these disputes were cooperatively and productively resolved.  The parties, however, reached an impasse on the issues set forth below.

4863-0396-6130.v1

57.     During the course of the document review, Lead Counsel's review team began to notice several issues with Defendants' document production. For example, after reviewing tens of thousands of documents, no "chat" messages had been uncovered.

58.     After significant discussions and letter writing between the parties on this and other issues, Lead Plaintiff filed a motion to compel on February 3, 2023, seeking: (i) chat messages in "native" or otherwise useable format; (ii) documents referenced via internal hyperlinks; (iii) responsive documents of two additional custodians; (iv) certain other specific documents; and (v) an extension of the fact discovery deadline in order to sort through the issues and, if necessary, to re-take depositions in light of new evidence that may arise. ECF 116.

59.     Defendants filed their opposition on February 17, 2023. ECF 121.

60.     Lead Plaintiff filed its reply in further support of the motion to compel on March 6, 2023. ECF 127.

61.     Oral argument on Lead Plaintiff's motion to compel was held concurrently with argument on the motion for class certification on July 11, 2023. ECF 147.

62.     On July 14, 2023, the Court issued its decision on the motion to compel. ECF 149. While denying Lead Plaintiff's motion in part, the Court granted it with respect to chats, finding that "[t]he Trust raises the reasonable concern that as presently produced the chat messages are difficult, if not impossible, to understand because the messages are not produced in thread or chronological format." *Id*. at 3. The Court therefore ordered Defendants to produce certain relevant "chat threads in native format or, by agreement, in another comprehensible format." *Id*.

63.     As a result, Defendants produced over 4,000 chat messages arranged in a useable format which Lead Counsel promptly reviewed.

4863-0396-6130.v1

## I.      Expert Discovery

64.     In addition to conducting comprehensive fact discovery, Lead Plaintiff and Lead Counsel retained well-qualified experts while investigating and prosecuting the case.  These experts offered opinions in the areas of: (i) market efficiency; (ii) materiality; (iii) loss causation; (iv) damages; and (v) the features, functionality, and development process of VME.  Lead Counsel assisted the experts' analysis through careful examination of the discovery record.  The expert opinions were used to support Lead Plaintiff's motion for class certification, to oppose Defendants' motion for summary judgment, during mediation, and to prepare Lead Plaintiff's case for trial.

65.     On September 16, 2022, Lead Plaintiff filed the expert report of Bjorn I. Steinholt, CFA, who opined on market efficiency and presented a damages model in support of class certification.  ECF 95-1.

66.     On November 4, 2022, Defendants filed the expert declaration of Stewart Mayhew, Ph.D., who opined on certain economic features of the event study methodology set forth in Mr. Steinholt's report, in support of Defendants' opposition to Lead Plaintiff's motion for class certification.  ECF 102-30.

67.     Lead Counsel took Dr. Mayhew's deposition on December 7, 2022.

68.     In connection with the substantive expert discovery phase, Lead Plaintiff served the following expert reports on February 17, 2023:

(a)     Mr. Steinholt, who opined on materiality, loss causation, and damages under the federal securities laws; and

(b)     Ronald S. Schnell, who opined on: (i) the features and functionality of VME; (ii) the development methodologies for VME; (iii) the efficacy of the development of VME; (iv) any security issues and/or defects with VME; and (v) the quality and readiness of VME at the time of its

launch and subsequent general availability.

69.    In total, Lead Plaintiff's opening expert reports encompassed 66 pages along with voluminous supporting exhibits, and cited dozens of documents and multiple deposition transcripts.

70.    Defendants also submitted the following expert reports on February 17, 2023:

(a)    Paul A. Gompers, Ph.D., Professor of Business Administration and Faculty Chair of the M.B.A. Elective Curriculum at the Harvard Business School, who opined on loss causation, materiality, and damages;

(b)    Douglas C. Schmidt, Professor of Engineering and Associate Chair in the Department of Computer Science at Vanderbilt University, who opined on common practices in software development and the extent to which Carbonite's VME project conformed to (or differed from) those typical software industry practices; and

(c)    Jon B. Weissman, Ph.D., Professor of Computer Science and Engineering at the University of Minnesota, who opined on certain technical aspects of VME, including its design and development process.

71.    In total, Defendants' expert reports encompassed 195 pages with voluminous supporting exhibits, and citations to numerous documents and multiple deposition transcripts.

72.    In response to Defendants' expert reports, Lead Plaintiff served the following rebuttal reports on March 17, 2023, totaling 57 pages plus exhibits:

(a)    Steinholt, who responded to Dr. Gompers' materiality, loss causation, and damages analysis; and

(b)    Schnell, who responded to the technical analyses submitted by Professors Schmidt and Weissman.

4863-0396-6130.v1

73.     Defendants also submitted three rebuttal reports on the same day, which totaled 58 pages:

(a)     Gompers, who responded to Mr. Steinholt's loss causation, materiality, and damages analysis;

(b)     Schmidt, who responded to Mr. Schnell's technical analysis; and

(c)     Weissman, who also responded to Mr. Schnell's technical analysis.

74.     In addition, Lead Counsel took and/or defended the depositions of all six of these expert witnesses.  The chart below identifies the expert depositions taken in the action by deponent, affiliation, deposition date, and location:

| Deponent | Position | Date | Location |
|---|---|---|---|
| Stewart Mayhew | Defendants' economic expert | December 7, 2022 | Remote |
| Ronald S. Schnell | Lead Plaintiff's expert on software development | April 25, 2023 | New York, NY |
| Douglas C. Schmidt | Defendants' expert on software development | April 28, 2023 | New York, NY |
| Paul A. Gompers | Defendants' expert on materiality, loss causation, and damages | May 3, 2023 | Boston, MA |
| Jon B. Weissman | Defendants' expert on software development | May 4, 2023 | Boston, MA |
| Bjorn I. Steinholt | Lead Plaintiff's expert on materiality, loss causation, and damages | May 8, 2023 | New York, NY |

**J.     Defendants' Motion for Summary Judgment**

75.     On June 2, 2023, Defendants moved for summary judgment. ECF 131. Defendants' motion was supported by a filing setting forth 116 purportedly undisputed facts pursuant to Local Rule 56.1, as well as 146 exhibits.  ECFs 134, 135.  In their brief, Defendants contended that: (i) Defendants did not make any false statements; (ii) Defendants did not act with scienter; and

(iii) Lead Plaintiff lacked sufficient evidence to support loss causation.  ECF 132.  Specifically, on

these issues, Defendants argued, *inter alia*, that:

- "[T]he Trust cannot offer evidence that Defendants' highly subjective November 1 and 15, 2018 statements that VME was 'extremely competitive' and 'super strong' were actually false on the theory VME 'never worked' — VME **did** work. Subjective statements of optimism about VME and its competitive prospects cannot provide the basis of a viable Section 10(b) claim, and summary judgment is therefore warranted." *Id.* at 15 (emphasis in original);

- "[T]he Trust cannot offer evidence that Mr. Ali and Mr. Folger's statements were made with 'a conscious intent to defraud' or 'an extreme departure from the standards of ordinary care,' as is required to prove scienter." *Id*. at 17;

- "There is no evidence from any event preceding the July 25, 2019 withdrawal of VME that might show that investors ever attributed any part of the value of Carbonite stock to Defendants' public statements about VME." *Id*. at 7; and

- "[T]he Trust cannot offer any evidence that any part of the decline in Carbonite's stock price that followed its July 25, 2019 post-market close announcements was attributable to any statement that any Defendant had previously made about VME, as opposed to Mr. Ali's departure, the company's further reduction in its current year revenue guidance, or any other subject discussed in Carbonite's announcements on that date." *Id*. at 10.

76.    Lead Plaintiff served its opposition to Defendants' motion for summary judgment on

August 10, 2023.  ECF 154.  Lead Plaintiff's opposition papers included an additional statement of

189 material facts and 246 exhibits.  ECFs 155, 156.  Lead Plaintiff's responses to Defendants'

statement of undisputed facts comprised 56 pages.  ECF 155.  In its opposition, Lead Plaintiff

summarized the evidence gathered in discovery to argue, *inter alia*, that:

- "Despite carrying the burden on this motion, Defendants offer no evidence to suggest VME was 'super strong,' 'completely competitive,' or 'extremely competitive' – as they had told investors." ECF 154 at 3;

- "The First Circuit already found that the CAC alleged 'a **very strong** inference' of scienter as to Ali and Folger. . . .  Extensive discovery has now corroborated both Plaintiff's allegations and the First Circuit's findings.  The documentary and testimonial record in this case decisively establish [scienter]." *Id*. at 10 (emphasis in original);

- "Loss causation in this case could not be more clear-cut. . . . Based on the widely accepted event study methodology, Plaintiff's loss causation and damages expert, Bjorn I. Steinholt, established that Carbonite's stock price suffered a company-specific, statistically significant residual decline on July 26, 2019, and explained the relationship between this fraud-related, company-specific information, and Plaintiff's allegations." *Id*. at 15; and

- "Defendants' issues with Steinholt's conclusions may be appropriate fodder for cross-examination at trial, but they are not sufficient to grant them summary judgment." *Id*. at 16.

77.     Defendants served their reply brief in further support of their motion for summary judgment on September 11, 2023.  ECF 163.

78.     Defendants' motion for summary judgment was fully briefed and pending decision at the time the Settlement was reached.

## K.     Defendants' Motion to Decertify the Class

79.     Also on September 11, 2023, Defendants filed a motion to decertify the Class. ECF 165.  Defendants asserted that the Class should be decertified in light of an August 10, 2023 decision by the U.S. Court of Appeals for the Second Circuit in *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023).

80.     Lead Plaintiff filed its brief in opposition to Defendants' motion to decertify on October 16, 2023 (ECF 171), arguing, *inter alia*:

- "The *Goldman* Second Circuit Decision did not, in any way, represent a change in controlling 'substantive or procedural law' which is what would be necessary to support a motion to decertify." *Id*. at 4;

- "This Court has already ruled on Defendants' price impact argument under the guidance of the Supreme Court's *Goldman* decision." *Id*. at 5;

- "The Second Circuit's subsequent application of the Supreme Court's guidance to the particular facts and statements at issue in *Goldman* does not entitle Defendants to another bite at the apple here." *Id*. at 6-7; and

- "Even putting aside all of the many procedural issues with Defendants' motion, decertification is not warranted here because this case is nothing like *Goldman*." *Id*. at 9.

- 22 -

81.     Defendants did not file a reply brief.  The motion to decertify was still pending when the Settlement was reached.

**L.     Reaching the Settlement**

82.     The Settlement Agreement is the product of hard-fought arm's-length negotiations, that included Lead Counsel's participation in an in-person mediation session before Mr. Murphy, and numerous follow-up calls over the next six months following the in-person mediation.

83.     The mediation took place on May 9, 2023, in New York, New York.  During the mediation session, the parties gave detailed presentations, supported by evidence, on their respective positions on various issues.  In advance of the mediation, the parties submitted and exchanged opening and reply statements with detailed descriptions of the evidence supporting their claims and defenses.  Lead Plaintiff's opening 25-page mediation statement included 43 exhibits and its 11-page reply mediation statement included an additional 18 exhibits.

84.     Although the parties did not settle this Action during the May 9, 2023 mediation, the Settling Parties continued their good faith efforts to resolve the case with the assistance of Mr. Murphy.  On November 29, 2023, Mr. Murphy made a mediator's recommendation to settle the case for $27,500,000, which the parties accepted.

85.     Thereafter, Lead Counsel worked diligently to negotiate the terms of the Settlement Agreement with Defendants' counsel.  On January 31, 2024, Lead Plaintiff filed an unopposed motion seeking preliminary approval of the proposed Settlement.  ECF 173.  The next day, the Court granted Lead Plaintiff's motion for preliminary approval and set the final settlement hearing for May 15, 2024.  ECFs 178, 179.

III.    **NATURE AND ADEQUACY OF THE SETTLEMENT**

86.    Lead Plaintiff, by and through Lead Counsel, zealously litigated this Action and the Settlement was reached only after Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the claims alleged in the CAC.  As discussed above, Lead Counsel conducted an extensive pre-filing investigation, including interviews with former Carbonite employees, analyzed and reviewed approximately 485,000 pages of documents produced by Defendants and third parties, took seven fact depositions and four expert depositions, exchanged expert reports, fully briefed Defendants' summary judgment motion including supporting evidence, and exchanged with Defendants several mediation statements and presentations.

87.    While Lead Plaintiff and Lead Counsel strongly believe the case against Defendants has merit and were prepared to proceed to trial, there were a number of factors that made the outcome of continued litigation uncertain.  Some of the risks Lead Plaintiff faced are discussed in the following paragraphs.  Lead Plaintiff and Lead Counsel carefully considered each of these risks, which informed Lead Plaintiff and Lead Counsel's decision as to the Settlement.

A.    **Risks to Proving Falsity**

88.    Defendants argued that the alleged misstatements – in particular their statements in November 2018 that VME was "*a **super strong product**,*" that was already making Carbonite "***extremely competitive**,*" and "***completely competitive**" (*see* ECF 53) in the VM backup market – were not actionable because they were merely loose statements of corporate optimism that were not untruthful because, *inter alia*, VME exhibited certain aspects of functionality before its release. While Lead Plaintiff disputed Defendants' arguments on falsity and believes the documentary evidence contradicted most – if not all – of Defendants' claims, there was a real risk that the Court at

summary judgment, or a jury at trial, could find otherwise for some or all of the alleged misrepresentations and omissions.

### B.    Risks to Proving Scienter

89.    Lead Plaintiff also faced considerable challenges in demonstrating Defendants' scienter (*i.e.*, the requisite state of mind to establish securities fraud).  Defendants argued that Ali and Folger lacked the requisite scienter when making the alleged misstatements because they received mixed and/or positive reviews about VME before its release.  In addition, Defendants asserted that there was no evidence in the record that anyone ever told Mr. Ali or Mr. Folger of VME's problems prior to their November 2018 statements.  Moreover, Defendants contended that the record evidence established that Mr. Ali's departure from the Company was completely unrelated to VME's failure.

90.    While Lead Plaintiff believed it supported its claims regarding scienter with persuasive evidence in its summary judgment briefing, and would have done so with expert testimony at trial, it is impossible to predict the Court's or jury's reactions, interpretations, and inferences gleaned from the evidence and testimony concerning Defendants' states of mind and the circumstances surrounding Mr. Ali's departure from the Company.

### C.    Defendants' Challenges to Loss Causation and Damages

91.    Even if the Court or a jury found Lead Plaintiff succeeded in proving falsity and scienter, there remained a significant risk related to Lead Plaintiff's ability to prove loss causation and damages as the Action proceeded.

92.    In their summary judgment papers, Defendants strenuously challenged Lead Plaintiff's ability to prove loss causation and recover damages by claiming that Lead Plaintiff cannot offer any evidence that the alleged misrepresentations ever had an impact on Carbonite's stock price.

4863-0396-6130.v1

Specifically, Defendants contended that the decline in Carbonite common stock following the alleged July 25, 2019 disclosures was not caused by the alleged fraud but rather by non-fraud information – including Carbonite's reduced revenue guidance and Mr. Ali leaving the Company for a different job.  Moreover, Defendants maintained that only one-third of Carbonite's July 25, 2019 guidance reduction was related to VME, and therefore damages (if any) were capped at just one-third of the adverse disclosure.

93.    Although Lead Plaintiff was confident in its loss causation arguments at the summary judgment stage, and would have been able to prove loss causation and damages with qualified and persuasive expert testimony, it recognized that jury reactions to competing experts are difficult to predict, and Defendants – as they did on summary judgment – would have presented highly experienced experts to support their various defenses to liability at trial.  Accordingly, in the absence of a settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total Settlement Amount – or even nothing at all.

**D.    Defendants' Pending Motion to Decertify**

94.    Lead Plaintiff also faced the risk that this Court would find this case comparable to *Goldman Sachs* and revisit its Class Certification decision, by either narrowing it, or finding this case unsuitable for class action treatment, which would have effectively ended the litigation.  While Lead Plaintiff was confident in its challenge to Defendants' motion to decertify, it was entirely possible that the Court would have felt otherwise.

*    *    *

95.    Given the risks to proceeding with litigation and the substantial recovery obtained, Lead Plaintiff and Lead Counsel respectfully request that the Court find that the proposed Settlement is fair, reasonable and adequate, approve it in full, and enter the proposed Judgment.

- 26 -

4863-0396-6130.v1

## IV.   THE PLAN OF ALLOCATION

96.   The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, submit a valid and timely Proof of Claim and Release form and whose *pro rata* recovery is $10.00 or more.  The Plan of Allocation, which was set out in the Notice, provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Carbonite common stock during the Class Period.

97.   For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its economics and damages expert, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Lead Plaintiff prevailed at trial.  The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Carbonite common stock during the Class Period and what the price of Carbonite's stock would have been had the allegedly omitted information been disclosed.  To date, not a single Class Member has objected to the proposed Plan of Allocation.

## V.   THE APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

98.   Lead Counsel, on behalf of all counsel for Lead Plaintiff, is requesting an attorneys' fee award of 33-1/3% of the Settlement Amount, plus interest.  As set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Charges and Costs and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Memorandum"), the requested 33-1/3% fee falls squarely within what is recognized in this Circuit as the range of reasonable percentage of fund amounts.

4863-0396-6130.v1

99.     Lead Counsel also requests payments of litigation expenses, charges, and costs in connection with the prosecution of the Action from the Settlement Fund in the amount of $475,395.89, plus any accrued interest.  The total payment requested for Lead Plaintiff's Counsel's expenses is well below the $600,000 maximum expense cap that the Class was advised could be requested.

100.     The fee application is being submitted with the prior approval of Lead Plaintiff, which has actively monitored the Action and developed an understanding of the strengths and weaknesses of this case, the risks to continued litigation, and the nature and extent of Lead Counsel's efforts on behalf of the Class.  Clement Decl., ¶¶4, 6.

### A.     The Significant Results Achieved

101.     The $27,500,000 cash Settlement here provides an immediate and certain benefit to the Class.  As explained in the Fee Memorandum, the $27,500,000 cash Settlement is nearly double the 2023 median settlement value in securities class action settlements.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review*, 20, Fig. 19 (NERA Jan. 23, 2024), attached hereto as Exhibit A.

102.     This favorable Settlement was achieved as a result of the extensive prosecutorial and investigative efforts of counsel and contentious and complicated motion practice, extensive fact discovery, class certification discovery, and settlement negotiations, as detailed herein.  As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very real risk of no recovery in the absence of a settlement.

### B.     The Diligent Prosecution of This Action

103.     A 33-1/3% fee is also warranted in light of the extensive efforts on the part of counsel, as outlined above, that were required to produce this Settlement.  For instance, Lead

4863-0396-6130.v1

Counsel and its in-house professionals spent over 14,785 hours of time on the case, *inter alia*, conducting discovery, reviewing and analyzing nearly half a million pages of documents, mastering the relevant facts and dynamics of Carbonite's business and the VM backup software market, drafting the CAC as well as comprehensive memoranda of law concerning difficult issues in connection with the: (i) motion to dismiss; (ii) First Circuit appeal; (iii) class certification motion; (iv) motion to compel; and (v) motion for summary judgment, formulating strategy, working with experts and other consultants in order to make effective arguments on the merits and to conduct meaningful settlement discussions, and otherwise preparing this case for trial.

### C.     The Risks and Unique Complexities of the Litigation

104.    This Action presented substantial challenges from its outset.  The specific risks that were faced in proving Defendants' liability and damages are detailed herein.

105.    Lead Counsel respectfully submits that any assessment of the proposed fee request should appropriately account for those significant risks.  Given that an excellent result was achieved for the Class in the face of these risks, Lead Counsel should be rewarded accordingly.  Indeed, without the efforts and skill of Lead Counsel, this Settlement would not have been consummated.

106.    The foregoing risks are in addition to the more typical risks accompanying securities class action litigation, including that this Action was undertaken on a contingent basis.

107.    In that regard, Lead Counsel understood from the outset that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average lag time of several years for these cases to conclude,

- 29 -

the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, counsel for Lead Plaintiff have received no compensation during the course of the Action, but have incurred more than 14,860 hours of time, for a total lodestar of $9,292,701.00, and have incurred $475,395.89 in expenses, charges, and costs in prosecuting the Action for the benefit of the Class.[3]

108.    Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part). Even with the most vigorous and competent efforts, success in contingent-fee litigation, such as this, is never assured.

109.    Lead Counsel knows from experience that the commencement of a class action does not guarantee a recovery. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

110.    Lead Counsel is aware of many hard-fought lawsuits where because of the discovery of facts unknown when the case was commenced or changes in the law during the pendency of the case, or a decision of the court or a jury verdict following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

111.    Moreover, even if Lead Plaintiff successfully opposed Defendants' motion for summary judgment, this is not a guarantee that Lead Plaintiff would have prevailed at trial. Indeed, while only a modest number of securities class actions have been tried before a jury, some have been

---

[3]    *See* accompanying Declaration of David A. Rosenfeld Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Exhibits A-B and Declaration of Theodore M. Hess-Mahan Filed on Behalf of Hutchings Barsamian Mandelcorn, LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Hess-Mahan Decl."), Exhibits A-B. Collectively, the Robbins Geller Decl. and the Hess-Mahan Decl. are referred to as the "Fee Decls." or the "Fee Declarations."

4863-0396-6130.v1

lost in their entirety. *See, e.g.*, *In re Tesla Inc. Sec. Litig.*, No. 3:18-cv-04865-EMC, ECF 676 (N.D. Cal. Feb. 9, 2023). Additionally, a plaintiff who succeeds at trial still may find its verdict overturned on appeal. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (major portion of plaintiffs' verdict reversed on appeal); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1219 (10th Cir. 1996) (overturning plaintiffs' jury verdict obtained after two decades of litigation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same). And, even when a plaintiff wins a jury verdict, it still may face substantial challenges in securing a recovery. *See, e.g.*, *In re Bank Atlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd sub nom., Hubbard v. Bank Atlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (granting defendants' post-trial motion for judgment as a matter of law following jury verdict for plaintiff).

112. Courts have held repeatedly that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See, e.g.*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 865 (E.D. Mo. 2005) ("The Supreme Court has emphasized that while private actions provide "'a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action,'" it is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation, and the benefits that would not otherwise be achieved.") (citations omitted). Vigorous private enforcement of the federal securities laws and state corporation laws can occur only if the private plaintiff can obtain some semblance of parity in representation with that available to large corporate interests. If this important policy is to be carried

out, courts should award fees that will adequately compensate private plaintiff's counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

113.    When counsel undertook to act for the Class in this matter, we were aware that the only way we would be compensated was to achieve a successful result.  The benefits conferred on the Members of the Class by the Settlement are noteworthy in that a common fund worth $27,500,000 (plus interest) was obtained for the Class despite the existence of substantial risks and Defendants' zealous and vigorous defense.

114.    Here, diligent efforts by counsel in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class.  In circumstances such as these, and in consideration of the substantial effort expended and the very favorable result achieved, the requested fee of 33-1/3% of the Settlement Fund and payment of $475,395.89 in expenses, charges, and costs is reasonable and should be approved.

**D.    A Lodestar Cross-Check Supports the Requested Award of Attorneys' Fees**

115.    A lodestar cross-check supports the requested attorneys' fees.  A lodestar cross-check is performed by multiplying the number of hours expended in the litigation by the hourly rates of the attorneys.  While a lodestar cross-check is often a useful tool in determining the reasonability of a fee request, whether or not to perform one is within the Court's discretion.[4]

---

[4]    Additional work will be required of Lead Counsel on an ongoing basis, including: preparation for, and participation in, the Settlement Hearing; responding to any objections; supervising the claims administration process being conducted by the Claims Administrator (including responding to inquiries from Class Members); and supervising the distribution of the Net Settlement Fund to Class Members who have submitted valid Proofs of Claim.  Lead Counsel will **not** seek payment for this work.

4863-0396-6130.v1

116.    As more fully set forth above, the Action settled only after Lead Counsel conducted a comprehensive investigation into the Class' claims; researched and prepared the detailed CAC; fully briefed and argued Defendants' motion to dismiss; fully briefed and argued Lead Plaintiff's appeal before the First Circuit; moved for, fully briefed, argued, and obtained class certification; requested and reviewed hundreds of thousands of pages of documents produced by Defendants and third parties; fully briefed Lead Plaintiff's motion to compel; conducted and defended fact and expert depositions; fully briefed Defendants' motion for summary judgment; fully briefed Defendants' motion to decertify; prepared thorough mediation materials; and engaged in an arm's-length mediation process.  At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Class, whether through settlement or trial, by the most efficient means necessary.

117.    Here, Lead Plaintiff's Counsel have expended over 14,864 hours in the prosecution and investigation of the Action.  *See* Robbins Geller Decl., Ex. A; Hess-Mahan Decl., Ex. A.  The lodestar calculates the time spent by the attorneys and other professionals employed by counsel, compiled from contemporaneous daily time records regularly prepared and maintained by counsel, multiplied by the hourly rate for each timekeeper.

118.    The 2024 hourly billing rates of Lead Counsel in this Action range from $785 to $1,400 for members/partners and $375 to $540 for associate attorneys.  *See* Robbins Geller Decl., Ex. A.[5]  Although Robbins Geller does not assert that hourly clients regularly pay these rates, the foregoing hourly rates have been submitted to and approved by district courts around the country.

---

[5]    Particular attorney billing rates are determined by, among other things, the experience level and expertise of the attorney in question.  *See* Robbins Geller Decl., ¶4.

119.    Lead Plaintiff's Counsel's lodestar is $9,292,701.00.  Pursuant to a lodestar "cross-check," the requested fee of 33-1/3% of the Settlement Fund (which equates to $9.15 million) results in a slightly negative "multiplier" of 0.98 on the lodestar, which does not include any time that will necessarily be spent obtaining approval of and thereafter administering the Settlement.  As detailed in Lead Counsel's Fee Memorandum, this level of multiplier is well below the range of multipliers approved in this Circuit and elsewhere.

### E.    Standing and Expertise of Counsel

120.    Robbins Geller, Court-appointed Class Counsel, is highly experienced in complex securities class actions and has successfully prosecuted numerous securities class action suits throughout the country.  *See* Robbins Geller Decl., Ex. F.  As detailed therein, Robbins Geller has been approved by courts to serve as lead counsel in scores of securities class actions throughout the United States.  Moreover, the firm has served as lead counsel in numerous high-profile matters which, during the last several years alone, have recovered billions of dollars for investors.

### F.    Standing and Caliber of Defense Counsel

121.    Carbonite was represented throughout this Action by Skadden, Arps, Slate, Meagher & Flom LLP, one of the finest law firms in the country, and which possesses substantial resources and expertise in the defense of complex securities litigation.  This prominent law firm and its attorneys zealously provided its clients with a very vigorous and aggressive defense of this Action. In the face of this formidable opposition, Lead Counsel developed the case and successfully negotiated the Settlement.

### G.  Request for Litigation Expenses, Costs, and Charges

122.  Lead Plaintiff's Counsel also seek payment from the Settlement Fund of $475,395.89 in litigation expenses, charges, and costs reasonably and necessarily incurred by them in connection with commencing and prosecuting the claims against Defendants.

123.  From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, counsel was motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.  The expenses, charges, and costs for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to litigants who are billed by the hour.  These expenses include, among others, travel costs, computer-based research, and mediator and expert fees.

124.  The supporting Fee Declarations summarize by category expenses, charges, and costs incurred by Lead Plaintiff's Counsel in connection with the prosecution of this Action.  These expenses, charges, and costs are reflected on the books and records maintained by Lead Plaintiff's Counsel.  These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses incurred.

125.  All of the litigation expenses, charges, and costs incurred by Lead Plaintiff's Counsel, which total $475,395.89, were necessary to the successful prosecution and resolution of the claims against Defendants.

### H.  The Reaction of the Class to the Fee and Expense Application

126.  As of April 8, 2024, over 13,800 Postcard Notices have been mailed to potential Class Members and nominees.  *See* Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Murray Decl."), ¶11, submitted

4863-0396-6130.v1

herewith.  The Postcard Notice and Notice stated that Lead Counsel would seek an award of attorneys' fees not to exceed 33-1/3% of the Settlement Amount, plus interest, and payment of expenses, charges, and costs in an amount not greater than $600,000, plus interest.  Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over *Business Wire. Id.*, ¶12.  The Notice also has been available on the Settlement website maintained by Gilardi & Co. LLC.  *Id.*, ¶14.

127.   While the deadline set by the Court for Class Members to object to the requested fees and expenses has not yet passed, to date there have been no objections to the requested fee, no objections to the requested expenses, and no objections to Lead Plaintiff's expense application.  Lead Counsel will respond to any objections received by the April 24, 2024 deadline in the reply papers, which are due on May 8, 2024.

## VI.   CONCLUSION

128.   For all of the foregoing reasons, Lead Counsel respectfully requests the Court grant final approval of the Settlement, approve the Plan of Allocation, award attorneys' fees in the amount of 33-1/3% of the Settlement Amount and $475,395.89 in expenses, plus interest, and award the Pension Trust $14,000.00 for its time incurred in representing the Class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of April, 2024, at Melville, New York.

_____
ROBERT D. GERSON

4863-0396-6130.v1

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on April 10, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD